IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

VICENTA CANTU, et al.          :

Plaintiffs                     :          JUL  1 2003

vs.                            :          Michael N. Milby
                                          Clerk of Court

CAMERON COUNTY, et al.         :          CIVIL ACTION NO. B-03-096

Defendants                     :

## TABLE OF CONTENTS

**Table of Contents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Index of Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Statement of Nature and Stage of Proceeding** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

DEFENDANT COUNTY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT OF
PLAINTIFFS CANTU, MUNOZ AND WEAVER BASED ON FAILURE TO STATE A
CLAIM UNDER RULE 12(b)(6).

**I.  Status of Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. Issues Presented** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**III. Nature of Allegations by Cantu, Munoz and Weaver** . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     Plaintiff Cantu's Alleged Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.     Plaintiff Munoz' Alleged Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.     Plaintiff Weaver's Alleged Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . 4
      D.     Cantu, Munoz and Weaver's Alleged Association Right . . . . . . . . . . . . . . . . . . 5

**IV. Argument and Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.     Whether Defendant Yzaguirre is a Final Policy Maker for Defendant County . . . 6

      C.     Elements of First Amendment Retaliation Claim . . . . . . . . . . . . . . . . . . . . . 11

      D.     Plaintiffs Failed to Allege Any Violation of Rights to Association . . . . . . . . . . 12

      E.     Cantu Fails to Allege Protected Speech on Matters of Public Concern . . . . . . . . 14

      F.     Munoz Fails to Allege Facts Showing Speech on Matter of Public Concern . . . 18

      G.     Weaver Fails to Allege Facts Showing Speech on a Matter of Public Concern . 18

**V. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

INDEX OF AUTHORITIES

CASES

*Anderson v. Pasadena I.S.D.*
    184 F. 3d 439, 444 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Baker v. Putnal*
    75 F. 3d 190 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bennett v. Pippin*
    74 F. 3d 578, 586 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beraux v. City of Garland*
    205 F. 3d 150, 156 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bradshaw v. Pittsburg I.S.D.*
    207 F. 3d 814, 816 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15,18,19

*Brady v. Fortbend County*
    145 F. 3d 691 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of Dallas v. Stanglin*
    490 U.S. 19, 23-24 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12

*Collins v. Morgan Stanley Dean Witter*
    *224 F. 3d 496, 498-499 (5th Cir. 2000)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Connick v. Myers*
    461 U.S. 138, 149 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,15

*Davis v. Ector County, texas*
    40 F. 3d 777 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fiesel v. Cherry*
    294 F. 3d 664, 608 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

*Finch v. Ft. Bend I.S.D.*
    ___ F. 3d___, 2003 WL 21290879 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13,15*

*Foley v. Univ. Houston System*
    324 F. 3d 310, 318 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*Fyfe v. Curlee*
     92 F. 2d 401, 403 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*Guidry v. Bank of LaPlace*
     954 F. 2d 278, 281 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Henrise v. Horvath*
     174 F. Supp. 2d 493, 500-501 (N.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

*Ibarra v. Houston I.S.D.*
     84 F. 2d 825, 837 (S.D. Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,14,17

*Jones v. Collins*
     132 F. 3d 1048 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*

*Keenan v. Tejeda*
     290 F. 3d 252 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Meadowbriar Home for Children, Inc. v. Gunn*
     81 F. 3d 521,529 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*McCab v. Sharrett*
     12 F. 3d 1558, 1562 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Monell v. New York City Dept. of Social Services*
     436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d 611 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Moore v. Miss. Valley state Univ.*
     871 F. 2d 545, 551 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Noyola v. Texas Dept. of Human Resources*
     846 F 2d 1021 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pembaur v. City of Cincinatti*
     475 U.S. 469, 471, 106 S. Ct. 1292, 1294,89 L. Ed. 2d . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*Pritchard & Abbott v. McKenna*
     350 S. W. 2d 333 (Tex. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rhode V. Denson*
     776 F. 2d 107 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Serna v. City of San Antonio*

       244 F. 3d 479, 482 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Van Ooteghem v. Gray*
       774 F. 2d 1332 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Vanderhurst v. Colorado Mt. Dist.*
       16 F. 2d 1297, 1305 (D. Colo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wallace v. Texas Tech Unv.*
       80 F. 3d 1042, 1051 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,12

*Wilson v. UT Health Center*
       973 F. 2d 1263, 1267 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATUTES

Tex. Adm. Code  § 17.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tex. Loc. Gov't. Code Ann. § 85.003 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tex. Gov't. Code Ann. § 41.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Gov't. Code Ann. § 41.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Loc. Gov't. Code Ann. Chapter 83 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tex. Tax Code § 6.21- 6.3 and § 501.137 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tex. Transp. Code § 501.021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,16

Tex. Transp. Code  § 502.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,11

F.R.C.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5,6,7,13,20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, et al.          :
                               :
        Plaintiffs             :
                               :
        vs.                    :          CIVIL ACTION NO. B-03-096
                               :
CAMERON COUNTY, et al.         :
                               :
        Defendants

**STATEMENT OF NATURE AND STAGE OF PROCEEDING**

Plaintiffs Cantu, Munoz, and Weaver filed suit under 42 U.S.C. § 1983 claiming employment retaliation for exercise of First Amendment rights to freedom of speech and freedom of association.  Defendant County moves to dismiss their complaints for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

vi

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 1 2003

Michael N. Milby
Clerk of Court

VICENTA CANTU, et al.               :
                                    :
        Plaintiffs                  :
                                    :
vs.                                 :          CIVIL ACTION NO. B-03-096
                                    :
CAMERON COUNTY, et al.              :
                                    :
        Defendants                  :


**DEFENDANT COUNTY'S MOTION TO DISMISS FIRST AMENDED
COMPLAINTOF PLAINTIFFS CANTU, MUNOZ AND WEAVER
BASED ON FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW **Defendant Cameron County**, and files this Motion to Dismiss First

Amended Complaint of Plaintiffs Cantu, Munoz and Weaver based on Failure to State a

Claim Under Rule 12(b)(6) and would respectfully show the Court as follows:

## I. Status of Case

Plaintiffs Cantu, Munoz, and Weaver filed suit under 42 U.S.C. § 1983 claiming

employment retaliation for exercise of First Amendment rights to freedom of speech and

freedom of association. Defendant County moves to dismiss their complaints for failure to

state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. Issues Presented

1.      Whether Defendant Yzaguirre is a final policy maker for Defendant County.

2.      Whether Plaintiffs Cantu, Munoz and Weaver have alleged a claim for retaliation against the exercise of their right of association protected by the First Amendment.

3.      Whether Plaintiff Cantu has alleged that her disagreements with Defendant Yzaguirre over her individual decisions concerning vehicle titles was a matter of public concern. Specifically, whether she has adequately alleged that she complained to Defendant Yzaguirre that he was engaged in corruption or serious official misconduct.

4.      Whether Munoz and Weaver's criticism of where some customers paid for their vehicle registration was comment on a matter of public concern.

5.      Whether Weaver's report to Defendant Yzaguirre of what other people were saying was speech on a matter of public concern.

### III. Nature of Allegations by Cantu, Munoz and Weaver

**A.      Plaintiff Cantu's Alleged Protected Speech**

Plaintiff Cantu was a title registration examiner for the Auto Crimes Enforcement Task Force within Defendant's office.  Amended Complaint (Am. Comp.) ¶ 22

The basic thrust of her First Amendment speech claims is that Defendant Yzaguirre continually "overrode" her decisions not to process or approve title registrations she claims were "fraudulent." Am. Comp.¶¶ 23.  However, she alleges only four instances of speech. Am. Comp.¶¶ 24, 25, 26, 27, 30.

The first instance occurred on January 9, 2001.  Am. Comp.¶ 24.  Cantu alleges she had denied several title registrations as not complying with the law; Defendant Yzaguirre told her that she should only be concerned with whether the vehicles were stolen and to release

the transactions. Am. Comp.¶ 24. Cantu alleges that she was telling him he was "violating the law." Am. Comp. ¶ 24. Cantu does not allege in what respect the registrations were deficient or how they misused tax payer money.

The second instance occurred on July 30, 2001. Defendant Yzaguirre allegedly told her to stop faxing to Texas Department of Transportation (TexDOT) "complaints" about "fraudulent" vehicle registration paperwork submitted mostly by Defendant Yzaguirre's "friends and business associates." Am. Comp. ¶ 26. Cantu does not allege that the complaints were hers or that the TexDOT would be the proper investigative agency. Cantu does not state in what respect the registration paperwork was "fraudulent", violated Texas law, or involved tax payer money. She alleges Defendant Yzaguirre told her not to fax complaints to the TexDOT without his approval. Am. Comp.¶ 26.

The third instance occurred on November 27, 2001. Cantu claims that she rejected a vehicle registration submitted by Mr. Angeles because it "did not meet the legal requirements." Am. Comp.¶ 27. She alleges Defendant Yzaguirre told her to process the paperwork anyway and she told him his actions were "unlawful." Am. Comp.¶ 27. Cantu does not specify in what manner the paperwork was "fraudulent" or involved a "misuse of tax payer money."

Finally, Cantu alleges that she continually told Defendant Yzaguirre that he was not following the law regarding the processing of "fraudulent vehicle registrations." Am. Comp. ¶ 30. She does not give the specifics for any of these communications; she does not specify

any transaction, explain how it violated Texas law, or how it involved the misuse of tax payer money.

**B.    Plaintiff Munoz' Alleged Protected Speech**

Munoz was the Auto Crimes Enforcement Task Force Project Coordinator. Am. Comp.¶ 34. He alleges only two instances of speech. Am. Comp.¶¶ 36, 38.

First, sometime after October, 2001, Munoz became suspicious of the demeanor of Defendant Yzaguirre's friends and associates who came to the administrative office to process their vehicle registrations. When he saw a co-worker counting the sums of money they left, he told her that it "looked bad" to be counting large sums of money in the open. Am. Comp.¶ 36. Munoz does not allege that the money was misappropriated or that any of these individuals paid less (or more) than they owed. Rather, he alleges these were public concern only because they "involved business transactions." Am. Comp.¶ 36.

The second instance occurred in Spring 2002 in which Munoz told Defendant Yzaguirre that he was concerned that Defendant Yzaguirre was giving "special treatment" by processing vehicle registrations at the administrative office. Am. Comp.¶ 38. Munoz does not explain why it would be unlawful or a misuse of tax payer funds to accept payment for vehicle registration at the administration office rather than some other office.

**C.    Plaintiff Weaver's Alleged Protected Speech**

Weaver was Defendant's Executive Secretary. Am. Comp.¶ 3. She alleges only two instances of speech. First, on October 2001, she told Yzaguirre that the "word out on the

street" was that people could get their auto titles "fixed" through Defendant Yzaguirre. Am. Comp.¶ 45.

The next instance occurred between October 2001 and May 2002; Weaver alleges that on more than one occasion she asked why title registration transactions were being processed in the administration office rather than the auto division office, as was the office policy and practice. Am. Comp.¶ 48. Although she alleges this violated the law and involved a "misuse of tax payer money," she does not explain those conclusions.

**D.      Cantu, Munoz and Weaver's Alleged Associational Right**

Plaintiffs Cantu, Munoz and Weaver alleged that they were "closely associated" with each other in the performance of their duties for Defendant Yzaguirre. Am. Comp.¶¶33, 44, and 49. They often went to lunch together. Am. Comp.¶ 49. Cantu told Munoz and Weaver that she had seen fraudulent vehicle registration work being processed by Defendant Yzaguirre. Am. Comp.¶¶ 40, 49. Plaintiffs allege in a conclusory manner that they "organized" to discuss unlawful vehicle registration practices by Defendant Yzaguirre. Am. Comp.¶ 83.

## IV. <u>Argument and Authorities</u>

**A.      Standard of Review**

Defendant County moves to dismiss the federal claims based on failure to state a claim. Under Rule 12(b)(6), the Court must accept the allegations as true and must review them in the light most favorable to the Plaintiff, drawing all reasonable inferences in favor of the pleader. *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996). Dismissal under Rule 12(b)(6)

is correct when it appears that no relief can be granted under any set of facts that can be proven consistent with the allegations. *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996). However, the complaint must state facts, not conclusions, to survive a Rule 12(b)(6) challenge. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).

**B.      Whether Defendant Yzaguirre is a Final Policy Maker for Defendant County.**

Plaintiffs assert a cause of action against Defendant County for alleged violations of protected speech and freedom of association under the First Amendment pursuant to Title 42 U.S.C. § 1983. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court concluded that municipal liability under 42 U.S.C. § 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature...." See also *Pembaur v. City of Cincinnati*, 475 U.S. 469, 471, 106 S.Ct. 1292, 1294, 89 L.Ed.2d 452 (1986). While a single act of a final policy making authority could constitute official policy, liability would attach *only* where the official is responsible for establishing final government policy. (emphasis mine). *Id.* at 480-83. In this case, Plaintiffs wrongly assert Defendant Yzaguirre is a final policy making official of Cameron County and that Defendant Yzaguirre's decision to terminate and/or demote Plaintiffs constituted official and final policy of Defendant County.

Defendant County is its own final policy maker; the issue before the Court is whether Defendant Yzaguirre as an elected officer of Cameron County can make personnel decisions which constitute official and final policy of Cameron County. The authority to make official

and final policy may be granted directly by a legislative enactment or may be delegated by an official or municipal body which possesses such authority, and of course, whether an official ultimately has final policymaking authority is determined by state law. *Id.* at 483; *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996). Plaintiffs have not cited any case law or legislative enactment to support their contention that Defendant Yzaguirre is a final policy making official for Cameron County. Plaintiffs rely on the Personnel Policies Manual of Cameron County to suggest that Defendant County, the official body which possess final authority, has delegated such final authority to department heads, such as Defendant Yzaguirre. See Plaintiff's First Amended Complaint, Paragraphs 68 and 69.

The Personnel Policy Manual of Cameron County does not grant final policy making authority to any department head or elected official. The policy specifically states as follows: "This Personnel Policies Manual is not intended to create any contractual or other legal rights, but is intended solely as a guide" and confirms that the "Commissioners Court is the policy making Body for the County." See Exhibit "A" attached hereto and incorporated herein by reference, the Personnel Policies Manual of Cameron County; specifically see the front page and page 1, paragraph 1.01.[1] According to the policy, department heads and/or elected officials implement the County policy to operate their respective office, and nowhere in the policy does Defendant County explicitly or impliedly  grant final policy making

---

[1] The attachment of this writing does not convert this into a motion for summary judgment under Federal Rule of Civil Procedure 56. When a complaint refers to a writing, but does not attach it, the court may consider the document for the purpose of determining the sufficiency complaint under Rule 12(b)(6). *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir. 2000). This will not convert it into a Rule 56 motion and Defendant does not wish such conversion.

authority to its elected officials or department heads. In section 13.06, the section Plaintiffs cite, the policy allows for a department head to dismiss an employee for various reasons consistent with the Cameron County personnel policy manual, however, this provision should not be construed to constitute a waiver of Defendant County's final policy making authority. The personnel policies manual clearly demonstrates Defendant County's intent to keep its status as the final policy making body. As such, Plaintiffs' reliance upon one section of Defendant County's personnel policy manual to suggest Defendant Yzaguirre is a final policy maker of Defendant County is misplaced and taken out of context when considering the policy as a whole.

Even though the Fifth Circuit has held that a District Attorney and County Sheriff are considered final policy makers for a county government, there are no cases holding that a County Tax Assessor-Collector is final policy making authority. See *Brady v. Fortbend County*, 145 F.3d 691 (5th Cir. 1998) and *Davis v. Ector County, Texas*, 40 F.3d 777 (5th Cir. 1995) These decisions are supported by the respective official's duties which are codified by legislative enactments. In *Brady*, the Court emphasized that "Texas law unequivocally vests the sheriff with final policymaking authority" pursuant to section 85.003(c) of the Texas Local Government Code. *Brady* at 699 - 700. The Local Government Code provides that deputies "serve at the will of the sheriff." *Tex. Loc. Gov't Code Ann.* § 85.003(c). In *Davis*, the Court concluded that the District Attorney was acting as a policy maker for the county and was exercising official policy when he fired Davis. *Davis* at 784. The Texas Government Code specifies that a District Attorney may employ his or her assistants and

office personnel which are required for the proper and efficient operation and administration of the office. *Tex. Gov't Code* § 41.102. Moreover, the Government Code provides that "all personnel of the prosecuting attorney's office are subject to removal at the will of the prosecuting attorney." *Tex. Gov't Code* § 41.105. In considering the position of District Attorney and Sheriff, it is clear that legislative enactments created specific duties making their actions, including personnel decisions, official and final policy for a county.

Defendant County is not aware of any case law or statute which provides a County Tax Assessor-Collector with final policy making authority on behalf of a county. Defendant County is aware of only one case wherein a department head or elected official, other than District Attorney or Sheriff, was determined to have final policy making authority for a county. *Van Ooteghem v. Gray*, 774 F.2d 1332 (5th Cir. 1985). In *Gray*, the Fifth Circuit concluded, based on the circumstances in Harris County, that the County Treasurer possessed final decision making authority to bind the county. However, it is apparent from reading the *Gray* opinion that Harris County must have delegated final authority to the Treasurer because the opinion discusses prior policies and personnel decisions made by the Treasurer constituting final policy. It is the opposite for Defendant County, because Defendant County has never delegated or granted its official final policy making authority to any officials, save and except the Sheriff and District Attorney, as per state law. A County Treasurer is governed by Chapter 83 of the Texas Local Government Code. See *Tex. Loc. Gov't Code*, Chapter 83. Nowhere in Chapter 83 does the legislature express an intent to provide a County Treasurer with final authority to terminate an employee at will, like a District

Attorney or Sheriff.  Since state law does not afford a County Treasurer with final policy making authority, the logical conclusion is that Harris County delegated official authority to its Treasurer.

