

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
ENTERED

APR 0 1 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk _____

| | | |
|---|---|---|
| VICENTA CANTU, ET AL. | § | |
| **Plaintiffs** | § | |
| | § | |
| v. | § | **C.A. No. B-03-96** |
| | § | |
| CAMERON COUNTY AND TONY | § | |
| YZAGUIRE, Tax Assessor-Collector | § | |
| of Cameron County and Director, | § | |
| Cameron County Automobile Crimes | § | |
| Enforcement Task Force, in his | § | |
| individual capacity | § | |
| **Defendants.** | § | |

## ORDER

BE IT REMEMBERED that on March 31, 2004, the Court **Granted in part and Denied in part** Defendant Cameron County's Motions to Dismiss the claims of Plaintiffs Alvarado, Garcia, Cantu Munoz, and Weaver [Dkt. Nos. 13 & 14]; and **Granted in part and Denied in part** Defendant Yzaguirre's Motions to Dismiss the claims of Plaintiffs Alvarado, Garcia, Cantu, Munoz, and Weaver [Dkt. Nos. 15 & 16].

## I. Introduction[1]

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, alleging Defendants

---

[1]Defendants request the Court to strike Plaintiffs Alvarado and Garcia's Amended Complaint because they failed to seek leave from the Court before amending. Defendants state that although no responsive pleading has been filed, Federal Rule of Civil Procedure 15(a) does not apply because the amended complaint adds new plaintiffs with different causes of action. Defendants cite an inapplicable case, Summit Office Park v. U.S. Steel Corp., for the proposition that Plaintiffs had to seek leave before adding Plaintiffs with new causes of action. Summit did not stand for this proposition. Instead, Summit held that when the "original plaintiff [is] left with no cause of action upon which it could recover as the result of an intervening Supreme Court decision . . . [t]here was no way in which the plaintiff could properly amend the complaint to give it a cause of action. Plaintiff had no identity of interest with either the new proposed plaintiffs, or the new class named in the complaint, or their cause of action. It is clear that the new cause of action which the new proposed amended complaint attempted to insert could not benefit the original plaintiff." 639 F.2d 1278, 1282 (5th Cir. 1981). Furthermore, the Fifth Circuit acknowledged in Summit that the circumstances were unique. Rule 15(a) applies to Plaintiffs' amended complaint, and as no responsive pleading had been filed, they did not need to seek leave before amending their complaint.

acting under color of state law violated their First Amendment right to freedom of speech and right to freedom of association under the United States Constitution. Plaintiffs allege that while they were employees in the Cameron County Tax Assessor-Collector's Office, they each spoke on matters of public concern, for which they suffered adverse employment actions including termination, demotion, and transfer. More specifically, they allege Defendant Yzaguirre violated Texas laws regarding the processing of vehicle registration papers, and allowed fraudulent documents to be accepted and approved by the Tax Assessor-Collector's office.  Plaintiffs allege Yzaguirre illegally processed and approved these documents as paid "favors" to his friends and business associates.  See Plaintiffs' First Amended Complaint, § I, pp. 1-2 [Dkt. No. 8].  Pending before this Court are Defendants' motions to dismiss in relation to each named Plaintiff.

## II.  Rule 12(b)(6) Standard

A motion to dismiss for failure to state a claim is "viewed with disfavor and is rarely granted." Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 365 (5th Cir. 2000); Lowrey v. Texas A & M University System, 117 F.3d 242, 247(5th Cir. 1997), quoting Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir. 1982).  Fifth Circuit law dictates that a district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.  See Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996).  See also Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).  A complaint will not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  See also Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir. 1986).  The Fifth Circuit has held, however, that dismissal is appropriate "if the complaint lacks an allegation regarding a required element necessary to obtain relief." Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted).

2

### III. Speech Retaliation Claims

Plaintiffs contend they suffered various adverse employment actions as a result of their exercise of free speech and free association. Speech and expressive conduct relating to personal matters and not matters of public concern are not protected by the First Amendment. See Connick v. Meyers, 461 U.S. 138, 146 (1983). There are four elements the Plaintiffs, as public employees, must establish to prevail on a First Amendment retaliation claim: (1) they must suffer an adverse employment action; (2) they must establish that the speech involved a matter of public concern; (3) they must establish that the speaker's interest in commenting on matters of public concern outweigh any interest the employer has in promoting efficiency; and (4) they must demonstrate the speech motivated or precipitated the employer's adverse action. See Teague v. City of Flower Mound, Texas, 179 F.3d 377, 380 (5th Cir. 1999); Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999). Whether the speech involved a matter of public concern and whether the employee's interest as a citizen in commenting on the matters of public concern outweighed the interest of the state as an employer are legal questions determined by the Court. See Connick, 461 U.S. at 147-48, n.7; Teague, 179 F.3d at 380. Factual disputes concerning whether Plaintiffs' protected speed was a motivating factor in the adverse employment decision is left to the jury to resolve. Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir. 2001) (citing Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996)).

### IV. Matters of Public Concern

Matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. Speech that addresses mainly a personal employment dispute and is a matter of general concern is not considered speech on a matter of public concern. See, e.g., Connick, 461 U.S. at 148 n.8; Terrell v. Univ. of Tex. Sys. Police, 792 F.2d 1360, 1362 (5th Cir. 1986). The Fifth Circuit has used two tests, sometimes together, to analyze whether speech is properly categorized as relating to a matter of public concern. See Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 366 (5th Cir. 2000). Both tests originate from Connick v. Meyers. The first test is the "content-form-context

3

test: '[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole court record.'" Kennedy, 224 F.3d at 366 (quoting Connick, 461 U.S. at 147-48); see also Tompkins v. Vickers, 26 F.3d 603, 606 (5th Cir. 1994)). The second test is called the "citizen-employee test: 'when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters *only* of personal interest,'" the speech is not considered to involve matters of public concern. Id. (quoting Connick, 461 U.S. at 147); see also Schultea v. Wood, 27 F.3d 1112, 1120 (5th Cir. 1994), superceded on other grounds by, 47 F.3d 1427 (5th Cir. 1995)). "In cases involving mixed speech, [courts] are bound to consider the Connick factors of content, context, and form, and determine whether the speech is public or private based on these factors." Teague, 179 F.3d at 382. Thus, the Courts must "decide whether the speech at issue . . . was made *primarily* in the plaintiff's role as citizen or primarily in his role as employee." Terrell, 792 F.2d at 1362. In this test, the role of context and form are elevated over content. "[The] focus [is] on the hat worn by the employee when speaking rather than upon the 'importance' of the issue." Gillum v. City of Kerrville, 3 F.3d 117, 121 (5th Cir. 1993).

