# EXHIBIT NO. 1

## Civil Action No. B-03-096

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment
Claims for Retaliation for Exercise of Associational Rights

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VICENTA CANTU, ET AL | X | |
| | X | |
| | X | |
| VS. | X | CIVIL ACTION NO. B-03-096 |
| | X | |
| | X | |
| CAMERON COUNTY, ET AL | X | |

ORAL DEPOSITION OF VICENTA CANTU
FEBRUARY 7, 2006
VOLUME 1

Volume 1 of the Oral Deposition of VICENTA CANTU,

who resides in Cameron County, Texas, taken by Craig

Vittitoe, Attorney for Defendant Tony Yzaguirre, Tax

Assessor-Collector of Cameron County and Director of

Cameron County Automobile Crimes Enforcement Task Force

in His Individual Capacity, reported by SHELLEY

STINGLEY, Certified Court Reporter in and for the State

of Texas, on FEBRUARY 7, 2006, in the offices of Adams

& Graham, 222 East Van Buren, West Tower, Harlingen,

Texas.

APPEARANCES

COUNSEL FOR PLAINTIFFS:

> GAY E. GILSON
> LAW OFFICE OF GAY E. GILSON
> 719 South Shoreline, Suite 301-A
> Corpus Christi, Texas  78401
> DAVID LEE McGEE
> LAW OFFICES OF DAVID LEE McGEE
> 701 Park Avenue
> Corpus Christi, Texas  78401

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR OF
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE IN HIS INDIVIDUAL CAPACITY:

> CRAIG H. VITTITOE
> ROGER W. HUGHES
> ADAMS & GRAHAM
> 222 East Van Buren, West Tower
> Harlingen, Texas  78550

COUNSEL FOR CAMERON COUNTY:
> BRUCE HODGE
> CIVIL LITIGATION
> LEGAL DIVISION COMMISSIONERS COURT
> Cameron County Courthouse, 4th Floor
> 964 East Harrison Street
> Brownsville, Texas  78520

> CHARLES WILLETTE, JR.
> HEATHER SCOTT
> WILLETTE & GUERRA
> 1534 East 6th Street, Suite 200
> Brownsville, Texas 0 78520

ALSO PRESENT:
> Tony Yzaguirre
> Felix Munoz

Page 215

1    Q.   Okay.  Now, you've also alleged in this lawsuit

2    that your freedom of association was influenced

3    adversely.  Do you understand that?  Do you know what I

4    mean?

5    A.   No.  Can you repeat it?

6    Q.   Did you have an association where you talked

7    about the problems in the office with Mr. Munoz, Ruth

8    Weaver, Ms. Alvarado and Linda Garcia?

9    A.   Well, not Linda.  With Ruth and Tina and

10   Mr. Munoz, yes, we would have lunch and we would

11   discuss stuff.

12   Q.   Okay.  And did anyone else engage in those

13   conversations other than you four?

14   A.   I think -- no, I don't recall nobody else.

15   Q.   So you and Felix Munoz and Ruth Weaver and

16   Ms. Alvarado would go to lunch and talk about the

17   problems in the office?

18   A.   Yes, we would.

19   Q.   How often did you do that?

20   A.   Just -- I can't like tell you once a week or

21   every two weeks or maybe twice a week.  It was

22   different times.

23   Q.   When did that association start?

24   A.   When we started -- like when the program, the

25   auto crime task force, when we got like -- we would all

Page 216

1    work together more.  We were closer.

2         Q.  About 1999?

3         A.  More or less.

4         Q.  So in 1999 until you left, you folks had

5    meetings?

6         A.  We would have lunch and we would talk, yes.

7         Q.  Where would you go to lunch?

8         A.  Chili's, different places.

9         Q.  And you would talk about, what, the operation

10   of the office?

11        A.  We would talk about the problems at work,

12   things we didn't like, things that were going on.

13        Q.  Did you talk about these notaries and these car

14   dealers and, in your opinion, the special treatment

15   that they received there at the office?

16        A.  Yes, yes.

17        Q.  Okay.  And was this a formal association that

18   you had with these coworkers?

19        A.  No, it would be like just -- like coworkers,

20   just going out, having lunch, and discussing.

21        Q.  And you're talking about work, right?

22        A.  Yes.

23        Q.  In other words, you're not talking about --

24        A.  We would talk about everything, work and our

25   families or movies and stuff, and everything.

1    Q.   Did anyone ever try to restrict your meetings,

2  meeting with these folks, or having lunch with these

3  folks, or going to their homes, anything like that?

4    A.   One time -- I guess it was the last year I was

5  there -- it was my birthday and we all got together at

6  Chili's and I was walking out of the office,

7  Mr. Yzaguirre was coming in, and he told me -- he made

8  a remark saying that how come he wasn't invited.

9  "You're not on my list no more."

10    Q.   Now, who said that?

11    A.   Mr. Yzaguirre.

12    Q.   Okay.  So Mr. Yzaguirre indicated that his

13  feelings were hurt for not being invited to a birthday

14  party?

15    A.   I don't know if they were hurt.  He was just

16  like making fun.

17    Q.   Okay, okay.  Did you have a birthday party that

18  day?

19    A.   It was a lunch they had.

20    Q.   Okay.  So you had a luncheon, correct?

21    A.   Yes.

22    Q.   And did it involve these other people or more

23  than that?

24    A.   More than that.

25    Q.   Okay.

1      A.  Mireles, Marisol.

2      Q.  But I think what I'm trying to ask is the group

3  that would talk about the problems in the office, was

4  it you, Felix, Ruth, and Ms. Alvarado?

5      A.  Yes.

6      Q.  Did it involve anybody else?

7      A.  Marisol sometimes would go.

8      Q.  Okay.  Was she a participant or was she more of

9  just an observer?

10     A.  Oh, no, she would participate.

11     Q.  Okay, anyone else?

12     A.  Right now that's all I can recall.

13     Q.  Okay.  And you would talk about everything in

14  the world, I guess, including the problems at the

15  office?

16     A.  Including the problems at the office.

17     Q.  Okay.  I think my question is, did

18  Mr. Yzaguirre do anything to stop you or curtail you in

19  those meetings that you had over lunch or wherever you

20  had your meetings?

21     A.  Repeat me the question.

22     Q.  Yes, ma'am.  Did Mr. Yzaguirre or anybody at

23  the tax assessor's office try to stop you from those

24  meetings or meeting and discussing about the problems

25  at the office?

Page 219

1      A.  It was our lunch hour.  I mean, you could go

2  wherever you wanted to go.

3      Q.  So the answer to the question is no, correct?

4      A.  Well, he never told me nothing, not to have

5  lunch with them.

6      Q.  You don't know of anything that he did or any

7  supervisor did at the tax assessor's office that would

8  indicate to you that you couldn't meet with these

9  people?

10      A.  Me personally, he never told me anything.  I

11  don't know about the rest.

12      Q.  You never felt that he was pressuring you not

13  to talk about these things that you were talking about

14  concerning the problems at the office, did you?

15      A.  He never told me anything.

16      Q.  Okay.  And no one else did, either, for that

17  matter, correct?

18      A.  The rest of them, I don't know if he ever told

19  them something or not.  I can't answer you.

20      Q.  Okay.  Did these meetings of your association

21  involve anyone else, for example, in law enforcement?

22      A.  Mireles would -- yeah, Mireles went.

23      Q.  Okay.  He would go?

24      A.  He would go.

25      Q.  Okay, and he would talk about the problems at

1    enforcement.

2        Q.  I'm talking about outside the office.

3        A.  No.

4        Q.  Okay, now, again, you would have these meetings

5    with your coworkers, right?

6        A.  Yes.

7        Q.  And you would talk about the problems at the

8    office, right?

9        A.  Yes.

10       Q.  Did you talk about your suspicion that maybe

11   Tony was receiving -- Tony Yzaguirre was receiving

12   money under the table or improperly?

13       A.  Yes, we would discuss it.

14       Q.  Okay.  And these meetings, did they happen on a

15   set date?

16       A.  No.

17       Q.  Or did they just happen informally?

18       A.  They just happened.

19       Q.  They were just gatherings that you would have

20   over lunch?

21       A.  Yes.

22       Q.  And they would happen -- you might talk about

23   what was going on at the office just whenever it would

24   come up, right?

25       A.  Correct.

1    Q.  You didn't have set meetings?

2    A.  No.

3    Q.  Okay.  And do you think Mr. Yzaguirre knew what

4    you were talking about at those meetings?

5    A.  I don't know.

6    Q.  Do you have any information that he knew what

7    you were talking about at those meetings?

