# EXHIBIT NO. 1

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Alvarado's
Amendment Speech Claims

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, FELIX R.          )(
MUNOZ, RUTH WEAVER AND           )(
DIAMANTINA ALVARADO,             )(
    Plaintiffs                   )(
                                 )(
VS.                              )(
                                 )(
CAMERON COUNTY and               )(
TONY YZAGUIRRE, JR., Tax         )(   CIVIL ACTION NO. 03-CV-96
Assessor-Collector of            )(
Cameron County and               )(
Director, Cameron County         )(
Automobile Crimes                )(
Enforcement Task Force,          )(
in his Individual                )(
Capacity,                        )(
    Defendants                   )(

---

ORAL DEPOSITION OF
DIAMANTINA ALVARADO
FEBRUARY 15, 2006

---

    ORAL DEPOSITION OF DIAMANTINA ALVARADO, produced

as a witness at the instance of the DEFENDANT TONY

YZAGUIRRE, JR., TAX ASSESSOR-COLLECTOR OF CAMERON COUNTY

AND DIRECTOR, CAMERON COUNTY AUTOMOBILE CRIMES

ENFORCEMENT TASK FORCE, IN HIS INDIVIDUAL CAPACITY,

taken in the above-styled and numbered cause on FEBRUARY

15, 2006, reported by CORINNA N. GARCIA, Certified Court

Reporter No. 5210, in and for the State of Texas, at

Adams & Graham, L.L.P., 222 East Van Buren, West Tower,

Harlingen, Texas.

APPEARANCES

COUNSEL FOR PLAINTIFFS:

 GAY E. GILSON
 LAW OFFICE OF GAY E. GILSON
 719 South Shoreline, Suite 301A
 Corpus Christi, Texas  78401
 (361) 887-0552

COUNSEL FOR DEFENDANT CAMERON COUNTY:

 HEATHER SCOTT
 WILLETTE & GUERRA, L.L.P.
 1534 East 6th Street, Suite 200
 Brownsville, Texas  78520
 (956) 541-1846

 BRUCE W. HODGE
 CIVIL LITIGATION
 LEGAL DIVISION COMMISSIONERS COURT
 CAMERON COUNTY COURTHOUSE, 4TH FLOOR
 964 East Harrison Street
 Brownsville, Texas  78520
 (956) 550-1345

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, JR., TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR,
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE, IN HIS INDIVIDUAL CAPACITY:

 ROGER W. HUGHES
 ADAMS & GRAHAM, L.L.P.
 222 East Van Buren, West Tower
 Harlingen, Texas  78550
 (956) 428-7495

ALSO PRESENT:

 Tony Yzaguirre, Jr.
 Felix Munoz

Page 3

INDEX

| | PAGE |
|---|---|
| Appearances ................................. | 2 |

DIAMANTINA ALVARADO

| | |
|---|---|
| Examination by Ms. Hughes ................... | 4 |
| Examination by Mr. Hodge ................... | 126 |
| Examination by Ms. Hughes ................... | 156 |
| Examination by Mr. Hodge ................... | 161 |
| Examination by Ms. Gilson ................... | 162 |
| Examination by Mr. Hodge ................... | 163 |
| Errata Sheet/Signature Page ................. | 165 |
| Reporter's Certificate ..................... | 166 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE IDEN. |
|---|---|---|
| 1 | Employment Application ................ | 13 |
| 2 | Memorandum Dated May 7, 2003 from Michael Amezquita to Marcia Canville .. | 13 |
| 3 | Letter dated May 28, 2003 from Diamantina Alvarado to Frutoso Gomez .. | 13 |
| 4 | Memo dated May 15, 1997 from Jesse Garcia, Jr. to Tina Alvarado ......... | 33 |
| 5 | Memo dated August 19, 1997 from Tony Yzaguirre, Jr. to Tina Alvarado ....... | 35 |
| 6 | Memo dated June 24, 1998 from Tony Yzaguirre, Jr. to Tina Alvarado ....... | 35 |
| 7 | Memo dated January 13, 1999 from Tony Yzaguirre, Jr. to Jesse Garcia, Jr. ... | 64 |

1                    DIAMANTINA ALVARADO,

2      having been duly sworn, testified as follows:

3                        EXAMINATION

4      BY MR. HUGHES:

5          Q.  Could you please state your complete name and

6      where you live?

7          A.  Diamantina Alvarado, Brownsville, Texas.

8          Q.  And how old are you?

9          A.  33 years old.

10         Q.  You're single?

11         A.  Yes.

12         Q.  You've never been married?

13         A.  No.

14         Q.  Okay.  And where did you go to school, ma'am?

15         A.  In Brownsville, Texas.

16         Q.  What was the last school you attended?

17         A.  The University of Texas in Brownsville.

18         Q.  And what did you study there, ma'am?

19         A.  Nursing.

20         Q.  How many semester hours or semesters did you go?

21         A.  Four semesters.

22         Q.  Okay.  Did you complete anything?

23         A.  No.

24         Q.  Okay.  When was the last time you attended?

25         A.  1993, '94.

Page 36

1    never a conversation.  They just gave me this letter and

2    made me a supervisor, but there was never a

3    conversation.