The Fifth Circuit has rejected the argument that simply because an official is elected by the people, he is an official policy maker for the county. *Rhode v. Denson*, 776 F.2d 107, (5th Cir. 1985); *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002).  In both *Rhode* and *Keenan*, the courts held that an elected constable did not possess a final policy making position so as to expose the county to civil rights liability.  It is Defendant County's position that Defendant Yzaguirre does not constitute a final policy maker simply because he is a department head and an elected official.  No legislative enactment imposes final policy making authority on a County Tax Assessor-Collector with regard to personnel matters and Defendant County has not delegated its official policy making power to Defendant Yzaguirre.

Applicable statutes to the County Tax Assessor-Collector include the *Texas Tax Code* Sections 6.21 through 6.30 and Section 501.137 of the *Texas Transportation Code*.  Also, in *Pritchard & Abbott v. McKenna*, 350 S.W.2d 333 (Tex. 1961), the Texas Supreme Court held that a county could usurp the functions and duties of a County Tax Assessor-Collector finding it was within the county's authority to contract with a firm to conduct the appraisals of all properties in the county.

Assuming Plaintiffs' non-conclusory facts are true in their amended complaint, they still do not establish that Defendant Yzaguirre is a final policy maker for Defendant County in order to state a claim pursuant to section 1983.  Accordingly, Defendant County cannot

be held liable for the claims asserted by Plaintiffs and Plaintiffs' claims against Defendant County should be dismissed in their entirety.

## C.     Elements of First Amendment Retaliation Claim

A party must satisfy four elements to recover on a First Amendment retaliation claim under 42 U.S.C. § 1983. The party must (1) suffer an adverse employment action, (2) show that the speech in question was a matter of public concern, (3) show that their interest in commenting on matters of public concern outweighs the public employer's interest and efficiency, and (4) show the speech motivated the adverse employment action. *Serna v. City of San Antonio*, 244 F.3d 479, 482 (5th Cir. 2001); *Beraux v. City of Garland*, 205 F.3d 150, 156 (5th Cir. 2000). The same analysis applies when a party claims retaliation for exercise of association rights protected by the First Amendment. *Anderson v. Pasadena I.S.D.*, 184 F.3d 439, 444 (5th Cir. 1999); *McCab v. Sharrett*, 12 F.3d 1558, 1562 (11th Cir. 1994).

Strictly speaking, the First Amendment does not protect a "right of association". *City of Dallas v. Stanglin*, 490 U.S. 19, 23-24 (1989). Rather, the First Amendment embraces the right to associate only in two circumstances: (1) the choice to enter into certain intimate human relationships (aka "familial association"), or (2) an association for the purpose of engaging in activities protected by the First Amendment, i.e. speech, exercise of religion, etc. *Stanglin*, 490 U.S. at 24; *Wallace v. Texas Tech Unv.*, 80 F.3d 1042, 1051 (5th Cir. 1996). The right of "expressive association" extends to groups organized to engage in speech. *Stanglin*, 490 U.S. at 25. The "familial association" right recognized under the First Amendment has only been recognized in the area of marriage, procreation and child rearing.

*Stanglin*, 490 U.S. at 24-25; *Fyfe v. Curlee*, 92 F.2d 401, 403 (5th Cir. 1990). There is no recognized right of "socialist association" protected under the constitution. *Stanglin*, 490 U.S. at 25; *Wallace*, 80 F.3d at 1051; *Ibarra v. Houston I.S.D.*, 84 F. Supp. 2d 825, 837 (S.D. Tex. 1999).

**D.    Plaintiffs Failed to Allege Any Violation of Rights to Association**

The only alleged facts for their claim of "association" are that Cantu, Munoz and Weaver worked together, they would go to lunch together, and Cantu spoke to them about her complaints. These facts at best allege nothing more than social contact which is not protected by the First Amendment. See, e.g., *Stanglin*, 490 U.S. at 25 (teenagers had no "association right" to meet with older teenagers and young adults at dance hall); *Wallace,* 80 F.3d at 1050 (college basketball coach had no "association right" to speak with student team players concerning whether they were eligible for scholarships); *Ibarra*, 84 F. Supp.2d at 827(superintendent had no "association right" to socialize publically with state politicians).

The right of "expressive association" extends only groups organized to engage in speech, religious activities, etc. *Stanglin*, 490 U.S. at 25. Plaintiffs do not allege facts showing that they organized or met primarily or exclusively for the purpose of discussing the office practices they found objectionable. The First Amendment does not require that a public office be run as a round table for employee complaints over internal office affairs. *Connick v. Myers*, 461 U.S. 138, 149 (1983). If simply working together and discussing their jobs without more creates a "expressive association" among employees, every public office will become exactly the kind of "protected" round table *Connick* says was never intended.

The Fifth Circuit has rejected expressive claims of "expressive association" rights in similar circumstances. See *Finch v. Ft. Bend I.S.D.*, __ F.3d __, 2003 WL 21290879, *6; *Henrise v. Horvath*, 174 F. Supp.2d 493, 500-501 (N.D. Tex. 2001), *aff'd in part, rev'd in part*, 45 Fed. Appx. 323 (5th Cir. 2002) (unpublished).[2] In *Finch*, a school superintendent claimed she was forced to resign over an unsuccessful program to create special courses for gifted children. 2000 WL 21290879 (*1). Apparently, Finch spoke with members of the school board and students' parents in the course of developing and advocating her proposal. The Fifth Circuit concluded that restraining her interactions with the students' parents and the school board members did not implicate rights of expressive association. *Id.* at *6.

In *Henrise*, a police officer claimed he was harassed and demoted as a result of his association with his partner who was terminated. 174 F.Supp. 493, 495. Henrise and his supervisor Pothen came to the conclusion that the Police Chief Horvath was involved in significant public corruption; both made these allegations to superiors and Pothen was terminated. *Id.* at 496. Pothen then sued and Henrise was expected to be a witness. *Id.* During this time, Henrise claimed he developed a strong association with Pothen, both as a fellow officer and a close personal "police friend." *Id.* Henrise claimed that he was then demoted and harassed as a result of his close personal relationship with Pothen. *Id.* at 497. The District Court granted a Rule 12(b)(6) motion on Henrise's First Amended association

---

[2] The Fifth Circuit's unpublished opinion in *Henrise* is attached as Exhibit "B".

claim. *Id.* at 500. It concluded that his personal and professional affinity with Pothen did not give rise to an expressive or familial association right. *Id.* at 500.

On that point, the Fifth Circuit affirmed. See Exhibit "B", pp. 13-15. The unpublished opinion concluded there was no indication the complaint alleged expressive association rights. Exhibit "B", p. 14. Therefore, with regard to the associational claims, Plaintiffs have failed to allege facts showing any association protected by the First Amendment.

**E.    Cantu Fails to Allege Protected Speech on Matters of Public Concern**

Carefully considered, Cantu's allegations focus only on claims that she and Mr. Yzaguirre disagree over how she processed vehicle titles and registration. All of her allegations focus on his decisions about *her* work, not the work of the office generally. Moreover, she simply applies conclusory labels of "fraud" and "illegal" not describing in what manner the approving the applications constituted crimes or serious official misconduct.

Speech rises to the level of public concern when an individual speaks primarily as a citizen rather than an employee. *Bradshaw v. Pittsburg I.S.D.*, 207 F.3d 814, 816 (5th Cir. 2000). Determination of whether a statement constitutes a matter of public concern is a legal question to be determined by the court from the content, form and context of the statement that is revealed by the record. *Bradshaw*, 207 F.3d at 816-17; *Ibarra*, 84 F. Supp.2d at 835. A matter is not a public concern because it could, in different circumstances, give general interest to the public. The rationale behind the "public concern" requirement is to prevent public employees from relying on the Constitution to redress their personal grievances.

*Connick v. Myers*, 461 U.S. 138, 149 (1983). The First Amendment does not require the public office be run as a round table for employee complaints over internal office affairs. *Connick*, 461 U.S. at 149. Employee speech motivated primarily to defend their own personal philosophies on office policy and management are insufficient. See, e.g. *Finch v. Ft. Bend I.S.D.*, __ F.3d __ 2003 WL 21290879, *6 (5th Cir. 2003); *Noyala v. Texas Dept. of Human Resources*, 846 F.2d 1021 (5th Cir. 1988) (conversation between welfare case worker and supervisor criticizing procedures for handling case load and realignment of his own case load was only an internal grievance); *Ibarra*, 84 F. Supp.2d at 835-836 (Superintendent's remarks concerning his management philosophy and the role of the teacher's union was only a defense of personal beliefs). Although the choice to make an internal grievance privately rather than publicize one's complaints is not dispositive, it weighs in favor of finding the speech private rather than public. *Bradshaw*, 207 F.3d at 817.

The Fifth Circuit has recognized that reporting of corruption or serious official misconduct is a matter of public concern. See, e.g. *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir. 1998); *Wilson v. UT Health Center*, 973 F.2d 1263, 1267 (5th Cir. 1992). However, vague assertions that the speech pertained to official misconduct are insufficient; the plaintiff must be specific about the content of the statement, when and where they were made, and to whom. *Foley v. Univ. of Houston System*, 324 F.3d 310, 318 (5th Cir. 2003)(professor's bare assertion she complained about racism and hostile work environment insufficient to defeat qualified immunity). Speech in the context of an investigation into misconduct is not always a matter of public concern. See *Fiesel v. Cherry*, 294 F.3d 664, 668

(5th Cir. 2002)(during interview into inmate's claim that guards were selling him drugs, plaintiff told co-worker guard that he did not need to speak and could consult counsel; held, speech was not a matter of public concern)

Without specific allegations, it cannot be determined that Cantu complained that Yzaguirre was responsible for committing a crime, doing "paid favors," misusing money, etc. Texas law has considerable administrative laws and regulations concerning vehicle registration procedures, title transfers, and fees, etc. See TEX. TRANSP. CODE §§ 501.021 et. seq., 502.151, et. seq. (Vernon 1999); 43 TEX. ADMIN. CODE, § 17.22. Most are merely administrative pre-requisites; a failure to comply may make the application for a title or vehicle registration technically deficient, but hardly makes them fraudulent or criminal.

Cantu's first alleged instance of speech occurred when she rejected several registrations because they "did not comply" with Texas law. Am. Comp. ¶ 24. Yzaguirre told her to concern herself only with whether the vehicles were stolen and to release the titles. Am. Comp. ¶ 24. This shows that Cantu rejected the titles for technical deficiencies, rather than prove the applicants had stolen the vehicle or were not entitled to own or possess them. In short, the facts disclose nothing more than a dispute between Cantu and her supervisor whether she was correctly construing administrative requirements for registration.

The next alleged speech instance occurred when she faxed "complaints" to the TexDOT. Am. Comp. ¶ 26. Cantu does not say these were *her complaints*. Moreover, she does not state in what sense the vehicle registrations were "fraudulent" or why TexDOT was an appropriate agency to which to fax these complaints. Moreover, she admits that Yzaguirre

did not forbid her sending complaints, only that they should be done with his approval. Am. Comp. ¶ 26.

Unless Cantu claims these complaints were *her* complaints, she has no First Amendment claim for other people's statements or any mis-perception the other persons' statements were hers. See *Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir. 1998); *Vanderhurst v. Colorado Mt. Dist.*, 16 F.2d 1297, 1305 (D. Colo. 1998).

Moreover, the limitation that Plaintiff not fax complaints without Yzaguirre's approval is a reasonable limitation. See *Ibarra v. Houston I.S.D.*, 84 F. Supp.2d at 837 (limitation placed on school superintendent to avoid discussing school related issues with local politicians without the presence of school's representative did not violate a First Amendment right). Here, the requirement was entirely reasonable so that Yzaguirre (as a local elected official) could coordinate and centralize communications with a state agency.

Plaintiff's third instance of speech occurred after she rejected Mr. Angeles's title registration application because it did not meet "legal requirements." Am. Comp. ¶ 27. Defendant Yzaguirre told her to process it anyway. Am. Comp. ¶ 27. Plaintiff does not explain how any technical deficiencies in Mr. Angeles's application could be considered a matter of public concern. Again, this is simply a disagreement over how she did her work.

The last instances of speech are conclusory allegations that on unknown occasions between December 2001 and May 2002, she told Yzaguirre that certain applications were "fraudulent." Again, Cantu does not explain how these applications were "fraudulent" or a misapplication of public monies, rather than merely technically deficient applications.

Given that Cantu's opinions were expressed privately and concern matters concerning her work product, the facts alleged did not arise to speech on a public matter. The mere fact that Plaintiff may have made incidental references to protecting public moneys or criticism of her supervisors does not convert her chiefly personal concerns about a disagreement over her job performance into a public concern. See, e.g., *Bradshaw*, 207 F.3d at 817; *Moore v. Miss. Valley State Univ.*, 871 F.2d 545, 551 (5th Cir. 1989) (employee's complaints about favoritism and toleration of misconduct by their employees was not a matter of public concern).

## F.    Munoz Fails to Allege Facts Showing Speech on Matter of Public Concern

Munoz's speech concerned his statements (1) that it "looked bad" to count money in the open and (2) criticizing an informal practice of processing vehicle registrations in administrative office rather than another office. Am. Comp. ¶¶ 36, 38. He claims the latter practice was "unlawful" but does not explain how it violated any state law. He does not claim any money was misappropriated or that people paid more or less in taxes and fees than they owed. In short, he alleges only statements critical of office or administrative practices. This is insufficient. *Compare Finch*, 2003 WL 211209879, *6 (school principals speech to administrators on internal administrative approach to running a school was not on a matter of public concern).

## G.    Weaver Fails to Allege Facts Showing Speech on a Matter of Public Concern

Weaver's primary speech fact was a complaint that on various unspecified occasions between October 2001 and May 2002 she complained to Yzaguirre about the same informal

registration process; she alleges that it was violating the law and a "fraudulent transaction." Am. Comp. ¶ 48. Her conclusory allegations suffers from the same deficiency as Mr. Munoz's claim.

Her second speech act was to advise Yzaguirre that the "word was on the street" that he was "fixing" titles for people. Am. Comp. ¶ 45. As such, it appears that Weaver stated only that a rumor existed; her statement does not show she told Yzaguirre he was "fixing titles." First, Plaintiff did not say that the rumor was true, i.e., that Yzaguirre was in fact "fixing" titles for anyone.

Moreover, if Weaver was simply advising Yzaguirre of the existence of a rumor without expressing a belief in it, this is not a matter of public concern. First, that she communicated it privately, is in favor of it not being of public concern. *Bradshaw*, 207 F.3d at 817. Moreover, Weaver was his Executive Secretary and therefore had a confidential position within Yzaguirre's office. Circumstances plus her position show that probably she did not intend the statement to be made public or that it be publicized.

## IV. <u>Conclusion</u>

Defendant Yzaguirre is not a final policy making official for Defendant County and therefore, Defendant County cannot be held accountable for his actions. With regard to the associational claims, Plaintiffs have failed to allege facts showing any association protected by the First Amendment. Further, Plaintiffs alleged protected speech does not constitute a matter of public concern necessary to prove violation of a First Amendment right. As such,

Plaintiffs' First Amended Complaint should be dismissed in its entirety based on Plaintiffs' failure to state a claim pursuant to Rule 12(b)(6).

WHEREFORE, PREMISES CONSIDERED, Defendant County prays that upon submission of this motion, the Court dismiss the complaints of Plaintiffs Cantu, Munoz and Weaver, or for such other and further relief to which Defendant County may show itself entitled.

Respectfully submitted,

**WILLETTE & GUERRA, L.L.P.**
International Boulevard, Suite 460
3505 Boca Chica Boulevard
Brownsville, TX 78520
(956) 541-1846
(956) 541-1893 (Fax)

By_____ for

**Charles Willette**
State Bar No. 21509700
Federal ID 1937
**Dino Esparza**
State Bar No. 00795337
Federal ID 22703

Attorneys for Defendant CAMERON COUNTY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of above and foregoing instrument was forwarded to the following counsel of record on this the ___1st___ day of July, 2003.

Mr. Craig Vittitoe
Mr. Roger Hughes
ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, Texas 78551-1429

Mr. David Lee McGee
LAW OFFICES OF DAVID LEE McGEE, P.C.
201 S. 15th, Ste. 204, McAllen (78501)
701 Park Avenue
Corpus Christi, TX 78401

Gay E. Gilson
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301A
Corpus Christi, TX 78401

_____
Roman "Dino" Esparza

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VICENTA CANTU, et al. | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | CIVIL ACTION NO. B-03-096 |
| | : | |
| CAMERON COUNTY, et al. | : | |
| | : | |
| Defendants | : | |

**ORDER SETTING HEARING ON DEFENDANT COUNTY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT OF PLAINTIFFS CANTU, MUNOZ AND WEAVER BASED ON FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**

On this the ___ day of July, 2003, came on to be considered, *Defendant County's Motion to Dismiss First Amended Complaint of Plaintiffs Cantu, Munoz and Weaver Based on Failure to State a Claim under Rule 12(b)(6)*. The parties appeared and requested that this matter be set for hearing. After considering same, the Court is of the opinion that a hearing should be set. IT IS THEREFORE,

ORDERED, ADJUDGED and DECREED that Defendant County's Motion to Dismiss First Amended Complaint of Plaintiffs Cantu, Munoz and Weaver Based on Failure to State a Claim under Rule 12(b)(6) be and is hereby set for hearing on the ____ day of _____ 2003 at _ ____ a.m. o'clock in the Southern District Court of Cameron County, Texas.