Plaintiffs cite a number of cases in which the Fifth Circuit has determined the reporting of official misconduct was protected speech under the First Amendment because it involved matters of public concern. "There is perhaps no subset of matters of public concern more important than bringing official misconduct to light." Davis v. Ector County, Texas, 40 F.3d 777, 782 (5th Cir. 1994). Additionally, the Fifth Circuit has held, "the disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." Brawner v. City of Richardson, Tex., 855 F.2d 187, 192 (5th Cir. 1988). In Davis, an investigator for a drug task force sent a letter to the County Commissioner's Court in which he detailed his wife's allegations of sexual harassment and alerted the Court to a potential cover-up. See 40 F.3d at 780-81. The Fifth Circuit determined the "letter squarely [fell] within Brawner's ambit: it address[ed] the misbehavior of public officials (the sexual harassment of public employees) and

4

disclos[ed] the possibility of an official coverup." Id. at 782. The content of Davis's letter certainly addressed a matter of public concern; and Davis wrote the letter in his capacity as a citizen and not as a public employee, thus satisfying the content, context, and form test. In Brawner, the Fifth Circuit also determined the speech involved a matter of public concern when a patrol officer informed the President of the Combined Law Enforcement Agency of Texas ("CLEAT") of allegations of police misconduct and CLEAT's attorney wrote a letter to the City Manager on behalf of Brawner, which contained allegations of possible police misconduct. Brawner, 855 F.2d at 191.

"The fact that the Plaintiffs cho[o]se to file internal grievances rather than publicize their complaints is not dispositive." Benningfield v. City of Houston, 157 F.3d 369, 375 (5th Cir. 1998) (holding police misconduct was matter of public concern where plaintiffs filed complaints and followed internal grievance procedures). Similarly, in an earlier pronouncement, the Court found the speech involved a matter of public concern where a sergeant with a university health center's police force filed a written report detailing incidents of sexual misconduct. Wilson v. UT Health Center, 973 F.2d 1263 (5th Cir. 1992); see also Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 222 (5th Cir. 1999) (holding speech involved a matter of public concern because the teachers "spoke . . . as elected representatives of the faculty . . . in compliance with their duties" when they served on a committee formed to create and implement an improvement plan for the high school); Thompson v. City of Starkville, Mississippi, 901 F.2d 456 (5th Cir. 1990) (holding police officer who filed written grievance concerning, among other issues, unethical conduct of police officers who had received promotions spoke on matters of public concern).

Conversely, there are several instances where the Fifth Circuit determined the speech was not a matter of public concern. For example, in Terrell v. University of Tex. Sys. Police, the Court determined that a personal notebook diary was not speech on a matter of public concern because Terrell made no effort to communicate it to the public. 792 F.2d 1360, 1363 (5th Cir. 1986). In Gillum v. City of Kerrville, the Court focused "on the hat worn by the employee when speaking rather than the 'importance' of the issue [to] reflect[ ] the reality that at some level of generality almost all speech of state

employees is of public concern[.]" 3 F.3d 117, 121 (5th Cir. 1993). The Court determined
that whether the police chief had smoked dope with a woman who had a criminal record
was of public concern. Id. But, Gillum's speech was not directed at ferreting out the
police chief's misconduct. Rather, Gillum was responding to the fact that the internal
affairs investigation would proceed without further participation by him. Only then did
Gillum declare that he would not compromise his badge, and he quit. Id. The Court did
not explicitly conduct a content-context-form test, but instead determined that although
corruption was certainly a matter of public concern, Gillum had spoken "as an employee
embroiled in a personal employment dispute,"–that is, whether he would personally
have a continued role in the investigation. Id. Finally, in Teague v. City of Flower
Mound, Texas, the Fifth Circuit held two police officers had not demonstrated their
speech was on a matter of public concern when they had filed a grievance against the
chief of police because their focus was primarily on clearing their own names and not
on attacking internal misconduct. 179 F.3d 377,382 (5th Cir. 1999).

　　　　The "existence of an element of personal interest on the part of an employee in
the speech does not prevent finding that the speech as a whole raises issues of public
concern." Kennedy, 224 F.3d at 366. Furthermore, "[t]he private nature of the
statement does not . . . vitiate the status of the statement as addressing a matter of
public concern." Thompson, 901 F.2d at 467 (quotations omitted). "A holding to the
contrary would mean that loyal employees seeking to rectify problems would lose
constitutional protection for attempting to correct problems inhouse." Id.

　　　　The Fifth Circuit recently canvassed a large number of mixed speech cases and
determined:

> First, the content of the speech may relate to the public concern if it does not
> involve solely personal matters or strictly a discussion of management policies
> that is only interesting to the public by virtue of the manager's status as an arm
> of the government. . . If releasing the speech to the public would inform the
> populace of more than the fact of an employee's employment grievance, the
> content of the speech may be public in nature . . . Second, speech need not be
> made to the public, . . . but it may relate to the public concern if it is made
> against the backdrop of public debate . . . And third, the speech cannot be made
> in furtherance of a personal employer-employee dispute if it is to relate to the
> public concern.

Kennedy, 224 F.3d at 372. Finally, in order for speech to be considered a matter of public concern, the speech must be identified with a degree of precision, explaining "when [the] statement or statements were made, to whom they were made, whether they were oral or written, and the content of those statements." Foley v. University of Houston, 355 F.3d 333, 342 (5th Cir. 2003).

### A. Is Plaintiffs' Speech Protected as a Matter of Public Concern?

#### a. Cantu's Speech

Plaintiff Vicenta Cantu ("Cantu") served as the Titles Registration Examiner for the Cameron County Automobile Crimes Enforcement Task Force, which is a subdivision of the Office of the Tax Assessor-Collector of Cameron County ("Tax Assessor's Office"). Cantu ensured that vehicle registration paperwork passing through and processed in the Tax Assessor's Office complied with the law, including the Texas Transportation Code. See Pls' Cmplt. at ¶¶ 21-22.

Cantu alleges she rejected vehicle registrations that did not meet various legal requirements, which included fraudulent registration paperwork. She states that on several occasions "Defendant Yzaguirre 'overrode' her rejections and, despite the fact that the vehicle registration paperwork was clearly fraudulent, ordered Plaintiff Cantu to process the paperwork." Id. ¶ 23. Cantu articulated to Yzaguirre several times that she believed he was violating the law by processing the fraudulent paperwork. Cantu argues in her response to Defendants' motions to dismiss that her speech involved matters of public concern because it involved official misconduct and the misuse of taxpayer monies and violations of Texas law.

Cantu alleges in her first amended complaint that she spoke on matters of public concern on four separate occasions.

1. In January 2001, Cantu rejected several vehicle registrations

because they did not comply with Texas law. Defendant Yzaguirre approached Plaintiff Cantu and asked her why the files were rejected. Plaintiff Cantu responded that . . . the files did not comply with Texas laws. Defendant Yzaguirre became extremely upset and ordered Plaintiff Cantu to release the transactions and that the only thing she should be concerned about is whether the vehicle was stolen–"he didn't care about the rest." Plaintiff Cantu again told Defendant Yzaguirre that the [Tax Assessor's Office] and the Cameron County

Automobile Crimes Enforcement Task Force were obligated to follow Texas law. Id. ¶ 24.

2. In July 2001, Yzaguirre ordered Cantu to stop "faxing complaints about fraudulent vehicle registration from automobile dealers to the Texas Department of Transportation, Texas Motor Vehicle Enforcement Division. Defendant Yzaguirre told Plaintiff that she would only be allowed to fax such a complaint if he approved it first." Id. ¶ 26. Cantu argues her act of faxing these complaints and informing Yzaguirre that those complaints should be faxed was speech involving matters of public concern. Cantu alleges the complaints she was faxing mostly concerned the fraudulent vehicle registration paperwork of "friends and business associates" of Yzaguirre. Id.