8    A.  Not that I know of.

9    Q.  Do you have any information that you can

10   communicate to us today that any of the participants at

11   these meetings in which you discussed the office

12   procedure and your criticisms of Mr. Yzaguirre and the

13   criticisms of the office, that any of that information

14   leaked back to Mr. Yzaguirre?

15   A.  Repeat me the question.

16   Q.  Yes.  Do you have any information that you can

17   share with us and the judge and the jury in this case

18   that Mr. Yzaguirre knew what you were talking about in

19   these meetings?

20   A.  I think he had an idea.  He fired me.  He

21   demoted Mr. Munoz.  He fired Ruth and then he fired

22   Tina.

23          MR. VITTITOE:  Objection; nonresponsive.

24   Q.  Do you have any information, based on your

25   personal knowledge --

Page 299

1    A.   No, I don't have any information.

2    Q.   -- based on your personal knowledge that

3    Mr. Yzaguirre knew what was being discussed in these

4    meetings, these informal meetings that would just

5    happen at lunch, whenever you guys wanted to meet --

6    correct?

7    A.   Correct.

8    Q.   You don't have any information?

9    A.   No.

10    Q.   Personal knowledge?

11    A.   Not personal knowledge --

12    Q.   Okay.

13    A.   -- only that they would see us leave together.

14    Q.   Okay.

15    A.   That's it.

16    Q.   But it's not uncommon for -- here at Adams &

17    Graham, my law firm, secretaries and lawyers go out to

18    lunch every day and we may go to have lunch together.

19    The same is probably true at the tax assessor's office

20    then and today, correct?

21    A.   Well, like I'm saying, I was fired, then

22    Mr. Munoz demoted, and then Ruth was fired.  It was

23    just our little group that we used to hang around

24    together.

25              MR. VITTITOE:  Objection; nonresponsive.

1    Q.  My question to you is that no one ever told you

2    or indicated to you who you could go to lunch with or

3    who you couldn't go to lunch with?

4    A.  No.

5    Q.  Okay, and you would go to lunch and you would

6    decide who was going to go to lunch, whether it

7    involved the little group you told us about or whether

8    it involved other participants in the little group,

9    correct?

10   A.  Yes.

11   Q.  And you made those decisions as well as the

12   participants, right?

13   A.  We would all decide, not only me.

14   Q.  But you're not telling us under oath from your

15   personal knowledge that Mr. Yzaguirre somehow

16   interfered with your right to get together with your

17   little group?

18   A.  No, he never told us we couldn't --

19   Q.  Okay.

20   A.  -- go to lunch.

21   Q.  And he never indicated that he knew what in the

22   world you were talking about other than the office or

23   matters just in general involving food when you were

24   out at lunch?

25   A.  No.

Page 301

1    Q.  He never indicated to any of your group that he

2    knew what you were talking about?

3              MS. GILSON:  Objection; calls for

4    speculation.

5    A.  I don't know about the rest of the group.  I

6    only --

7              MR. VITTITOE:  Objection; nonresponsive.

8    Move to strike as nonresponsive.

9    Q.  I'm asking about your personal knowledge.  Do

10   you have any piece of information from your own

11   personal knowledge that Mr. Yzaguirre knew what these

12   meetings were about?

13             MS. GILSON:  Object; asked and answered

14   several times.

15             MR. VITTITOE:  If she will answer that,

16   I'll move on.

17   A.  Repeat me the question.

18   Q.  Within your personal knowledge -- do you agree

19   that within your personal knowledge that you have no

20   evidence as to what Mr. Yzaguirre knew or did not know

21   you were discussing during these meetings?

22   A.  I don't know if he knew or didn't know.

23   Q.  Thank you, ma'am.  Let me now move on to

24   another subject matter.  I'm just curious, how did the

25   nickname "El Monster" or "The Monster" come up?

Page 640

1    he was the officer.

2       Q.  Okay.  Okay.  Let's see here.  Let's go to the

3    subject of this little group of people that had lunch

4    together again.

5       A.  Okay.

6       Q.  If I understand it, that was you and Ruth Weaver

7    and her sister Diamantina Alvarado and Felix Munoz?

8       A.  And Marizol and Mireles sometimes.

9       Q.  Okay.  Sometimes they would join you as well?

10      A.  Yes, sir.

11      Q.  When Mireles and Marizol were there, did you

12   discuss the problems that you were referring to earlier

13   with Mr. Vittitoe?

14      A.  Marizol knew of everything because her and me,

15   we would talk about that when we were at the office.

16   Mireles -- Mireles knew because he told me when I asked

17   him for the copies.  I said, Mireles can I make copies?

18   And he goes, "I know what's going on, Bibi.  Don't worry

19   about it.  Just do them."  So, you know, Mireles would

20   make comments.

21      Q.  Okay.

22      A.  But, I mean, I'm not going to say that he would

23   get -- he would like make little comments, stuff about

24   the office, but that's about it.

25      Q.  Did you and the other members of your lunch

Page 641

1   group have an agreement that what was discussed about

2   the county tax assessor-collector office affairs at

3   lunch would remain a secret?

4       A.   No, sir.

5       Q.   Okay.  Did you have an agreement that one or

6   more of you would speak out on these affairs that were

7   discussed at lunch?

8       A.   I don't remember that.

9       Q.   Was there a leader of this group of people that

10  discussed these things?

11      A.   No.

12      Q.   Were you the only one that was critical of

13  Mr. Yzaguirre?

14      A.   What do you mean by that?

15      Q.   Do you know what I mean when I say the word

16  criticize?

17      A.   Oh, that we would criticize him?

18      Q.   Yes.

19      A.   No.

20      Q.   You didn't criticize him?

21      A.   Oh, everybody did, sir.

22      Q.   Everybody did?

23      A.   Yes, even Mireles, everybody, Marizol.  I mean,

24  everybody did.

25      Q.   Okay.  Even Diamantina Alvarado?  She criticized

Page 642

1    him as well?

2        A.   It wasn't like criticize him.  We would discuss

3    things we would see, things that were going on in the

4    office.

5        Q.   Did you ever -- did the word criminal ever come

6    up in any of those discussions?

7        A.   Not that I remember.

8        Q.   You never accused Yzaguirre of a crime, did you,

9    during those lunch brakes?

10       A.   It was a criminal -- no, I don't remember.

11       Q.   All right.  And I think that Mr. Vittitoe

12   already asked you this, but just to be sure, because we

13   don't have your transcript back yet, am I right to say

14   that you, yourself, never voluntarily went to any law

15   enforcement people on your own to report any of the

16   goings on at the tax office?

17       A.   No, I never went on my own.

18       Q.   Okay.  It wasn't until the sheriff deputy I

19   guess called you?

20       A.   Manuel Trevino, Rumaldo and some other gentleman

21   that I don't know the name went to my house.

22       Q.   All right.  And we've already covered all that.

23   I don't particularly want to go back into that.  But --

24   now, did you see Ruth Weaver during those lunch meetings

25   that she was being very careful not to let anyone else

Page 643

1    overhear what was being said?

2       A.   I was -- I was just there.  I mean, I'm not

3    going to say, yes, I did, or no.  Sometimes we were

4    eating already.  And it wasn't like meetings because we

5    would call -- Mr. Munoz' wife works at VICC, we would

6    reserve a table, and we would go there.  It was not just

7    like all four of us.  I mean, sometimes even Vickie used

8    to go with us.  Vickie would go with us.

9       Q.   Vickie who?

10      A.   Saldana, the secretary.

11      Q.   Okay.

12      A.   Yes.  I mean, it wasn't like just us.  You make

13   it sound like it was just -- we didn't hang around with

14   nobody else.  We did.

15      Q.   Yeah, I was just wondering.  I mean --

16      A.   Yes, we did.  We did.  And, like I'm telling

17   you, I mean, Vickie would go.  I mean, several people

18   would go.

19      Q.   Okay.

20      A.   Even Lupita a couple of times went and had lunch

21   with us too.

22      Q.   Was the purpose of these meetings to somehow

23   scheme against Mr. Yzaguirre?

24      A.   No.

25      Q.   Were you all somehow conspiring to unseat him or

Page 644

1     something like that?

2          A.   No.

3          Q.   No?

4          A.   No.

5          Q.   Okay.  Let's go to the -- I understand that

6     there was a time when from time to time you would go to

7     Dillards and make payments on your account there.

8          A.   I would go shopping like everybody else.

9          Q.   And Diamantina Alvarado worked there?

10         A.   She still works there.

11         Q.   She still does?

12         A.   Yes, sir.

13         Q.   And do you recall any particular occurrence

14    where you went to her counter?  I think she worked at

15    Estee Lauder.

16         A.   I get my makeup.  I'm an Estee Lauder client.

17         Q.   Okay.  And did you go over there and ask her to

18    make a payment on your account for you?