4        Q.  Okay.  So you were put -- that's the memo making

5    you the deputy clerk to the tax collections supervisor,

6    the auto tax deputy clerk to the tax collections

7    supervisor, correct?

8        A.  Correct.

9        Q.  And no one promised you when you were put --

10   when you were given that position that you would hold it

11   for any period of time?

12       A.  Nobody told me that.

13       Q.  Okay.  Now, this -- when you were the head

14   teller, who was your -- who was your supervisor?

15       A.  Mr. Jesse Garcia.

16       Q.  I see.  And was -- was there an auto tax deputy

17   clerk to the tax collections supervisor before you took

18   that position?

19       A.  Can you repeat the question?

20       Q.  Okay.  Who helped -- when you were made auto tax

21   deputy clerk to the tax collections supervisor, who held

22   that position before you?

23       A.  I don't remember the lady's name.

24       Q.  Okay.  When -- it says you were the deputy clerk

25   to the tax collections supervisor.  Who was the tax

Page 54

1    correct?

2        A.   No.

3        Q.   Oh, it is correct there -- you do have some

4    information?

5        A.   No.

6        Q.   Okay.  So you don't -- is it -- do you have

7    information or not?

8        A.   Just what I told you.

9        Q.   Well --

10            MR. HODGE:  Object, unresponsive.

11       Q.   Let me put it this way.  Maybe I'm

12   misunderstanding it, but it's a simple question.  Either

13   the answer is yes, you have information, or no, you

14   don't.  And you don't -- you won't say no.  So I've got

15   to assume the answer is yes, you have some information.

16   And I don't want to find out about it the first time at

17   trial.  So what information do you possess or are you

18   aware of now that someone -- that Mr. Yzaguirre learned

19   what you said?

20       A.   Sir, just what I told you.  That's all the

21   information I have.

22       Q.   You don't have anything; isn't that the case?

23       A.   Just what I told you.

24       Q.   Okay.  Then what is it that you told me that

25   shows that Mr. Yzaguirre learned what you said?

1    A.  All I'm saying, if they were coming from him, he

2  knows what was going on.

3    Q.  How?

4         MR. HODGE:  Object, unresponsive.

5    Q.  How does he know, ma'am?

6    A.  I was just being told to do the procedure.

7  That's all I was doing.  I did tell Ms. Lupita de Leon

8  that I needed the insurance cards.

9    Q.  My question is not whether he knew what you were

10  being asked to do, my question is how did he know what

11  you said?  That's what I want to know.

12    A.  How am I supposed to know?  I was just doing my

13  work.

14    Q.  Okay.  So you have no information that he ever

15  learned what you said?

16    A.  No.

17    Q.  You have none.  Okay.  And you were working for

18  Ms. de Leon only in, what, 1997, 1998?

19    A.  And throughout the time that they needed

20  assistance at the auto registration to help out with the

21  customers.

22    Q.  Okay.  But generally speaking it was only when

23  you were working under her that she would bring titles

24  to you to apply.

25    A.  Yes.

Page 56

1    Q.  And after working in auto titles under

2  Ms. de Leon, you were essentially promoted, weren't you?

3    A.  Yes.

4    Q.  Despite what you told her, you get promoted.  In

5  other words, you're telling her --

6    A.  But she --

7    Q.  You're telling her while you're doing this that

8  it shouldn't be done, and the next thing that happens is

9  you get promoted out of that job?

10   A.  She's not --

11        MR. HODGE:  Objection to the form of the

12  question.  Assumes facts not in evidence.

13   Q.  Well, let's see here --

14   A.  She's not my supervisor.  Mr. -- well, Mr. Jesse

15  Garcia was my supervisor.

16   Q.  Okay.  Well, you were put in the automobile tax

17  department in 1997, right?

18   A.  Right.

19   Q.  And it was during this time that you were

20  obviously telling her that you couldn't process these

21  titles, right?

22   A.  Right.

23   Q.  And then a couple of months later you're made

24  head teller, right?

25   A.  Right.

1    Q.  That's a promotion, isn't it?

2    A.  It was just a head teller.

3    Q.  Okay.

4    A.  I wasn't the supervisor.

5    Q.  Okay.  And then the next year you're made the

6    auto tax deputy clerk to the tax collections supervisor.

7    Wasn't that a promotion?

8    A.  Yes.

9    Q.  Now, when did the vehicle inventory tax

10   collection law go into effect?

11   A.  I don't recall the year.

12   Q.  It was in the mid '90s, wasn't it?

13   A.  I don't remember, sir.

14   Q.  What are the tax reports that the Cameron County

15   tax assessor's office has to collect and any dealers

16   about the vehicle inventory tax?

17   A.  It's called special inventory.  They have to

18   report a -- when a person buys a car, they have to pay a

19   fee.