SIGNED ON this _____ day of _____, 2003.

_____
PRESIDING JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, et al.     :
            :
 Plaintiffs      :
            :
vs.           :    CIVIL ACTION NO. B-03-096
            :
CAMERON COUNTY, et al.    :
            :
 Defendants

---

## ORDER GRANTING DEFENDANT COUNTY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT OF PLAINTIFFS CANTU, MUNOZ AND WEAVER BASED ON FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)

---

BE IT REMEMBERED on this _____ day of _____, 2003, came to be considered *Defendant Cameron County's Motion to Dismiss First Amended Complaint of Plaintiffs Cantu, Munoz and Weaver Based on Failure to State a Claim Under Rule 12 (b)(6).* The Court is of the opinion same should be granted.

It is THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant Cameron County's Motion to Dismiss First Amended Complaint of Plaintiffs Cantu, Munoz and Weaver Based on Failure to State a Claim Under Rule 12 (b)(6), and is hereby GRANTED.

Signed this _____ day of _____, 2003, at Brownsville, Texas.

          _____
          Judge Presiding

Exhibit "A"



# PERSONNEL POLICIES MANUEL

## OF

## CAMERON COUNTY, TEXAS

**The Personnel Policies Manuel is not intended to create any contractual or other legal rights, but is designed solely as a guide. Periodically, this Manual may be revised and updated.**

Adopted by the Cameron County Commissioners Court

October 1, 1984

Revisions approved on the following dates:

October 1, 1986
April 17, 1989
March 5, 1990
May 28, 1991
December 9, 1991
February 10, 1992
August 10, 1992
August 10, 1993
November 2, 1999
May 21, 2002

# TABLE OF CONTENTS

## 1.00 INTRODUCTION

1.01 CAMERON COUNTY .................................................PAGE 1
1.02 AUTHORITY .......................................................... 1
1.03 RESPONSIBILITY ................................................... 1
1.04 PURPOSE ............................................................ 2
1.05 APPLICABILITY OF POLICIES .................................... 2
1.06 DISSEMINATION OF POLICIES ................................... 2
1.07 COMMUNICATION .................................................. 2

## 2.00 EMPLOYEE RESPONSIBILITIES

2.01 GENERAL ............................................................ 3
2.02 TIMELINESS ........................................................ 3
2.03 OUTSIDE EMPLOYMENT ........................................... 3
2.04 CONFLICT OF INTEREST ......................................... 3
2.05 POLITICAL ACTIVITY ............................................ 4
2.06 NATURAL DISASTERS AND EMERGENCIES......................... 5
2.07 USE OF COUNTY-OWNED VEHICLES ............................. 5
2.08 USE OF PERSONAL VEHICLES ................................... 5

## 3.00 EMPLOYMENT STANDARDS

3.01 EQUAL EMPLOYMENT OPPORTUNITY ............................. 7
3.02 SEXUAL HARASSMENT ............................................ 7
3.03 PHYSICAL STANDARD ............................................ 8
3.04 DRESS CODE ...................................................... 8
3.05 EMPLOYMENT OF RELATIVES .................................... 8

## 4.00 RECRUITMENT AND SELECTION

4.01 GENERAL POLICY .................................................. 10
4.02 VACANCIES ......................................................... 10
4.03 QUALIFICATIONS .................................................. 10
4.04 RECRUITMENT AND SELECTION ................................. 10
4.05 PUBLIC ANNOUNCEMENT .......................................... 11
4.06 APPLICATION FOR EMPLOYMENT ................................. 11
4.07 CONSIDERATION OF CURRENT EMPLOYEES ...................... 11
4.08 DISQUALIFICATION ............................................... 11

## 5.00 TYPES OF EMPLOYMENT

5 01 CATEGORIES ............................................................................ 12
5.02 EVALUATION PERIOD .............................................................. 12
5 03 ASSIGNED STAFF .................................................................... 12

## 6.00 WORK SCHEDULE AND TIME REPORTING

6.01 ADMINISTRATIVE WORK ........................................................ 14
6.02 SCHEDULE ADJUSTMENTS ..................................................... 14
6.03 OFFICIAL CLOSING ................................................................. 14
6.04 NUMBER OF HOURS WORKED .............................................. 15
6.05 OVERTIME AND COMPENSATORY TIME ............................... 15

## 7.00 EMPLOYEE COMPENSATION AND ADVANCEMENT

7.01 PAY PERIOD ........................................................................... 17
7.02 PAYROLL DEDUCTIONS .......................................................... 17
7.03 PAY PLAN ............................................................................... 17
7.04 PROMOTIONS ......................................................................... 18
7.05 LATERAL TRANSFERS ............................................................ 18
7.06 DEMOTIONS ........................................................................... 18
7.07 APPROVING AUTHORITY ....................................................... 18
7.08 PRIOR SERVICE WITH COUNTY ............................................ 19
7.09 CALCULATION OF TERMINATION PAY ................................. 19

## 8.00 SUMMARY OF EMPLOYEE BENEFITS

8.01 MEDICAL ................................................................................ 20
8.02 SOCIAL SECURITY .................................................................. 20
8.03 RETIREMENT PLAN ................................................................ 20
8.04 WORKER'S COMPENSATION .................................................. 22
8.05 UNEMPLOYMENT INSURANCE ............................................... 22
8.06 VACATION TIME ..................................................................... 22

## 9.00 LEAVE AND HOLIDAYS

9.01 DEFINITIONS .......................................................................... 23
9.02 APPROVAL OF LEAVE ............................................................ 23
9.03 VACATION LEAVE .................................................................. 23
9.04 SICK LEAVE ........................................................................... 25
9.05 MILITARY LEAVE ................................................................... 26
9.06 CITIZENSHIP LEAVE .............................................................. 26
9.07 LEAVE OF ABSENCE FOR NON-MEDICAL REASONS ............... 27

9.08 FAMILY MEDICAL LEAVE ............................ . .................................. 27
9.09 REASONS FOR LEAVE OF ABSENCE .... . ................................ 28
9.10 USING LEAVE IN COMBINATION ............................................. 30
9.11 HOLIDAYS ................................................................................ 31
9.12 LEAVE AND HOLIDAY RECORDS ............................................. 32
9.13 FUNERAL LEAVE ....................................................................... 32
9.14 OTHER TIME ............................................................................. 32

## 10.00 HEALTH AND SAFE

10.01 SAFETY POLICY ...................................................................... 33
10.02 EMPLOYEE RESPONSIBLITIES ............................................... 33
10.03 EMPLOYEE SUGGESTIONS .................................................... 33
10.04 ON-THE-JOB INJURIES ........................................................... 33
10.05 DRUG AND CHEMICAL DEPENDANCY POLICY ......................... 35

## 11.00 PERFORMANCE EVALUATIONS

11.01 PURPOSE ................................................................................ 39
11.02 PERFORMANCE EVALUATION REPORT ..................................... 39

## 12.00 DISCIPLINE

12.01 REASONS FOR DISCIPLINARY ACTION ..................................... 40
12.02 PROGRESSIVE DISCIPLINE .... ................................................ 41
12.03 SUSPENSION FOLLOWING INDICTMENT ................................... 41

## 13.00 SEPARATIONS

13.01 TYPES OF SEPARATION ............................................................ 43
13.02 RESIGNATION .......................................................................... 43
13.03 RETIREMENT ........................................................................... 43
13.04 REEDUCATION IN FORCE ........................................................ 44
13.05 ELIMINATION OF POSITION ..................................................... 44
13.06 DISMISSAL .............................................................................. 44
13.07 DISABILITY .............................................................................. 45
13.08 DEATH .................................................................................... 45
13.09 EXITY INTERVIEW AND RECORDS ........................................... 45

## 14.00 GRIEVANCES

14.01 POLICY ...................................................................... ............ 46
14.02 GROUNDS FOR A GRIEVANCE ................................................. 46
14.03 INFORMAL GRIEVANCES .......................................................... 46
14.04 FORMAL GRIEVANCES ............................................................. 46

14.05 ADVISORY GRIEVANCE COMMITTEE PROCEDURES ........ . .................. .. 47

## 15.00 PERSONNEL FILES

15.01 GENERAL ............................................. .    .................... ....................................... 49
15.02 PERSONNEL ACTION FORM ................................................ ......................... 49
15.03 CONTENTS OF PERSONNEL FILES ............................................................ 50
15.04 LEAVE RECORDS .................................................................................... 50

## 16.00 COUNTY BUSINESS TRAVEL

16.01 REIMBURSEMENT .................................................................................. 51
16.02 TRAVEL ADVANCES .............................................................................. 51
16.03 AVAILABLE FUNDS ............................................................................... 51
16.04 HOTEL ALLOWANCES ........................................................................... 51
16.05 ASSOCIATION SEMINARS .................................................................... 52
16.06 EXPENSE VERIFICATION ...................................................................... 52
16.07 RESPONSIBILITY ................................................................................. 53

## 17.00 EXEMPT POSITIONS

DRAFT

# CAMERON COUNTY PERSONNEL POLICIES

## 1.00 INTRODUCTION

### 1.01 CAMERON COUNTY

Cameron County's governmental organization is established by
The Constitution of the State of Texas and by the State
Statutes.  State and federal govern its operations Law and by
actions of the Commissioners Court.

The Commissioners Court consists of Four County Commissioners,
each elected by the voters of a Commissioner's Precinct, and the
County Judge, elected by all of the voters of the County.  The
Commissioners Court is the policy making Body of the County.

County operations are conducted through departments each
Administered by an elected official or appointed Department
Head.

### 1.02 AUTHORITY

These policies are established by the Commissioners Court of
Cameron County.  They replace all previously approved
Policies to the extent of any conflict.  Amended, revised, or
New policies must be approved by the Commissioners Court.

Any benefits herein offered to the employees are contingent upon
Available funds in each County department's budget and in the
General Cameron County operating budget.

### 1.03 RESPONSIBILITY FOR IMPLEMENTATION
####      OF PERSONNEL POLICIES

Each Department Head, elected or appointed, is responsible
For the administration of the personnel policies within their
department and may issue detailed departmental operating
procedures to implement these adopted policies as long as
they are consistent with these policies.

1.04 PURPOSE

These policies set forth the primary rules governing
employment with Cameron County.  The policies contained here
inform employees of the benefits and obligations of
employment with the County.  They have been prepared and
adopted in order to promote consistent, equitable, and
effective practices which will result in high quality public
service by both employees and supervisors.

Receipt of the Personnel Policies Handbook by the employee
does not constitute any type of employment agreement or
contract with the County.  Cameron County is an At-Will employer.

1.05 APPLICABILITY OF PERSONNEL POLICIES

The personnel policies apply equally to all employees and
officials of the County unless a class of employees is
specifically exempted.  In cases where federal law or
regulation supercedes local policy for specific groups of
employees, such laws or regulations will substitute for these
personnel policies only insofar as necessary to comply.
Elected officials are personally exempt from the personnel
policies but must abide by the personnel policies in the
administration of their Departments.

1.06 DISSEMINATION OF PERSONNEL POLICIES

The County Personnel Administrator shall maintain complete
sets of the Personnel Policies with all revisions for
reference purposes.  The County Personnel Administrator or a
designee shall provide each employee with a copy of the
Employee Handbook and information about any revisions, and
shall provide each department head with a copy of the
Personnel Policies Manual.

Each department head, elected or appointed, and each employee
shall acknowledge receipt in writing of a copy of the
Personnel Policies Manual or Handbook.

1.07 COMMUNICATION

Employees are encouraged to make constructive suggestions for
improvements in these policies or in work procedures or
conditions to their immediate supervisors or department heads.

2

2.00 EMPLOYEE RESPONSIBILITIES

## 2.01   GENERAL

Cameron County is a public tax-supported organization.
Exceptions include the Cameron County Park System and the
International Bridge Department, which are operated as
enterprise funds, and are self-sustaining departments.
Cameron County employees must adhere to high standards of
public service that emphasize professionalism, courtesy, and
avoidance of even the appearance of illegal or unethical
conduct.  Employees are expected to carry out efficiently the
work items assigned as their responsibility, to maintain good
moral conduct, and to do their part in maintaining good
relationships with the public, with other governmental
employees and officials, with their supervisors, and with
fellow employees.

## 2.02   TIMELINESS

Employees are to be punctual in maintaining work hours,
keeping appointments and meeting schedules for completion of
work.

## 2.03 OUTSIDE EMPLOYMENT

An employee wishing to engage in outside employment must
request approval to do so from his or her Department Head.
The Department Head may deny the request if it is determined
that the outside employment would:

1.   be inconsistent or incompatible with employment with
     the County, or

2.   adversely affect the employee's job performance.

## 2.04 CONFLICT OF INTEREST

An employee may not:

1.   solicit, accept, or agree to accept a financial benefit,
     directly or indirectly, other than from the   County,
     that might reasonably  tend to influence his or   her

3

performance of duties for the County, or that he or she
knows or should know is offered with intent to influence
the employee's performance.

2.  accept employment or compensation that might reasonably
    induce him or her to disclose confidential information
    acquired in the performance of job duties;

3.  accept outside employment or compensation that might
    reasonably tend to impair independence of judgment in
    performance of duties for the County.

4.  make any personal investment that might reasonably be
    expected to create a substantial conflict between the
    employee's private interest and duties for the County; or

5.  Solicit, accept, or agree to accept a financial benefit
    from another person in exchange for having performed
    duties as a County employee in favor of that person.

## 2.05 POLITICAL ACTIVITY

Employees of Cameron County are encouraged to vote and to
exercise other prerogatives of Citizenship consistent with
state and federal law and these policies.

1.  A county employee may not use his or her official authority
    or influence to interfere with or affect the result of
    an election or nomination for office. The wearing of buttons
    or display of other advertising on the employee during working
    hours is prohibited when the employee is dealing with the
    public, and when in the course of dealing with the public
    it unreasonably disrupts the smooth operation of the
    department.

2.  A county employee may not directly or indirectly coerce,
    attempt
    to coerce, command, or advise a state or county official or
    employee to pay, lend, or contribute anything of value to a
    party, committee, organization, agency or person for political
    purpose.

3.   A county employee who chooses to run for the office of the
     Department in he/she works must resign at the time of filing

## 2.06   NATURAL DISASTERS AND EMERGENCIES

Employees of Cameron County may be required to work during
any natural disaster or emergency.  These emergencies may
require separation from family members for extended periods
and each employee is encouraged to provide for his or her
family accordingly.  Refusal to work during such emergencies
may result in disciplinary action,  up to and including
termination.  This is a formal condition of employment with
Cameron County. The determination to which positions or
natural disaster and the designation of personnel  who shall
be required to work during such emergencies shall be made by
each department heads and is incorporated in Cameron County's
Emergency Operation's Plan.

## 2.07 USE OF COUNTY-OWNED VEHICLES

Cameron County employees who are authorized to drive
County-owned vehicles must observe the following rules:

*  County-owned vehicles may not be used for any purpose
   other than official County business.

*  County-owned vehicles may not be used to transport
   non-County employees except in the course of official
   business.

*  County-owned vehicles are not to be driven by anyone other
   than the Cameron County employee who is authorized to do
   so.

Cameron County employees who are authorized to drive
County-owned vehicles are required to maintain clean driving
records to assure insurability under the County's Auto
Liability Coverage, Should a county driver become uninsurable
He/she must be removed from all driving activities and possible
termination if unable to perform primary job functions.

## 2.08 USE OF PERSONAL VEHICLE TO CONDUCT COUNTY BUSSINESS

Employees who are authorized to operate their personal vehicle to
conduct county business must observe the following.

*  Must show proof of current liability insurance.

- The vehicle must have current registration and inspection. A copy of insurance verification must be provided to the county auditor's office.

- Employee must posses a clean driving record as per county liability insurance check.

VIOLATION OF THIS SUBSECTION OF THE COUNTY PERSONNEL POLICIES MAY RESULT IN DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION.

## 3.00 EMPLOYMENT STANDARDS AND PRACTICES

### 3.01 EQUAL EMPLOYMENT OPPORTUNITY

Cameron County is committed to providing equal employment opportunity without regard to race, color, religion, national origin, sex, age, handicap or veteran's status, as required by state and federal laws.  The County's commitment extends to all employment-related decisions and terms and conditions of employment.

### 3.02  SEXUAL HARASSMENT

Cameron County strictly prohibits any conduct which constitutes sexual harassment.  Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and any other conduct of a sexual nature (including sexually explicit language, jokes, etc.) when:

1.  The employee must submit to the offensive conduct as an explicit or implicit condition of employment.

2.  The employee rejects advances and risks losing a job, promotion, privileges, or benefits; whereas, the employee who submits gains favors and advantages.

3.  The employee's job performance is interfered with as a result of the offensive behavior, or the work atmosphere becomes hostile or intimidating.

It is the responsibility of Cameron County management staff to create an atmosphere free of sexual harassment.  It is the responsibility of each employee to respect the rights of fellow employees.  For purposes of interpretation and application of this policy, the following forms of sexual harassment are set forth:

1.  overt physical:  the employee is subjected to actual touching or objectionable conduct.

2.  overt non-physical:  the employee is approached with the suggestion of sexual relations,  along with stated or suggested adverse job consequences that would result from rejection of the advances.

7

3.  subtle:  the employee is approached in a more subtle
    manner, with the suggestion that "friendly" employees
    will have more opportunities for advancement.