3. In November 2001, Cantu rejected the vehicle registration documents submitted by Andres Angeles. Yzaguirre approached Cantu and asked why she had rejected this paperwork. Cantu explained to Yzaguirre that the paperwork did not meet legal requirements and told Yzaguirre that his actions in processing the deficient paperwork was unlawful. Yzaguirre allegedly told Cantu that if she continued rejecting these registrations, she knew what would happen to her. Id. ¶ 27.

4. Between December 2001 and May 2002, Cantu continued "telling Defendant Yzaguirre that he was not following the law regarding the processing of fraudulent vehicle registrations." Id.¶ 30.

Defendants attempt to portray Cantu's speech as involving only personal issues of employment because the "allegations focus only on claims that she and Mr. Yzaguirre disagree over how she processed vehicle titles and registration." Def Yzaguirre's Motion to Dismiss, at p. 13 [Dkt. No. 16]. Furthermore, although Defendants acknowledge that expressing opinions privately does not signify the death knell of a First Amendment retaliation claim, they continue to argue Cantu's speech was an internal private grievance that was conclusory and did not describe how the approval of the applications constituted crimes of serious misconduct. The Court disagrees with some of Defendants' assessment of Cantu's allegations.

First, Cantu alleges that she told Yzaguirre certain vehicle registrations were deficient and as such did not comply with Texas laws. Most importantly Cantu alleges

8

she told Yzaguirre that his orders to process the registrations despite these deficiencies were improper because Yzaguirre, as the Tax Assessor-Collector of Cameron County and as the Director of the Cameron County Automobile Crimes Enforcement Task Force was obligated to follow applicable Texas law. See Pls' First Amended Cmplt. ¶ 24. Indeed, as a Titles Registration Examiner for the Cameron County Automobile Crimes Enforcement Task Force, Cantu's job and duty was to ensure that vehicle registration paperwork processed in the Tax Assessor's Office was lawful. Id. ¶ 22. It matters not whether Cantu at times admonished Yzaguirre because she felt he was ordering her to process claims that were "merely technically deficient." The point is that Cantu detected registration deficiencies that indicated the vehicle registrations did not comply with the law. She expressed her concern that processing the vehicle registrations further violated the law and abrogated the Tax Assessor's duties and obligations to follow the legal requirements concerning vehicle registrations. It would be inimical to the purpose of the First Amendment to say that Cantu was speaking only as an employee and not on a matter of public concern. Her position as Titles Registration Examiner by nature involved the ferreting out of illegalities relating to vehicle registrations. See Harris, 168 F.3d at 222 (holding that speech of elected representatives of school faculty were speaking on matters of public concern when they upheld their duties as committee members and spoke about problems at the school).

Additionally, Cantu's speech not only involved informing Yzaguirre that deficient and fraudulent vehicle registrations were filed, but more importantly, *that his insistence upon processing these deficient or fraudulent registrations was itself an act of misconduct and an abrogation of Yzaguirre's own duties under the law.* Arguably Cantu commonly encountered deficiencies in vehicle registration, and each individual occurrence would not necessarily be a matter of public concern. Her allegations, however, that Yzaguirre was thwarting the process by allegedly approving registrations that were deficient and fraudulent and hence did not comport with the law, were certainly a matter of public concern.

Were the Court to find that Plaintiff has not stated a claim upon which relief may be granted for at least some of her speech, the Court would in essence be holding that

9

Cantu's failure to file some kind of internal grievance, other than voicing her concerns to her supervisor, or her failure to "go public" with her allegations would be dispositive on the issue of whether her speech constituted a matter of public concern. The Fifth Circuit has time and again pronounced that restricting one's speech to a private forum does not preclude a First Amendment retaliation claim. See, e.g., Benningfield, 157 F.3d at 375. Even letters that are marked as personal and confidential and are only circulated internally may constitute speech on a matter of public concern. See Davis v. West Community Hospital, 755 F.2d 455, 460-61 (1985). As the Davis Court noted, Supreme Court precedent has held that a teacher's criticisms of discriminatory policies was protected speech, even when the comments were made only to the teacher's supervisor, the principal. Nor does the fact that Yzaguirre first approached Cantu regarding her refusal to process certain deficient registrations indicate Cantu was speaking only as an employee and in response to an employment dispute. Although she was accounting for her actions, Cantu clearly had a bigger goal in mind–that being to inform Yzaguirre that his actions constituted misconduct and violated state law.

Given the principles discerned from the decision in Kennedy after the Fifth Circuit engaged in an exhaustive review of mixed speech cases, this Court cannot say Cantu failed to state a First Amendment retaliation claim. The content of her speech did not involve solely personal matters as it addressed misconduct and the failure to follow proper procedure in the Tax Assessor's Office, a matter that was of public concern. Her speech was not, and need not, be made to the public. Although Cantu discussed the various alleged illegalities with Yzaguirre after he approached her, Cantu's speech was not part of an on-going employment dispute. Furthermore, Cantu's speech was not designed to clear her name or otherwise quell an employment dispute. If anything, Cantu's comments to Yzaguirre explained why she didn't process certain registrations. These comments inevitably caused friction. Given the content, form, and context of Cantu's speech, she has adequately alleged that she spoke on matters of public concern.

Cantu's second allegation of protected speech concerns her faxing of various "complaints about fraudulent vehicle registration from automobile dealers to the Texas

10

Department of Transportation, Texas Motor Vehicle Enforcement Division." Pls' First Amended Cmplt. ¶ 26. Initially, Cantu's First Amended Complaint was somewhat unclear concerning whether Cantu authored these complaints, or whether the complaints were grievances filed by outside parties, which she forwarded on to the Department of Transportation. In Cantu's Rule 7(a) Reply, which will be discussed more later in this opinion, Cantu explains that after reviewing certain vehicle registrations from automobile dealers, she suspected the registrations were fraudulent. Believing she had a duty under the law to report such suspicions that are raised by audits to the Texas Department of Transportation, she faxed these complaints. As part of Cantu's overall suspicions that Yzaguirre was providing paid favors to his friends and associates, she noted that most of the suspected fraudulent paperwork was submitted by friends and associates of Yzaguirre.

Cantu does not provide the Court with a detailed description of the complaints she faxed. For example, were the complaints in narrative form; were the complaints part of a standardized form designed for Cantu's use in audits, etc.? Nevertheless, it is of particular importance that Cantu alleges she told Yzaguirre that she needed to fax these complaints because of her suspicions and that he then told her she would not be allowed to fax such complaints without his approval. See Pls' First Amended Cmplt. ¶ 26, Pls' Rule 7(a) Reply, ¶ 20. Complaints in written form that outline or catalogue illegalities in vehicle registrations involves matters of public concern. Even more telling, however, is the fact that when Cantu told Yzaguirre that she need to fax such complaints he responded by limiting future faxes. At this relatively early stage of the proceedings, the Court cannot say this speech does not constitute matters of public concern.

Cantu's third allegation of speech concerns the vehicle registration of Andres Angeles in which she alleges the paperwork did not meet the legal requirements to be accepted. When Yzaguirre "overrode" Cantu's decision, Cantu again explained that Yzaguirre's disregard for the laws and regulations concerning the processing of vehicle title registrations was itself unlawful. For the reasons stated above, Cantu's speech involves a matter of public concern and is adequately pled.