19         A.   I think I paid some stuff, some boots that I

20    bought that day.  I think I paid some boots or some

21    shoes.  I don't remember what I bought.  And I needed to

22    change my blush and stuff.  So, yeah, I went with her

23    and I still go with her.

24         Q.   Okay.  But I think what my question is is was

25    she there to help you make a -- in other words, just

# EXHIBIT NO. 2

## Civil Action No. B-03-096

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment
Claims for Retaliation for Exercise of Associational Rights

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| VICENTA CANTU, FELIX R. )( | |
| MUNOZ, RUTH WEAVER AND )( | |
| DIAMANTINA ALVARADO, )( | |
|     Plaintiffs )( | |
| )( | |
| VS. )( | |
| )( | |
| CAMERON COUNTY and )( | |
| TONY YZAGUIRRE, JR., Tax )( | CIVIL ACTION NO. 03-CV-96 |
| Assessor-Collector of )( | |
| Cameron County and )( | |
| Director, Cameron County )( | |
| Automobile Crimes )( | |
| Enforcement Task Force, )( | |
| in his Individual )( | |
| Capacity, )( | |
|     Defendants )( | |

ORAL DEPOSITION OF
FELIX MUNOZ
FEBRUARY 15, 2006
VOLUME 2

VOLUME 2 OF THE ORAL DEPOSITION OF FELIX MUNOZ,

produced as a witness at the instance of the DEFENDANT

TONY YZAGUIRRE, JR., TAX ASSESSOR-COLLECTOR OF CAMERON

COUNTY AND DIRECTOR, CAMERON COUNTY AUTOMOBILE CRIMES

ENFORCEMENT TASK FORCE, IN HIS INDIVIDUAL CAPACITY,

taken in the above-styled and numbered cause on

FEBRUARY 15, 2006, reported by CORINNA N. GARCIA,

Certified Court Reporter No. 5210, in and for the State

of Texas, at Adams & Graham, L.L.P., 222 East Van Buren,

West Tower, Harlingen, Texas.

Page 130

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GAY E. GILSON
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301A
Corpus Christi, Texas  78401
(361) 887-0552

COUNSEL FOR DEFENDANT CAMERON COUNTY:

BRUCE W. HODGE
CIVIL LITIGATION
LEGAL DIVISION COMMISSIONERS COURT
Cameron County Courthouse
964 East Harrison, 4nd Floor
Brownsville, Texas  78520
(956) 550-1345

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, JR., TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR,
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE, IN HIS INDIVIDUAL CAPACITY:


ROGER W. HUGHES

ADAMS & GRAHAM, L.L.P.

222 East Van Buren, West Tower

Harlingen, Texas  78550

(956) 428-7495


ALSO PRESENT:


Tony Yzaguirre, Jr.

Vicenta Cantu

9d44e4fa-b1fb-4b45-beb1-3293332530b6

## INDEX

|  | PAGE |
|---|---|
| Appearances ................................. | 130 |

FELIX MUNOZ

| | |
|---|---|
| Examination by Mr. Hughes .................... | 132 |
| Examination by Mr. Hodge ..................... | 239 |
| Examination by Mr. Hughes .................... | 275 |
| Examination by Mr. Hodge ..................... | 281 |

## EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 4 | Letter dated May 17, 2002 from Felix Munoz to Tony Yzaguirre, Jr. .......... | 139 |
| 5 | Letter dated May 21, 2002 from Mark Yates to Antonio Yzaguirre, Jr. ....... | 152 |
| 6 | Memo dated May 23, 2002 from Tony Yzaguirre, Jr. to Felix Munoz ......... | 156 |
| 7 | Grant Application Package ............. | 159 |
| 8 | Affidavit of Felix Munoz dated August 3rd, 2002 ..................... | 166 |
| 9 | Memo dated September 26, 2002 from Tony Yzaguirre, Jr. to Felix Munoz ......... | 189 |

Page 132

1                    FELIX MUNOZ,

2   having been previously duly sworn, testified as follows:

3                    EXAMINATION (Cont.)

4   BY MR. HUGHES:

5       Q.  Are you the same Felix Munoz that we were

6   deposing last week?

7       A.  Yes, sir.

8       Q.  Do you remember -- do you realize you're still

9   under oath from last week?

10      A.  Yes, sir.

11      Q.  Okay.  Well, you were -- you attended the

12  deposition of Esthela Guerra?

13      A.  Yes, sir.

14      Q.  Do you recall her saying she came to your office

15  with a question or a problem?

16      A.  Yes, sir.

17      Q.  Did she?

18      A.  Yes.

19      Q.  Well, what did she tell you the problem was or

20  what was her question?

21      A.  She had a problem with some type of -- it was a

22  title problem.  I don't recall the exact details about

23  it.

24      Q.  Did she call you about -- did she come by your

25  office with paperwork that was going to the Nueces

Page 226

1      A.   No.

2      Q.   All right.  So we've talked about your reason to

3   resign.  We've talked about the salary.  You were

4   unhappy with that particular type of work.  You were

5   having to pay for travel out of your own pocket.  And

6   you couldn't get along with Ms. Barbosa because she

7   wouldn't answer your questions.  Is there anything else

8   about the work -- about anything else that was -- caused

9   you to resign?

10     A.   No.

11     Q.   Now, when did you start going to lunch with

12  Ms. Cantu?

13     A.   When -- after she joined the task force.

14     Q.   Okay.  And when did the two of you -- how often

15  would you have lunch with her?

16     A.   It would be periodic.

17     Q.   Well, are we talking -- was there any regular

18  frequency at all, like every week, every month, or just

19  whenever?

20     A.   No, sometimes the whole task force would get

21  together and go to lunch.

22     Q.   Okay.  So you heard her talking about that she

23  was very careful about talking things about the office

24  over lunch.  Was she?

25     A.   Who is that?

1    Q.  Ms. Cantu.

2    A.  I don't recall.

3    Q.  Did -- do you recall her at any of these

4  luncheon meetings telling you things that she had

5  observed in the office?

6    A.  On occasion she would bring stuff up.

7    Q.  Do you recall what she would bring up?

8    A.  I don't know.

9    Q.  Okay.  So as you're sitting here today, you

10  can't recall any specific thing that Mrs. Cantu brought

11  up during these luncheon meetings?

12    A.  Not a specific thing, no.

13    Q.  Okay.  Well, when you say not specific, what was

14  she talking about that you can recall?

15    A.  I don't recall.

16    Q.  Can't recall even generalities?

17    A.  Huh-uh.  No.

18    Q.  And during these lunch -- and so until

19  Ms. -- until Ms. Cantu was terminated, you can't -- you

20  can't recall any things that she said at any of these

21  luncheon meetings?

22    A.  No.

23    Q.  Okay.  Do you recall her -- ever urging her to

24  do anything about something?

25    A.  Urging who?

1    Q.  Mrs. Cantu.

2    A.  Who was urging her?

3        MR. HODGE:  Ask that question again, Roger.

4  It kind of came out funny.

5    Q.  Okay.  Before she was terminated, do you recall

6  at any of these luncheon meetings urging her to do

7  anything?

8    A.  No, sir.

9    Q.  To speak out, take any kind of action?

10   A.  No, sir.

11   Q.  Okay.  Before Mrs. Weaver -- now Mrs. McGinnis

12  -- was terminated, do you recall at any of these

13  luncheon meetings where you or anyone else urged

14  Ms. Weaver to speak out or do anything about stuff she

15  was saying?

16   A.  No, sir.

17   Q.  Do you recall before -- okay.  Before Ms. Weaver

18  was terminated, do you recall her saying anything

19  specific at any of these luncheon meetings?

20   A.  No, sir.

21   Q.  Do you recall her complaining about anything

22  that she had seen or saying that she had seen anything

23  unusual or improper going on in the office?

24   A.  No, sir.

25   Q.  Okay.  Not at all before she was terminated?

Page 229

1      A.  No.

2      Q.  Okay.  At any of these luncheon meetings, did

3   anybody ever encourage or suggest to Mrs. Cantu or

4   Mrs. Weaver that they needed to do something?

5      A.  No, sir.

6      Q.  I mean, that -- not -- not that you can recall?

7      A.  What's that?

8      Q.  Not that you can recall, sir?

9      A.  Not that I can recall.

10     Q.  Now, at any time before Ms. Alvarado left the

11  tax assessor-collector's office, do you recall her

12  saying anything at any of these luncheon meetings?

13     A.  No.

14     Q.  You don't recall anything she said?

15     A.  No.

16     Q.  Do you recall anyone ever urging her to speak

17  out or do anything at any of these luncheon meetings?