20   Q.  Yeah.

21   A.  Vehicle inventory, and it has to be collected

22   through the car dealer.

23   Q.  Okay.

24   A.  And they would make the reports every month.

25   Q.  Yes.  And they have what's also called a vehicle

1    inventory tax?

2        A.   Yes.

3        Q.   And it's a declaration that has to be filed

4    monthly?

5        A.   Yes.

6        Q.   And it has to be filed with the tax -- both the

7    tax assessor-collector and the tax appraiser?

8        A.   Yes.

9        Q.   What kind of fees are associated with these

10   reports that they have to pay?

11       A.   The value of the car multiplied times the rate.

12   That's how they would come up with the tax.

13       Q.   Okay.  And what -- how did your duties relate to

14   this tax collection?  What were you supposed to do?

15       A.   I had to collect the moneys of the vehicles that

16   were being sold monthly by each car dealer.

17       Q.   Uh-huh.  It would also mean you'd have to review

18   the reports and check to see if they were filed?

19       A.   Yes.

20       Q.   Now, you have alleged something about late fees

21   being waived.  Could you tell me about that?

22       A.   There is a late fee every time the car dealer

23   doesn't do his monthly reports on time.  It's a $500

24   fee.

25       Q.   Uh-huh.  And when did you start noticing that

Page 59

1    fees were being waived?

2        A.   I don't remember the date.

3        Q.   Okay.  Who was getting their fees waived?

4        A.   I don't remember the names.

5        Q.   You don't remember the names of the dealers

6    whose fees were waived?

7        A.   No.

8        Q.   Can you tell me when you started noticing that

9    fees were waived?

10       A.   All the time.

11       Q.   Well, can you recall which dealers had fees

12   waived?

13       A.   No.

14       Q.   Can you -- do you recall -- you don't recall the

15   names of any of them?

16       A.   No.  There were so many of them, sir.  It's all

17   Cameron County.

18       Q.   Okay.  Did you make any records of whose fees

19   were late?

20       A.   They have the records, the bookkeeping

21   department does.

22       Q.   You have no special monthly roster that you

23   would go "this guy is late" or whatever?

24       A.   No.

25       Q.   Okay.  So what did you do about it?

Page 64

1    A.   Yes.

2    Q.   Did you tell him what you meant by wrong?

3    A.   Yes.

4    Q.   What did you tell him you meant by the word

5    wrong?

6    A.   That they were not supposed to waive the $500

7    fee, that the car dealer needed to pay his $500 fee for

8    paying late and reporting the reports late too.

9    Q.   Okay.  Did you keep track of who was getting

10   waived?

11   A.   No, sir.

12   Q.   Okay.

13        MR. HUGHES:  Can we get this marked as the

14   exhibit next in order?

15   Q.   I'm going to show you what's been marked as your

16   Exhibit No. 7 and ask you to take a look at it for a few

17   minutes.  Okay.  You've had a chance to look at it.  Do

18   you recognize this memo?

19   A.   I haven't finished, sir.

20   Q.   Okay.  Go ahead.

21   A.   I'm finished.

22   Q.   Okay.  Do you remember seeing that memo?

23   A.   No.

24   Q.   You've never seen this memo before?

25   A.   I don't remember.

Page 65

1    Q.  Not at all?

2    A.  No.

3    Q.  All right.  Well, let's look at this for a

4    moment.  It's written in 1999.  It says that the vehicle

5    inventory tax was implemented in 1994.  Do you recall

6    that that was the year that the vehicle inventory tax

7    was implemented?

8    A.  I don't remember.

9    Q.  Okay.  The next sentence, it says, "Some

10   businesses do not understand the process of how VIT is

11   paid or calculated."  Do you think that was true in

12   1999, that there were dealers out there who didn't

13   understand in 1999 how to pay or calculate their VIT?

14   A.  I remember at the beginning when we started

15   collecting, that there were several car dealers that

16   didn't know how to calculate it.

17   Q.  Okay.  Now, the next sentence says that "Some

18   have sent in their report to the Cameron appraisal

19   district together with the payment, causing them to be

20   late on their report, consequently requiring them to pay

21   a penalty."  Do you recall some dealers sending their

22   payments to the appraisal district instead of the tax

23   collector?

24   A.  Yes.

25   Q.  That did happen?

1    A.   Yes, a lot.

2    Q.   A lot.  So you're saying that happened a lot?

3    A.   At the beginning, when we started collecting the

4    special inventory.

5    Q.   Okay.  And the next sentence, it says, "As you

6    know, we have had several businesses report their VIT

7    report late for some reason or another."  In 1999 was it

8    true that some businesses were reporting their VIT late?

9    A.   I don't remember that, sir.

10   Q.   Okay.  Now, the next two sentences say that "if

11   a business has a legitimate excuse for reporting their

12   VIT late, we will waive the penalty for that month, but

13   we will advise them that this office will not waive

14   another penalty for that business for the remainder of

15   the year regardless of the excuse.  We will treat all

16   businesses alike."  As you sit here now, in 1999 were

17   there any businesses that got a waiver more than twice

18   in a year?