An employee who believes he or she is a victim of sexual
harassment on the job should immediately report the matter to
his or her immediate supervisor or to the Personnel
Administrator.  The choice of whom to report the harassment
is the employee's alone to make.  Any employee found to be
sexually harassing another employee or applicant for
employment shall be dealt with under the disciplinary
policies and procedures contained in this Manual.

## 3.03  PHYSICAL STANDARDS

Cameron County is committed to equal employment opportunity
and will reasonably accommodate job applicants and employees
with disabilities.   All Cameron County employees are
expected to be able to perform their job duties as required
by their job description.

Employees whose positions pose some special risk of injury or
public safety risk is required to have a post-offer physical
examination.  This requirement will be specified in the
Employees job description.  Examples of these positions
include but are not limited to the following positions:
deputy sheriff, park ranger, heavy equipment operators, and
positions with lifting or driving requirements.

The post-offer physical examinations will be conducted by a
physician of the County's choice and at the County's expense.

## 3.04  DRESS CODE

A dress code may be implemented by department directors/heads for
professional standards (uniforms, coat, tie, etc.) as required.

## 3.05  EMPLOYMENT OF RELATIVES

Nepotism is the showing of favoritism toward a relative.  The
practice of nepotism in hiring personnel or awarding
contracts are forbidden by the County.  No person may be hired
who is related within the second degree by affinity
(marriage) or within the third degree by consanguinity

(blood) to any member of the Commissioners Court, to a county official who appoints him or her to the position, or to any employee who would directly supervise his or her job performance.  Prohibited degrees of relationship are defined in the following Figures 1 and 2."

In the event that two current county employees become related in a manner prohibited by this section, the two parties will

be given a reasonable time for one or the other to secure another position, either within the County in another department, or outside County government.  For purposes of this policy, a reasonable time will not normally exceed two months.  If the two parties cannot decide which of them will forfeit his or her job, the party with the least seniority will be terminated.

**(SEE NEPOTISM CHARTS)**

4.00 RECRUITMENT AND SELECTION

## 4.01 GENERAL POLICY

Each department head, elected or appointed, is responsible for the selection and tenure of his or her employees within budget and numerical limits set by the Commissioners Court. Personnel budgets and authorized numbers of positions are established by the county budget and salary schedules, and amendments thereto, as approved by the Commissioners Court.

## 4.02 VACANCIES

Employee vacancies in county departments are filled on the basis of merit, whether by promotion from within or by initial appointment. Selections of the persons best matched to fill the vacancies are made only on the basis of occupational qualifications and job related factors such as skill, knowledge, education, experience, and ability to perform the specific job.

## 4.03 QUALIFICATIONS

Cameron County maintains a job description, which establishes for each staff position the required knowledge, skills, and abilities and the acceptable levels of experience and training for the position.  The job description sets forth the minimum acceptable qualifications to fill the position.

Cameron County will make a reasonable effort to accommodate job applicants and employees who have disabilities.

## 4.04 METHODS OF RECRUITMENT AND SELECTION

Cameron County has four methods of recruiting and selecting persons to fill vacancies.  They are as follows:

1.  promotion from within;

2.  lateral transfer from within;

3.  public announcements and competitive  consideration of applications for employment, and

4. selection from a valid current eligibility list.
Each department head determines the method of selection to be
used in filling a vacancy.

## 4.05 PUBLIC ANNOUNCEMENTS

Cameron County is an "At Will" equal employment opportunity
employer and Public announcements of position openings with the
County are disseminated by the Personnel Administrator or the
respective department head, in the manner most appropriate to the
particular position being held.

## 4.06 APPLICATION FOR EMPLOYMENT

Each applicant for county employment  must submit a written
application and other pertinent information regarding
training and experience.  The department head shall make
appropriate inquiries to verify experience, character, and
suitability of any applicant.

## 4.07 CONSIDERATION OF CURRENT EMPLOYEES

Employees of the County will be notified by the Personnel
Administrator of known vacancies in the organization for
which applications will be accepted.  Employees will be
permitted to apply for positions for which they believe
themselves to be qualified.

## 4.08 DISQUALIFICATION

An applicant is disqualified from employment by the County if
he or she does not meet the minimum qualifications for
performance of the duties of the position involved; knowingly
has made a false statement on the application form; has
committed fraud during the selection process; or is not
legally permitted to hold the position.

An employee may be terminated if it is later discovered that
he or she knowingly falsified information on the application
form.

5.00 TYPES OF EMPLOYMENT

5.01 CATEGORIES

There are three categories of employment with Cameron County:

Regular Full-time.  A regular full-time employee is employed to hold an authorized position that involves, on the average, at least forty (40) hours per week.

Regular Part-time.  A regular part-time employee is employed to hold an  authorized position that involves, on the average, fewer than forty (40) hours per week, but no less than eighteen (18) hours per week.

Temporary.  A temporary employee is an employee hired to complete a specific project within a specified period of time.  Temporary employees may be full time or part time.

There is no tenure or permanent lifetime employment or appointment for Cameron County employees.  All employees are subject to periodic performance review and evaluation at least once a year in accordance with the Personnel Policies.

5.02 EVALUATION PERIOD

In order to become a regular employee, each employee must complete a probationary period of six months following initial employment or reemployment in a regular budgeted position.  The evaluation period may be extended by the Department Head for a period of up to an additional six months.

The Department head may immediately terminate an employee at Anytime during the evaluation period.  After completing The evaluation period, the employee will be subject to periodic performance evaluations at least once a year.

Cameron County is "At Will" employer and there is no tenure or permanent lifetime employment or appointment.

5.03 ASSIGNED STAFF

Staff who are assigned to the County for supervision but who are directly paid by another government or private organization is not County employees. Benefits are as specified in the individual's contract for services. As a condition of their assignment, they are governed by all terms of these policies not in conflict with their contract for services.

6.00 WORK SCHEDULE AND TIME REPORTING

6.01 ADMINISTRATIVE WORKWEEK

The normal work schedule for County employees is from 8:00 a.m. to 5:00 p.m., Monday through Friday, with a one (1) one hour unpaid lunch period, for a total of forty (40) hours per work period, excluding Law Enforcement Personnel. The normal work schedule for Law Enforcement Personnel shall be determined in accordance with designated schedules totaling 171 hours per 28 day work period.

Employees must report punctually for duty at their place of work; work their established work schedule as determined by their Department; take a one (1) hour unpaid meal period, and may take two (2) fifteen (15) minute paid rest breaks, one in the morning and one in the afternoon. Should the employee duties or workload not permit him/her to take a break, this time cannot be accumulated.

Department Heads or Supervisors have the right to set the times for meals and rest breaks taken by employees in their Departments.

6.02 SCHEDULE ADJUSTMENTS BY DEPARTMENT HEADS

Adjustments to the regular hours of operation may be made by a Department Head in order to better serve the public or to meet requirements for continuous services related to the protection of public health and safety.

Offices may remain open during the noon hour, and lunch periods may be staggered according to the requirements of the office and the decisions of the Department Head.

6.03 OFFICIAL CLOSINGS OF COUNTY OFFICES

County offices may be closed at any time during the regular work week only by order of the Commissioners Court or the County Judge for reasons such as bad weather or funeral services for county officials. Work time lost by employees due to official closings of county offices will be charged to "other time", unless the employee was already on some other type of leave, e.g., vacation, sick leave, etc., in which case that particular leave status remains in effect.

## 6.04 NUMBER OF HOURS WORKED

Department heads may determine the number of hours worked by an employee for the compensation to be received subject to laws governing working hours and subject to the provisions of the County budget and approved salary schedules.

## 6.05 OVERTIME AND COMPENSATORY TIME

General.  Cameron County employees will receive compensatory time off for overtime hours worked, but may receive cash payment if money is available for this purpose in their department budget.  Requests to work overtime must be submitted to the Department Head before the overtime is worked on the Agreement to Work Overtime Form, on which the Department Head will specify if the request is approved or denied, the number of overtime hours to be worked, and the method of compensation that will apply.

For the purpose of computing overtime, time away from the job during the workweek, such as vacation, holidays, illness, or approved absences, will not be included in a workweek.

Non-Law Enforcement Personnel.  Employees covered by the Fair Labor Standards Act will receive compensatory time off for time worked beyond the forty-(40) hour workweek, which runs from Friday to the following  Thursday, but may receive cash payment if there is money in the department budget for this purpose, and the Department Head has approved the cash payment.  The maximum accumulation of compensatory time is twenty-four (24) hours, and it is accumulated at one and one half (1 1/2) times the overtime hours worked.  Payment for overtime is calculated at one and one half (1 1/2) times the regular hourly rate.

Law Enforcement Personnel. Deputies and jailers Personnel will receive compensatory time for time worked beyond the one hundred seventy-one hours(171) per twenty-eight (28) day pay period, but may receive cash payment if there is money in the department budget, and the Department Head has approved the cash payment.  The maximum accumulation of compensatory time is forty (40) hours, and it is accumulated at one and one half (1 1/2) times the overtime hours worked.  Payment for overtime is calculated at one-half (1/2) the regular hourly rate.

Transfer Employees.  An employee who is transferred from one department will be allowed to transfer his or her compensatory time if the new Department head is in agreement, or will be permitted to use all accumulated compensatory time prior to the transfer.

7.00 EMPLOYEE COMPENSATION AND ADVANCEMENT

7.01 PAY PERIOD

Cameron County will pay its salaried full-time and part-time
employees once every twenty-eight (28) days with an advance
every fourteen (14) days. Hourly part-time employees will
only be paid every twenty-eight (28) day pay period without
interim advances. In the event that a payday falls on a
County holiday, checks are distributed on the previous
working day.

7.02 PAYROLL DEDUCTIONS

Deductions will be made from each employee's pay for the
following:

. Federal Income Taxes;

. Social Security; and

. Employee's contribution to the County and District Retire-
  ment System

In accordance with policies and general procedures approved
by the Commissioners Court, deductions from an employee's pay
may be authorized by the employee for:

. Deferred Compensation;

. Group Health/Medical Insurance for dependents;

. Credit Union Deposits;

. United Way Contributions; or

. Supplemental policies as authorized by the Commissioners
  Court

7.03 PAY PLAN

Each year the Commissioners Court, under statutory budgetary
procedures, decides the number of regular   and temporary
positions allowed to each department and the salary range of

each. Requests for additional positions or changes in
position salary not granted at budget time must be submitted
to and approved by the Commissioners Court.

## 7.04 PROMOTIONS

Promotions are changes in the duty assignment of an employee
from a position in one classification to a position in
another classification in a higher pay group.  A promotion
recognizes advancement to a higher position requiring higher
qualifications and involving greater responsibility.

A promoted employee will receive a salary increase.

Promotions are approved by the department head within the
staffing pattern and budget limits approved by the
Commissioners Court.

Upon promotion, an employee is probationary in the new
position for a period of six months from the date of the
written approval of the promotion, unless extended by the
department head for an additional period of up to six months.


## 7.05 LATERAL TRANSFERS

Lateral transfers are movements of an employee between
positions in the same pay group.  Lateral transfers may be
made within the same department or among other departments of
the County with the approval of the Department Heads.

## 7.06 DEMOTIONS

A demotion is a change of duty assignment of an employee from
a position in one classification to a position in another
classification in a lower pay group.  Demotions may be made
for the purpose of voluntary assumption of a less responsible
position, as a disciplinary measure because of unsatisfactory
performance in a higher position, or as a result of
elimination of the higher positions.

## 7.07 APPROVING AUTHORITY

The Department Head is the final authority for all
departmental payrolls and for any pay increases, decreases,
or payroll transfers granted under the terms of these

policies, or the an...d budget and salary schedules

## 7.08    PRIOR SERVICE WITH COUNTY

New hires with prior service with Cameron County may be considered for appointment above customary entry level and allowed to retain years of service if:

1. Rehire is same or similar position.
2. Slot being filled is at required pay level.
3. Was laid-off or separated due to reduction in work force and/or separated in good standing with previous department.
4. The break in service with the county must be within same fiscal year and retirement funds not withdrawn.
5. All adjustments must be executed at time of rehire and authorized by the Elected Official or Department Head.
6. Effective date of policy concurrent with fiscal year as of October 1, not retroactive.

Note: A previous hire returning to work in the County may buy back pension credits in accordance with retirements system rules. (Texas County and District Retirement System handbook or Personnel, Safety Risk Department for more-details.)

**Approved: Commissioners Court 5-21-02**

## 7.09    CALCULATION OF TERMINATION PAY

Upon termination from county employment, employees who have completed the initial six-month probationary employment period will be paid for earned and unused vacation leave up to the limit of their maximum allowable accumulation based upon length of employment, and for earned and unused compensatory time up to the maximum allowable accumulation based upon job classification – law enforcement or non- law enforcement. Payment for vacation time and compensatory time will be included in the employee's final paycheck and will be calculated in the following manner:

The total work time, allowable vacation leave time (as if worked), and compensatory time will be laid out on the calendar. If the result covers a full pay period(s) amount. If the result requires payment for less than a full pay period, the employee will be paid a prorated share of the full pay for the period. Partial pay periods will be paid on an hourly basis based on the number of work hours in the year.

19

8.00 SUMMARY OF EMPLOYEE BENEFITS

8.01 MEDICAL

Cameron County provides group health and life insurance coverage for regular employees who work more than Nine hundred (900) hours a year. Premiums for employees are paid in full by the County. Group coverage will commence the 1st of the month following a thirty (30) day grace period after the date of employment. An eligible employee may add dependent coverage for his or her family members to any such plan at his or her expense. This coverage will become effective in accordance with the group policy provisions. All premiums for dependent coverage shall be deducted and remitted to the insurance company on a prepaid basis.

HIPAA, Health Insurance Portability and Accountability Act of 1996, puts a limit on pre-existing condition exclusions in-group health plans and gives new enrollees credit for prior coverage. In addition to these "portability" requirements, the law also makes it illegal to use health status a reason for denying coverage, guarantees group coverage for employers with 50 or fewer employees, and guarantees renewability of group health plans.

COBRA, Consolidated Omnibus Budget Reconciliation Act, was enacted to ensure that employees and their dependents do not lose their health insurance when workers lose their jobs. COBRA requires group health insurance policies to permit group members to continue their insurance when they leave the group for anyone of a number of reasons. COBRA's protections are temporary and are intended as a stopgap until insurance can be obtained from another source, such as a new employer. Under both state and federal laws, continuation requires the insured to pay the full premium (including former employers share), but the insured does get the advantage of the cheaper rate. (HIPAA and COBRA complement each other)

8.02 SOCIAL SECURITY

All employees of Cameron County are covered by Social Security. The County matches each employee's contribution to the Social Security System dollar for dollar.

8.03 RETIREMENT PLAN

Cameron County participates in the Texas County and District Retirement System. The County contributes an amount equal to

seven percent of the employee's pay to the retirement fund to
match a seven- percent contribution that the employee makes.
Mandatory participation in the Retirement plan is required by
state law for regular employees who work more than
Nine hundred (900) hours a year. Regular retirement benefits
and disability retirement benefits are available to
retirement system members.

Terminated Employees.  A member who ceases to be employed by
Cameron County except by death or retirement, shall upon
application,  be paid in full the amount  plus interest that
he or she has contributed to the system.

A terminated employee who has less than four (4) years of
service with the County may leave his or her deposits in the
System for a period of five (5) years from the date of last
deposit, thus retaining membership and all related credited
service on deposits at the end of each year during the
period.  However, if at the end of the five (5) year period
of inactivity the inactive member  has not resumed
participation with the system, membership will terminate and
all previously earned credited service will be forfeited.  No
further interest will be earned on deposits.

A terminated employee who  has earned at least four (4) years
(but less than ten years) of credited service may leave his
or her deposits in the System for as long as desired, thereby
retaining membership and all related credited service as well
as the right to receive interest on the balance of deposits
at the end of each year.  However, additional credited
service with the System, or one of the other statewide
systems must be earned to satisfy the length of service
requirement for service retirement.

Withdrawal of Deposits in the Event of Death.  Every employee
who becomes a member of the Retirement System should
designate a beneficiary at the time of application for
membership.  The member should  review the designation from
time to time and change the designation if necessary.  In the
event of the member's death, the beneficiary will receive
all of the member's deposits with interest provided the
member was not eligible for deferred service retirement
benefits, in which case the beneficiary may receive a monthly
income for a specific number of years, or for life.  If the
deceased member was not eligible for deferred service
retirement and had not designated a beneficiary, the member's
deposits and interest earnings are payable to the member's

estate.

8.04 WORKER'S COMPENSATION

All employees of Cameron County and its elected officials and appointed Department Heads are covered under a worker's compensation policy purchased by the County. The County pays the premium for this insurance. The purpose of the insurance is to provide all benefits (e.g., medical costs and lost wage benefits) afforded under the Texas Worker's Compensation Law to any County employee injured on the job who is protected by such law.

8.05 UNEMPLOYMENT INSURANCE

All employees of the County are covered under the Texas Unemployment Compensation Insurance Program and the County pays this tax.

8.06 VACATION TIME

Cameron County employees are eligible for vacation leave as set forth in Section 9.03.

9.00 LEAVE AND HOLIDAYS

## 9.01 DEFINITIONS

Leave time is time during regular working hours in which an
employee does not engage in the performance of job duties.
Leave time may be either paid or unpaid.  Holidays are days
designated by the Commissioners Court when County offices are
closed on what would otherwise be regular business days.

## 9.02 APPROVAL OF LEAVE

All leave taken by County employees must be approved in
writing by the employee's department head.

Department heads are responsible for determining that
employees are eligible for leave and that leave time is
available for use in the amounts requested by an employee.