11

Finally, because Cantu alleges Yzaguirre terminated her for protected speech, "she is required to be specific as to when her statement or statements were made, to whom they were made, whether they were oral or written, and the content of those statements." Foley v. Univ. of Houston Sys., 2003 WL 22965483, *7 (5th Cir. Dec. 18, 2003). Cantu's general allegations that between December 13, 2001, and May 6, 2002, Cantu continued telling Yzaguirre that he was not following the law regarding the processing of fraudulent vehicle registrations is too conclusory to adequately put Defendants on notice of the specific statements and incidents Cantu alleges were protected speech. This paragraph of Cantu's pleadings does nothing more than express that Cantu's criticisms of Yzaguirre were on-going and continued even after Cantu alleges she was stripped of her job duties as Titles and Registration Examiner and replaced by another employee. See Pls' First Amended Cmplt. ¶ 30. Cantu, therefore, has not adequately pled allegations regarding protected speech between December 13, 2001, and May 6, 2002.

The Court **denies** Defendants' Motions to Dismiss Cantu's speech claims.

### b.  Munoz's Speech

Plaintiff Munoz served as the Project Coordinator for the Cameron County Automobile Crimes Enforcement Task Force. Munoz alleges two instances of speech: (1) after viewing a coworker count large amounts of money, he said it "looked bad" to count such large amounts of money in the open; and (2) Munoz stated to Yzaguirre that Yzaguirre should stay away from a particular friend of Yzaguirre's that was highly suspicious and that Munoz was concerned that Yzaguirre was giving these friends special treatment in the processing of their vehicle registrations. See Pls' First Amended Cmplt. ¶ 36, 38.

Plaintiffs filed a Federal Rule of Civil Procedure 7(a) Reply in which they elaborate on Munoz's allegations. Although the reply elucidates further Munoz's perceptions concerning the alleged misconduct and corruption on the part of Yzaguirre, the reply does not present new instances of speech. See Pls' Reply, at p. 27-28 [Dkt. No. 23].

Munoz's first statement to Lupita DeLeon, the Automobile Titles and

12

Registrations Supervisor in the Tax Assessor's Office, that it "looked bad" to count such large sums of money in the open does not constitute speech that specifically discusses corruption or misconduct. Because of its nebulous nature, if the comment were released to the public it would have little value. Additionally, Munoz alleges in only a cursory fashion that DeLeon told Yzaguirre that Munoz said it looked bad to count the money where someone from the public could see it. Plaintiffs assert in their Rule 7(a) reply, that from the speech it can be "inferr[ed] that the transactions [were] unlawful and there was corruption within the Cameron County Tax Assessor-Collector's office." Id. at 28. The Court cannot rule this speech is a matter of public concern. An inference that a comment is a matter of public concern goes beyond the parameters of protected speech, and is not specific enough to constitute protected speech.

Munoz's second statement made to Yzaguirre that Munoz was concerned that Yzaguirre was giving special treatment to friends in the processing of vehicle registrations cannot be dismissed so easily. This statement on its face, if revealed to the public, could expose potential wrongdoing. It does not suffice to say that Munoz's statement only concerns personnel matters or a topic only relevant to the internal workings of the Tax Assessor's office. See Brawner, 855 F.2d at 191-92 & nn. 10-14. Furthermore, as the Court has reiterated numerous times throughout this opinion, the private nature of Munoz's speech is not dispositive because "[t]his alone, . . . does not necessitate a finding that his alleged speech was not connected to a matter of public concern." Thompson, 901 F.2d at 463. Munoz pleads nothing that would indicate his speech concerned a personal matter or was in response to a concern about his performance. The content, form, and context of Munoz's statement to Yzaguirre was on a matter of public concern.[2]

The Court **denies** Defendants' Motions to Dismiss Munoz's speech claims.

---

[2]Defendants only move to dismiss Munoz's claims because they believe he did not allege speech on a matter of public concern. They do not brief the issue of whether Munoz suffered an adverse employment action. Munoz alleges that he was removed from the Project Coordinator position, transferred to the Harlingen Branch Tax Office, and lost a $3,000 per year stipend in retaliation for his exercise of free speech and associational rights. Munoz has sufficiently alleged an adverse action to survive dismissal at this stage of the proceedings.

### c. Weaver's Speech

Plaintiff Weaver was employed in the Cameron County Tax Assessor's Office as the Executive Secretary to Yzaguirre. Weaver alleges that she told Yzaguirre that the "word out on the street is that certain people can get their automobile titles fixed through you [Yzaguirre] and that Esthela Guerra, a notary public, has privileges with you [Yzaguirre] to fix anything that is crooked." Pls' Cmplt. ¶ 45. Weaver also alleges that from October 2001 until May 2002 she "asked Defendant, on more than one occasion, why vehicle title registration transactions were being processed through administration rather than through the auto division - as was the practice and policy." Id. ¶ 48.

Weaver asks the Court to make the general leap that her question concerning the processing of vehicle registrations was really a comment on the alleged fraudulent transactions being processed in the Tax Assessor's Office. Weaver's question about the processing of the vehicle transactions does not on its face connote official wrong-doing or misconduct. This question alone does not suggest Weaver is commenting on anything other than office policies.

Additionally, Weaver's statement to Yzaguirre concerning "word out on the street," was simply a retelling of other people's speech and is not attributable to Weaver directly. Weaver did not accuse Yzaguirre of fixing crooked vehicle registrations. Weaver only stated that she was aware of certain people's perceptions outside of the Tax Assessor's Office. Weaver does not discuss her own observations of perceived illegalities. Furthermore, the fact that Weaver later allegedly overheard a conversation between Yzaguirre and Esthela Guerra does not make her *speech* to Yzaguirre anymore a matter of public concern. Weaver's alleged speech adds nothing to public knowledge, except to say that another person has heard rumors on the street–something the public already knows, as Weaver's statement indicates. Finally, simply because there is allegedly a widespread belief that corruption and wrongdoing is occurring in the Tax-Assessor's Office, does not transform all speech on the topic into a matter of public concern. Weaver has not, therefore, alleged she spoke on matters of public concern. The Court **grants** Defendants' Motions to Dismiss Weaver's speech

14

claim.[3]

### d. Garcia's Speech

Plaintiff Garcia is a former Manager of the San Benito Branch Office of the Tax Assessor's Office. Garcia alleges she suffered a First Amendment violation when she spoke on a matter of public concern in the form of a written reprimand Garcia sent to her supervisee, Eniel Barreda, an Auto/Tax Clerk. See Pls' First Amended Cmplt. ¶ 65. The reprimand was in the form of a memo with a subject line entitled, "improper procedures on registration." Defendant Yzaguirre's Motion to Dismiss, at Ex. A [Dkt. No. 15].[4] The memo was copied to Yzaguirre. Garcia alleges Barreda is the son and grandson of two friends of Yzaguirre. These friends, Plaintiffs allege, received special favors from Yzaguirre. The reprimand concerned three distinct incidents where the employee, Barreda, did not follow proper procedures by: 1) improperly processing a vehicle registration from another county without proof of residence, 2) improperly selling a renewal sticker to the employee's cousin who was not the actual owner of the car, and 3) failing to make a change of address. Only one of the three issues addressed in the memo can be fairly characterized as addressing a matter that may be of public concern because it relates to the same irregularities and misconduct that Plaintiffs allege Yzaguirre condoned and actively participated in. The other issues addressed in the reprimand memo, however, do not address systematic corruption or misconduct in the Tax Assessor's Office. Furthermore, the form of the reprimand is private because it was in the form a reprimand memo between supervisor and employee. Garcia sent ("cc'd") a copy of the memo to Yzaguirre, but Garcia's main motivation for writing the

---

[3]The Court dismisses Weaver's speech claims as they are pled in her First Amended complaint. The Court discusses Weaver's added speech claim in the Rule 7(a) Supplement. See infra, Section X.