18     A.  No, I don't recall.

19     Q.  Did you ever at any of these luncheon meetings

20  encourage her or suggest to her that she needed to take

21  some sort of action or that she should speak out in any

22  way, shape or form?

23     A.  No, sir.

24     Q.  Now, as you sit here today, do you have any

25  information that would indicate or suggest that

Page 230

1   Mr. Yzaguirre learned what Mrs. Cantu was saying at

2   these luncheon meetings?

3       A.  No.

4       Q.  Do you have any information that before

5   Mrs. Weaver was terminated, that Mr. Yzaguirre found out

6   what Mrs. Weaver was saying at these meetings?

7       A.  No.

8       Q.  Do you have any information, as you sit here

9   now, that before Ms. Alvarado left the tax

10  assessor-collector's office, that Mr. Yzaguirre found

11  out what she might be saying at any of these luncheon

12  meetings?

13      A.  No.

14      Q.  Do you have any information, as you're here

15  today, that before you lost your $3,000-a-year stipend,

16  that Mr. Yzaguirre found out that -- what you might have

17  said at any of these luncheon meetings?

18      A.  No, sir.

19      Q.  Do you have any information that before he

20  decided in May of 2002 to transfer you to the

21  Brownsville office, that he found out what you or

22  Ms. Cantu or Ms. Weaver or Ms. Alvarado were saying at

23  these luncheon meetings?

24      A.  No.

25      Q.  Do you have any information that he found out or

Page 231

1    understood that you-all were having any kind of meetings

2    over the lunch hour?

3        A.   No.

4        Q.   Okay.  I understand now you work for Montenegro

5    Paving.  Is that the name of the business, sir?

6        A.   Yes.

7        Q.   What do you do for them?

8        A.   Just billing and payables.

9        Q.   Okay.  What -- what does that kind of work

10   entail, sir?

11       A.   Sending out statements for work that's been

12   done.

13       Q.   Okay.  Do you -- do you handle money?

14       A.   No.

15       Q.   Do you handle accounts receivable?  Pardon me.

16   Handle in the sense that you receive payments.

17       A.   No.

18       Q.   Okay.  Do you handle what they call accounts

19   payable; that is --

20       A.   I write -- he gives me the checkbook, I write

21   out his checks for him.

22       Q.   Okay.  And do you have to supervise anybody?

23       A.   No.

24       Q.   How are you paid?

25       A.   With a check.

Page 253

1    Q.  And was it more or less a year or so after the

2    antitheft program got started that she first invited you

3    out to lunch with the girls?

4    A.  I don't recall.  Because we used to eat, as a

5    task force, once or twice or on special occasions or

6    birthdays or whatever.

7    Q.  Okay.  But am I right to say, Mr. Munoz, that

8    you do remember having lunch on several occasions where

9    it was you and Ruth and Bibi Cantu -- Ruth Weaver, Bibi

10   Cantu and Diamantina Alvarado?

11   A.  Yes, sir.

12   Q.  Just the four of you?

13   A.  Yes, sir.

14   Q.  I believe you told Mr. Hughes earlier that you

15   don't remember the specifics of anything that was really

16   said by any of the people during those lunch meetings;

17   is that fair to say?

18   A.  Fair to say.

19   Q.  But am I right to say that there was some

20   bad-mouthing going on of Tony Yzaguirre?

21          MS. GILSON:  Object to the term

22   "bad-mouthing."

23   A.  Well, I mean, you know, comments were made, but

24   I wouldn't say bad-mouthing Mr. Yzaguirre.

25   Q.  You wouldn't say they were bad-mouthing him?

# EXHIBIT NO. 3

## Civil Action No. B-03-096

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment
Claims for Retaliation for Exercise of Associational Rights

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, ET AL       X
                           X
                           X
VS.                        X    CIVIL ACTION NO. B-03-096
                           X
                           X
CAMERON COUNTY, ET AL      X

---

ORAL DEPOSITION OF RUTH WEAVER McGINNIS
FEBRUARY 9, 2006

---

Oral deposition of RUTH WEAVER McGINNIS, who resides

In Cameron County, Texas, taken by ROGER W. HUGHES,

Attorney for Defendant Tony Yzaguirre, Tax

Assessor-Collector of Cameron County and Director of

Cameron County Automobile Crimes Enforcement Task Force

in His Individual Capacity, reported by SHELLEY

STINGLEY, Certified Court Reporter in and for the State

of Texas, on FEBRUARY 9, 2006, in the offices of Adams

& Graham, 222 East Van Buren, West Tower, Harlingen,

Texas.

APPEARANCES

COUNSEL FOR PLAINTIFFS:

      GAY E. GILSON
      LAW OFFICE OF GAY E. GILSON
      719 South Shoreline, Suite 301-A
      Corpus Christi, Texas  78401
      DAVID LEE McGEE
      LAW OFFICES OF DAVID LEE McGEE
      701 Park Avenue
      Corpus Christi, Texas  78401

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR OF
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE IN HIS INDIVIDUAL CAPACITY:

      CRAIG H. VITTITOE
      ROGER W. HUGHES
      ADAMS & GRAHAM
      222 East Van Buren, West Tower
      Harlingen, Texas  78550

COUNSEL FOR CAMERON COUNTY:
      BRUCE HODGE
      CIVIL LITIGATION
      LEGAL DIVISION COMMISSIONERS COURT
      Cameron County Courthouse, 4th Floor
      964 East Harrison Street
      Brownsville, Texas  78520

      CHARLES WILLETTE, JR.
      HEATHER SCOTT
      WILLETTE & GUERRA
      1534 East 6th Street, Suite 200
      Brownsville, Texas 0 78520

ALSO PRESENT:
      Tony Yzaguirre
      Vicenta Cantu
      Diamantina Alvarado
      Felix Munoz

db2abba7-fd22-43cd-a4e5-850eff2fb2b8

INDEX

Appearances ..................................... 1

Examination by Mr. Hughes .....................  4

Examination by Mr. Hodge ...................... 155

Examination by Mr. Hughes ..................... 195

Examination by Mr. Hodge ...................... 203


Errata Sheet/Signature page ................... 205

Reporter's Certificate ........................ 206

DOCUMENTARY EVIDENCE

| Ex. No. | Description | Iden. |
|---|---|---|
| 1 | 8-2-02 Statement by Ruth Weaver .... | 103 |
| 2 | February 2003 e-mails .............. | 147 |
| 3 | February 2003 e-mail .............. | 148 |

Page 4

1                    RUTH WEAVER McGINNIS,

2      having been duly sworn, testified as follows:

3                         EXAMINATION

4      BY MR. HUGHES:

5          Q.   Could you please state your name, please?

6          A.   Ruth A. McGinnis.

7          Q.   And how old are you?

8          A.   39.

9          Q.   And where were you born?

10         A.   Brownsville, Texas.

11         Q.   Brownsville, born and raised?

12         A.   Yes, sir.

13         Q.   Where did you go to high school?

14         A.   In Brownsville.

15         Q.   What school, ma'am?

16         A.   James Pace High School.

17         Q.   When did you graduate?

18         A.   1984.

19         Q.   Did you attend -- get any additional schooling

20     after that, college?

21         A.   Yes.

22         Q.   Could you describe for us what your additional

23     schooling was?

24         A.   At the University of Texas, a legal secretary.

25         Q.   Was that UT Brownsville, ma'am?

1    were, and if I was available we would go.  If I wasn't,

2    well, we wouldn't.

3        Q.   Did that arrangement ever change?

4        A.   Off and on.

5        Q.   Okay.  Would she be usually the one to ask you

6    to go to lunch or vice versa?

7        A.   Vice versa.

8        Q.   And your sister, is her nickname Tina?

9        A.   Yes.

10       Q.   Is she usually called Tina or Diamantina?

11       A.   Tina.

12       Q.   Your sister, how is it that you would come to

13   eat lunch with her?

14       A.   She would go -- she would always have lunch

15   with me.

16       Q.   Okay.  She always ate with you?

17       A.   Yes.

18       Q.   And when did Mr. Munoz start eating with you?

19       A.   I don't remember.  I don't have an exact date.

20       Q.   Was it in 2001 or 2002?

21       A.   I don't remember.

22       Q.   Do you recall why it was that he started eating

23   lunch with you?

24       A.   I believe he got invited.

25       Q.   Who invited him?

1      A.   I don't remember.

2      Q.   Did you invite him, ma'am?

3      A.   I don't remember.

4      Q.   Was there a reason why you might have invited

5   him?

6      A.   Yes.

7      Q.   What?

8      A.   To talk about what was going on on the task

9   force.

10     Q.   Okay.  And what was going on?

11     A.   That the illegal paperwork was being processed

12  anyway.