19   A.   I don't remember, sir.

20   Q.   So you can't remember any businesses that got

21   more than one waiver in a year in 1999?

22   A.   I don't remember.

23   Q.   Can you recall any that got more than one waiver

24   in a year for 2000 or 2001?

25   A.   No, I don't remember.

1    Q.  Okay.  The next paragraph says, "Some of the
2    legitimate excuses that have been reported are sending
3    payments to the appraisal district."  Did some dealers
4    send payments to the appraisal district?
5    A.  That, I do remember.
6    Q.  Okay.  The next sentence says "sending payments
7    to the different districts that we collect for."  Do you
8    recall that some people had sent their payments to
9    another taxing entity instead of the tax assessor-
10   collector?
11   A.  No.
12   Q.  You don't recall that?
13   A.  No.
14   Q.  The next one says that "payment was not posted
15   by U.S. Mail correct."  Do you remember payments coming
16   in late in the mail?
17   A.  No.
18   Q.  The next one is "emergency at the business due
19   to sickness."  Do you recall any of the dealers saying
20   that there had been an illness in the business and they
21   couldn't attend to it, they couldn't get it in on time?
22   A.  No.
23   Q.  The next one is "the business bookkeeper turns
24   in paperwork with no money."  Have you ever had somebody
25   turn in a report with no money?

Page 68

1    A.  No.

2    Q.  Okay.  So you never saw this memo before you

3  were transferred?

4    A.  No.

5    Q.  Okay.  So when Mr. Yzaguirre -- when Mr. -- when

6  you were talking to Mr. Garcia about this, what did he

7  tell you?

8    A.  About the waiving of the $500?

9    Q.  Yeah.

10   A.  Just to go ahead and process it.

11   Q.  Okay.  Was there -- on any of these occasions

12  that you talked to him, was there anyone there besides

13  you and him?

14   A.  No.

15   Q.  Do you recall anyone that might have overheard

16  you making these statements to him?

17   A.  No.

18   Q.  And did Mr. Garcia give you an explanation as to

19  why these waivers were being processed?

20   A.  No.

21   Q.  Did you ever ask any of the dealers what was

22  their reason for being late?

23   A.  No.

24   Q.  So you would get a late report and you wouldn't

25  call them to find out if they had any reason for the

1    late payment or that?

2       A.  No, because they were already -- they had

3    already talked to Mr. Yzaguirre or to Mr. Garcia, and

4    then Mr. Garcia or Yzaguirre would tell me just to

5    process the work.

6               MR. HODGE:  Objection, unresponsive.

7       Q.  Okay.  Maybe I'm not --

8               MR. HUGHES:  I'll join the objection.

9       Q.  Maybe I'm not familiar then.  When the dealers

10   would submit their monthly report and their fees, et

11   cetera, et cetera, would that come directly to you?

12   Would they come and drop it on your desk, or would they

13   go someplace else first?

14      A.  No, they would come in -- sometimes they would

15   come in through the front line.

16      Q.  Okay.

17      A.  And I would tell them they needed to pay their

18   $500 fee.  They would get all mad and they would say

19   they were going to go talk to Mr. Yzaguirre.  And then

20   they would come back and tell me that they were not

21   going to pay the $500 fee.  So I would get a call from

22   Mr. Yzaguirre or Mr. Garcia just to collect the taxes.

23      Q.  Okay.

24      A.  No $500 fee.

25      Q.  Okay.  So the dealers would normally bring their

Page 70

1    paperwork and any applicable fees, et cetera, to the

2    front desk?

3        A.  Yes.

4        Q.  Now, you -- again, I'm not there.  Are you at

5    the front desk or are you in another office?

6        A.  No, I was only in the front line.  I never had a

7    personal office, no.

8        Q.  Okay.  So they would essentially be bringing it

9    to you in the first instance?

10       A.  Me or another clerk.

11       Q.  And then that clerk would give it to you?

12       A.  No, they would sometimes tell me that the dealer

13   was saying that he's not going to pay the $500 fee.

14       Q.  Okay.  Well, I'm trying to get an idea of what

15   the paper flow is if there is no problem.  It comes to

16   the front line and it either -- the customer or the

17   dealer gives it to you or gives it to the clerk?

18       A.  Yes, either/or.

19       Q.  And then if the clerk gets it, the clerk gives

20   it to you; is that what happens?

21       A.  No, because they could handle it themselves.

22       Q.  Okay.  Okay.  So if you get it or the clerk gets

23   it, then where does the paper go next?

24       A.  We'll review it, go through it and see if

25   it's -- if it's properly calculated and if they're not

Page 71

1    late, and we collect the fee.

2         Q.   Okay.  And then once the fee is collected, where

3    does it go next?

4         A.   We deposit it at the end of the day and turn it

5    in to the bookkeeping department.