## 9.03 VACATION LEAVE

Regular full-time employees earn vacation leave according to
the following schedule:

| No. of Years Employed | Vacation Leave Per Year |
|---|---|
| 0 through 5th year anniversary | 10 days |
| After 5 years through 15th year anniversary | 15 days |
| After 15th year | 20 days |

The amount of vacation leave which a full-time employee is
entitled is calculated by determining the number of years of
continuous, uninterrupted service with the County that the
employee has as of the beginning of the fiscal year.

Regular part-time employees are eligible for vacation leave
in proportion to the number of hours worked in a forty (40)
hour workweek.

Temporary employees are not eligible for vacation leave.
With the exception of first year employees who's probationary

period extends beyond the fiscal year of hire, employees are
required to use their full vacation allowance before the end
of the fiscal year, or the vacation time is lost.

Employees are not eligible to take vacation leave during the
six (6) month probationary period.

Upon completion of the six (6) month probationary period, a
regular, full-time employee may take vacation leave in
accordance with the table on the preceding page at any time
during the fiscal year, subject to the Department Head's
approval.

An employee whose six (6) month probationary period extends
beyond the fiscal year of hire may take vacation leave the
subsequent fiscal year, prorated according to the number of
months worked in the fiscal year of hire. The vacation time
for said previous fiscal year must be taken within three
months after the end of the probationary period.

In the event that an employee is unable to take vacation
leave prior to the end of the fiscal year because the request
for vacation leave is denied by the Department Head due to
scheduling problems or other needs of the Department, the
employee is entitled to a grace period during the first three
(3) months of the next fiscal year. The vacation leave
will be reflected in the records for the previous fiscal
year, and must be taken by the end of the calendar year, i.e.
December 31st.

Regular part-time employees are eligible for vacation leave
according to the table on the preceding page in proportion to
the number of hours worked in a forty-(40) hour week.

Employees who are transferred from one department to another
will be transferred with accumulated vacation time, provided
the new department is in agreement, or will be permitted to
take all vacation time prior to the transfer.

Vacation leave to be taken by an employee shall be in the
amounts and at the times approved by the Department Head.
Department Heads shall schedule vacation leaves in the manner
least disruptive to the operations of the department.
Seniority will be used as the basis for resolving any
conflict among vacation dates requested by employees within a
department.

In the event that a regular employee leaves employment with the County and has taken all vacation time prior to completing employment for that particular fiscal year, the County reserves the right to deduct any unearned vacation leave salary from a final warrant (paycheck) or to make claim for such unearned amount, but only after providing such employee with notice and an opportunity to be heard.

## 9.04 SICK LEAVE

Regular employees are eligible for sick leave with pay not to exceed ten (10) days per year.

Earned sick leave may be utilized by employees who are absent from work due to:

1. Personal illness or physical or mental incapacity;

2. Illness or physical or mental incapacity of member of the immediate household;

3. Medical, dental, or optical examinations or treatments; or

4. Medical quarantine resulting from exposure to a contagious disease.

Medical Statement. The Department Head may request, and employees must provide, a physician's written verification of medical disability precluding availability for duty at any time that sick leave benefits are requested for a period of more than three days. The physician's written statement should identify the nature and extent of the disability and when the employee can be expected to work on a full-time basis. The Department Head may also require proof of illness in cases where the employee has compiled a poor attendance record or has exhibited a pattern of absences.

Notification. To receive paid sick leave, an employee shall personally communicate with his/her immediate supervisor, Department Head, no later than one hour after the time set for beginning work on a daily basis, except in cases where the employee is physically unable to communicate.

Accrual of Sick Leave. Regular full-time employees accrue sick leave benefits at the rate of eight hours per month

beginning at the date of employment, but not to exceed more than ten (10) days per year.  Regular part-time employees accrue sick leave benefits based upon the proportion of the time worked to a forty-(40) hour workweek.

Accumulation of Sick Leave.  Sick leave not used during the year in which it accrues, accumulates and is available for use in succeeding years.   The maximum allowable accumulation of sick leave is sixty (60) days.

Exhaustion of Sick Leave.  An employee who has exhausted earned sick leave benefits may request a leave of absence without pay for a period not to exceed sixty (60) days.

No advance of unearned sick leave benefits will be made except in the case of absence due to bona fide on-the-job injuries that are covered by worker's compensation benefits.

Cancellation upon Termination.  Unused sick leave is cancelled upon termination of employment without compensation to the employee.

## 9.05  MILITARY LEAVE

Regular employees of the County who are members of the State Military Forces or members of any of the Reserve Components of the Armed Forces of the United States are entitled to leave of absence from their duties, without loss of time or efficiency rating or vacation time or salary, on all days during which they are engaged in authorized training or duty ordered by proper authority, for a period not to exceed fifteen (15) days in any one calendar year.  Requests for approval for military leave must have copies of the relevant military orders attached.  Military leave in excess of fifteen (15) days will be charged to vacation leave or leave without pay.

Regular employees of the County who enter active duty with the State Military Forces or with the Armed Forces of the United States is entitled to be restored to employment subject to the provisions of the law upon honorable release from active duty.

## 9.06 CITIZENSHIP LEAVE

Employees will be granted citizenship leave with pay for jury duty, for serving as a subpoenaed witness in an official

proceeding, and for the purpose of voting. Citizenship leave cannot be used by an employee who is absent from work for a personal case in which he or she serves in a capacity as a party to the proceeding.

## 9.07 LEAVE OF ABSENCE FOR NON-MEDICAL REASONS

Leave of absence for non-medical reasons is an approved absence from duty in a non-pay status. Upon approval of the Department Head, an employee may be granted up to sixty days unpaid leave of absence. Employees on leave of absence for non-medical reasons receive no compensation and accrue no benefits such as vacation or sick leave. However, previously accrued benefits are exhausted or utilized during leave of absence unless otherwise prohibited by the terms or provisions of the benefit programs. An unpaid leave of absence for non-medical reasons can be extended beyond sixty days by action of the Commissioners Court, provided the employee has worked no less than 1250 hours in the previous twelve months at time of request.

A leave of absence for non-medical reasons is appropriate for one or more of the following reasons:

1. Educational purposes when successful completion will Contribute to the work of the County.

2. The undertaking of a public service assignment; or

3. Attending to important personal business.

## 9.08 LEAVE OF ABSENCE FOR FAMILY AND MEDICAL REASONS

Upon approval of the Department Head, an employee may be granted up to sixty (60) work days leave of absence, during any 12-month period, for family and medical reasons. The 12-month period in which the 60-work day's leave of absence occurs shall be based on a rolling 12-month period and must have worked no less than 1250 hours measured backward, from the date an employee uses any leave for family and medical reasons.

Leave of Absence for family and medical reasons is an absence from duty in a paid or unpaid status or combination thereof. Employees on leave of absence for family and medical reasons receive no compensation and accrue no benefits, such as vacation, sick leave or County contribution on retirement plan, unless said leave is in a paid status. However, employees on

27

leave of absence for family and medical reasons, whether in a paid or unpaid status, shall retain coverage under the County's group health insurance plan, assuming said coverage would have been provided if the employee had continued working. If the employee wishes to retain existing dependent coverage while on leave arrangements for direct payment of dependent health benefit premiums must be requested during non-pay leave.

Leave of absence for family and medical reasons may be extended beyond 60 work days if the employee has worked no less than 1250 hour in the previous twelve months and must be approved by the Commissioner's Court and provided there is a reasonable expectation that the employee will return to work.

9.09 A leave of absence for family and medical reasons is Appropriate for one or more of the following reasons:

1.  Family, because of the birth of a son or daughter of the employee and in order to bond with son or daughter;

2.  Family, because of the placement of a son or daughter with the employee for adoption or foster care;

4.  Medical, in order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition; and

5.  Medical, because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Entitlement to leave under Reasons 1. and 2. above, for a birth or placement of a son or daughter, shall expire at the end of the 12-month period beginning on the date of such birth or placement.

In the event a husband and wife are both entitled to leave, under the Reasons 1. and 2. above, and both are employed by the County, the aggregate number of work days of leave to which both are entitled shall be limited to 60 workdays, during any 12-month period. This limitation shall also apply to leave for the care of a parent with a serious health condition, as stated in Reason 3.

EMPLOYEE ELIGIBILITY

To be eligible for an absence of leave for family and medical reasons an employee must have worked for the County for at least twelve (12) months and not fewer than 1,250 hours over the immediate twelve (12) months preceding the leave request.

REQUIRED NOTICE AND CERTIFICATION

To be granted an absence of leave for family and medical reasons an employee must provide thirty (30) days advance notice when the leave is foreseeable based on expected medical treatment. If the date of such treatment requires leave to begin in less than thirty (30) days, the employee shall provide such notice as soon as practical.

The Department Head may require medical certification to support a leave request. A copy of the required certification form shall be made available by the County and shall be completed by the employee's health care provider.

INTERMITTENT LEAVE

An employee may take leave of absence for family and medical reasons intermittently or by working a reduced leave schedule to reduce the number of work hours per day or workweek. Intermittent or reduced leave schedules are subject to approval by the Department Head, unless medically necessary and medically certified.

In the case of a planned or foreseeable intermittent leave request, the Department Head may allow an employee to temporarily transfer to an alternate position, for which the employee is qualified, if such a position is available. In general, intermittent leave shall not be applicable to Reasons 1. and 2. above unless both the employee and Department Head otherwise agree.

RETURN FROM LEAVE

Upon return from leave of absence for family and medical reasons, an employee shall be restored to his or her original or equivalent position with equal pay, benefits, and applicable employment terms. However, upon return from leave for the employee's own serious health condition, the Department Head may require a "fitness-for-duty"

certification from the employee.   The required

"fitness-for-duty" certification form shall be made available
by the County and shall be completed by the employee's health
care provider.

DENIAL OF RESTORATION

A Department Head may deny an otherwise eligible employee
restoration of equivalent position with equal pay, benefits,
and applicable employment terms, if:

1.   Such denial is necessary to prevent substantial and
     grievous economic injury to the operations of the County.

2.   The Department Head notifies the employee of the intent
     of the County to deny restoration on such basis at the
     time the County determines such injury would occur; and

3.   In any case in which the leave has commenced, the
     employee elects not to return to employment after
     receiving such notice.

An eligible employee as described in this paragraph is a
salaried eligible employee who is among the highest paid ten
(10) percent of the employees employed by the County.

REVOCATION OF LEAVE

Failure to provide the required medical certification or
medical status reports or to contact the employee's
supervisor, as may be agreed to by the employee and the
supervisor prior to commencement of leave, shall be grounds
for revoking an employee's leave of absence and for taking
disciplinary action.

9.10 USING LEAVE IN COMBINATION

Unless an employee who is absent on sick leave requests leave
without pay, upon exhaustion of sick leave, he or she will
automatically be placed on annual vacation leave status until
annual leave is exhausted.

Sick leave cannot be used for vacation purposes when vacation
leave is exhausted.
With the approval of an employee's supervisor and the
department head, other types of leave and holidays can be

used in any combination if it is determined to be in the best
interest of the County and the employee.

## 9.11 HOLIDAYS

Prior to the start of the fiscal year, the Commissioners
Court will adopt the Holiday Schedule for that year.
Holidays can be changed from year to year by vote of the
Commissioners Court.

The following days are generally observed as paid holidays
for  regular County employees:

| | |
|---|---|
| . New Year's Day | January 1 |
| . Washington's Birthday | February, on date according to National Observance |
| . Good Friday | Friday before Easter |
| . Memorial Day | may, on date according to National Observance |
| . Independence Day | July 4 |
| . Labor Day | 1st Monday in September |
| . Veteran's Day | November 11 |
| . Thanksgiving | 4th Thursday and Friday in November |
| . Christmas | December 24 and 25 |

**In the event that a holiday falls on Saturday, County offices
will be closed the preceding Friday.  When a holiday falls on
Sunday, County offices will be closed the following Monday.**

**Employees whose regular day off falls on a holiday or who are
required to work on a holiday will be provided an alternate
day off.**
Official County holidays occurring during an employee's
vacation leave or sick leave shall not be counted against
leave use.  A County employee who is paid out of a

combination of State and County funds is entitled to take the above mentioned holidays only, and is not entitled to take state holidays, which are not offered by the County.

All regular part-time employees (900 hours or more per year) will also observe All County holidays, but will be compensated only for the number of hours they normally or regularly would have worked on that holiday.

## 9.12 LEAVE AND HOLIDAY RECORDS

In order to be given credit for leave, an employee must have leave time available as evidenced by attendance and leave reports in his or her file.

## 9.13 FUNERAL LEAVE

Funerals.  Up to three (3) consecutive calendar days absence with pay, chargeable against sick leave, shall be granted to a County employee following a death within the "immediate family," as defined below, provided  that it shall be the duty of the Department Head or the designated department representative to determine that application for such leaves is justified.  Furthermore, it shall be within the discretion of the Department Head or the designated department representative to limit such leave to any amount less than three (3) days.

"Immediate family," for the purpose of this section, shall include only the following relations of the County employee: father, mother, sister, brother, wife, husband, mother-in-law, father-in-law, son, daughter, son-in-law, daughter-in-law, grandchildren, or grandparents, (of either the employee or the employee's spouse).

## 9.14 OTHER TIME

Work time lost by County employees due to official closings of County Offices, for reasons such as bad weather or funeral services for county officials, will be paid and charged  to "Other Time."

## 9.12  FUNERAL LEAVE



**IMMEDIATE FAMILY**
FIGURE 1.

10.00 HEALTH AND SAFE

## 10.01 SAFETY POLICY

It is the policy of Cameron County to make every effort to provide healthful and safe working conditions for all of its employees.

## 10.02 EMPLOYEE RESPONSIBILITIES

Employees are responsible for conducting their work activities in a manner that is protective of their own health and safety, as well as that of other employees. An accident, no matter how minor, must be reported immediately to an employee's supervisor, who must complete a first report of injury or illness TWCC-1 Form and submit it to the Personnel/Worker's Comp Clerk no later than a week after the accident.

## 10.03 EMPLOYEE SUGGESTIONS

Employees shall report immediately to their supervisors any conditions that, in their judgment, threaten the health and safety of employees or visitors. Employees are encouraged to make suggestions to their supervisors of improvements that would make the County work place safer or more healthful.

## 10.04 ON-THE-JOB INJURIES

Insurance. The County provides Worker's Compensation insurance coverage, which provides for certain benefits (e.g., medical costs and lost wage benefits) if an employee is absent from work because of a bona fide on-the-job injury for more than seven (7) days. A bona fide on-the-job injury is defined as an injury arising out of or resulting from the performance of job duties by an officer or employee of the County, which takes place during an activity which normally would be compensated by the County.

Compensation. If a County employee sustains a bona fide on-the-job injury which renders him or her unfit and unable to perform the duties of the said employee's job, then the said employee will be compensated as follows:

1.  For up to seven days the County employee receives his or her regular pay for that period with time charged against

accrued sick leave or against future sick leave benefits to be earned.

2. Beginning on the eighth day and for any days thereafter that the said employee receives payments from the insurance carrier in accordance with the Texas Worker's Compensation Law, the said employee may use up to twenty (20) days earned sick leave or whatever vacation leave has been earned to provide compensation above the insurance payment (i.e. two-thirds of employee salary), but not to exceed an amount equal to the employee's regular salary, or he or she may request unpaid leave of absence. For every day that an employee elects to use compensable leave (sick leave, vacation leave and compensatory time), the Department Head will deduct the appropriate leave category by one-third day.

3. Since said employee is unable and unfit to perform the duties of his or her job, and thus, are not working for the County, the said employee, to the extent and for the time said employee is unfit and unable to work, will be compensated by those benefits required by law and provided by the County's insurance carrier. The said employee will not be paid any type of supplement in addition to such benefits, including payments which, when added to such benefits, would exceed the employee's regular salary. However, during the period of disability (i.e., the period that said employee is unfit for duty and unable to perform such duties), the employee shall receive all other employee benefits, including insurance coverage, to which he or she would be entitled had there been no on-the-job injury.

**Medical Attention.** A County employee who sustains a bona fide on-the-job injury may seek medical attention from the medical facility or professional of his or her choice. The County requires periodic statements of medical condition, which may include completion of the Work Capacity Form and a copy of a release to return to work (from the attending physician).

**Discharge.** No County employee shall be discharged or otherwise discriminated against because said employee has in good faith filed a claim under the Texas Worker's Compensation Law. However, this provision in no way precludes a discharge or disciplinary action for another legitimate reason.

Reporting. The Department Head (i.e., the relevant elected

official or appointed departmental supervisor) may require
that County employees on leave due to an on-the-job injury
periodically contact a supervisor to report on his or her
condition, the frequency of such reports to be determined by
the Department Head.  The failure to provide the required
medical status reports or to contact the supervisor on the
required schedule is grounds for revoking the leave and for
taking disciplinary action.

## 10.05 DRUG AND CHEMICAL DEPENDANCY POLICY

It is the intent of the County to eliminate the use, exchange
or presence of illegal drugs and to prevent the misuse of
legal drugs or chemicals, of any kind, in County offices,
facilities, and work sites.  The purpose of this policy is to
prevent harm to individuals, damage to County property, and
disruption of the work environment.

Illegal drugs are defined as any prescription drug obtained
other than through a valid prescription, as well as, the
commonly known illegal drugs such as, but not limited to
marijuana, cocaine, amphetamines and heroin.  Chemicals can be
defined but not limited to alcoholic beverages, non-prescribed
inhalants and any other chemical that disrupts the ability of the
employee to perform his/her work safely to avoid personal injury
or to others.

## Drug Free Workplace

1.  Employees are required to refrain from the unlawful use,
    manufacture, procurement, distribution, sale, dispensing
    or possession of illegal drugs.