[4]Plaintiffs expressly reference this reprimand memo in their First Amended Complaint. Defendant Yzaguirre attached the same memo to his motion to dismiss. The Fifth Circuit has explicitly determined that "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.'" Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000) (citations omitted). Plaintiffs' arguments that Defendants' motions to dismiss should be converted to motions for summary judgment are, therefore, baseless.

memo was not to confront Yzaguirre concerning widespread corruption. The context of this memo, however, does weigh in favor of public speech. The memo was written at a time when there was a backdrop of debate within the office and some indication that the public may have perceived there to be problems in the Tax Assessor's Office. See Harris, 168 F.3d at 222. The real stumbling block here is that although "public employees, by virtue of their public employment, may make valuable contribution to public debate," there is no indication that Garcia intended her memo to be used in the broader context of informing the citizenry of corruption within the Tax Assessor's Office. Markos v. City of Atlanta, Texas, 2004 WL 569854 (5th Cir. Mar. 23, 2004). Nor is there any indication that Garcia was intentionally commenting on corruption or misconduct beyond this one incident. Additionally, more of the memo than not addresses matters that are entirely about this particular employee's failure to follow procedures.

Ultimately, after balancing the appropriate factors, the Court finds this memo does not meet the criteria for material that is a matter of public concern. As a result, the Court **grants** Defendants' Motions to Dismiss Garcia's speech claim.

## V.  Right to Association

The right to free association has been recognized in limited contexts:

[The Supreme Court's] decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984). Marriage and family are born of the "highly personal relationships" and personal affiliations that "attend the creation and sustenance of these highly personal relationships." Id. at 618-20; see also Hobbs v. Hawkins, 968 F.2d 471, 482 (5th Cir. 1992). "Associational rights derivative of

16

the First Amendment rights of speech, assembly, petition for redress of grievances, and exercise of religion" comprises the second category of rights discussed above. Hobbs, 968 F.2d at 482. Freedom of association does not extend to the right to form "private relationships" that are social. See Stanglin, 490 U.S. at 25. For example, in Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1051-52 (5th Cir. 1996) the Court held a sports coach did not have a First Amendment right to associate with his basketball players.

### A. Do Plaintiffs Cantu, Munoz, Weaver, Alvarado, and Garcia Have a Protected Right to Association ?

#### a. Cantu, Munoz, and Weaver's Association

Plaintiffs allege: "Cantu, Munoz, and Weaver closely associated with each other in the performance of their duties for Defendant. The adverse actions taken against Plaintiffs Cantu, Munoz, and Weaver were also taken against them because of their close association with each other in speaking out against Defendant Yzaguirre's unlawful actions in the processing of vehicle title registrations." Pls' First Amended Cmplt. ¶ 33. Additionally:

> Because of [the] escalating concern over illegalities occurring within the Cameron County Tax Assessor-Collector's Office regarding the processing of vehicle registration paperwork, in the Spring of 2002 Plaintiff Munoz spoke with Plaintiff Cantu, who was serving as the Titles and Registration Examiner. During Plaintiff Munoz' conversation with Plaintiff Cantu, Plaintiff Cantu told Plaintiff Munoz that she observed fraudulent vehicle registration paperwork being processed by Defendant Yzaguirre and that she had spoken out in opposition to such conduct to Defendant Yzaguirre. . . Plaintiff Cantu and Plaintiff Munoz had the right to associate as guaranteed by the First Amendment to the United States Constitution with each other to discuss the fraudulent vehicle registration paperwork being processed by Defendant Yzaguirre . . . .

Id. ¶ 40. Finally, Plaintiffs allege, "From 2001 to approximately May 2002, Plaintiff Cantu and Plaintiff Weaver discussed their concerns about Defendant Yzaguirre's unlawful actions in processing vehicle title registrations. The adverse actions taken against Plaintiffs Cantu, Munoz, and Weaver were also taken against them because of their close association with each other in speaking out against Defendant Yzaguirre's unlawful actions in the processing of vehicle title registrations." Id. ¶ 49.

Defendants minimize the importance of Plaintiffs' associational right by

characterizing their association as "nothing more than social contact which is not protected by the First Amendment." Def. Yzaguirre's Motion to Dismiss, at p. p. 11. Although it is clear from the pleadings that the Plaintiffs did socialize with each other at work, Plaintiffs have alleged specific time periods in which they associated at least in part to expressly discuss the alleged misconduct, fraudulent behavior, and corruption in the Tax-Assessor's office and Yzaguirre's acts specifically. Plaintiffs' claims are not based on their personal friendships, but rather on shared beliefs, perceptions, and accounts of behavior. Plaintiffs, therefore, did not associate solely for personal reasons, but instead to discuss grievances. The fact that their personal friendships, or even acquaintanceships in the office setting, bled into their associations concerning Yzaguirre's alleged misconduct is not fatal. The Court is aware of no authority making friendship and the right to associate under the First Amendment mutually exclusive. Indeed, in many instances those who gather expressly for the purpose of articulating protected speech will at some point develop stronger relationships. To find otherwise would mean that people who had some basis of friendship or those who worked closely with one another could not as a matter of law have a recognized right of association. This would be inimical to the spirt of the freedom to associate. In short, Plaintiffs have alleged more than mere personal affinity with each other. As pled, Plaintiffs' associational claims fall within the class of contexts outlined in Roberts.

The Court, therefore, **denies** Defendants' Motions to Dismiss the associational claims of Cantu, Munoz, and Weaver.[5]

### b. Alvarado's Association[6]

Plaintiff Alvarardo is the former Supervisor of the Property Tax Collection

---

[5]Plaintiffs have pled facts that Weaver, at the very least, was aware of rumors or suspicions concerning Yzaguirre's misconduct in the Tax Assessor's office. At this early stage of the proceedings, the Court will not dismiss Weaver's associational claim because Plaintiffs have alleged that she gathered with these coworkers to discuss the perceived problems in the office.

[6]Defendant Cameron County also argues Alvarado has not alleged any adverse employment action. The Court does not reach these arguments because Alvarado has failed to allege a valid right to association. Any adverse employment actions taken, therefore, are not relevant in the constitutional context here.

Division for the Tax Assessor's Office. Alvarado is Plaintiff Weaver's sister. She alleges only one First Amendment associational claim –that is, that on or about February 26, 2003, Alvarado was working at Dillard's Department store when Plaintiff Cantu "stopped by the counter where Plaintiff Alvarado was working and asked if she could make a payment on her Dillard's account." Pls' First Amended Cmplt. ¶ 58. While Alvarado and Cantu were talking, Yzaguirre's wife saw the two women together and "stared" at them. Id.