13     Q.   Okay.  Which paperwork are you referring to?

14     A.   The title transactions from the notaries.

15     Q.   Okay, which notaries?

16     A.   The five previously mentioned.

17     Q.   Okay.  You know that three of them are not

18  notaries?

19     A.   Which ones?

20     Q.   Well, what made you think that any of them were

21  notaries?

22     A.   I know Esthela is a notary and I don't remember

23  the names of the other ones right now.

24     Q.   Okay, well, what made you think that Moises or

25  Aaron Torres are notaries?

1    A.  Okay, his wife is a notary.

2    Q.  Okay, he is not a notary?

3    A.  You're right.  His wife is a notary.

4    Q.  Is Aaron a notary?

5    A.  No, but that's his brother.

6    Q.  Okay.  And Mr. Barreda, Sr., or Mr. Barreda,

7    Jr., are they notaries?

8    A.  No.

9    Q.  So if only one of these five people is a

10   notary, why do you refer to all of them as notaries?

11   A.  Because we were previously talking about the

12   same people.

13   Q.  Okay.  And why was it you wanted to talk to

14   Mr. Munoz about this?

15   A.  I wanted to let him know what I was seeing and

16   what he thought about it.

17   Q.  And what is it that you were seeing?

18   A.  What we discussed earlier.

19   Q.  That is the paperwork that was being left at

20   the main office?

21   A.  Yes.

22   Q.  That was all you wanted to talk to him about?

23   A.  Yes.

24   Q.  Okay.  And why did you need to go to lunch to

25   talk to him about that?

Page 91

1     A.   Because at the office there's no time.

2     Q.   He was your -- he was a supervisor there,

3     wasn't he?

4     A.   Yes.

5     Q.   And he was a project coordinator of the task

6     force, wasn't he?

7     A.   Yes.

8     Q.   And the operation of the task force and

9     examining titles was under his direction, right?

10    A.   Mr. Yzaguirre's, also.

11    Q.   Yes, but he was also in charge of it as project

12    coordinator, correct?

13    A.   Yes.

14    Q.   So he didn't have time during business hours to

15    talk about something that fell within his work?

16    A.   No.

17    Q.   Just because he was too busy at work?

18    A.   Yes.

19    Q.   You couldn't just go over to his office or make

20    an appointment?

21    A.   He always had people in his office.

22    Q.   So you didn't think you could just call him and

23    say, "Could you make some time to talk to me about the

24    task force?"

25    A.   There was always a lot of work with different

1    things at the office, especially when you're dealing

2    with the public.

3        Q.  So you were too busy with your own work to make

4    time during regular office hours to speak to the

5    project coordinator about something going on that

6    directly affected him?

7        A.  Yeah.

8        Q.  And so you thought -- where were you going to

9    go for lunch?

10       A.  I don't even remember.

11       Q.  It was a public restaurant, wasn't it?

12       A.  Yes.

13       Q.  Okay.  So you were going to go to a public

14   restaurant to discuss office business?

15       A.  Yes.

16       Q.  That was your purpose?

17       A.  No, plus to also eat.

18       Q.  Okay.  You considered this a sensitive subject?

19       A.  I did, yes.

20       Q.  Okay.  To be discussed over dinner at a public

21   restaurant?

22       A.  Lunch.

23       Q.  Well, that's where you were going, weren't you?

24       A.  Yes, but you said dinner, and it was lunch.

25       Q.  Lunch, I'm sorry.  To be discussed over lunch.

Page 93

1    A.   Yes.

2    Q.   Where even a waitress could overhear you?

3    A.   No.

4    Q.   Well, aren't you the slightest bit concerned

5    that people who -- people outside the office would

6    overhear this?

7    A.   No.

8    Q.   You weren't concerned about that?

9    A.   I was, but that's why, when I was talking, I

10   would always make sure who was around, and if there

11   were close-by people or not.

12   Q.   Okay.

13   A.   And if the waitress or waiter would come by, I

14   wouldn't talk.

15   Q.   Okay.  Well, when was the first time you and

16   Ms. Cantu ever discussed what was going on with the

17   task force?

18   A.   I don't remember a date.

19   Q.   Was it over lunch?

20   A.   Yes.

21   Q.   And was this in 2001?

22   A.   I don't remember a date.

23   Q.   How many times in 2001 did you have discussions

24   like this over lunch?

25   A.   There were several.  I don't have an exact

Page 94

1    number.

2        Q.  Okay.  More than ten or less than ten in 2001?

3        A.  Maybe more than ten.

4        Q.  More than 20?

5        A.  I don't know.

6        Q.  More than 10 but you don't know if it's more

7    than 20?

8        A.  I don't have an exact number.

9        Q.  Okay, on how many of these occasions was your

10   sister present?

11       A.  In all of them.

12       Q.  All of them, because she always ate lunch with

13   you?

14       A.  Yes.

15       Q.  Okay.  And on all these occasions, did

16   Ms. Cantu call you up and say, "This is why we're going

17   to go to lunch.  We're going to talk about

18   Mr. Yzaguirre and what's going on"?

19       A.  No.

20       Q.  That's not what she called you up on?

21       A.  No.

22       Q.  On none of them?

23       A.  No.

24       Q.  She would just call you up and say, "Let's go

25   to lunch"?

1      A.   Yes.

2      Q.   Did Mr. Munoz ever call you up in 2001 and

3   say, "Let's go to lunch"?

4      A.   No.

5      Q.   As you sit here now, do you recall when he

6   started joining in?

7      A.   No, I don't.

8      Q.   Do you think it was you or Ms. Cantu or

9   Ms. Alvarado who invited him the first time?

10     A.   I don't remember.

11     Q.   The first time he went to lunch with you and

12   your sister or you and your sister and Ms. Cantu, did

13   you discuss office business?

14     A.   Yes.

15     Q.   You did?

16     A.   Yes.

17     Q.   Was that the purpose of bringing him there?

18     A.   We would talk just in general conversation

19   about many things, and then while in conversation, it

20   would come up.

21     Q.   Okay.  Was that the purpose of inviting him?

22     A.   I don't know because I never invited him

23   personally.

24     Q.   Okay.  So on none of these occasions when he

25   went to lunch did you invite him; that was done by

1    someone else?

2        A.  Yes.

3        Q.  Do you know whether it was your sister, Tina

4    Alvarado, or Ms. Cantu?

5        A.  I don't know.

6        Q.  Okay.  Now, is there anyone else who joined in

7    these discussions at lunch?

8        A.  No.

9        Q.  Okay.  Let me back up.  You and your sister

10   always went out for lunch?

11       A.  Yes.

12       Q.  Five days a week rain or shine?

13       A.  Yes.

14       Q.  So you were always going out with your sister

15   regardless?

16       A.  Yes.

17       Q.  Now, how did you know when it was that --

18   before you left for lunch, anything about Mr. Yzaguirre

19   was going to be discussed at lunch?

20       A.  I did not know.

21       Q.  Okay.  That was not -- you can't recall any

22   intentions where a luncheon was specifically planned so

23   you could go out and talk about Mr. Yzaguirre and what

24   he was doing?

25       A.  No.

1      Q.  On all of these occasions at lunch, it just

2  came up during the course of the conversation?

3      A.  Yes, sir.

4      Q.  Was anyone else invited to join these

5  luncheons?

6      A.  No.

7      Q.  Was that intentional?

8      A.  I don't know.

9      Q.  Did you ever try to invite anyone else?

10      A.  No.

11      Q.  Do you know if Tina Alvarado or Ms. Cantu tried

12  to invite anyone else?

13      A.  No, I don't know.

14      Q.  Okay.  Well, what do you recall in these

15  luncheons that Ms. Cantu would say about Mr. Yzaguirre?

16      A.  That she had seen certain documents that were

17  wrong but she still had to process them because he

18  would get after her or that he had called her in and

19  had gotten after her because she had stopped the

20  processing of a certain document and that he would turn

21  around and order Ms. De Leon to still go ahead and

22  process it or to take it away from her or Lieutenant

23  Mireles, ongoing problems that were happening in there.

24      Q.  Okay.  Did she say what were the nature of the

25  problems that she observed in the paperwork?

Page 98

1    A.   All she would mention was illegal transactions.

2    Q.   She didn't say what they were?

3    A.   No.

4    Q.   She never told you in any of these luncheons --

5    what was the problem with the paperwork that made it

6    illegal, in her opinion?

7    A.   Sometimes she would talk about it, but since

8    she dealt directly with certain people, I mean, I

9    wouldn't know the back story of it, so I would just

10   listen to her.

11   Q.   Okay.  As you sit here now, do you recall

12   anything specific that she said was illegal?