6         Q.   Okay.  Now, in any of these occasions in which

7    you felt the person needed to pay a fee immediately, did

8    you ever ask them why they were late?

9         A.   No.

10        Q.   It didn't matter to you they were late.  If

11   they're late they paid 500 bucks, period, no questions

12   asked.  Was that what you understood you were doing?

13        A.   That's what they told me to do.

14        Q.   Who --

15        A.   Mr. Garcia.

16        Q.   Okay.

17        A.   They had to pay their $500 fee regardless if

18   they -- I mean, they were late, they were late.

19        Q.   Okay.  So you would never ask any of these

20   people why they were late?

21        A.   No.

22        Q.   And if they complained, they had to go above you

23   with their complaint.

24        A.   Correct.

25        Q.   So now let me go back.  On these occasions,

Page 72

1    then, that you would be talking to Mr. Garcia about that

2    you didn't think the fee should be waived, were all of

3    those instances where you had wanted -- you had told the

4    customer to pay $500, the late fee, and they had made a

5    complaint?

6        A.   (Moving head up and down)

7        Q.   I'm sorry.  You'll have to answer out loud.

8        A.   I'm sorry, yes.

9        Q.   So in all these instances with Mr. Garcia, those

10   had begun with you assessing -- you telling the customer

11   they had to pay more money and the customer going over

12   your head with a complaint?

13       A.   Yes.

14       Q.   And in each one of them --

15            MR. HODGE:   What was that?

16       A.   Yes.

17       Q.   And in each one of those cases, then, when you

18   were telling Mr. Garcia that the fee had to be collected

19   is when he would come back to you after the complaint

20   had been received to tell you what to do?

21       A.   Yes.

22       Q.   And that was -- and those -- and it was only

23   when he came back to you and would tell you to collect

24   the fee, it was only in those instances when you were

25   telling him, "This is wrong.  We need to collect the

1  money"?

2       A.  Yes.

3       Q.  Other than it was -- telling him it was

4  wrong, telling Mr. Garcia that it was wrong and we

5  needed to collect the money, did you tell him anything

6  else on any of these occasions?

7       A.  No, that was all.

8            MR. HODGE:  It seems like a good time for a

9  break.

10           MR. HUGHES:  I'm sorry.  I haven't been

11 keeping track of the time.  What do you-all say?

12           MS. GILSON:  It's been about an hour and a

13 half.

14           MR. HUGHES:  It's fine with me if you want

15 to take a break.

16           (Brief recess)

17      Q.  Now, when people asked to have the $500 penalty

18 waived, would they have to make a written request?

19      A.  No.

20      Q.  No?  You never saw any written requests?

21      A.  I never heard of such a thing.

22      Q.  You never heard of it at all?

23      A.  A written request, no.

24      Q.  Do you remember anyone making records of every

25 time somebody would make -- make a request for a waiver

Page 74

1    and what their excuse was?

2        A.  No.

3        Q.  Okay.  You didn't get involved in that?

4        A.  No.

5        Q.  Do you know who Carlos Nava is?

6        A.  Yes.

7        Q.  Who is he?

8        A.  He's the bookkeeper.

9        Q.  Okay.  Do you know if he was making records of

10   every time somebody got a waiver and what the reasons

11   were?

12       A.  I don't know.

13       Q.  Okay.  Now, these conversations you had with

14   Mr. Garcia about the waivers, they would take place

15   where?

16       A.  In his office.

17       Q.  And do you have any information, as you sit here

18   now, that Mr. Yzaguirre learned of what it was you said

19   to Mr. Garcia?

20       A.  No.

21       Q.  Now, from 1998 to 2003, until January of 2003,

22   you were not demoted?

23       A.  No.

24       Q.  And your pay wasn't reduced?

25       A.  No.

Page 75

1      Q.   And your title wasn't changed?

2      A.   No.

3      Q.   In fact, during that period, didn't you get good

4    job evaluations?

5      A.   Yes.

6      Q.   And do you obtain some certifications from the

7    board of tax examiners?  Can you tell the jury what

8    those are?

9      A.   Yes.

10     Q.   Go ahead.

11     A.   I got certified in school for introduction to

12   property tax.  I don't recall exactly -- property tax

13   law, assessments, Course 8/9.

14     Q.   Okay.  And who paid for any of the courses that

15   you have to take for that?

16     A.   The county.

17     Q.   And who -- you have to take exams in order to

18   get to the next level, right?

19     A.   Yes.

20     Q.   Who paid for those?

21     A.   Cameron County.

22     Q.   Now, when you were hired or put in a position,

23   did anyone ever promise you the county would pay for

24   those courses or would pay for the exams?

25     A.   No.

1    Q.    And -- but nonetheless, the tax assessor-
2    collector's office did pay for those courses and pay for
3    those exams so that you wouldn't have to pay for it out
4    of your own pocket, right?