2.  Employees are required to refrain from the use of alcohol
    while on duty and for a sufficient time prior to the
    performance of duty so that none of the effects of the
    use of alcohol remains during job performance.

3.  Employees are required to refrain from the misuse of
    legal drugs while on duty and for a sufficient time prior
    to the performance of duty so that none of the effects of
    the misuse of legal drugs remains during job performance.

4.  Employees are required to refrain from the misuse of chemical
    Substances and materials in the work place which may result in
physical or mental impairment.

Personnel Actions

1. Within thirty (30) days after receiving notice from an employee of a conviction of a drug or alcohol related criminal statute, supervisors and department heads shall either takes appropriate personnel
   action up to and including termination of that employee or require that employee to participate and satisfactorily complete a drug or alcohol abuse assistance or rehabilitation program approved by the County Health Department or the Texas Department of Health and Mental Retardation. Once an employee is enrolled in a substance abuse rehabilitation program, he or she is protected from termination because of substance abuse, as long as the employee remains substance free.

2. Supervisors and department heads shall initiate appropriate personnel action after review by the County Attorney's Office, up to and including termination for a first criminal offense of any employee who is found to use, procure, manufacture, distribute, sell, dispense or possess illegal drugs, or to use chemicals such as alcohol or when its effects remain during job performance.

   Disciplinary action is not required for an employee who voluntarily identifies himself/herself as a user of illegal drugs prior to being identified through other means and who obtains counseling and/or rehabilitation and thereafter refrains from using illegal drugs in accordance with the provisions of this policy.

3. Supervisors and department heads shall not allow any employee to remain on duty in a sensitive position such as law enforcement, medical, or safety related position, if that employee is found to use, manufacture, distribute, procure, sell, dispense or possess illegal drugs or is found to use alcohol when its effects will remain during job performance, unless that employee has successfully completed a rehabilitation or counseling program. An employee that successfully completes a rehabilitation or counseling program may be allowed to return to duty in a sensitive position, if it is determined that this action would not pose a danger to public health or safety.

4. Supervisors and department heads shall initiate personnel action to remove from employment any employee who is

known to use illegal drugs, or use alcohol when its
effects remain during job performance, and that employee:

* Refuses to obtain counseling or rehabilitation through
  a program approved by the County; or

* Does not refrain from using illegal drugs or using
  alcohol when its effects remain during job performance
  after having obtained counseling or rehabilitation.

5. All medical evaluations and treatments shall remain
   confidential unless otherwise specifically authorized in
   writing by the employee.

6. The determination that an employee is using illegal drugs
   or using alcohol when its effects will remain during job
   performance may be made on the basis of direct
   observation, or the results of a drug test. If drug test
   results are positive, the employee may rebut the results
   with other evidence that he/she has not used illegal
   drugs or that the employee was not using alcohol when its
   effects would remain during job performance.

## County Programs and Department Responsibilities

1. The Personnel/Safty Risk Department will develop and implement
   a drug-free awareness program to inform All County employees
   about:

   * the dangers of drug abuse in the workplace;

   * the County's drug and alcohol abuse policy;

   * drug and alcohol counseling and rehabilitation
     programs approved by the County or that may be
     available through the County's group health
     insurance; and

   * the range of personnel actions that may be
     imposed on employees for violations of the
     County's drug and alcohol abuse policy.

2. Any elected official or department heads whose department
   or office receives a grant or administers a contract
   financed directly by federal funds shall give a copy of
   the County's drug and alcohol abuse policy to each
   employee involved in the performance of that grant or
   contract.

3.  Any elected official or department heads whose department or office receives a grant or administers a contract financed directly by federal funds shall notify the appropriate federal government agency responsible for those funds of any employee who is convicted of a criminal statute relating to illegal drugs for a violation occurring in the workplace no later than ten (10) days after a conviction.

## Drug Testing

1.  Any employee who is subjected to disciplinary action because that employee is found to be in noncompliance with the County's drug and alcohol abuse policy may voluntarily request that an appropriate drug test be performed.  If that employee requests a drug test, the County shall pay for the test.  If alcohol use is suspected, the test may be a Breathalyzer, urinalysis, or blood test.  If illegal drug use is suspected, the test must be done by a certified laboratory and may be an immunoassay or a gas chromatograph-mass spectrometer test, both of which are based on a urine sample.

2.  The County shall comply with all constitutional federal and state laws that require employees to submit to drug tests, but will not extend mandatory drug testing of County employees beyond the requirements of these laws.

## Adoption and Dissemination of Policy

This policy was adopted by the Cameron County Commissioners Court on May 28, 1991.  The policy shall be incorporated in to Section 10.00 of the County's current Personnel Policies Manual, dealing with "Health and Safety," and shall be given and explained to all County employees.  Each County employee shall be required to execute a statement of receipt, acknowledgment and understanding of the policy.

11.00  PERFORMANCE EVALUATIONS

## 11.01  PURPOSE

The performance evaluation is designed to help the supervisor
and employee measure how well the employee is doing his or
her job; to provide a tool for management decisions regarding
assignment, promotion and retention of employees; and to
identify performance problems that need to be addressed.

## 11.02  PERFORMANCE EVALUATION REPORT

Each Regular County employee's work performance should be
evaluated at lease once a year prior to the anniversary date
of his or her employment or last promotion.  An employee may
be evaluated more than once a year at the discretion of the
department head.  The evaluation will be done on a form
provided  by the Personnel Office.  New employees shall be
evaluated at the completion of the six months of employment.


The employee's supervisor will complete the performance
evaluation reports and meets with the employee in a setting
that is private and free of distractions to explain and
discuss the evaluation.  The supervisor will discuss with the
employee any improvements in performance which appear
desirable or necessary.

Employees are expected to sign the performance evaluation
report to acknowledge their participation in the evaluation
process, and will receive  a copy of the completed form.

Employees who are dissatisfied with their evaluation should
put their objections in writing and submit copies of this
statement to their supervisor and their supervisor's
immediate superior, who will review the employee's complaint
and determine whether remedial action is warranted.


A copy of the performance evaluation report, including any
statements by the employee, will be placed in the employee's
personnel file.

## 12.00 DISCIPLINE

### 12.01 REASONS FOR DISCIPLINARY ACTION

Disciplinary action may be taken against an employee for various reasons, which include but are not limited to the following examples:

. Insubordination, i.e., willful disregard of a job assignment;

. Absence without leave, including failure to notify a supervisor of sick leave and repeated tardiness or early departure;

. Endangering the safety of other persons through negligent or willful acts, e.g., horseplay, reckless use of County vehicles or equipment, etc.;

. Unauthorized use or misuse of public funds or property, i.e., theft; misuse of vehicles, equipment, etc.;

. Conviction of a felony;

. Conviction of official misconduct or oppression;

. Falsification of documents or records;

. Unauthorized use of official information or unauthorized disclosure of confidential information;

. Unauthorized or abusive use of official authority;

. Violation of on the job safety rules;

. Violation of the The County's Sexual Harassment Policy;

. Violation of the County's Drug and Alcohol Abuse Policy;

. Incompetence or neglect of duty;

. Disruptive behavior which impairs the performance of others; e.g., fighting and sexual harassment, etc.;

. Violation of the requirements of these personnel policies;

. Other misconduct which may render an employee liable for
  disciplinary action.

12.02 PROGRESSIVE DISCIPLINE

To the greatest extent practical, the County uses the
following progressive discipline system. The County,
however, is not obligated to use all of the steps defined
below. Additionally, the County may begin the disciplinary
process at any level, up to and including discharge, based
upon the severity of the infraction.

. Verbal Warnings with records of each warning maintained by
  the supervisor and filed in the employee's personnel file;

. Written Reprimands to the employee which the supervisor
  must, in all cases, transmit through the department head
  to the employee's personnel file;

. Demotion;

. Suspension from duty without pay for up to thirty (30)
  days; or

. Separation by involuntary dismissal.

Except in the case of verbal warning, disciplinary action is
accomplished or preceded by written notice to the employee
involved. A notice to an employee would include a
description of the reason for the action, and except in the
case of dismissal states the likely consequences of further
unsatisfactory performance or conduct. Written notice of
disciplinary action is always included in the employee's
personnel file.

Disciplinary action does not automatically or permanently
disqualify an employee from consideration for future
promotion, pay increases, commendations, or other beneficial
personnel action.

12.03 SUSPENSION FOLLOWING INDICTMENT

If an employee is arrested for a felony, prior to indictment,
Or if some other conduct or behavior of an employee is brought
to the attention of a Department Head, the Department Head
may suspend the employee with pay pending investigation (external
or internal) of such alleged conduct or behavior, until indictment

or until other disciplinary action.    Provided that any suspension
with pay must be reviewed and approved by the Civil Division of
the Commissioner's Court and may not be extended beyond two weeks
without the consent of the Commissioner's Court.    Further provided
that the "other conduct or behavior of the employee" must be of a
nature that would, if true, impact such employee's ability to
perform their job.

A suspended employee is entitled to reinstatement to the
position held before such suspension, without loss of pay or
benefits for the period the employee did not work due to such
suspension if the indictment or information is dismissed, the
employee acquitted, or the conviction reversed on appeal.
However, in the case where an employee is a deputy or
appointee of an elected official no longer in office and the
succeeding official does not wish to hire or appoint such
deputy or appointee, the reimbursement of pay or benefits
will be only for that period in which said employee could
have worked for the original elected official.    The
suspension of an employee subsequently reinstated or
reimbursed under this subsection is not to be interpreted as
a disciplinary suspension.

## 13.00 SEPARATIONS

### 13.01 TYPES OF SEPERATION

All separations of employees are designed as one of the following types:

. Resignation;

. Retirement;

. Reduction in Force;

. Elimination of Position;

. Dismissal;

. Disability; or

. Death.

### 13.02 RESIGNATION

An employee who intends to resign must notify his or her department head in writing at least ten working days prior to the last day of work.

An employee who resigns without sufficient notice is subject to having a written reprimand placed in his or her file documenting this violation of personnel policies unless there is a valid reason approved by the Department Head for not being able to give sufficient notice.

### 13.03 RETIREMENT

Employees who retire must submit their written retirement notice to the Department Head and County Auditor in time for an application to retire to be received by the Office of the Texas County and District Retirement System at least thirty (30) days but not more than ninety (90) days prior to the date on which the retirement is to become effective.  The effective date specified in the application must be the last day of the calendar month and shall not be a date preceding the termination of the member's employment with the County.

There is no mandatory retirement age for employees of Cameron County, and employees are encouraged to remain in their

respective positions, subject to the requirements of pertinent policies for the performance of their respective duties.

## 13.04 REDUCTION IN FORCE

An employee may be separated for lack of work or funds.

In deciding who will be separated from their employment as a result of a reduction in force, the County will consider, but is not limited to, the following factors:

1.   the employee's length of service with the County,

2.   the performance record of each employee,

3.   a qualification of the employee for remaining positions.

## 13.05 ELIMINATION OF POSITION

An employee may be separated because of changes in duties or reorganization.  The relative necessity of each position  to the organization is considered  when  positions are considered for elimination.

## 13.06 DISMISSAL

A new employee may be dismissed at any time during the initial six (6) month or the extended probationary period when, in the judgment of the Department Head, the quality and performance of his or her work does not merit continuation as a County employee.

An employee who has completed his or her initial probationary period may be dismissed by the Department Head for various reasons, which include but are not limited to those listed in Section 12.01.  All employees remain subject to performance evaluations to be conducted at least once a year.

There is no tenure or permanent lifetime employment or appointment with Cameron County.

13.07 DISABILITY

If it is determined that an employee has a disability as defined by law, and that employee can no longer perform the duties of his or her job, the County will make a reasonable effort to accommodate such employee to the extent such an accommodation will not cause an undue hardship on the County. If reasonable accommodation is not possible, the employee may be dismissed or reassigned, as is allowed by state and federal law

13.08 DEATH

If a County employee dies, his or her estate receives all earned pay and any earned and payable benefits.

13.09 EXIT INTERVIEWS AND RECORDS

Employee Separation forms.  An Employee Separation Form must be filled out by the supervisor or Department Head for each employee who is separated, noting the reason for the separation.  The Department Head shall keep a copy of the form and submit the original to the Payroll Clerk and a copy to the Personnel Department for further processing.

Payroll Attendance Worksheet.  Information regarding employee separations must also be reported to the Payroll Clerk on the Payroll Attendance Worksheet and must reflect any vacation and/or comp-time pending.

Exit Interview Form.  Each supervisor separating an employee will fill out an employee exit interview form to be submitted to the Personnel Office.  Whenever possible, the Personnel Administrator will discuss the separation in an interview with the employee.

14.00 GRIEVANCES

14.01 POLICY

It is the policy of Cameron County, insofar as possible, too prevent the need for employee grievances and to deal promptly with those which occur.

14.02 GROUNDS FOR A GRIEVANCE

Any difference or disagreement between the County and any employee who has completed his or her initial evaluation period involving the interpretation, application, or enforcement of any of the provisions of this Handbook, except those involving involuntary dismissal, shall constitute a grievance and must be taken up by the employee in the manner set forth in the following sections. The grievance procedure provided in the following sections is not available to the employee who has been involuntarily dismissed from employment by the County or to the employee who has not completed his or her initial evaluation period.

14.03 INFORMAL GRIEVANCE

The first step in the grievance procedure is for the employee to resolve the grievance by an informal conference with his or her immediate supervisor within ten (10) working days after the events upon which the grievance is based. If informal conference with the supervisor does not result in a resolution of the problem(s) that is satisfactory to the employee, he or she may file a formal grievance.

14.04 FORMAL GRIEVANCES

Formal grievances should be in writing, signed by the employee, and presented to the employee's Department Head within ten working days after the informal conference is held. The employee should state what action he or she would like to see taken to resolve the grievance.

Within five (5) working days after being presented with a formal grievance, the Department Head shall elect to either:

1.  request a recommendation from the Advisory Grievance Committee appointed by the Commissioners Court, in accordance with the procedures set forth in Section 14.05; or

2.  make a determination of the grievance without requesting
    a recommendation from the Advisory Grievance Committee
    appointed by the Commissioners Court.

If the Department Head elects to make a determination of the
grievance without requesting a recommendation from the
Advisory Grievance Committee appointed by the Commissioners
Court, he shall:

1.  investigate and make a decision on the grievance within
    five (5) working days from the date of his initial
    election; and

2.  Communicate his decision in writing to the employee
    within two (2) working days after it is made.

The manner of investigating the grievance shall be left to
the discretion of the Department Head, but shall involve, at
a minimum, a review of the employee's personnel file and any
other documents relevant to the grievance, and a discussion
with the employee and a discussion with the employee's
immediate supervisor concerning the events upon which the
grievance is based.

In the case of elected Department Heads, the decision of the
Department Head is final.  In the case of Department Heads
appointed by the County Judge and/or the Commissioners Court,
appeals may be made to the Commissioners Court (in executive
session).  Department Heads appointed by a board may choose
to recommend a method of appeal to that board.

**14.05 ADVISORY GRIEVANCE COMMITTEE PROCEDURES**

If a Department head presented with a formal grievance elects
to request a recommendation from the Advisory Grievance
Committee appointed by the Commissioners Court, the Advisory
Grievance Committee shall convene a meeting within ten (10)
working days after the Department Head requests a
recommendation.  The purpose of the meeting shall be to
uncover sufficient facts to allow the Advisory Grievance
Committee to determine whether the actions upon which the
grievance is based are in violation of the County Personnel
Policies as set forth in this Manual.  It is not an
adversarial proceeding.

Within five (5) working days after the meeting is adjourned,

the Advisory Grievance Committee shall transmit a written

letter to the Department Head stating one of the following conclusions:

1.    "After completion of an investigation of this matter in accordance with the provisions of Section 14.05 of the Cameron County Personnel Policies Manual, it is the opinion of the Advisory Grievance Committee appointed by the Commissioners Court that the County Personnel Policies as set forth in the Cameron County Personnel Policies Manual have been followed.  It is therefore our recommendation that the formal grievance be denied"; or

2.    "After completion of an investigation of this matter in accordance with the provisions of Section 14.05 of the Cameron County Personnel Policies Manual, the Advisory Grievance Committee is not satisfied that the County Personnel Policies as set forth in the Cameron County Personnel Policies Manual has been followed.  It is therefore our recommendation that the action requested by the employee in the formal grievance be [granted] [modified as follows:  {recommended action to be taken}]."

After receipt of the recommendation from the Advisory Grievance Committee, the Department Head shall:

(1)    investigate and make a decision on the grievance within five (5) working days; and

(2)    communicate his decision to the employee in writing within the two-(2) working days after it is made.

The manner of investigating the grievance shall be left to the discretion of the Department Head, but shall involve, at a minimum, a review of the employee's personnel file and any other documents relevant to the grievance.

In the case of elected Department Heads, the decision of the Department Head is final.  In the case of Department Heads appointed by the County Judge and/or the Commissioners Court, Appeals may be made to the Commissioners Court (in executive session).  Department Heads appointed by a board may choose to recommend a method of appeal to that board.

15.00 PERSONNEL FILES

## 15.01 GENERAL

Personnel files are maintained by each Department Head or elected official. The record copy of all personnel information related to an employee shall be filed in the employee's personnel file.

Most information in an employee's personnel file is open to the public unless disclosure of specific items is prohibited or not required by law. New employees will be asked to sign a Disclosure of Home Address and Telephone Number Form, indicating whether or not they wish to allow public access to their home address and telephone number. No information from any record placed in an employee's file will be communicated to any person or organization except by a Department Head, the County Auditor, the Personnel Administrator, or by an employee authorized to do so by one of these persons.