Alvarado has not adequately stated a First Amendment associational claim because her association with Cantu does not fit remotely within the two categories of recognized associational rights derived from the First Amendment. Alvarado does not allege that she associated with Cantu for "the express purpose of speaking out on" misconduct or "illegal activity that may have occurr[ed] in the [Tax Assessor's Office.]." Henrise v. Horvath, 174 F. Supp.2d 493, 500 (N.D. Tex. 2001), aff'd on relevant grounds, 45 Fed. Appx. 323 (5th Cir. 2002). At best, Alvarado's association with Cantu can be described as social, which does not serve as a basis for a First Amendment constitutional violation. See, e.g., Roberts, 468 U.S. at 617-18; City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) ("generalized right of social association" not protected by the First Amendment). As alleged, Alvarado and Cantu were discussing Cantu's payment for her Dillard's account. This is not a protected association.

Furthermore, Alvarado claims an associational right based on her familial relationship with Weaver, as her sister. This claim too is legally insufficient because Alvarado has not alleged an association that bears "an intrinsic element of personal liberty." Roberts, 468 U.S. at 620. The right to freely associate as a personal liberty attaches to relationships that "attend the creation and sustenance of a family" including marriage, childbirth, raising and educating children, and cohabitation with one's relatives. Id. at 619-20. Compare, Thompson v. Ashe, 250 F.3d 399, 407 (6th Cir. 2001) (determining adult brother did not have an associational right or liberty interest under the due process clause in visiting his brother at a public housing complex). Alvarado has cited no case law, nor is this Court aware of any, in which a fundamental liberty interest has been extended to siblings who wish to associate with one another in

the workplace. Alvarado has no fundamental right to associate with her sister while at work.

The Court **grants** Defendants' Motions to Dismiss Alvarado's associational claims.

## VI. Legal Framework for Claims Under § 1983

"To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution of laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." Moore v. Willis Indep. Sch. Dist., 233 F.3d 871, 874 (5th Cir. 2000).

> [Q]ualified immunity shields a state official from personal liability for damages under 42 U.S.C. § 1983 when the official's exercise of discretionary authority results in a violation of an individual's federal constitutional or statutory rights, unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on which the suit was founded.

Palmer v. Johnson, 193 F.3d 346, 351 (5th Cir. 1999) (citations omitted).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." See Austin v. Johnson, 328 F.3d 204, 207 (5th Cir. 2003) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526,105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).  The defense of qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" Austin, 193 F.3d at 207 (quoting Wooley v. City of Baton Rouge, 211 F.3d 913, 918-19 (5th Cir. 2000)).  The initial question is whether "taken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 121 S.CT. 2151, 150 L.Ed.2d 272 (2001).  The test for qualified immunity necessitates a two-part or "bifurcated" test of (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and if so (2) whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident.  See Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001).

The qualified immunity defense is available to individual municipal officials, but

not to municipalities. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517, 523 (1993). Qualified immunity shields government officials from civil liability for damages based on the performance of their discretionary functions if the acts were objectively reasonable in light of then clearly established law. See Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001). To survive a motion to dismiss in cases where the qualified immunity defense is raised, a plaintiff must state facts, which if proven, would defeat the defense. See Jacquez v. Procunier, 801 F.2d 789 (5th Cir.1986); Elliott v. Perez, 751 F.2d 1472 (5th Cir.1985). The plaintiff must demonstrate the official's wrong doing violated "clearly established" law and "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Acts are "objectively reasonable" unless all reasonable officials under the same circumstances would have known the conduct violated the Constitution or federal law. See Thompson, 245 F.3d at 457. Qualified immunity allows officials to take reasonable but incorrect actions that constitute a constitutional violation. See Glenn v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001).

### A. Is Defendant Yzaguirre Entitled to Qualified Immunity?

The Court has determined that Plaintiffs Cantu, Munoz, and Weaver either spoke on matters of public concern or have pled an associational right under the First Amendment. Qualified immunity turns on the objective reasonableness of a defendant's acts without regard to his subjective state of mind. See Thompson v. Upshur County, TX, 245 F.3d 447, 457 (5th Cir. 2001). Established law dictates that a public employee cannot be terminated in retaliation for his or her exercise of free speech. The law must be so clearly established that every similarly situated official under the same circumstances would know that the defendant's actions violated federal law. See Sorenson v. Ferrie, 134 F.3d 325, 330 (5th Cir. 1998). Plaintiffs spoke and associated on matters that have long been held in the most esteemed place, matters concerning corruption, misconduct, and unethical behavior of public

21

officials. These issues were a matter of public concern, clearly established at the time of Defendant's terminations and retaliations. Defendant Yzaguirre does not argue, even after Plaintiffs filed their Rule 7(a) Reply, that his conduct was not objectively unreasonable. At this stage of the proceedings, the Court cannot dismiss Plaintiffs' claims against Yzaguirre on the basis of qualified immunity because Plaintiffs have sufficiently pled facts indicating Yzaguirre is not entitled to qualified immunity.

The Court **denies** Defendant Yzaguirre's Motion to Dismiss the claims of Cantu, Munoz, and Weaver based on qualified immunity.

## VII. Cameron County's Liability Under Section 1983

Liability for municipalities and entities such as county governments may attach under 42 U.S.C. § 1983 only if the plaintiff demonstrates a deprivation of a constitutional right that was inflicted pursuant to an official policy or custom. See Board of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997); City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). Counties are contemplated as "municipalities" for the purpose of section 1983 liability. Municipal liability requires proof of "1) a policymaker; 2) an official policy; 3) and a violation of constitutional rights whose 'moving force' is the policy or custom." Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 247 (2003) (citing Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001).

Municipalities cannot be liable for acts of its employees under a respondeat superior theory. See Pembaur, 475 U.S. at 477. See also Monell v. New York City Dept. of Soc. Serv., 436 U.S. 658, 694 (1978). However, a municipality may be liable for the actions of those municipal or county officials who have "final policy making authority." Praprotnik, 485 U.S. at 124. State law governs whether a particular official has final policy making authority. Id. See also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).

22

## A.  Was Defendant Yzaguirre a Final Policy Maker for Defendant County?

Plaintiffs allege Defendant Yzaguirre is a "high policy making official for Cameron County and the highest policy making official in regard to Cameron County Automobile Crimes Enforcement Task Force and the office of the Cameron County Tax Assessor-Collector.  Further, Defendant Yzaguirre is the final policy making authority in regard to hiring, firing, and reassignment of the Plaintiffs."  Pls' First Amended Cmplt. ¶ 68.  Plaintiffs plead that pursuant to 13.06 of the Personnel Policies Manual of Cameron County,[7] the County Commissioners have given Department Heads, such as the Defendant, the final authority to dismiss employees. Id. ¶ 69. Defendants contend Plaintiffs have not properly alleged the County's liability because Defendant Yzaguirre is not a final policy maker for the County.

Final policy makers are usually empowered by the state to "define objectives and choose the means of achieving them" without supervision by other government officials.  Colle v. Brazos County, Tex., 981 F.2d 237, 244 (5th Cir. 1993).  Courts have distinguished between final *decision making* authority in a given area versus final *policy making* authority.  See Jett, 7 F.3d at 1246; Rivera, 349 F.3d at 248 (noting the district court made such a distinction); see also Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81 (1986).   Final policy making may be granted either by legislative enactment or the official body that has final policy making authority may delegate such authority.  See Pembaur, 475 U.S. at 483.