13   A.   At this moment, I don't.

14   Q.   Okay.  You used the word illegal a moment ago.

15   Is that her word or did she use a different word to

16   describe what she was seeing?

17   A.   That was her wording.

18   Q.   She called them illegal?

19   A.   Yes.

20   Q.   But as you sit here now, you cannot recall what

21   specific things she said she was seeing that were

22   illegal?

23   A.   Time has passed by so much already, I just

24   don't recall exactly what it was.

25   Q.   Okay.  And so you can't tell us any specifics

1    at this time?

2        A.   No, sir, not at this time.

3        Q.   Now, did Ms. -- pardon me.   Did your sister

4    Tina Alvarado during this say she saw or was aware of

5    anything improper that was going on?

6        A.   Only what she would hear --

7        Q.   Okay.

8        A.   -- in the conversations.

9        Q.   And what do you recall at these luncheon

10   meetings that your sister said that she overheard or

11   heard about?

12       A.   She really wouldn't tell me anything because we

13   worked both there at the same place, same time, so we

14   really wouldn't tell each other anything.

15       Q.   Okay.   Do you recall her telling you anything

16   specific that she had overheard or become aware of that

17   Mr. Yzaguirre was doing that she considered improper?

18       A.   I don't remember at this time.

19       Q.   Okay.   Did Mr. Munoz describe to you anything

20   that he saw or overheard that was considered improper

21   or illegal?

22       A.   Yes.

23       Q.   What did he tell you?

24       A.   He would tell me that he just did not

25   understand why Mr. Yzaguirre was authorizing certain

1    documentation that he had already seen that was wrong

2    and he would still tell Ms. De Leon to still go ahead

3    and process it, that he just could not understand why

4    that was going on if he was the director of the task

5    force, and that it was out of his hands to even stop it

6    because the person who had the last wording was

7    Mr. Yzaguirre.

8        Q.  Okay.  As you sit here now, do you recall any

9    specific transactions that he mentioned?

10       A.  I do not recall specific transactions, but I do

11   recall that they were brought in by Mr. Barreda or

12   Mr. Torres.

13       Q.  Which Mr. Torres?

14       A.  Moises or Aaron.

15       Q.  Okay, either -- he told you that improper

16   paperwork had been brought in by Moises Torres and

17   Aaron Torres.  And which Mr. Barreda?

18       A.  Both, Enrique Barreda, Jr., and Enrique

19   Barreda, Sr.

20       Q.  And those were the four individuals he told you

21   about?

22       A.  Yes, sir.

23       Q.  Anyone else?

24       A.  Sometimes about Ms. Esthela Guerra, too.

25       Q.  Okay, did he tell you what was wrong with their

1   paperwork and why he was suggesting that they should be

2   rejected?

3       A.  Yes.  Sometimes he would mention that irregular

4   signatures, for example, which is similar to what I had

5   already seen.

6       Q.  Okay.

7       A.  And I would mention to him, also, that I had

8   also seen that and that I had even told Mr. Yzaguirre

9   about it, also, but that I would never get any feedback

10  from him.

11      Q.  Okay.  So he told you about irregular

12  signatures.  What else did he tell you was improper

13  about the paperwork?

14      A.  The white-outs.

15      Q.  The white-outs?

16      A.  Or the amount that the vehicle was sold for.

17      Q.  Or the amounts?

18      A.  Yes, that they were wrong.

19      Q.  Okay, what else, ma'am, that he told you about?

20      A.  Offhand, this is all I can remember right now.

21      Q.  Okay.  And did you or your sister or Ms. Cantu

22  tell -- at any time during these luncheon meetings tell

23  Mr. Munoz what he should do?

24      A.  No.

25      Q.  Did you encourage him to do anything?

1    A.    No.

2    Q.    Did your sister encourage him to do anything?

3    A.    Not that I know of, no.

4    Q.    Did Ms. Cantu encourage him to do anything?

5    A.    Not that I know of.

6    Q.    During these luncheon meetings that you had,

7    did you or Mr. Munoz or your sister ever encourage

8    Ms. Cantu to do anything about what she was seeing?

9    A.    No.

10    Q.    Did any of them encourage you or tell you or

11    suggest to you what you should do?

12    A.    Sometimes I would -- it would be my

13    understanding that I should tell Mr. Yzaguirre, but I

14    would tell them, "I've already told him."  But what can

15    you do?  There's nothing you can do.

16    Q.    Okay.  So the most they said is "Just talk to

17    Mr. Yzaguirre," and you were saying that you didn't

18    think that would do any good?

19    A.    Well, I had already done it and nothing

20    happened so, no.

21    Q.    Okay.  My question -- so the only thing they

22    encouraged you to do was to tell Mr. Yzaguirre, right?

23    A.    Sometimes.

24    Q.    Sometimes they encouraged you.  Did they

25    encourage you to do anything else?

Page 103

1    A.   No.

2    Q.   And did you tell them that you thought that

3    that would not do any good?

4    A.   Sometimes I would just listen to them.   I

5    wouldn't say anything.

6    Q.   Okay.  Was anyone ever else -- was anyone

7    besides the four of you suggested to come to your

8    lunches with you?

9    A.   I never did.

10   Q.   Okay.  Did anyone else ever invite anyone?

11   A.   No.

12   Q.   Okay.  Is there any way of knowing in advance

13   of lunch who was going to be going to lunch that day --

14   A.   No.

15   Q.   -- besides your sister?

16   A.   No.

17   Q.   Okay.

18           MR. HUGHES:  Can I get this marked?

19           (Weaver McGinnis Exhibit No. 1 marked)

20   Q.   Okay, that's been marked as your Exhibit No. 1.

21   Do you recognize that?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's a statement I gave.

25   Q.   To whom?

1    A.   No, sir.

2    Q.   So if they were cured, if the defects were

3    cured, okay, such that they were able to be processed,

4    your testimony is that it would have been impossible

5    for them to have cleared up this defect before

6    processing?

7    A.   That's right.

8    Q.   Even though you don't have specific knowledge

9    of precisely how they fixed the defects with the

10   documents; is that correct?

11   A.   That's right.  I did not see how they did it.

12   Q.   Earlier when you were talking to Mr. Hughes

13   about the lunch group, I'm curious to know about the

14   formation of this group.  And I know that there was

15   some testimony about it and, if I recall correctly,

16   your testimony was that Bibi would ask you or you would

17   ask her, one or the other, that either of you would ask

18   the other to go to lunch?

19   A.   Not on a daily basis, but off and on.

20   Q.   Okay.  Am I right to say that the, quote, lunch

21   group was ultimately the same people every time?

22   A.   Off and on.

23   Q.   Okay.  And that constituted you and your

24   sister, right?

25   A.   Yes.

1    Q.   And Bibi?

2    A.   Yes.

3    Q.   And Mr. Munoz?

4    A.   Yes.

5    Q.   There were four of you?

6    A.   Yes.

7    Q.   And there was never a fifth person, a member of

8    that group; is that correct?

9    A.   No.   The only exception would be that whenever

10   the guys from the task force wanted to get together to

11   go have lunch, then the whole group would go have

12   lunch.

13   Q.   Okay.

14   A.   But nothing was discussed there.

15   Q.   Right.   In other words, you-all considered this

16   information, let's call it, that was being passed

17   between you and your sister and Bibi and Mr. Munoz, to

18   be very sensitive information?

19   A.   Yes.

20   Q.   You already told us that.

21   A.   Yes.

22   Q.   You were so concerned about the sensitivity of

23   it that you were even on guard all the time to make

24   sure no one overheard what was being said, right?

25   A.   That's right.

1      interrogatories?

2          A.  Yes.

3          Q.  And it just slipped your mind?

4          A.  I would say so in this case.

5          Q.  Okay.  So did you ever discuss with

6      Mr. Yzaguirre what was going -- what was being talked

7      about at the lunches that you had with your sister,

8      Bibi -- pardon me, Ms. Cantu, or Mr. Munoz?

9          A.  If I discussed about that?

10         Q.  If you told him that "This is what people were

11     saying about you at lunch."

12         A.  Yes.

13         Q.  You did?

14         A.  Yes.

15         Q.  When did you tell him that that's what was

16     being said at lunch about him?

17         A.  I don't remember dates when I told him that.

18         Q.  What did you tell him?

19         A.  What Ms. Guerra had told me.

20         Q.  Okay.  Did you tell him that you were going to

21     lunch with Ms. Cantu or Mr. Munoz or your sister and

22     talking about what to do about what he was doing?

23         A.  Who did I tell?

24         Q.  Did you tell Mr. Yzaguirre that you were going

25     to lunch with your sister or Ms. Cantu or Mr. Munoz and

Page 199

1    at these luncheons you were talking about what to do

2    about what he was doing?