5    A.    Correct.

6    Q.    But no one ever promised you that, did they?

7    A.    No.

8    Q.    Now, in the position you were at in January of
9    2003, did you have your own office?

10    A.    I never had my office.

11    Q.    Okay.  Were you given a personal computer of
12    some sort to do your work?

13    A.    We used computers.

14    Q.    Okay.

15    A.    But personal, no.

16    Q.    Okay.  Not one assigned specifically to you?

17    A.    No.

18    Q.    Okay.  What computers -- this is a very general
19    question.  What computers did you have access to in
20    order to do your job?

21    A.    I had access to taxpayers' records.  Towards the
22    end they did include -- what did they include, like to
23    write memos.

24    Q.    Okay.

25    A.    Software.

A. No.

Q. Was he a regular?

A. I don't remember.

Q. Okay. Now, your sister was terminated in September of 2002. You were transferred at the end of February?

A. Yes.

Q. That's when you got the letter?

A. 2003, yes.

Q. And when you got the letter, what did you do about it?

A. Well, Mr. Garcia called me in and Lupita was present.

Q. Okay.

A. I just followed the duties.

Q. Okay. What did they tell you in this meeting?

A. They told me that as per February -- I don't recall the exact date -- of 2003, I was supposed to report to Linda in San Benito from now on until further notice. That it was a part of a cross-training.

Q. Okay. You had been cross-trained before, hadn't you?

A. Yes.

Q. And had people been transferred out of the Brownsville office to be cross-trained at other offices

Page 88

1    A.   He didn't raise his voice, but his tone -- I

2    mean, he wasn't yelling.

3    Q.   Okay.   Did he use profanity?

4    A.   No.

5    Q.   Okay.  And I guess, for want of a better term,

6    after you were transferred, what other things did

7    Mr. Garcia say or do to you that you considered mean or

8    harassment?  You've already told me about the one with

9    the plants.  What else?

10   A.   I had called him to also advise him that I

11   was -- I needed to get recertified from my classes.

12   Q.   Yes.

13   A.   And he said that if I wanted to get recertified,

14   to pay out of my own pocket for my certifications as a

15   tax assessor.

16   Q.   Okay.

17   A.   For my level 3 class.

18   Q.   Okay.  What class was it that you needed?

19   A.   It's the final exam, the level 3.

20   Q.   Okay.

21   A.   I don't --

22   Q.   You needed to take the level 3 exam?

23   A.   Yes.

24   Q.   When did you need to take that?

25   A.   To update my education.

1      Q.   I'm sorry.   When did you need to take the exam

2  by?

3      A.   That year, '03.   I don't remember the month or

4  the expiration date on it, but -- I mean, the actual

5  month.   I don't remember the --

6      Q.   Okay.   Now -- and he told you that you would

7  have to pay for it out of your own pocket?

8      A.   Yes.

9      Q.   Did he say why?

10      A.   Because there was only moneys in the budget for

11  Mr. Yzaguirre and Rick Camarillo.

12      Q.   Okay.   So he gave you -- he told you that there

13  wasn't money in the budget to do it?

14      A.    Not for me but only for Mr. Yzaguirre and for

15  Rick Camarillo.

16      Q.   Okay.   And had -- before this date, had you been

17  promised that they would pay your -- pay for you to take

18  the exam?

19      A.   No, but I was up for certification.

20      Q.   Okay.   Had you ever postponed taking the exam

21  before?

22      A.   No.

23      Q.   Do you know if it was possible to postpone

24  taking the exam?

25      A.   No.

1    Q.   So you -- okay.  When you say no, does that mean

2    you don't know whether it's possible, or you know and

3    it's not?

4    A.   No, I don't know it's possible to be postponed.

5    Q.   Okay.  And, now, at -- what else?  There was

6    the -- did he raise his voice when he said this to you?

7    A.   No, but he said it in a sarcastic, laughing way.

8    Q.   Okay.  Do you have some information now that

9    there was -- that there was money in the budget to pay

10   for this?

11   A.   That's what he told me.

12   Q.   To pay for your exam, I mean -- sorry, ma'am, to

13   pay for your exam.

14   A.   That there's money?

15   Q.   Well, that there was money in the budget to do

16   it.

17   A.   Well, he told me that -- to pay out of my own

18   pocket.

19   Q.   Yes.

20   A.   But that there was no money to pay for my exam.

21   Q.   Okay.

22   A.   That there was only money in the budget for Rick

23   Camarillo and for Tony Yzaguirre.

24   Q.   Okay.  And as you're sitting here now, do you

25   have some information that that statement about what

Page 98

1    A.   Linda told me that Mr. Munoz -- Mr. Garcia told

2    her, as per Mr. Yzaguirre, to keep a tab on me.

3    Q.   Okay.  Okay.  But you don't know why he did

4    that?

5    A.   No.

6    Q.   Okay.  Anything else?

7    A.   The phone calls, who was calling me.

8    Q.   Okay.  And do you know that he requested

9    Mrs. Garcia to do that?

10   A.   She told me that -- that's what she told me,

11   that she had to keep a tab on me.