An employee or his or her representative designated in writing, may examine the employee's personnel file upon request during normal working hours at the County offices. Exceptions to this policy may be made when the records are related to pending or reasonably expected litigation .

Employees are expected to inform their supervisors of any changes in or corrections to information recorded in their individual personnel file such as home address, telephone number, person to be notified in case of emergency, or other pertinent information.

## 15.02 PERSONNEL ACTION FORM

The Personnel Action Form is the official document for recording and transmitting to the personnel file each personnel action. This form is used to promote uniformity in matters affecting:

. Position Title and Classification (i.e., Demotion or Promotion),

. Annual Salary (i.e., Pay increase or decrease), and

. Other actions affecting the employee's status (i.e., Separation).

Each Personnel Action Form becomes a permanent part of the employee's personnel file, and a copy is given to the employee.

## 15.03 CONTENTS OF PERSONNEL FILES

An employee's personnel file contains; a copy of the employee's application for employment, a signed copy of the employee's acknowledgment of receiving the Personnel Policies Handbook, Insurance Handbook, and Retirement System Handbook, the class (job) description for the position he or she currently occupies, personnel action forms, performance evaluation records, records of any citations for excellence or awards for good performance, records of leave accrued and taken, and any other pertinent information having a bearing on the employee's status.

## 15.04 LEAVE RECORDS

Official records of annual leave and sick leave accrual and of leave the Department will keep usage for each employee Head.  Leave records are updated at the end of each month. Leave balances are shown on the official record to reflect any remaining Leave the employee is entitled.

## 16.00 COUNTY BUSINESS TRAVEL

### 16.01 Reimbursement

The Commissioner's Court will reimburse county employees traveling out of the county on county business, for such travel only upon submitting the appropriate travel expense forms and prior approval.

### 16.02 Travel Advances

Travel advances will be issued only if Commissioner's Court has approved travel before date of travel.

### 16.03 Available Funds

All travel expenditures requisitioned must be encumbered on official encumbrance form prior to actual travel to insure that actual funds are available.  If travel is for a seminar, conference, etc. a copy of the pamphlet or brochure must be attached.

### 16.04 Hotel Allowances

The maximum daily allowance for hotel stay is $100/nightinclusive of all applicable taxes. Exception to this rule must have prior approval by Commissioner's Court. Except in the following cities.

| City | Per Diem |
|------|----------|
| Washington D.C. | $200.00 |
| New York City | $200.00 |
| Mexico City | $200.00 |

The per diem is per person per night. If a room is shared, than accommodations costing more than $100.00 per night can fall within the policy guideline. For example:

| | |
|------|----------|
| Hotel Room/night | $125.00 |
| State Hotel Tax | $  9.00 |
| City Hotel Tax | $ 10.00 |
| Total | $144.00 |

Allowable for 2 Occupants @ $100.00 pre diem each is $200.00.

16.05 Association Seminars

Travel for an association's annual seminar and hotel rates have been negotiated and a block of rooms reserved; than, the negotiated room rate plus tax will be the allowed rate. A copy of the association seminar announcement will be required with request.

If no more blocked rooms are available due to late enrollment the normal per diem of $100.00 applies.

Exceptions
Overnight lodging will not be allowed for travel within four county areas, which includes Cameron, Willacy, Hidalgo and Starr Counties.

Seminars or conventions held at South Padre Island may be excluded from the four county policies. Officials with offices in Port Isabel or South Padre Island will not be reimbursed for overnight stay.

16.06 Expense Verification

Receipts for all expenses incurred while on travel for county business with the exception of meals. (hotel/motel, taxi/car rental, handbooks or resource material, etc.)

Expenses for daily travel (not overnight) will be reimbursed only total time exceeds six (6) hours. Receipts are required for all expenditures including meals. Meals must not exceed the allowable amount as per meal schedule.

Meal Expenses

Expenses for meals when travel time is less then six (6) will not be refunded.

The employee will be reimbursed per meal based on travel time from 7:00 A.M. to 7:00 P.M.  departure if before 7:00 A.M.. Evening meal if return at 7:00 P.M. or after.

|  |  |
|---|---|
| Morning Meal | $ 7.00 |
| Noon Meal | $ 8.00 |
| Evening Meal | $10.00 |

Transportation Expenses

The County will reimburse for actual expenses on travel by Air, Bus, Train or Personal Vehicle At the lowest possible cost to Cameron County.

Employees traveling outside the county for 500 or more miles round trip will be reimbursed at the rate not to exceed the cost of round trip airfare coach class. Amounts in excess of that cost must be submitted to the Commissioners Court for approval one-month in advance. Extradition of prisoners is exempt.

Authorized use of personal vehicle is differentiated by two classifications. Those that are awarded a car allowance for travel expenses incurred while performing job functions within Cameron County. Those who receive mileage reimbursement for travel on county business in or out of Cameron County as needed.

Mileage reimbursement Guide:

|  |  |
|---|---|
| In County Travel | $0.25 |
| Out of County | $0.20 |

(Employees receiving car allowance may receive mileage for travel outside Cameron County.)

On regular workday mileage is calculated from employees place of work. The employees required to travel on a non-working day will initiate travel mileage from their home.

It is recommended that Cameron County employees traveling to the same conference/seminar in county or personal vehicle share transportation. When more than one employee travel in the same personal vehicle only one may claim mileage reimbursement. They are allowed other travel reimbursements for eligible expenses.

## 16.07 Responsibility

It shall be the responsibility of the Official or Department Head to use out-of-county travel funds for official county business only. These funds are budgeted for the purpose of allowing Officials, Department Heads and their employees to attend various association meetings, training seminars, education seminars, and required law enforcement travel relating to prisoner and probationers.

Officials and Department Heads are responsible for the strict enforcement of these policies

## 17.00 EXEMPT POSITIONS

Except as otherwise provided, only elected County officials are exempt from these personnel policies.

Exhibit "B"

174 F.Supp.2d 493
144 Lab.Cas. P 59,322
(Cite as: 174 F.Supp.2d 493)

**H**

United States District Court,
N.D. Texas,
Dallas Division.

James T. HENRISE, Plaintiff,
v.
John D. HORVATH, et al., Defendants.

**No. Civ.A.3:97-CV-2472-L.**

April 30, 2001.

Police officer sued municipality, police chief and police officers under §§ 1983 and 1985, claiming that he was retaliated against in response to his support of fellow officer bringing suit against municipality. Defendants moved to dismiss. The District Court, Lindsay, J., held that: (1) close personal relationship with officer did not constitute type of association protected by First Amendment, precluding suit based on interference with relationship; (2) conspiracy claim was not stated; and (3) claim was not stated against municipality.

Motions granted.

West Headnotes

**[1] Civil Rights** ⊂═240(5)
78k240(5) Most Cited Cases

Only after a plaintiff demonstrates the existence and violation of a clearly established constitutional or statutory right is a defendant seeking qualified immunity from a civil rights suit required to show that he was performing a discretionary function and that a reasonable official would not have considered his actions to be unconstitutional at the time of the incident in question.

**[2] Constitutional Law** ⊂═91
92k91 Most Cited Cases

**[2] Municipal Corporations** ⊂═185(1)
268k185(1) Most Cited Cases

Close personal relationship between police officer and colleague was not an associational right protected by First Amendment, precluding § 1983 claim that police officers retaliated against officer in violation of First Amendment in effort to discourage officer from testifying on behalf of colleague in colleague's suit against municipality. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[3] Conspiracy** ⊂═18
91k18 Most Cited Cases

Police officer failed to state claim that other officers conspired to violate his civil rights, by working in concert to prevent him from testifying on behalf of colleague bringing civil rights action, when officer cited no facts in support of contention. 42 U.S.C.A. § 1985.

**[4] Civil Rights** ⊂═206(3)
78k206(3) Most Cited Cases

To support a § 1983 civil rights claim against a municipality, based upon the existence of an official custom or policy, the claimant must plead facts which show that (1) a policy or custom existed, (2) the governmental policy makers actually or constructively knew of its existence, (3) a constitutional violation occurred, and (4) the custom or policy served as the moving force behind the violation. 42 U.S.C.A. § 1983.

**[5] Civil Rights** ⊂═206(3)
78k206(3) Most Cited Cases

Police officer failed to state § 1983 claim that municipality violated his constitutional rights, as result of policy encouraging retaliation against him for his prospective support of fellow officer suing municipality, when officer did not provide any factual support for conclusion that policy existed, and in any event officer had failed to state violation of any underlying constitutional right. 42 U.S.C.A. § 1983.

*494 Douglas R. Larson, Law Office of Douglas R. Larson, Mesquite, TX, Russell Daniels, Logan & Lowry, Vinita, OK, for James T. Henrise.

Joe C. Tooley, Tooley & Voss, Dallas, TX, for John D. Horvath.

Joe C. Tooley, Tooley & Voss, Dallas, TX, Edwin P. Voss, Jr., Brown & Hofmeister, Dallas, TX, for Clarence V. Johns, Warren Box, Robin Flores.

James T. Jeffrey, Jr., Law Office of Jim Jeffrey, Arlington, TX, for City of Desoto.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

### MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are the following motions:

1. Motion for Summary Judgment of Defendants Johns, Box, Horvath, and Flores, filed November 5, 1999;

2. Plaintiff's Rule 56(f) Motion for Continuance, filed December 9, 1999;

3. City of DeSoto's Motion and Supporting Brief to Dismiss the Plaintiff's *495 Second Amended Complaint, filed May 30, 2000; and

4. Second Motion to Dismiss of Johns, Box, and Flores; First Motion to Dismiss of Horvath; and Alternative Motion to Strike, filed May 31, 2000.

The court, for the reasons stated herein, **grants** the Second Motion to Dismiss of Johns, Box, and Flores; **grants** the First Motion to Dismiss of Horvath; **denies** Defendants' Alternative Motion to Strike; **grants** the City of DeSoto's Motion to Dismiss the Plaintiff's Second Amended Complaint; **denies as moot** the Motion for Summary Judgment of Defendants Johns, Box, Horvath, and Flores; and **denies as moot** Plaintiff's Rule 56(f) Motion for Continuance.

### I. *Procedural and Factual Background*

Plaintiff James Henrise ("Plaintiff" or "Henrise") initiated this litigation against Defendants John Horvath, Clarence Johns, Warren Box, Robin Flores, and City of DeSoto (collectively "Defendants" unless otherwise indicated) on October 7, 1997, pursuant to 42 U.S.C. §§ 1983 and 1985. Henrise filed his First Amended Complaint on October 30, 1997. As a result of two court orders on April 21, 2000, Plaintiff filed on May 18, 2000, a Rule 7(a) Reply and his Second Amended Complaint ("Complaint"). [FN1] Plaintiff contends that as a result of the acts and omissions of all Defendants, he has been retaliated against in violation of the First and Fourteenth Amendments to the United States Constitution. [FN2] In response to Plaintiff's Second Amended Complaint, Defendants Johns, Box, and Flores filed a second motion to dismiss; Defendant Horvath filed a motion to dismiss; and Defendant City of DeSoto filed a second motion to dismiss. [FN3]

FN1. The individual Defendants correctly note that the court's orders on April 21, 2000, directed Plaintiff to amend his Complaint as to the City of DeSoto and file a Rule 7(a) reply with respect to the individual Defendants. In light of these orders, Defendants alternatively move to strike Plaintiff's Second Amended

Complaint because it was filed without leave. While Defendants are technically correct, the court finds that a plaintiff will often amend his pleadings in lieu of filing a Rule 7(a) reply, which the court finds acceptable. In this case, Plaintiff filed an abbreviated reply. The court sees no benefit to striking a document which also serves the purpose of a Rule 7(a) reply. Plaintiff has incorporated his Second Amended Complaint into his abbreviated Rule 7(a) reply. Accordingly, the motion to strike is denied, and the court's analysis is based on the allegations set forth in Plaintiff's Second Amended Complaint.

FN2. Plaintiff's First Amendment claim is one asserting the violation of the right to freedom of association. Henrise has not pleaded anywhere in the Complaint that he was retaliated against because he spoke out on matters of public concern. The clear and unequivocal allegations of the Complaint are that certain actions of Defendants violated his right to freedom of association. For this reason, the court has not analyzed Henrise's First Amendment claim as one pertaining to protected speech and considers no arguments advanced by the parties regarding such speech.

FN3. Henrise sues the City of DeSoto only under 42 U.S.C. § 1983, but sues the individual Defendants under §§ 1983 and 1985(2). *See* Compl. ¶¶ 39-41.

The court now sets forth the operative facts of Plaintiff's Complaint upon which it relies in ruling on Defendants' motions to dismiss. *See* Compl. at 2- 6. The facts are accepted as true for the purpose of ruling on the pending motions to dismiss. Arguments and conclusory allegations unsupported by specific factual assertions are not included in the recitation.

Plaintiff was hired as a police officer by the City of DeSoto on January 14, 1985. He was promoted to the rank of sergeant in the latter part of 1989. Thereafter, Henrise gained training and experience *496 and served for substantial periods of time in both the Criminal Investigations Division ("CID") as well as the Special Investigation Unit ("SIU"). Henrise received the "Top Cop" award by the DeSoto Citizens Police Academy Alumni.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Henrise holds a Master Peace Officer Certification from the Texas Commission on Law Enforcement Officer Standards and Education, and retains departmental seniority in the rank of sergeant. While working in SIU, Henrise was under the command of Lieutenant P. Paul Pothen ("Pothen"). SIU undertook investigations into public corruption, vice, narcotics, and organized crime.

In August 1994, Defendant Horvath was confirmed as Chief of Police of the City of DeSoto. Because of their work in SIU during the early part of 1995, Henrise and Pothen formed the good faith belief that Horvath was involved in serious misconduct which had criminal implications. This included, but was not limited to, the release of confidential police murder investigation files to a civilian investigator, the removal of and failure to return material physical evidence related to a murder investigation, and the acceptance of both public and private funds to finance a family vacation to Europe under alleged "police business." In addition, the SIU uncovered what appeared to it to be significant public corruption, including bribery, surrounding high ranking DeSoto public officials and their cohorts.

In April 1995, Horvath, who was Chief of Police of the City of DeSoto, had a private meeting with Henrise. During the meeting, Chief Horvath demanded that Henrise provide him any information that he (Henrise) had which was adverse to Pothen, and to observe Pothen and report back any matters which were negative against Pothen. Henrise refused Horvath's demand.

Henrise and Pothen made known their allegations regarding Horvath by directly notifying DeSoto City Manager Ron Holifield ("Holifield"), in detail, of the various acts of misconduct in which Police Chief Horvath had engaged. Holifield, as DeSoto's City Manager, failed to act upon the complaints made by Pothen and Henrise. In addition, at or around the same time period, City employee Linda Bertoni filed a 19-page sworn statement against Police Chief Horvath with the City Manager, City Mayor, and City Council members that detailed Horvath's misconduct. This notification to the City did not result in any investigative action, or any action whatsoever, being taken by the City into the actions of Horvath.

The end result of Pothen's and Henrise's complaints was that both officers were placed on administrative leave by Horvath. Both officers were charged with a complaint regarding a search conducted by SIU. On the advice of counsel, Plaintiff agreed to accept a one-day suspension to resolve the matter, and then return to DeSoto with the same rank and seniority. Plaintiff

maintains that he committed no error during the search at issue, and only accepted the suspension so he could return to police work. Pothen was terminated and pursued his appellate remedies under state civil service laws, and later sought other remedies in federal court. During this time period, Henrise maintained a strong association with Pothen, both as a fellow officer and close personal police friend. Police officers rely on each other not only for emotional and physical support on and off duty, but also routinely rely on each other in life-threatening situations.

After his termination, Pothen placed the City and the individual Defendants on notice that he would challenge his termination. The individual Defendants were *497 all aware that Henrise maintained a close personal relationship with Pothen and would testify favorably on Pothen's behalf, and that Henrise's testimony would be adverse to the City and Horvath.

Henrise returned to work on October 4, 1995, and reported to Defendant Box. Although Plaintiff's status was for regular duty, Box assigned Henrise to tasks such as enforcing handicap parking, being municipal court bailiff, filing citations, and moving boxes. Henrise was a highly trained investigator and had seniority in his position. Plaintiff describes the tasks that he performed as "menial."

Plaintiff contends that this assignment of tasks was the first in a series of retaliatory and harassing events against him. Henrise alleges that these acts were done in an effort to punish him for his association with Pothen, to intimidate him into not testifying on Pothen's behalf in a federal lawsuit, and to retaliate against him for continuing to associate with Pothen and providing truthful testimony on Pothen's behalf in a federal forum. The court finds it unnecessary to enumerate the other alleged retaliatory and harassing events, as they are not necessary for its analysis.

## II. *Appropriate Legal Standards*

### A. Motion to Dismiss—12(b)(6) Failure to State a Claim

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir.1997).* A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957);*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir.1995). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir.1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.; Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir.1999), *cert. denied*, 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid cause of action when it is viewed in the light most favorable to the plaintiff and with every doubt resolved in favor of the plaintiff. *Lowrey*, 117 F.3d at 247. A plaintiff, however, must plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir.1992).

**B. Qualified Immunity**

Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A defendant official must affirmatively plead the defense of qualified immunity. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Defendants Box, Johns, Flores, and Horvath have pleaded this defense.