The Court has reviewed the policy manual at issue.  Section 13.06 allows the Department Heads in their judgment to dismiss employees when the quality and performance of their work merits such action, including insubordination, unauthorized use or misuse of public funds or property, and violation of personnel policies, among other grounds.  See Defendant County's Motion to Dismiss, Ex. A

---

[7]Defendants also attach the Personnel Policies Manual to their Motions to Dismiss. Because Plaintiffs reference this manual explicitly in their complaint, the Court may consider the attachment without converting the motions to dismiss into summary judgment motions.  See Collins, 224 F.3d at 498-99.

[Dkt. No. 14].  Section 1.02 of the manual explicitly states the "policies are established by the Commissioners Court of Cameron County."  Id.  There is nothing contained within the policy manual that indicates the Commissioners Court has delegated final policy making in the area of personnel decisions to Yzaguirre as the Tax-Assessor-Collector.  Plaintiffs cite no statutory authority demonstrating the Tax-Assessor-Collector has final policy making authority as a department head, and the Court has reviewed the relevant statute and found no authority granting the Tax Assessor-Collector final policymaking authority.  See Tex. Tax Code Ann. §§ 6.21 et. seq (West 2001); Tex. Transp. Code Ann. § 501.137 (West 1999).  "'[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.'"  Rivera, 349 F.3d at 248 (quoting Praprotnik, 485 U.S. at 126).

In support of the fact that Yzaguirre does have final policymaking authority, Plaintiffs cited the case of Brown v. City of Houston in the initial pretrial conference. 337 F.3d 539 (5th Cir. 2003).  The issue in Brown was whether the mayor, as opposed to the civil service commission, had final policymaking authority to terminate the employee.  There, the commission made the final decision to terminate the employee and the commission could reject any previous recommendations of the mayor.  See Brown, 337 F.3d at 541 (citing Houston, Tex., Code of Ordinances § 14-182(a) (2002)).  Because the mayor did not have the authority to make a final decision concerning the employee's termination, the mayor was not a final policymaker for the purpose of municipal liability.  See id.

In the case presently before this Court, the policy manual expressly states that grievance procedures are not available for involuntary dismissal decisions, and thus final decision making authority concerning termination does not rest with the Commissioners Court.  See Defendant County's Motion to Dismiss, Ex. A, Section 14.02.  There is no indication from this policy manual that there is any higher authority with "superintending responsibility over individual employment decisions" concerning involuntary dismissal.  Hitt v. Connell, 301 F.3d 240, 248 & n.3 (5th Cir.

2002) (holding constable who terminated a deputy constable had final policymaking authority, despite the fact that the civil service commission had review powers, which were in a quasi-judicial capacity).

At this stage of the proceedings, the Court cannot dismiss Cameron County on the basis that Yzaguirre was not the final policymaker in termination decisions. Should the Defendants desire, the Court will entertain more fleshed out arguments concerning the final policymaking authority of Yzaguirre in employment decisions. Should the County file future briefing on this issue, it would be wise to distinguish the circumstances of this case from Brown and Hitt, mentioned above, or any other pertinent authority demonstrating there either is a review process available for Yzaguirre's termination decisions or other authority showing Yzaguirre is not a final policymaker for personnel employment matters.  As a result, the Court **denies** Defendant Cameron County's Motion to Dismiss based on final policymaking authority.

## VIII.  Miscellaneous Matters

Once a Court determines speech is a matter of public concern, it normally proceeds beyond this threshold inquiry and balances "the interests of the [employee], as a citizen, in commenting upon matters of public concern [against] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ. of Tp. High School Dist., 391 U.S. 563, 568 (1968).  The Court does not have sufficient briefing or facts before it to engage in a Pickering balancing test at this early stage of the proceedings. See Anderson v. Pasadena Indep. Sch. Dist., 184 F.3d 439, 444-45 (5th Cir. 1999).  Additionally, the Court limits its rulings on these motions to dismiss to those elements of retaliation briefed and argued by the Defendants.   At this point a genuine issue exists as to whether Yzaguirre ended Plaintiffs' employment in response to their protected speech and whether he would have taken the same actions against Plaintiffs even without the protected speech. See Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1423 (5th Cir. 1997).

25

## IX. Rule 7(a) Reply

There has been some dispute between the parties in this case as to who should plead what and when on the issue of qualified immunity.  The Fifth Circuit has stated, "[v]indicating the immunity doctrine will ordinarily require [a Federal Rule of Civil Procedure 7(a)] reply, and a district court's discretion not to do so is narrow indeed when greater detail might assist."  Schultea v. Wood, 47 F.3d 1427, 1434 (5th Cir. 1995) (en banc).  Plaintiffs are not required to anticipate the defense of qualified immunity, nor are they required to provide greater specificity in their complaint before a Defendant raises the defense of qualified immunity.  The Rule 7(a) reply, therefore, is used to allow the Plaintiffs the opportunity to present a more particularized reply after Defendants have raised the defense.  At that point Plaintiffs should present "allegations of fact focusing specifically on the conduct of the individual who caused the plaintiff[s'] injury."  Reyes v. Sazan, 168 F.3d 158, 161 (5th Cir. 1999).

A Rule 7(a) reply is not mandatory when the original complaint sufficiently pleads facts focusing on the official's conduct that allegedly violated the Plaintiff's federal statutory or constitutional rights.  Rather, the Court requests such a reply on its on accord, or after motion, when the facts as pled are sparse with little or no detail of the officials claimed wrongdoing.  See id.

In this case, Defendants requested in the alternative to their motions to dismiss that the Court order Plaintiffs to file a Rule 7(a) reply.  Plaintiffs filed a colossal reply that is nothing if not voluminous.  This mammoth reply is comprised of 28 exhibits detailing Plaintiffs' alleged violations of Texas law, misconduct on the part of Yzaguirre, and perceived fraudulent title registrations.  See Plaintiffs' Rule 7(a) Reply [Dkt. No. 23].   The reply addresses Yzaguirre's alleged misconduct in violating Texas laws regarding the processing of vehicle registration papers, and allowing fraudulent documents to be accepted by the Tax Assessor-Collector's office as paid "favors" to his (Yzaguirre's) friends and associates.  It catalogues specific vehicle registrations that Plaintiffs suspect are fraudulent or do not comply with

Texas law, but nevertheless were processed by Yzaguirre or others in the Tax-Assessor's office.  Plaintiffs attach specific transactions as examples of their "protected speech to Defendant Yzaguirre about vehicle title registrations."  Pls' Rule 7(a) Reply, at p. 7.