3         A.   No.

4         Q.   Okay.  To your knowledge, did Mr. Munoz report

5    to him that you-all were going to lunch and at lunch

6    you were talking about what to do about him?

7         A.   I have no knowledge about that.

8         Q.   Do you know if your sister or Ms. Cantu

9    reported or told Mr. Yzaguirre that you were meeting at

10   lunch and talking about him and what was going on?

11        A.   I have no knowledge.

12        Q.   Okay.  So as you sit here today, do you have

13   any knowledge that Mr. Yzaguirre -- that before you

14   were terminated, before Ms. Cantu was terminated, or

15   before your sister was sent out to San Benito, someone

16   told him that you-all were meeting at lunch and talking

17   about him at lunch?

18        A.   I have no knowledge about that.

19        Q.   Okay.  Did you ever talk to a Michael Lepore at

20   U.S. Customs?

21        A.   Yes.

22        Q.   Okay.  Do you recall what you talked to him

23   about?

24        A.   The transactions that were happening there in

25   the tax office.

# EXHIBIT NO. 4

## Civil Action No. B-03-096

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment
Claims for Retaliation for Exercise of Associational Rights

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, FELIX R.      ) (
MUNOZ, RUTH WEAVER AND       ) (
DIAMANTINA ALVARADO,         ) (
    Plaintiffs          ) (
                        ) (
VS.                          ) (
                        ) (
CAMERON COUNTY and           ) (
TONY YZAGUIRRE, JR., Tax     ) (   CIVIL ACTION NO. 03-CV-96
Assessor-Collector of        ) (
Cameron County and           ) (
Director, Cameron County     ) (
Automobile Crimes            ) (
Enforcement Task Force,       ) (
in his Individual            ) (
Capacity,                    ) (
    Defendants          ) (

ORAL DEPOSITION OF
DIAMANTINA ALVARADO
FEBRUARY 15, 2006

    ORAL DEPOSITION OF DIAMANTINA ALVARADO, produced

as a witness at the instance of the DEFENDANT TONY

YZAGUIRRE, JR., TAX ASSESSOR-COLLECTOR OF CAMERON COUNTY

AND DIRECTOR, CAMERON COUNTY AUTOMOBILE CRIMES

ENFORCEMENT TASK FORCE, IN HIS INDIVIDUAL CAPACITY,

taken in the above-styled and numbered cause on FEBRUARY

15, 2006, reported by CORINNA N. GARCIA, Certified Court

Reporter No. 5210, in and for the State of Texas, at

Adams & Graham, L.L.P., 222 East Van Buren, West Tower,

Harlingen, Texas.

Page 2

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

    GAY E. GILSON
    LAW OFFICE OF GAY E. GILSON
    719 South Shoreline, Suite 301A
    Corpus Christi, Texas  78401
    (361) 887-0552

COUNSEL FOR DEFENDANT CAMERON COUNTY:

    HEATHER SCOTT
    WILLETTE & GUERRA, L.L.P.
    1534 East 6th Street, Suite 200
    Brownsville, Texas  78520
    (956) 541-1846

    BRUCE W. HODGE
    CIVIL LITIGATION
    LEGAL DIVISION COMMISSIONERS COURT
    CAMERON COUNTY COURTHOUSE, 4TH FLOOR
    964 East Harrison Street
    Brownsville, Texas  78520
    (956) 550-1345

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, JR., TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR,
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE, IN HIS INDIVIDUAL CAPACITY:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren, West Tower
    Harlingen, Texas  78550
    (956) 428-7495

ALSO PRESENT:

    Tony Yzaguirre, Jr.
    Felix Munoz

Page 3

INDEX

PAGE

Appearances ................................... 2

DIAMANTINA ALVARADO

Examination by Ms. Hughes ..................... 4

Examination by Mr. Hodge ..................... 126

Examination by Ms. Hughes .................... 156

Examination by Mr. Hodge ..................... 161

Examination by Ms. Gilson ................... 162

Examination by Mr. Hodge ..................... 163

Errata Sheet/Signature Page .................. 165

Reporter's Certificate ...................... 166

EXHIBITS

NUMBER DESCRIPTION                               PAGE
                                                IDEN.

1    Employment Application ................ 13

2    Memorandum Dated May 7, 2003 from
     Michael Amezquita to Marcia Canville .. 13
3    Letter dated May 28, 2003 from
     Diamantina Alvarado to Frutoso Gomez .. 13

4    Memo dated May 15, 1997 from Jesse
     Garcia, Jr. to Tina Alvarado .......... 33
5    Memo dated August 19, 1997 from Tony
     Yzaguirre, Jr. to Tina Alvarado ....... 35

6    Memo dated June 24, 1998 from Tony
     Yzaguirre, Jr. to Tina Alvarado ....... 35
7    Memo dated January 13, 1999 from Tony
     Yzaguirre, Jr. to Jesse Garcia, Jr. ... 64

Page 4

1                    DIAMANTINA ALVARADO,

2    having been duly sworn, testified as follows:

3                        EXAMINATION

4    BY MR. HUGHES:

5        Q.  Could you please state your complete name and

6    where you live?

7        A.  Diamantina Alvarado, Brownsville, Texas.

8        Q.  And how old are you?

9        A.  33 years old.

10       Q.  You're single?

11       A.  Yes.

12       Q.  You've never been married?

13       A.  No.

14       Q.  Okay.  And where did you go to school, ma'am?

15       A.  In Brownsville, Texas.

16       Q.  What was the last school you attended?

17       A.  The University of Texas in Brownsville.

18       Q.  And what did you study there, ma'am?

19       A.  Nursing.

20       Q.  How many semester hours or semesters did you go?

21       A.  Four semesters.

22       Q.  Okay.  Did you complete anything?

23       A.  No.

24       Q.  Okay.  When was the last time you attended?

25       A.  1993, '94.

Page 80

1    Q.  And when did you start going to lunch with her?

2    A.  We would always have lunch -- not all the time,

3    but, I mean, from time to time.  I don't remember the

4    exact year.

5    Q.  Can you remember how many years before you left

6    there that you had had lunches with her?

7    A.  I don't remember the year.

8    Q.  Okay.  How is it -- from speaking to your

9    sister, her deposition, I gather every day you went to

10   lunch with your sister?

11   A.  Just about.

12   Q.  Okay.  That was a -- correct me if I'm

13   wrong, that was kind of a standing arrangement?

14   A.  Not all the time, sir.  Sometimes I had my lunch

15   at 11:00, 12:00 or 1:00.

16   Q.  Okay.

17   A.  But the times that we had a chance to eat

18   together, we would go eat and have lunch together.

19   Q.  Okay.  So when -- when do you recall was it that

20   Bibi began to be part of -- would go to lunch with you?

21   A.  I don't remember, sir.

22   Q.  Do you remember who invited her?

23   A.  I don't remember.  Everybody would just gather

24   and say where they were going to lunch.

25   Q.  Okay.  So can you recall anything about why it

Page 81

1    would be that Bibi would have lunch with you sometimes

2    and not others?

3        A.   No.

4        Q.   Okay.  Who was normally -- I mean, normally if

5    you ate lunch, it would be you and your sister if she

6    was available.  Who else would be there?  Who else would

7    you normally have lunch with?

8        A.   I don't remember.  I mean, we had lunch with a

9    lot of people, but I don't remember who exactly.

10       Q.   Okay.  So when did you start having lunch with

11   Mr. Munoz?

12       A.   I don't remember.

13       Q.   Well, do you recall what the occasion was that

14   he started having lunch with you?

15       A.   No.

16       Q.   You didn't run into him after work, did you?

17       A.   No.

18       Q.   Okay.  So the only time you saw Mr. Munoz was

19   during work hours?

20       A.   Yes.

21       Q.   And do you recall who was the first person to

22   invite him to have lunch with you?

23       A.   No.

24       Q.   Do you recall what the occasion was that he

25   started -- that he came to lunch?

1    A.  No.

2    Q.  Was he a regular?

3    A.  I don't remember.

4    Q.  Okay.  Now, your sister was terminated in

5  September of 2002.  You were transferred at the end of

6  February?

7    A.  Yes.

8    Q.  That's when you got the letter?

9    A.  2003, yes.

10    Q.  And when you got the letter, what did you do

11  about it?

12    A.  Well, Mr. Garcia called me in and Lupita was

13  present.

14    Q.  Okay.

15    A.  I just followed the duties.

16    Q.  Okay.  What did they tell you in this meeting?

17    A.  They told me that as per February -- I don't

18  recall the exact date -- of 2003, I was supposed to

19  report to Linda in San Benito from now on until further

20  notice.  That it was a part of a cross-training.