12   Q.   Okay.  Now, how did you come to call

13   Mr. Montoya's office?

14   A.   I don't remember, sir.

15   Q.   You did try to call?

16   A.   Yes.

17   Q.   What were you -- when did this occur?

18   A.   I don't remember.

19   Q.   Was this after you were transferred?

20   A.   Yes.

21   Q.   All right.  So what phone did you call him on?

22   A.   From my house phone.

23   Q.   Oh.  So you called him from your house?

24   A.   Yes.

25   Q.   And who did you speak to in his office?

1    A.   I don't remember.  It was a lady, but I don't
2  remember her name.
3    Q.   Okay.  So what happened during this
4  conversation?
5    A.   I was asking her about my -- I wanted to take my
6  class, that if it was true that I was supposed to pay
7  out of my own pocket.  And the lady said that she had
8  never heard of such a thing like that, that the people
9  that pay for county employees is the county tax
10  assessor.
11    Q.   Okay.  Okay.
12    A.   And I wanted to talk to Mr. Montoya, but she
13  said that he was out, that he wouldn't be back until
14  later that afternoon.
15    Q.   Okay.  And then?
16    A.   That was it.  I left my name, my number to call
17  me back at the office because I couldn't call long
18  distance.
19    Q.   Okay.  And did you leave a voice mail message,
20  or did you just leave a message with the secretary?
21    A.   With the lady that answered the phone.
22    Q.   You don't recall her name?
23    A.   No.
24    Q.   Let's go back over the conversation.  You were
25  calling because you -- was this because you couldn't

Page 100

1    take a class or couldn't take -- you had to pay for a

2    class or you had to pay for an exam?

3        A.  Well, it's a class, and then they give you the

4    exam at the end.

5        Q.  Okay.  Now I understand.  And so when you called

6    them, it was -- you wanted to know if the county had to

7    pay or you had to pay.  Was that your question?

8        A.  Yes.

9        Q.  And so you called his office and who answers?

10       A.  I don't know the lady -- a lady, but I don't

11   know her name.

12       Q.  Okay.  And after you've introduced yourself, who

13   did -- what did you say next?

14       A.  I asked her that I wanted to know the procedure

15   on paying a class.

16       Q.  Yes.

17       A.  And she told me -- I told her what Mr. Garcia

18   had told me, that I had to pay out of my own pocket.

19       Q.  Yes.

20       A.  And she said, "I've never heard of such a thing

21   like that.  If you're a county employee, the county

22   needs to pay for it."

23       Q.  Okay.  Did she say why that was so?

24       A.  I didn't go into detail with her.  I just told

25   her what my supervisor had told me.

Page 101

1    Q.  Yeah, and then she told you the county needs to
2   pay for it?

3    A.  To pay for it.  And then I asked that I wanted
4   to speak to Mr. Montoya.

5    Q.  Okay.

6    A.  And she said that he was out of the office.

7    Q.  Okay.  So she tells you that the county should
8   pay for it, right?

9    A.  If you're a county employee, yes, the county
10  needs to pay for it.

11   Q.  Okay.  And so you said, "May I talk to
12  Mr. Montoya"?

13   A.  Yes.

14   Q.  Does -- and then she does -- she says he's out?

15   A.  Yes.

16   Q.  An then you say what?

17   A.  That I want to leave him a message to please
18  call me back.

19   Q.  Okay.  And is that the message you left, to
20  please call you back?

21   A.  Yes.

22   Q.  Okay.  That's the only message you left?

23   A.  That's all.  I don't know if she related the
24  message about not -- well, the story that I told her
25  about Mr. Garcia.

Page 102

1    Q.  All right.  Now, in this conversation, did she
2 tell you why it was she had the opinion that the county
3 needed to pay for it?
4    A.  Well, she just said that she had never heard of
5 such a thing, that if you're a county employee the
6 county always pays for your classes.
7    Q.  Okay.  Did she say it was a criminal offense or
8 fraudulent for him to fail to pay -- the county to fail
9 to pay?
10   A.  No, she didn't.
11   Q.  When you were calling, you were just calling to
12 find out -- get an answer to the question about who was
13 supposed to pay, right?
14   A.  Right.
15   Q.  Were you calling to accuse Mr. Yzaguirre of
16 committing a criminal offense or something fraudulent
17 when you were calling to speak to Mr. -- calling
18 Mr. Montoya's office?
19   A.  Not a criminal offense, sir.  I just wanted to
20 get my facts straight.  I didn't know if Mr. Garcia was
21 lying to me or not.
22   Q.  Okay.  So what message did you -- you probably
23 said this earlier and I'm not writing it down.  What
24 number did you ask to have the call returned to?
25   A.  In San Benito.

1    Q.   In San Benito at work?

2    A.   Yes.

3    Q.   Okay.  Well, I gather from your discovery

4    responses somehow the call got returned.  What happened?