In deciding a motion for summary judgment that raises the defense of qualified immunity, the court must *first* decide "whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established *498 at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999), citing *Siegert v. Gilley*, 500 U.S. 226, 232-33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *see also Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir.1999). The second prong of the test requires the court to make two separate inquiries: whether the right allegedly violated was clearly established at the time of the event giving rise to the plaintiff's claim, and if so, whether the conduct of the defendant was objectively unreasonable. *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir.1999). Although many cases continue to state that the determination of the qualified immunity issue requires the application of a bifurcated test, the analytical framework for resolving issues of qualified immunity necessarily requires, or may require, a *three-step* analysis. *See Kerr v. Lyford*, 171 F.3d at

339; *Evans v. Ball*, 168 F.3d at 860; *Hare v. City of Corinth*, 135 F.3d 320, 326 (5th Cir.1998); *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1305 (5th Cir.1995), *cert. denied*, 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

[1] Whether a defendant acted within the scope of his authority performing a discretionary function and whether a reasonable official in his position would have deemed his conduct unconstitutional are not to be considered by the court unless each part of the three-step inquiry has been answered affirmatively on behalf of the plaintiff. *Kerr v. Lyford*, 171 F.3d at 339. In other words, only after a plaintiff demonstrates the existence and violation of a clearly established constitutional or statutory right is the defendant required to show that he was performing a discretionary function and that a reasonable official would not have considered his actions to be unconstitutional at the time of the incident in question. *Id.* at 338.

[2] A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that his conduct violated the right in issue, not merely that the conduct was otherwise improper. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir.1994). Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that his actions [what he is doing] are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir.1998); and *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir.1997).

In *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. 3034, the Supreme Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have believed* that his conduct was lawful in light of clearly established law and the information possessed by him.

If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir.1995) (*citing Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir.1994)). Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster v. City of Lake Jackson*, 28 F.3d at 429. To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

action in question has previously been held unlawful." *499 _Anderson v. Creighton,_ 483 U.S. at 640, 107 S.Ct. 3034. For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like- situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." _Pierce v. Smith,_ 117 F.3d at 882; _Stefanoff v. Hays County,_ 154 F.3d at 525.

### III. *Analysis*

**A. Motion to Dismiss of Defendants Box, Johns, Flores, and Horvath**

**1. Failure to State a Claim upon which Relief can be Granted**

The first inquiry by the court in any action filed pursuant to 42 U.S.C. § 1983 is whether a plaintiff has suffered the deprivation of a right "secured by the Constitution and laws [of the United States]." _Baker v. McCollan,_ 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In this action, Henrise contends that Defendants retaliated against him because of his close association with Pothen and therefore violated his First Amendment right of freedom of association. Defendants Box, Johns, Flores, and Horvath contend that Henrise has not alleged a constitutionally protected right and therefore has failed to state a claim upon which relief can be granted with respect to his freedom of association claim. [FN4]

> FN4. To avoid duplicating arguments and unduly burdening the record, Plaintiff and the individual Defendants have referred the court to and incorporated arguments advanced in other pleadings. The court, in performing its analysis and reaching its conclusions, has considered all such referenced and incorporated pleadings by these parties.

With respect to the right of free association as secured by the First Amendment, the United States Supreme Court, in recognizing such a right in two specific contexts, stated:

> Our decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the

individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

> _Roberts v. United States Jaycees,_ 468 U.S. 609, 617-18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The first category is epitomized by "highly personal relationships" such as marriage and family, and the personal affiliations that necessarily "attend the creation and sustenance of these highly personal relationships." _Id._ at 618-20, 104 S.Ct. 3244; _Hobbs v. Hawkins,_ 968 F.2d 471, 482 (5th Cir.1992). The second category recognizes "associational rights derivative of the First Amendment rights of speech, assembly, petition for redress of grievances, and exercise of religion." _Hobbs v. Hawkins,_ 968 F.2d at 482.

The court has closely examined Plaintiff's Complaint, and Henrise in describing his relationship with Pothen speaks exclusively in terms of "a strong association *500 with Pothen, both as a fellow officer and close personal police friend"; "[p]olice officers who work together in close contact [and] enjoy intimate human bonds and personal relationships"; his "close personal relationship with Pothen"; his "close personal association with Pothen ...."; and his "close personal friendship and association with Pothen." Compl. ¶¶ 16-18, 23, 34. Nowhere in Plaintiff's Complaint does he allege that he joined with or associated himself with Pothen for the express purpose of speaking out on mismanagement, corruption or illegal activity that may have been occurring in the DeSoto Police Department. Moreover, Plaintiff does allege that he was ordered not to speak out publicly on these matters or complain to appropriate officials. Plaintiff's claim is based not on his desire to exercise any right secured by the First Amendment but on his personal friendship with Pothen--nothing more. Henrise's personal affinity with Pothen bears no relationship to the expression of beliefs protected by the First Amendment, and to give such personal affinity constitutional protection would be wholly repugnant to the teachings of _Roberts._ Since Plaintiff's claim is not derivative of the rights of free speech, assembly, petition for redress of grievances or exercise of religion, it receives no constitutional protection from the second category of the right to freedom of association. The question now is whether Plaintiff's claim falls within the first category recognized by the Supreme Court.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Henrise has diligently and repeatedly sought to characterize his claim in such a manner that one might initially believe that it falls in the first category recognized by the Supreme Court. The court, however, is unaware of any authority which has recognized a close friendship, without more, as the highly personal or intimate human relationship that is protected by the United States Constitution. [FN5] Indeed, at least one court in this circuit has held that "[f]riendships ... generally do not form the type of 'intimate associations' which are protected by the Constitution." *Reno v. Metropolitan Transit Auth.,* 977 F.Supp. 812, 825 (S.D.Tex.1997)(citing *Roberts v. United States Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). The court sees no basis to hold that the relationship between Pothen and Henrise should be accorded constitutional protection under the first category of freedom of association. Doing so would be wholly inconsistent with the precedent established in *Roberts.*

FN5. Henrise cites *Anderson v. Pasadena Indep. Sch. Dist.,* 184 F.3d 439 (5th Cir.1999), as support for his claim of freedom of association. Reliance on this case does not carry the day for Henrise and is of no assistance to him. In *Anderson,* the court makes only two references to a claim for freedom of association, *Id.* at 441, 444; however, one cannot determine the nature of the facts pled by Anderson. The Fifth Circuit concluded that Anderson had pleaded facts to state such a claim. In this case, however, Henrise has not pleaded facts sufficient to state a claim under either category of freedom of association.

For the reason stated, Henrise has not alleged the violation of a constitutionally protected right. His claim does not fall within either of the categories of freedom of association recognized by the Supreme Court. Since Henrise's claim as pleaded is not one recognized by the United States Constitution, he cannot prove any set of facts in support of his claim that would entitle him to relief. Accordingly, he has failed to state a claim upon which relief can be granted, and Defendants Box, Flores, Horvath, and Johns are entitled to dismissal of this claim.

The court has concluded that the facts alleged in the Complaint are insufficient to support a § 1983 claim by Henrise. Under some circumstances, the court will allow *501 a plaintiff to replead a deficient complaint. In this case, however, allegations offered by Henrise

indicate that he has already come forward with his best case. *See Jacquez v. Procunier,* 801 F.2d 789, 792-93 (5th Cir.1986)("At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit."); *Morrison v. City of Baton Rouge,* 761 F.2d 242, 246 (5th Cir.1985)( "We can assume, therefore, that the specific allegations of the amended complaint constitute the plaintiffs' best case...."). Henrise has amended his Complaint twice, and the court assumes that after three bites at the apple, he has pleaded his best case. Indeed, Henrise contends that the allegations in his Complaint are not only sufficient to state causes of action but also sufficient to engage the defense of qualified immunity asserted by the individual Defendants. *See* Plaintiff's Rule 7(a) Reply at 3. The court therefore concludes that further attempts to amend the complaint would be futile.

**2. Qualified Immunity of Defendants Johns, Box, Flores and Horvath**

The court has concluded that no constitutional violation has been alleged or exists insofar as Plaintiff's freedom of association claim. Based on the standard for qualified immunity as earlier set forth by the court, and the facts pleaded by Plaintiff, he has failed to allege the violation of an actual constitutional right at all. The court finds that Henrise failed to allege the violation of any constitutionally protected interest regarding his freedom of association claim, much less the violation of a *clearly* established constitutional right. Alternatively, the court holds that Defendants Box, Johns, Flores, and Horvath are entitled to qualified immunity with respect to Plaintiff's freedom of association claim. Even if one were to say that such a constitutional right has been alleged, it is beyond cavil that such right, if it exists as pleaded by Plaintiff, was not clearly established in 1995 and 1996, the times of the allegedly unconstitutional conduct by these Defendants. Dismissal of this claim is therefore appropriate on these grounds.

**3. Plaintiff's Claim Under 42 U.S.C. § 1985(a)**

[3] Henrise contends that Defendants conspired to prevent or intimidate him from testifying on behalf of Pothen in an action Pothen had pending in the Northern District of Texas. That action has since been resolved by the parties. The individual Defendants contend that the allegations of a conspiracy against them are conclusory. The court agrees.

A person who seeks to assert claims under 42 U.S.C. § 1985 must plead operative facts upon which his claim is based. *Holdiness v. Stroud,* 808 F.2d 417, 424 (5th

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Cir.1987). Conclusory and bald allegations are simply inadequate. *Id.* The court is aware that Plaintiff contends that Defendants engaged in a conspiracy to prevent or intimidate him from providing testimony favorable to Pothen and adverse to the City of DeSoto; however, the court does not understand the basis of this conclusory allegation because Henrise has not pleaded specific facts supporting a conspiracy. He has not stated what each individual Defendant did to promote or further the alleged conspiracy. As the essence of a conspiracy is an agreement or meeting of the minds of the participants, no facts are alleged that an agreement existed or which state the nature of each individual Defendant's acts. A hodgepodge of unrelated acts does not a conspiracy make, which is all Plaintiff sets forth. Other than Plaintiff's conclusions, there are no specific *502 facts which would indicate that Defendants conspired to prevent or intimidate Henrise from testifying on behalf of Pothen. Plaintiff does not even suggest that he was encouraged or told not to testify on Pothen's behalf by any of the individual Defendants. No facts are set forth as to how the goals of the conspiracy were to be accomplished or which acts were done in furtherance of the conspiracy. The conclusory allegations set forth in Plaintiff's Complaint are simply too slender of a reed to support a claim under § 1985(2). Henrise has not stated a claim upon which relief can be granted. Alternatively, he has simply failed to allege facts with the requisite specificity that would establish the existence of a *clearly* established statutory right under § 1985(2). Accordingly, Defendants Box, Johns, Flores, and Horvath are entitled to dismissal of this claim.

**B. Defendant City of DeSoto's Motion to Dismiss Plaintiff's Second Amended Complaint**

**1. Pleading Requirements for Municipal Liability under 42 U.S.C. § 1983**

[4] The City of DeSoto contends that Henrise has not adequately pleaded the existence of a policy or custom under Fifth Circuit precedent. Plaintiff contends that he has met the requirements of Fed.R.Civ.P. 8(a) and that his Complaint adequately states a claim for municipal liability. The court disagrees.

To resolve the issue presented by this motion, the court first cites the relevant authority under which a local government can be held liable pursuant to 42 U.S.C. § 1983. A governmental entity can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382,

137 L.Ed.2d 626 (1997); *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A governmental entity cannot be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id. See also Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979).

In light of Rule 8 and *Leatherman v. Tarrant County Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), Plaintiff states that DeSoto is entitled only to "a short and plain statement" of his claim. The "short and plain statement" must contain facts "that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Requiring a plaintiff to identify the specific policy or custom and allege that the policy or custom adopted by the municipality or policymaking official was the "moving force" behind the constitutional violation is in no way inconsistent with notice pleading or the mandate of *Leatherman.* Such requirement actually complements Rule 8 in that it puts a defendant on notice of the grounds on which a plaintiff's claim rests. In other words, the allegations of a complaint must not be conclusory; otherwise, a defendant is not placed on notice of the grounds for the claim. Conclusory allegations cannot survive a motion to dismiss. *See Guidry,* 954 F.2d at 281.

The court believes that language from two Fifth Circuit cases decided after *Leatherman* are illustrative and controlling: *Spiller v. City of Texas City, Police Dept.,* 130 F.3d 162 (5th Cir.1997), and *503Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521 (5th Cir.1996). In *Spiller,* the court stated:

> In order to hold a municipality or a local government unit liable under Section 1983 for the misconduct of one of its employees, a plaintiff must initially allege that an official policy or custom 'was a cause in fact of the deprivation of rights inflicted.' *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994). To satisfy the cause in fact requirement, a plaintiff must allege that 'the custom or policy served as the moving force behind the [constitutional] violation' at issue, *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 533 (5th Cir.1996), or that her injuries resulted from the execution of the official policy or custom, *Fraire v. Arlington,* 957 F.2d 1268, 1277 (5th Cir.1992). The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.

*Spiller,* 130 F.3d at 167. Embodying this same principle and requirement with respect to pleading a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

cause of action regarding municipal policy or custom, but stated somewhat differently, the court in *Meadowbriar* stated:

> To support a claim based upon the existence of an official custom or policy, the Plaintiff must plead facts which show that: 1) a policy or custom existed; 2) the governmental policy makers actually or constructively knew of its existence;    3) a constitutional violation occurred;  and 4) the custom or policy served as the moving force behind the violation.

*Meadowbriar,* 81 F.3d at 532-33 (citation omitted).

[5] The court has reviewed Plaintiff's Complaint in detail and finds that little, if anything, of substance has been added to it that is different from Plaintiff's First Amended Complaint. The Complaint is still lacking in that it does not contain basic and fundamental allegations to put DeSoto on notice as to the bases for its claims regarding municipal policy or custom. The new allegations are conclusory.

Plaintiff's Complaint does not meet the basic requirements for pleading municipal liability under Section 1983 as set forth in *Spiller* and *Meadowbriar.* Plaintiff refers the court to Fed.R.Civ.P. 84 and the Appendix of Forms, which he contends are examples of "how short and plain a statement" can be to satisfy the pleading requirements of Rule 8(a). The Fifth Circuit was aware of this provision of Rule 8(a) when *Spiller* and *Meadowbriar* were issued, and Plaintiff's pleadings comply with neither case. The court concludes that the allegations in Plaintiff's Complaint are conclusory, including the reference to Defendant Horvath as a policymaker, and as such fail to state a claim upon which relief can be granted. [FN6]

> FN6. In responding to the adequacy of the policy allegations of the Complaint, Henrise states that they are made without the "benefit of even rudimentary discovery." Pl.'s Resp. to Def. City of DeSoto's Motion to Dismiss at 5. Plaintiff strongly intimates that he could plead more specifically in this regard if he were allowed some basic discovery. The court finds this argument unavailing. Litigants engage in prefiling discovery and certainly ample means existed for Plaintiff, prior to the filing of his Complaint, to obtain information regarding the official and *de facto* structure and set up of the City of DeSoto's municipal government.

2. No Underlying Constitutional Violation

The court has held that Plaintiff has failed to state a claim upon which relief can be granted with respect to the individual *504 Defendants. Since Henrise has failed to state a constitutional claim upon which relief can be granted, he has suffered no constitutional injury. Accordingly, even if Plaintiff were to adequately set forth an unconstitutional policy, his claim fails as a matter of law because the court has found that there is no underlying constitutional violation. When there is no underlying constitutional violation, the policy becomes irrelevant and is "quite beside the point." *Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986);  *see also Saenz v. Heldenfels Bros., Inc.,* 183 F.3d 389, 392-3 (5th Cir.1999). If a person suffers no constitutional injury at the hands of the municipal officers, the alleged unconstitutional policy could not have been the cause of the harm to that person. For this additional reason, the City of DeSoto is entitled to dismissal of Plaintiff's First Amendment claim.

**IV. *Miscellaneous Matters***

Before the court is the Motion for Summary Judgment of Defendants Johns, Box, Henrise, and Flores, filed November 5, 1999. As the court has disposed of all claims against the individual Defendants by granting the Second Motion to Dismiss of Defendants John, Box, and Flores, and the First Motion to Dismiss of Defendant Horvath, it need not rule on Defendants' summary judgment motion, and it is hereby **denied as moot.**

Also before the court is Plaintiff's Rule 56(f) Motion for Continuance, filed December 9, 1999. Plaintiff sought an extension and requested discovery to fully oppose Defendants' summary judgment motion. Since the court denied as moot the summary judgment motion, the motion for continuance is also moot, and is hereby **denied.**

Finally, there is the matter of the counterclaim of Defendants Box, Johns, and Flores, filed October 26, 1998. These Defendants contend that Plaintiff's Complaint is "frivolous, groundless, and brought solely for purposes of harassment." Defendants seek attorneys' fees and all costs incurred in defense of this action. The court has reviewed the pleadings in this action and determines that this action is not frivolous, groundless, totally without merit, or brought solely for purposes of harassment. The court denies the counterclaim for attorneys' fees, but will allow costs pursuant to Fed.R.Civ.P. 54(d)(1).

**V. *Conclusion***

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

The court, for the reasons stated herein, **grants** the Second Motion to Dismiss of Johns, Box, and Flores; **grants** the First Motion to Dismiss of Horvath; **denies** Defendants' Alternative Motion to Strike; **grants** the City of DeSoto's Motion to Dismiss the Plaintiff's Second Amended Complaint; **denies as moot** the Motion for Summary Judgment of Defendants Johns, Box, Horvath, and Flores; and **denies as moot** Plaintiff's Rule 56(f) Motion for Continuance. This action is hereby **dismissed with prejudice** against Defendants City of DeSoto, Box, Johns, Flores, and Horvath. Judgment will be issued by separate document pursuant to Fed.R.Civ.P. 58. All allowable costs will be taxed against Plaintiff Henrise.

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works