In attaching this evidence, whether it is competent and admissible summary judgment evidence or not, Plaintiffs have missed a seminal point.  The goal of a Rule 7(a) reply is not to *prove* that Plaintiffs' concerns about the illegalities and misconduct in the Tax Assessor's Office were absolutely accurate.  Indeed, Plaintiffs' good faith allegations of *perceived* wrong-doing is adequate to survive a motion to dismiss.  See Denton v. Morgan, 136 F.3d 1038, 1043 (5th Cir. 1998).  "Neither the accuracy of the speech, nor the motivation of the speaker, plays a role in determining whether the expression involves a matter of public concern."  Id. (citations omitted).  Furthermore, Plaintiffs' evidence, even if it is an indicator of misconduct occurring in the Tax Assessor's Office, would not support a First Amendment retaliation claim without any specific allegation of protected *speech*. Plaintiffs could have believed these enumerated transactions were examples of illegalities, but if they never spoke to anyone about them, they would not have a viable First Amendment claim.

Additionally, the fact that Plaintiffs' speech was a matter of public concern, while a necessary element in a First Amendment retaliation claim, is a distinctly different issue than whether Yzaguirre committed constitutional violations against Plaintiffs.  Yzaguirre's alleged misconduct in processing fraudulent and legally deficient vehicle transactions does not infringe on Plaintiffs' First Amendment rights. Rather, Yzaguirre's alleged retaliatory actions based on their exercise of free speech and association would be constitutional violations of the First Amendment. The Rule 7(a) reply in this circumstance, if one was required at all, would be helpful in addressing specific facts demonstrating Yzaguirre's actions in retaliating against Plaintiffs were objectively unreasonable.  In this case it is likely that Plaintiffs had already pled sufficient facts that Yzaguirre's actions were not objectively reasonable.

27

The Court recognizes that Plaintiffs' proclivity to file such a monstrously large Rule 7(a) reply was prompted by Defendants' repeated assertions that Plaintiffs' allegations of fraud and misconduct were vague, unsupported, and that *Cantu* "applies conclusory labels of 'fraud' and 'illegal' not describing in what manner the [sic] approving the applications constituted crimes or serious official misconduct." *Defendant County's Motion to Dismiss*, at p. 14.

The Court considered Plaintiffs' Rule 7(a) Reply, but it did not consider the evidence attached to the reply. Frankly, the exhibits were unnecessary. Although not irrelevant to the issue at hand, they did not help to elucidate further Plaintiffs' allegations of speech or Yzaguirre's alleged retaliation. Additionally, there has been some dispute about the propriety of the personal information contained in many of the attached exhibits, which were largely examples of vehicle title registration applications, transfers, and the like. Because the Court finds these exhibits to be superfluous, it both **STRIKES** the exhibits and **ORDERS** the Clerk of the Court to remove the exhibits from the Rule 7(a) Reply [Dkt. No. 23]. Plaintiffs are free to file these exhibits as part of future motions or responses, if appropriate, with redactions that comply with the August 27, 2003, standing order in the Southern District concerning the inclusion of personal information in evidence and filings. To the extent, therefore, that the Rule 7(a) reply attaches evidence, the Court **STRIKES** this evidence. The Court does not strike the additional factual pleadings contained in the Rule 7(a) reply. The Court, therefore, **GRANTS in part** and **DENIES in part** Defendant Yzaguirre's Motion to Strike Rule 7 Reply [Dkt. No. 26].

## X.  Plaintiffs' Supplement to 7(a) Reply

Plaintiffs filed a Supplemental 7(a) Reply just days after an initial pretrial conference before this Court in which the parties argued the motions to dismiss. See Dkt. No. 41]. In this supplement Plaintiffs plead additional facts pertaining to Plaintiffs Munoz, Weaver, Alvarado, and Garcia. Plaintiffs state, "[f]or the record to be accurate as to the Plaintiffs' claims, Plaintiffs need the opportunity to supplement their 7(a) Reply." Id. at p. 2. The facts contained in the supplement are not new

28

facts that only became discoverable recently. Given the timing of this supplement, Defendants are naturally opposed to its filing. Because a scheduling order has not yet been entered in this case, and thus the proceedings are at an early stage, the Court will allow this supplement. This will be the last supplement of its kind because the Court now assumes that Plaintiffs have pled their best case.

This supplement does not add anything further to Munoz's claims, and thus this supplement does not alter the Court's rulings concerning Munoz. Similarly, Plaintiffs' supplement does not alter the Court's rulings concerning Plaintiff Garcia because the new allegations concern events that took place on or about September, 2003, which is over three months after Garcia had already been terminated on May 23, 2003. Any events allegedly occurring after the retaliation complained of are not relevant to this Court's inquiry concerning a First Amendment retaliation claim.

Plaintiff Alvarado now alleges that she too associated with the other Plaintiffs during lunch to discuss instances of misconduct. Additionally, Alvarado attempts to bolster her allegations by pleading new facts concerning the alleged adverse employment action taken against her. Plaintiff Weaver adds additional facts concerning alleged retaliation against her, including "a pay cut ordered by Defendant Yzaguirre in the amount of approximately $3,000.00" Id. ¶ 4. Additionally, Weaver asserts that "on or about August 2, 2002, she gave a statement to the Cameron County Sheriff's Department about Defendant Yzaguirre's possible unlawful conduct as the Cameron County Tax Assessor-Collector." Id. ¶ 8. This statement was given before Weaver was terminated on September 27, 2002, but after Yzaguirre allegedly forced her to take all her accrued vacation leave in May, 2002. This is the first time Plaintiffs have mentioned this statement allegedly given to the Sheriff.

In light of this supplement, which was filed days after the initial pretrial conference, the Court allows Defendants the opportunity to file renewed motions to dismiss concerning **only those new allegations raised by Plaintiffs Alvarado and Weaver**. Defendants should file these motions by April 26. Plaintiffs will have the time allowed under the local rules to respond. Unless the parties wish their motions

29

to be construed as summary judgment motions they should not attach evidence. Finally, the parties are to limit their arguments to the Plaintiffs mentioned above and to the new facts alleged in the Supplemental Rule 7(a) Reply [Dkt. No. 41]. The Court will then issue a prompt ruling on these renewed motions to dismiss, if any, so that this litigation may move forward.[8]

---

[8]The Court clarifies that because Plaintiffs have filed a Supplemental Rule 7(a) Reply, they have amended their pleadings. The Court is allowing these amendments in its discretion under Federal Rule of Civil Procedure 15(a). The Court's rulings on the motions to dismiss, therefore, address only the claims as they were pled through the first Rule 7(a) Reply.

## XI.  Conclusion

The Court **Grants in part and Denies in part** Defendant Cameron County's Motions to Dismiss the claims of Plaintiffs Alvarado, Garcia, Cantu, Munoz, and Weaver [Dkt. Nos. 13 & 14]; **Grants in part and Denies in part** Defendant Yzaguirre's Motions to Dismiss the claims of Plaintiffs Alvarado, Garcia, Cantu, Munoz, and Weaver [Dkt. Nos. 15 & 16]; **Grants in part** and **Denies in part** Defendant Yzaguirre's Motion to Strike Rule 7 Reply [Dkt. No. 26]; **Denies as moot** Defendant Yzaguirre's Motion to Stay Discovery [Dkt. No. 35]; and **Grants** Plaintiffs' Motion for Leave to Supplement 7(a) Reply [Dkt. No. 41].

After the Court resolves any renewed motions to dismiss, it will enter a scheduling order.  Initial disclosures will then be due 20 days after the Court's ruling on any renewed motions to dismiss or 20 days after April 26, if no renewed motions are filed.

DONE this 31st day of March, 2004, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge

31