21    Q.  Okay.  You had been cross-trained before, hadn't

22  you?

23    A.  Yes.

24    Q.  And had people been transferred out of the

25  Brownsville office to be cross-trained at other offices

1    A.   Yes.

2    Q.   Do you gossip?

3    A.   Who doesn't.

4    Q.   Well, that's kind of what I -- I mean, from what

5    I've gathered --

6    A.   Right.

7    Q.   -- whether you want to call it gossip or not,

8    there was some bad-mouthing going on at some of these

9    lunches about Mr. Yzaguirre.  Do you remember any of it?

10   A.   I don't remember.

11   Q.   Do you remember anybody bad-mouthing him?

12   A.   No.

13   Q.   Don't remember Mr. Munoz bad-mouthing him?

14   A.   No.

15   Q.   Since the lunch hour, have you had a chance to

16   figure out or recollect in your own mind how many times

17   the four of you-all got together for lunch?

18   A.   No.

19   Q.   Was there any particular place that you-all

20   liked to eat lunch?

21   A.   No.

22   Q.   Did you hear your sister's testimony the other

23   day about these lunches?

24   A.   I was present.

25   Q.   When -- in answering my questions, she said she

1    was real careful not to let anybody overhear what was

2    being said.  Did you hear that?

3        A.  Yes, I heard that.

4        Q.  Did you notice her doing that?

5        A.  I don't remember.

6        Q.  Were you part of what they were doing?

7        A.  No.

8        Q.  Can you tell me why you were there when they

9    talked about what they were doing and what they were

10   discussing?

11       A.  I was having lunch with them.

12       Q.  Okay.  Do you know why they trusted you with

13   this highly sensitive information?

14       A.  No.

15       Q.  Did you ever speak to anyone about any of these

16   lunches?

17       A.  No.

18       Q.  If you had heard someone bad-mouthing

19   Mr. Yzaguirre, would you have told anybody about it?

20       A.  No.

21       Q.  You were kind of keeping a secret, weren't you,

22   as far as that's concerned?

23            MS. GILSON:  Object.  Assumes facts not in

24   evidence.

25       Q.  Well, to the extent you were present and heard

Page 136

1    anything that was said, you weren't going to tell

2    anybody, were you?

3        A.  No.

4        Q.  So as far as you yourself saying, "Hey, this is

5    something really bad wrong.  I've got to tell somebody

6    about it," you never ever decided that you would have to

7    do that, did you?

8        A.  No.

9        Q.  Even when you were applying for new jobs there

10   at the county, you didn't tell anybody about what was

11   going on with your sister and Mr. Munoz and Bibi at

12   lunch, did you?

13       A.  No.

14       Q.  So I couldn't call a single person still working

15   over at Cameron County to the stand and have them say

16   that you had told them anything about that, could I?

17       A.  No.

18           MS. GILSON:  Object.  Asks for speculation.

19       Q.  When you were talking with Mr. Hughes earlier

20   about what you alleged to be a hostile work

21   environment -- remember when you-all were talking about

22   that?

23       A.  Yes.

24       Q.  All I think I heard you say is that you felt

25   like people gave you the cold shoulder.

Page 139

1    A.  No.

2    Q.  Or she resigned?

3    A.  No, he terminated her.  Mr. Yzaguirre terminated

4    her.

5    Q.  She was terminated?

6    A.  Yes.

7    Q.  But you never talked about that with her?

8    A.  No.

9    Q.  Why not?

10   A.  It's a very delicate subject.  I wouldn't want

11   to bring bad memories to her.

12   Q.  She never said it had anything to do with what

13   you-all were talking about at lunch or anything?

14   A.  No.

15   Q.  You say in your petition that you ran into Bibi

16   on February 26th, '03 at Dillard's.

17   A.  Yes.

18   Q.  Tell me about that.

19   A.  She went in to make a payment at the counter, at

20   the Estee Lauder counter.  We were there talking for a

21   bit.  That's it.  I mean --

22   Q.  Did you help her make a payment?

23   A.  Yes, I can take payments there at the counter.

24   Q.  So she just gave you some cash and you applied

25   it to her account?

Page 140

1    A.  Yes.

2    Q.  And how long were you there with her, a few

3    minutes?

4    A.  I think so.

5    Q.  And did you say that Tony's mother-in-law works

6    there at Dillard's with you?

7    A.  She works there with me at the Estee Lauder

8    counter.

9    Q.  At the Estee Lauder counter?

10    A.  Yes.

11    Q.  Okay.  And then Tony's wife came in; is that

12    right?

13    A.  She showed up while I was processing the

14    payment, and she kept looking at Bibi and me.

15    Q.  Well, did she greet you or what when she showed

16    up?  Mrs. Yzaguirre, I mean.

17    A.  I don't remember.  No, I don't think so.

18    Q.  Your petition says that "Diana Yzaguirre came

19    around the counter and greeted plaintiffs Cantu and

20    Alvarado."  Do you remember that?

21    A.  (Moving head side to side)

22    Q.  Did she bad-mouth you-all at that time?

23    A.  No.

24    Q.  Or accuse you of anything?

25    A.  No.

1    Q.   Was it a friendly engagement as far as you were

2    concerned?

3    A.   No.

4    Q.   Not friendly?

5    A.   I don't think she was friendly.

6    Q.   What was it?  You know, if she greeted you, I

7    mean, that sounds like a pretty friendly thing to do to

8    me.  Doesn't it to you?

9         MS. GILSON:  Object.  Asks for speculation.

10   Q.   Well, is greeting someone a friendly thing to do

11   or not, in your opinion?

12        MS. GILSON:  Mischaracterizes the

13   testimony.

14   A.   Sometimes.

15   Q.   Sometimes.  Okay.  Well, this wasn't -- you

16   know, she didn't walk up and go around the counter and

17   say "The heck with you guys," did she?  She said

18   something like "Good afternoon" or whatever, right?

19   A.   No.

20   Q.   Do you remember what she said?

21   A.   No.

22   Q.   Why do you say in your petition that she greeted

23   you?

24   A.   I don't remember.

25   Q.   What makes you think that you were transferred

Page 142

1    because Bibi made a payment at your counter at the

2    Dillard's store?

3        A.  All of a sudden, within days, I was -- I mean,

4    why was I transferred?  Nobody knows why.  Nobody can

5    give me a straight answer.

6        Q.  Okay.  So --

7        A.  I started putting two and two together.

8        Q.  Okay.  So, in your mind, because Tony's wife

9    happened to show up at the same time that Bibi was there

10   making a payment, somehow that was the reason why you

11   were transferred to San Benito; is that right?

12       A.  That -- yes.

13       Q.  Any other reason that you can think of why you

14   were transferred to San Benito?

15       A.  My association with her and Mr. Munoz and Ruth.

16       Q.  Okay.  And is there any evidence out there that

17   you know of that Mr. Yzaguirre knew that you were a

18   member of the so-called association?

19       A.  No.

20       Q.  And then I guess you would assume -- you would

21   have to assume that Mrs. Yzaguirre thought enough of

22   this encounter to tell her wife and say -- or tell her

23   husband that she saw you and Bibi at the Dillard's,

24   right?

25       A.  Yes.

1    information along to your sister?

2        A.   No.

3        Q.   Did you-all talk about your experience there at

4    the lunch hour, or not?

5        A.   No.

6        Q.   When you and Felix and --

7        A.   No.

8        Q.   I should say more properly Mr. Munoz and your

9    sister --

10       A.   No.

11       Q.   -- and Ms. Cantu.  You never passed along your

12   observations about this -- the odometers and the

13   insurance cards to them, did you?

14       A.   No.

15       Q.   I'm just wondering why you were there during

16   these lunches, other than you were sis?

17       A.   Having lunch.

18       Q.   Yeah, just having lunch with sister, right?

19       A.   Yes.

20       Q.   Did they -- were they depending on you, for some

21   reason, to do something?

22       A.   No, no.

23       Q.   Or to back them up on something, that you know

24   of?

25       A.   No.

# EXHIBIT NO. 5

## Civil Action No. B-03-096

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment
Claims for Retaliation for Exercise of Associational Rights

DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS

COUNTY OF CAMERON

"I declare under penalty of perjury under the laws of the United States of America

that the attached Exh. 1, 2, 3 and 4 are true and correct copies of excerpts from the

depositions of Plaintiffs Vicenta Cantu, Felix Munoz, Ruth Weaver McGinness, and

Diamantina Alvarado, respectively, taken in this case.   I declare under penalty of perjury

that the foregoing is true and correct."

Executed on March 1, 2006.

ROGER W. HUGHES