5    A.   I don't remember if it was Linda or Nora that

6    gave me the message.  I was attending customers.  And

7    they put on a little pink paper saying, "Call

8    Mr. Montoya.  He just is returning your call."

9    Q.   Right.

10   A.   But I couldn't call back anymore because I don't

11   have a code to call from the county phone.

12   Q.   Okay.  Did you ask permission to call his office

13   on the county phone?

14   A.   No.

15   Q.   Did you go to anyone to say, "I'd like to make a

16   long distance call to Mr. Montoya.  Please let me use

17   the county system"?

18   A.   No.

19   Q.   Okay.  So you were given the phone message?

20   A.   Yes.

21   Q.   Yeah.  And -- okay.  Do you recall what time of

22   the day it was?

23   A.   In the afternoon, late in the afternoon already.

24   Q.   Okay.  Did you have a cell phone of your own at

25   this time?

Page 104

1    A.   No.

2    Q.   No.  All right.  So you get the message.  Do you

3   make any effort that afternoon to try to call him back?

4    A.   No.

5    Q.   When did you try to call him back?

6    A.   I never called him back anymore.

7    Q.   You never called him back at all?

8    A.   No.

9    Q.   Why not?

10   A.   Because I resigned.

11   Q.   How --

12   A.   It was days before I was going to resign.

13   Q.   Okay.  So there were -- this occurred some days

14  before you resigned?

15   A.   Yes.

16   Q.   Do you remember how many days, ma'am?

17   A.   No, not exact.

18   Q.   All right.  But in those next couple of days,

19  you did not call him back?

20   A.   No.

21   Q.   And the reason you didn't is because you decided

22  to resign?

23   A.   No.

24   Q.   Okay.  So why?

25   A.   No, I just didn't call him back.  I didn't have

1  office why you were calling Mr. Montoya?

2      A.  No.

3      Q.  Was there anything on -- correct me if I'm

4  wrong.  You said somebody gave you one of those message

5  slips --

6      A.  Yes.

7      Q.  -- to tell you to call.  Was there anything on

8  that slip about why you had called him?

9      A.  No.  It just said to call back, Mr. Montoya

10  returning my call.

11      Q.  Do you have any information that somehow

12  Mr. Yzaguirre found out why you called Mr. Montoya's

13  office?

14      A.  No.

15      Q.  Okay.  Do you still eat lunch with your sister

16  Ruth?

17      A.  I'm sorry?

18      Q.  Do you still eat lunch regularly with your

19  sister Ruth?

20      A.  No.

21      Q.  When did that stop, ma'am?

22      A.  When I started working for Dillard's.  I don't

23  have a set lunch.  As of right now, you're saying?

24      Q.  Well, yes.  I meant after you ceased working at

25  the tax assessor-collector's office.  You don't have a

.

# EXHIBIT NO. 2

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Alvarado's
Amendment Speech Claims

# OFFICE OF THE
# TAX ASSESSOR-COLLECTOR
### P.O. BOX 952    BROWNSVILLE, TEXAS    78522-0952

**TONY YZAGUIRRE, JR.**
TAX ASSESSOR-COLLECTOR
RPA,RTA,CTA,CSTA



**FELIX R. MUNOZ**
CHIEF DEPUTY – OPERATIONS

**JESSE GARCIA, JR.**
CHIEF DEPUTY – ADMINISTRATION

# MEMO

**To:**        Jesse Garcia, Jr.
                Chief Deputy of Administration

**From:**     Tony Yzaguirre, Jr.
                Tax Assessor-Collector

**Subject:**   Vehicle Inventory Tax

**Date:**      January 13, 1999

Since the implementation of the Vehicle Inventory Tax (VIT) in 1994, we have had several calls from individuals that are required to pay their VIT to this office. Some businesses do not understand the process of how VIT is paid or calculated. Some have sent in their report to the Cameron Appraisal District together with the payment causing them to be late on their report consequently requiring them to pay a penalty. As you know we have had several business report their VIT report late for some reason or another. If a business has a legitimate excuse for reporting their VIT late, we will waive the penalty for that month. But we will advise them that this office will not waive another penalty for that business for the remainder of the year regardless of the excuse. We will treat all business alike.

Some of the legitimate excuses that have been reported are; sending payments to the appraisal district, sending payments to the different district that we collect for, payment was not posted by U.S. Mail correct, emergency at the business due to sickness, business bookkeeper turns in paper work with no monies, business owner out of town, etc. If we do waive a penalty for a business for whatever reason we will make a written notation in their VIT file of the amount waived, the reason for that action, and let the business know that we will not accept any further excuses for late payments, for any reason.

c.c.:   File

# EXHIBIT NO. 3

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Alvarado's
Amendment Speech Claims

## DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS

COUNTY OF CAMERON

"I declare under penalty of perjury under the laws of the United States of America that the attached Exh. 1 is true and correct copy of pages from the deposition of Plaintiff Diamantina Alvarado. Exhibit 2 is a true and correct copy of Exh. 7 to that deposition. I declare under penalty of perjury that the foregoing is true and correct."

Executed on March 1, 2006.

ROGER W. HUGHES