# EXHIBIT NO. 1

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, ET AL    x
                        x
                        x
VS.                     x  CIVIL ACTION NO. B-03-096
                        x
                        x
CAMERON COUNTY, ET AL   x

_____

ORAL DEPOSITION OF FELIX MUNOZ
FEBRUARY 9, 2006
VOLUME 1

_____

Volume 1 of the Oral deposition of FELIX MUNOZ, who

resides in Cameron County, Texas, taken by Roger

Hughes, Attorney for Defendant Tony Yzaguirre, Tax

Assessor-Collector of Cameron County and Director of

Cameron County Automobile Crimes Enforcement Task Force

in His Individual Capacity, reported by SHELLEY

STINGLEY, Certified Court Reporter in and for the State

of Texas, on FEBRUARY 9, 2006, in the offices of Adams

& Graham, 222 East Van Buren, West Tower, Harlingen,

Texas.

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:
GAY E. GILSON
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301-A
Corpus Christi, Texas  78401

DAVID LEE McGEE
LAW OFFICES OF DAVID LEE McGEE
701 Park Avenue
Corpus Christi, Texas  78401

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR OF
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE IN HIS INDIVIDUAL CAPACITY:
ROGER W. HUGHES
CRAIG VITTITOE
ADAMS & GRAHAM
222 East Van Buren, West Tower
Harlingen, Texas  78550

COUNSEL FOR CAMERON COUNTY:

BRUCE HODGE
CAMERON COUNTY DISTRICT ATTORNEY'S OFFICE
974 East Harrison, 2nd Floor
Brownsville, Texas  78520
HEATHER SCOTT
WILLETTE & GUERRA
1534 East 6th Street, Suite 200
Brownsville, Texas 0 78520

ALSO PRESENT:
Tony Yzaguirre
Vicenta Cantu
Diamantina Alvarado

Page 3

INDEX

Appearances ...................................... 1
Examination by Mr. Hughes ........................ 4

Errata Sheet/Signature page ..................... 127
Reporter's Certificate .......................... 128

DOCUMENTARY EVIDENCE

Ex.  Description                              Iden.

 1  Cameron County Job Description
    Job Title:  Chief Deputy of Operations Tax
    Assessor/Collector's Office ..............  28

 2  Project Coordinator Job Description .......  30

 3  December 11, 2001 Memorandum from
    Mr. Yzaguirre............................  97

Page 4

1          FELIX MUNOZ,
2  having been duly sworn, testified as follows:
3                EXAMINATION
4  BY MR. HUGHES:
5      Q.  Could you state your full name, sir?
6      A.  Felix Munoz.
7      Q.  And how old are you?
8      A.  56.
9      Q.  Are you married?
10     A.  Yes.
11     Q.  And what's your wife's name?
12     A.  Diana.
13     Q.  And how long have you been married, sir?
14     A.  Since '81.
15     Q.  I'm sorry?
16     A.  Since '81.
17     Q.  Okay.  And do you have any children by Diana?
18     A.  Yes, four children.
19     Q.  And could you give me their names and ages,
20  please?
21     A.  Felix, Jr., Frederick Lee, and they are 18.
22     Q.  They are all adult children?
23     A.  They are all four boys and the two older boys
24  are twins so they are 18.
25     Q.  Okay.

Page 18

1    Q.  Okay.  But you managed to stay on until the end
2  of the year?
3    A.  Uh-huh.
4    Q.  And that was because you were hired when he was
5  officially taking office as the elected official?
6    A.  Right.
7    Q.  And that was when he would be able to hire
8  people in his own right?
9    A.  Right.
10    Q.  What were you hired to do, sir?
11    A.  Chief deputy of Cameron County.
12    Q.  What did you understand your duties to be?
13    A.  Oversee everything in the office, operations,
14  including the budget, oversee staff, assist with the
15  operation of all the branch offices, essentially be
16  second to the tax collector.
17    Q.  Okay.  Now, have you ever been hospitalized for
18  any reason?
19    A.  No, sir.
20    Q.  In the past five years -- pardon me.  When I
21  saw your interrogatories, the answer was -- I asked a
22  question as to whether you had been to see a doctor for
23  any reason in the past five years, and if I recall, the
24  only answer you gave was the Family Night Clinic.
25    A.  Uh-huh.

Page 24

1    A.  Yes, sir.
2    Q.  When was that?
3    A.  '81.
4    Q.  Did you invite him to the wedding?
5    A.  Yes, sir.
6    Q.  Did he go?
7    A.  I believe he did.
8    Q.  Okay.  Was he ever a guest in the home of you
9  and your second wife?
10    A.  Yes.
11    Q.  Did you and your second wife ever socialize
12  with him?
13    A.  Yes.
14    Q.  Okay.  And when did you first meet Vicenta
15  Cantu?
16    A.  Not until I came to work for the county.
17    Q.  When she came to work for the county?
18    A.  Uh-huh.
19    Q.  And how is it that you knew her?
20    A.  Just as a coworker or as a subordinate there.
21    Q.  Okay.  When she came to work, who was her
22  supervisor?
23    A.  Her supervisor?
24    Q.  Yes.
25    A.  Lupita De Leon.

Page 25

1    Q.  And when she became head cashier, who was her
2  supervisor?
3    A.  Lupita De Leon.
4    Q.  And what -- well, then, who above Lupita was
5  her supervisor?
6    A.  I was.
7    Q.  Okay.  So when she was head cashier, the chain
8  of command would have been Ms. De Leon, then you?
9    A.  Uh-huh.
10    Q.  I'm sorry.  Yes?
11    A.  Yes, sir.
12    Q.  And then Mr. Yzaguirre?
13    A.  Right.
14    Q.  And what did you understand her job duties to
15  be when she was head cashier?
16    A.  She was responsible for accounting for all the
17  monies.
18    Q.  Okay.
19    A.  And making the deposit and doing whatever
20  reports she had to do for the state.
21    Q.  Okay.  And then after that -- correct me if I'm
22  wrong -- after being head cashier, at some point, she
23  was transferred, given the job of being a titles
24  examiner?
25    A.  Right.

Page 26

1    Q.  And who was her supervisor then at that point?
2    A.  I believe Lupita was her supervisor to a
3  certain extent and then me.
4    Q.  Okay, so it would have been Ms. De Leon to a
5  certain extent?
6    A.  Uh-huh.
7    Q.  And then you?
8    A.  Right.
9    Q.  And what did you understand her job duties to
10  be as a titles examiner?
11    A.  To examine all the titles that came in through
12  our office.
13    Q.  And was there anyone that she worked with?
14    A.  She worked with --
15    Q.  As title examiner, I mean, sir.
16    A.  As title examiner?
17    Q.  Yes, initially, who did she work with?
18    A.  In conjunction with?
19    Q.  Yes.
20    A.  I guess Lupita and her were responsible for
21  checking titles.
22    Q.  What was Ms. Sifuentes's responsibilities?
23    A.  Data entry.
24    Q.  Data entry only?
25    A.  Uh-huh.

Page 47

1  thought would make him a lot of money.
2      Q.  Okay.
3      A.  I think that's the reason he left.
4      Q.  Did he give you his reasons, sir?
5      A.  No.
6      Q.  Did Mr. Yzaguirre tell you what he thought his
7  reasons were?
8      A.  Well, that he was going to be a guide in
9  Mexico.
10     Q.  Okay.  Now, I understand from your pleadings
11 sometime in 2001 you saw something in the office
12 involving Mr. Barreda, Sr.; Mr. Barreda, Jr.;
13 Ms. Guerra; Moises Torres; and Mr. Carlos Torres.  What
14 did you see?
15     A.  They were in Mr. Yzaguirre's office quite often
16 and they were dropping off a lot of that paperwork on
17 that side of the office when all the paperwork should
18 come through the regular line, through the side of the
19 automobile division.
20     Q.  Okay.  Just for the sake of the jury, who may
21 not have been there as often as you are,
22 Mr. Yzaguirre's office and the -- the tax
23 assessor-collector's is on the first floor of the
24 administration building at the courthouse, right?
25     A.  Uh-huh, yes, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 59

1      Q.  I'm saying, when you saw this happen on the
2  cameras, what did you do?
3      A.  I brought it up to Lupita's attention and she
4  said it was, you know, Yzaguirre's friends dropping off
5  paperwork.
6      Q.  Okay.  Is that what -- is that the word she
7  used, "friends"?
8      A.  I don't recall, sir.
9      Q.  So you don't recall that Ms. De Leon used the
10 word "friends"?
11     A.  No.
12     Q.  Do you recall what word she did use when she
13 answered the question?
14     A.  No, sir.
15     Q.  Now, did she say there was anything wrong with
16 this paperwork?
17     A.  No, she did not.
18     Q.  Now, I understand when the dealers bring
19 paperwork in or someone brings it in for the dealers,
20 they are supposed to pay the taxes on the transaction?
21     A.  The dealers?
22     Q.  Yes, sir.
23     A.  Yes, sir.
24     Q.  In other words, the buyer, they are supposed to
25 collect the tax from the buyer and then pay the sales

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 60

1  tax they have collected from the buyer to your office?
2      A.  Uh-huh.
3      Q.  Can you use a word, sir?
4      A.  Yes, sir.
5      Q.  Okay.  On any of these paperworks that were
6  dropped off by these individuals, Mr. Barreda, Sr., Mr.
7  Barreda, Jr., Ms. Guerra, Mr. Moises Torres, or
8  Mr. Carlos Torres, on any of those occasions, are you
9  aware or do you have any information that whatever
10 taxes or monies that were due with these title
11 applications was not being paid?
12     A.  No, sir.
13     Q.  Do you know whether any of the money that was
14 left with them or turned in with them was misapplied or
15 went someplace it shouldn't have gone?
16     A.  No, sir.
17     Q.  So when you find out from Lupita -- pardon me
18 -- from Ms. De Leon that the titles are coming across
19 to her, what do you do, sir?
20     A.  I approached her and asked her why were the
21 titles coming across.
22     Q.  Okay.
23     A.  She said they were being dropped off at
24 Mr. Yzaguirre's office.
25     Q.  Okay.  And then what did you say?  Okay, did

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 61

1  you --
2      A.  I didn't see a problem with that.
3      Q.  At that time?
4      A.  At that time.
5      Q.  Okay, you didn't go over -- who was the --
6  okay, you're watching these individuals leave the
7  paperwork on the security camera, right?
8      A.  Uh-huh.
9      Q.  Who do this give it to?
10     A.  The receptionist right there or Ruth.
11     Q.  Okay.  And what did Ruth or the receptionist
12 then do with it?
13     A.  I saw Ruth walk across and bring it to Lupita.
14     Q.  So whoever got them in Mr. Yzaguirre's office
15 would then take them directly over to the office right
16 across the hall?
17     A.  Yes, sir.
18     Q.  Did you ever see them do anything else with
19 that paperwork?
20     A.  No, sir.
21     Q.  Did you ever see them -- other than just pick
22 them up and take them across the hall, did you see them
23 do anything to the paper or with the paper whatsoever?
24     A.  No.
25     Q.  Well, at some point then after October of 2001,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 62

1  this somehow makes you concerned.  What was the
2  problem?
3      A.  Well, the problem was this paperwork should
4  have either come through the front line or the dealer
5  section.  And the dealer section had a notary section.
6  If it was a notary, it should have come through that
7  section.  There they would document the titles that
8  were coming in.  Mr. Yzaguirre's office across the hall
9  was not a place to drop off paperwork for title
10  transactions.
11      Q.  Okay.  But you said initially when you saw this
12  that you didn't think it was a problem.  When did it
13  become a problem?
14      A.  As it grew more and more, as they were dropping
15  off more and more transactions over there.
16      Q.  Okay.  And so when you finally perceived it was
17  a problem, what did you do?
18      A.  I talked to Jesse Garcia, the administrative --
19  chief of administration and I said, "What's going on?
20  Don't you think we should approach Mr. Yzaguirre and
21  talk to him about this?"
22      Q.  Okay.
23      A.  He said, (Witness speaking in Spanish)
24      Q.  I'm sorry.  We need you to speak in English.  I
25  mean, I speak Spanish, but the court reporter hasn't

Page 63

1  got a clue what to write down.
2      MS. GILSON:  For the record, I would like
3  it to be said in Spanish, as he heard it, so it's
4  accurate as to what was actually said.
5      MR. HUGHES:  Well, if you want to leave a
6  space to write in the Spanish, that's fine, but I don't
7  think it's fair to the court reporter to take down
8  Spanish --
9      MS. GILSON:  I understand, but I don't
10  want someone later saying, "Well, you didn't say those
11  exact words."  That's all.  I don't have a problem with
12  him saying it in English, but I also want him to say it
13  in Spanish.
14      MR. HUGHES:  Understood.  And I'm not
15  asking him not to repeat what he said.  I'm just saying
16  I need a translation.
17      Q.  Go ahead.
18      A.  "No, don't give me any more problems."
19      Q.  Okay.  And when you said, "We ought to talk to
20  Mr. Yzaguirre about it," did you tell him why?
21      A.  Yes.
22      Q.  What did you tell him?
23      A.  That the paperwork should come through our
24  office, the line and the dealer section, notary
25  section, and not over there, being dropped off over

Page 64

1  there, because then Lupita would collect money, cash
2  monies, and do the transaction there.  I could see it
3  on the camera.  And that was not the proper thing to
4  do, to see cash money -- anybody walking down the hall
5  is going to think, "What's going on over there,
6  doing" --
7      Q.  Okay, now, again, my lack of familiarity, where
8  is Ms. De Leon's office?
9      A.  She's over here in the auto section.
10      Q.  So she's over in the section --
11      A.  She's over there in the lobby, in the reception
12  area over there, transaction -- doing cash transactions
13  or --
14      Q.  Okay.  And the -- and, again, I'm going to ask
15  for the office setup.  During 2000 and 2002, was she
16  the head cashier?
17      A.  No.
18      Q.  Did the head cashier work for her?
19      A.  Yes.
20      Q.  Okay.  So the money she was collecting was --
21  pardon me.  She would have been responsible for the
22  head cashier, right?
23      A.  Right.
24      Q.  And what does the head cashier do?
25      A.  The head cashier, at the end of the day, they

Page 65

1  would turn in all the money to her.  She would verify
2  everybody's deposit and she would prepare the deposit
3  the next morning for the armored car to pick it up.
4      Q.  Okay.  And Lupita would be supervising that
5  person?
6      A.  Uh-huh.
7      MR. HODGE:  "Yes"?
8      A.  Yes.
9      Q.  And who would be the person to take the money
10  to the armored car, turn it over to them?
11      A.  The armored car would walk right into the
12  office and go to the head cashier's in the back, pick
13  up the bags, they are locked, and take them.
14      Q.  Okay.
15      A.  Sign out for them and take them.
16      Q.  Did you trust Ms. De Leon to handle money?
17      A.  Yes.
18      Q.  Is she a bonded employee or not?
19      A.  I don't know if she's bonded.
20      Q.  Okay.  Did you think that if she was handling
21  money that somehow she might misapply the money?
22      A.  No.
23      Q.  So do people who walk into the tax assessor's
24  office know that she only supervises the head teller,
25  that she's not the head teller?  Do people who walk in

Page 66

1  the door know that?
2      A.  I don't know.  People that know her might know
3  what she does.
4      Q.  Okay.  So when you said it looked bad, who
5  besides you would it look bad to?
6      A.  The public.
7      Q.  How would they know that she's not supposed to
8  count the money?
9      A.  I don't know.  I just don't think it looks good
10  to be counting money in the reception area and not at
11  the work station.
12      Q.  So your objection -- and I'm not trying to
13  argue with you, but I'm just trying to understand what
14  you said at the time.  Your objection was where she was
15  counting the money?  That was your objection?
16      A.  Yes.
17      Q.  Not that she was counting the money?
18      A.  She was counting the money.
19      Q.  Okay.  But you wouldn't object to her counting
20  the money, would you?
21      A.  Oh, no.
22      Q.  Okay, because she supervises the people who
23  count the money, right?
24      A.  Uh-huh.
25          MS. GILSON:  Verbal answer, please.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755   Brownsville (956) 542-1020
f87990c8-fdef-41714ca3-616877bd8405

Page 67

1          THE WITNESS:  What's that?
2          MS. GILSON:  Verbal answer.
3      A.  Right.
4          MR. HODGE:  A "yes" or a "correct" or
5  something like that.
6      Q.  And so what were you afraid the people, the
7  public, would think if they saw her collecting money at
8  the receptionist's desk?
9      A.  That it was improper.
10      Q.  In what way?
11      A.  Well, like I say, that was not the place to
12  count money.
13      Q.  Well, if somebody walked off -- walked in off
14  the street and saw her counting money there, what were
15  you worried that they would think was improper that was
16  going on?
17      A.  I just felt like it shouldn't be there,
18  shouldn't be there.
19      Q.  Okay.
20      A.  That's why we had the work stations.  That's
21  why we had the assigned sections where the money should
22  be transferred, the paperwork should be done, and not
23  just count money that -- like counting money in the
24  hallway, you know, that wouldn't look proper, either.
25      Q.  Okay.  Did any member of the public ever come

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755   Brownsville (956) 542-1020
f87990c8-fdef-41714ca3-616877bd8405

Page 68

1  forward and say, "I saw this and I think something
2  improper is going on"?
3      A.  No.
4      Q.  Well, other than she's counting money in the
5  open, what impropriety might a member of the public
6  think is occurring in front of them?
7      A.  I don't know.
8      Q.  Okay.  So how many occasions did you see Lupita
9  counting money in the open?
10      A.  At least three times.
11      Q.  Three times?
12      A.  Uh-huh.
13      Q.  When was this?
14      A.  I don't remember.
15      Q.  Do you remember if it was in 2001 or 2002?
16      A.  I don't remember if it was 2001 or 2002.
17      Q.  Okay.  Who was present when you told her this,
18  when you asked -- when you saw this?
19      A.  Just her.
20      Q.  Just her.  On all three occasions, did you
21  speak to her or did you --
22      A.  Just that one time.
23      Q.  Just one.  Was it the first, second, or third,
24  sir?
25      A.  I think it was the second time.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755   Brownsville (956) 542-1020
f87990c0-fdef-41714ca3-616877bd8405

Page 69

1      Q.  Okay, so the first time you said nothing?
2      A.  Uh-huh.
3          MR. HODGE:  Was that a "yes"?
4          THE WITNESS:  Yes.
5      Q.  The second time you spoke with her?
6      A.  Yes.
7      Q.  What did you say, sir?
8      A.  I said, "Lupita, I think you should stop doing
9  that practice because it looks bad for you to be
10  counting money out there in the open," or something to
11  that effect.
12      Q.  Okay.  Did you tell her why it looked bad?
13      A.  No.
14      Q.  Did you tell her that you thought it might
15  foster the appearance of some sort of public corruption
16  or thievery going on?
17      A.  No.
18      Q.  Okay.
19      A.  I just told her it looked bad.
20      Q.  Okay.  Did you explain what "bad" meant?
21      A.  No.
22      Q.  Okay.  What did she say, sir?
23      A.  Sir?
24      Q.  What did Ms. De Leon say?
25      A.  I don't recall.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755   Brownsville (956) 542-1020
f87990c0-fdef-41714ca3-616877bd8405

Page 70

```
1    Q.  Did she say she would do it elsewhere or what?
2    A.  No, I just told her and she didn't answer me.
3  I don't recall that she answered anything.
4    Q.  Did she quit doing it right then?  Did she move
5  to a different desk and --
6    A.  No.
7    Q.  Did she explain why she was doing it?
8    A.  No.
9    Q.  Did you ask her why she was doing it?
10   A.  Well, I figured she was doing it because she
11 had done a transfer or title work for this person who
12 was there.
13   Q.  Okay, the money she was counting, did you see
14 where it came from?
15   A.  No.
16   Q.  You don't know who left the money on her desk?
17   A.  I believe that money that was there and that
18 she was counting was from Moi Torres.
19   Q.  How did you know that?
20   A.  I believe Moi was right next to her.
21   Q.  So Mr. Torres was there?
22   A.  Yes.
23   Q.  And do you know where -- so this was not
24 paperwork he left at Mr. Yzaguirre's office?
25   A.  I believe it would be the paperwork he left for
```

Page 74

```
1    A.  Right.
2    Q.  And so you would be in a position to instruct
3  her on how she ought to do her job?
4    A.  Right.
5    Q.  Did you tell her that she was not to deal with
6  Mr. Torres directly anymore?
7    A.  I told her not to do that anymore.
8    Q.  Okay.  And "that," when you said not to do
9  that, was counting money in the open?
10   A.  Right.
11   Q.  Did you tell her that she should not deal
12 directly with Mr. Torres anymore?
13   A.  No.
14   Q.  Okay, this was the second time?
15   A.  Yes, sir.
16   Q.  When was the third?
17   A.  The third time that I saw her, she handed the
18 money over to Julio.  Julio was working in his station
19 and she handed the money to him this way.
20   Q.  And you're talking about Mr. Hernandez?
21   A.  Yes.
22   Q.  What was his position in the office?
23   A.  Auto clerk.
24   Q.  Say again?
25   A.  Auto clerk.
```

Page 75

```
1    Q.  I see.  And what would he -- again, for those
2  of us who are unfamiliar, what would an auto clerk do?
3  What would be their position?
4    A.  They would be out at their station doing
5  vehicle registration.
6    Q.  Okay.  Would he normally be the one that the
7  members of the public would go to to give their
8  paperwork and the monies they are supposed to pay for
9  their taxes and fees?
10   A.  Yes.
11   Q.  So he would be an appropriate person to take
12 money?
13   A.  Yes, sir.
14   Q.  And how did -- again, you were watching this on
15 the videocamera?
16   A.  Yes, sir.
17   Q.  And what did you see again, sir?
18   A.  I saw Lupita come by and hand him some money.
19   Q.  Okay.  And do you know where she got the money
20 from?
21   A.  No, sir.
22   Q.  And did she hand him anything else other than
23 the money?
24   A.  Just the money as far as --
25   Q.  Cash or --
```

Page 76

```
1    A.  Cash.  I think it was cash.
2    Q.  Could you tell on the -- these are black and
3  white cameras, right?
4    A.  Yes.
5    Q.  Could you tell how much money it was?
6    A.  No.
7    Q.  Did you investigate?
8    A.  I asked her, "What's going on out there?"  And
9  she denied, "Nothing."
10   Q.  So when you say you asked her, did you go out
11 to talk to her?
12   A.  I called her into the office.
13   Q.  Okay, you called her in?
14   A.  Uh-huh.
15       MR. HODGE:  Was that a "yes"?
16   A.  Yes.
17   Q.  Okay, and what did you tell her, sir?
18   A.  I told her, "Lupita, what's going on out
19 there?"  She said, "Nothing, sir."
20   Q.  She said, "Nothing"?
21   A.  Yes, sir.
22   Q.  Did you ask her then, "What then?"
23   A.  What then?
24   Q.  Well, she said, "Nothing."  What did you do or
25 say next, sir?
```

Page 90

1    Q.  And you understood someone who had been a
2  coworker, someone who you let walk into your office,
3  say that someone across the hall is taking money and
4  you make no further investigations about it?
5          MS. GILSON:  Object; asked and answered.
6    Q.  You did nothing more, sir?
7    A.  I did nothing more.
8    Q.  Why didn't you speak to Mr. Yzaguirre about it?
9    A.  I didn't.
10   Q.  You didn't?
11   A.  No.
12   Q.  Okay.  When you -- earlier when you talked to
13  Ms. De Leon on these occasions about money in the open,
14  did you go talk to Mr. Yzaguirre about that?
15   A.  No.
16   Q.  Did Ms. De Leon go and talk to Mr. Yzaguirre
17  about that?
18   A.  I don't know if she did.
19   Q.  Well, do you have any information now how
20  Mr. Yzaguirre learned that you had these conversations
21  with Lupita De Leon before you filed your lawsuit?
22   A.  I don't know.
23   Q.  Okay, so you have no idea -- pardon me.  You
24  have information now that Mr. Yzaguirre learned about
25  these conversations you had with Ms. De Leon before you

Page 91

1  filed this lawsuit?
2    A.  No.
3          MR. HUGHES:  An aside, it's 11:15.  I know
4  lunch is coming up and we've been going at this for a
5  while.  If you want to push on to lunch or take a short
6  break now and kind of work into lunch -- what do you
7  want to do?
8          MR. HODGE:  Let's take five.
9          (Brief recess)
10   Q.  All right, sir, going back to the third
11  occasion when you saw Ms. Lupita De Leon hand something
12  to Mr. Julio Hernandez, what did you see?
13   A.  I saw her come in the office and hand --
14  underneath hand him some money.
15   Q.  So whatever she handed him was underneath
16  something?
17   A.  Well, like right here, the lower -- not over
18  the counter or on top of the counter but just like she
19  handed it under, underneath.
20   Q.  Okay.  And you saw this -- it just happened on
21  the camera?
22   A.  Yes, sir.
23   Q.  And these are black and white cameras?
24   A.  Black and white.
25   Q.  So you couldn't tell what color it was that she

Page 92

1  handed him?
2    A.  No.
3    Q.  And what was it you saw?
4    A.  He handed her money.
5    Q.  Money or -- how did you know it was money?
6    A.  Anything else would have been a paper or
7  anything -- this was just kind of wrapped up and handed
8  to him.
9    Q.  Okay.  When you say "it," why do you say it was
10  money?
11   A.  I just think it was money.
12   Q.  So you think it was money?
13   A.  Uh-huh.
14   Q.  But you didn't --
15         MR. HODGE:  Wait a minute.  You think it
16  was money; is that right?
17         THE WITNESS:  Yes, sir.
18         MR. HODGE:  "Yes," okay.  I'm just trying
19  to correct the "uh-huh," okay?  See, we understand
20  that.
21         THE WITNESS:  Yeah.
22         MR. HODGE:  But she doesn't, and when we
23  play it for a jury it becomes problematic, all right,
24  sir?
25         THE WITNESS:  Right.

Page 93

1          MR. HODGE:  I don't mean to interrupt, but
2  I'm just trying to keep it clear.
3    Q.  So you can't say you're positive it was money?
4    A.  No.
5    Q.  It could have been just some small piece of
6  paper, like a small note, couldn't it?
7    A.  It could have been.
8    Q.  Now, did Ms. De Leon tell you it was money?
9    A.  No.
10   Q.  Did you say, "I saw you pass money"?
11   A.  No.  I asked her what was going on out there
12  and she said, "Nothing."
13   Q.  Okay.  Now, did Esthela Guerra ever come to
14  your office to talk to you?
15   A.  Yes.
16   Q.  Okay.  How many occasions did she come to your
17  office to speak with you?
18   A.  Not very often.
19   Q.  On one of them, did she come to you and talk to
20  you about something going on at the county tax
21  assessor-collector's office in Nueces County?
22   A.  Yes, she brought in some documents.
23   Q.  What did she come into your office to tell you?
24   A.  That she saw that there was improprieties in
25  Nueces County.

Page 110

1  to assist you?
2      A.  No, no.
3      Q.  All right, now, sometime in the spring of 2002,
4  you have a conversation with Mr. Yzaguirre about Moises
5  Torres?
6      A.  Yes, sir.
7      Q.  When was this, sir?
8      A.  It was in Matamoros.
9      Q.  Do you recall the month, sir?
10     A.  No, I think it was February.
11     Q.  February, possibly February?
12     A.  Possibly.
13     Q.  And why were the two of you in Matamoros?
14     A.  We were going to do junkyard inspections with
15  Matamoros officials.
16     Q.  Okay.
17     A.  To check if there were any stolen vehicles over
18  there.
19     Q.  And where did this conversation take place?
20     A.  In the car.
21     Q.  In what -- in the car?
22     A.  Yes.
23     Q.  Whose car?
24     A.  Well, the county's car.
25     Q.  Okay.  Who was driving?

Page 111

1      A.  He was, Mr. Yzaguirre.
2      Q.  And you were a passenger, I assume?
3      A.  Yes.
4      Q.  Who else was in the car?
5      A.  I don't believe -- I don't recall if the
6  lieutenant was there, but I think it was the lieutenant
7  or the lieutenant had gotten off to talk to the
8  officials.
9      Q.  Lieutenant who, sir?
10     A.  I think it was Pena, Javier Pena.
11     Q.  And the conversation you're referring to was in
12  the car, right?
13     A.  Yes.
14     Q.  How did Mr. Torres's name come up?
15     A.  I told him, "Mr. Yzaguirre, I feel like you
16  should, you know, avoid contact with Mr. Moises
17  Torres."
18     Q.  Okay, well, let me back up.  Is this
19  conversation in English or Spanish?
20     A.  Spanish.
21     Q.  Spanish.  So you weren't -- let me back up.
22  Had the subject of the conversation turned to
23  Mr. Torres in some manner or did you just bring it up?
24     A.  I brought it up.
25     Q.  Okay.  Before that, what had you-all been

Page 112

1  talking about?
2      A.  About the inspections we were going to do at
3  the junkyards.
4      Q.  Okay.  And at the time you brought it up, who
5  was in the car?
6      A.  Mr. Yzaguirre.
7      Q.  Anyone else?
8      A.  I don't think so.
9      Q.  Mr. Pena was not there?
10     A.  No.
11     Q.  The two of you were alone?
12     A.  (Moving head up and down)
13     Q.  Okay.  And what did you say to Mr. Yzaguirre?
14     A.  "I think you should avoid Mr. Moises Torres."
15     Q.  Okay, what did you say in Spanish?
16     A.  (Witness speaking in Spanish)
17     Q.  Okay.  I'm sorry what was that again, sir?
18     A.  "I feel that you should avoid Moises Torres.  I
19  don't have any confidence in that guy."
20     Q.  Okay, I think the word you said was "ten
21  cuidado"?
22     A.  Yeah.
23     Q.  "Take care"?
24     A.  Yeah.
25     Q.  Okay.  You didn't use the word "evitar," like

Page 113

1  "avoid," did you?
2      A.  No, I don't think so.
3      Q.  Okay.  So when you -- when you said that, what
4  was Mr. Yzaguirre's response?
5      A.  There was no continuance of the conversation.
6      Q.  You just said that?
7      A.  Uh-huh.
8      Q.  And he said nothing?
9      A.  Nothing.
10     Q.  What was the next thing that was said by
11  anybody?
12     A.  I don't recall.  We went about doing the
13  inspection and checking out the junkyards and --
14     Q.  Did you discuss Mr. Torres at all again with
15  him that day?
16     A.  Anything else, no.
17     Q.  Okay.  What made you say that?
18     A.  That Mr. Yzaguirre had been driving the golden
19  Chevrolet or GMC truck, that it was my understanding
20  that it belonged to Moises Torres, but I had run the
21  license plates on the truck and they came back to
22  Sosa's Auto Sales.
23     Q.  Okay.  Why did you run the tags?
24     A.  Why?
25     Q.  Yes.

Page 114

1     A. Because I ran them.

2     Q. Why did you run the tags? What was your

3 reason?

4     A. Because I wanted to see who the owner of the

5 vehicle was.

6     Q. Why did that make you -- why did you do that?

7     A. Because I ran them.

8     Q. I'm sorry?

9     A. I ran them.

10     Q. Okay, well, I understand what you did, and I

11 understand that you were curious to find out who owned

12 the car. Why?

13     A. Just curiosity.

14     Q. Well, tell me, do you run the tags on every car

15 of every employee of the Cameron County Tax

16 Assessor-Collector's Office when you don't know who

17 owns it?

18     A. No, I don't.

19     Q. So why this time?

20     A. But I -- you know, if I saw another car -- for

21 example, I saw another car that I ran the plates on and

22 the sticker didn't come back as registered. Come to

23 find out that employee had taken one of our stickers

24 and placed it on her car.

25     Q. Okay. Was there some reason that you suspected

Page 115

1 the registration on this vehicle that Mr. Yzaguirre was

2 driving?

3     A. No.

4     Q. So you were -- why were you curious to know who

5 owned the vehicle that Mr. Yzaguirre was driving?

6     A. I was just curious.

7     Q. Didn't think anything was going on wrong?

8     A. No.

9     Q. You just ran the title?

10     A. Uh-huh.

11         MR. HODGE: You just ran the title, was

12 that --

13     Q. I mean, you ran the tags?

14     A. The tags.

15     Q. And so when you found out, did speak to

16 Mr. Yzaguirre about that?

17     A. No.

18     Q. What did you do when you found out who owned

19 the vehicle?

20     A. Nothing.

21     Q. You did nothing?

22     A. No.

23     Q. And what did you conclude, other than Mr. Sosa

24 owned the vehicle or that his business owned it?

25     A. Nothing, other than it didn't belong to Moises

Page 119

1     A. No, sir.

2     Q. And did you see him drop off money with this

3 paperwork?

4     A. Just that one time that I saw.

5     Q. Just the one time?

6     A. Uh-huh.

7     Q. And in each case, the paperwork was brought

8 directly over from Mr. Yzaguirre's office to the motor

9 vehicle department?

10     A. Right.

11     Q. And, to your knowledge, was it properly

12 processed there?

13     A. To my knowledge.

14     Q. Okay. Did you -- did you go over and tell the

15 people in Mr. Yzaguirre's office not to accept the

16 paperwork anymore and to tell Mr. Torres to take it

17 across the hall?

18     A. No.

19     Q. Okay, now, these were people that you

20 supervised, right?

21     A. Yes.

22     Q. Now, did you tell Mr. Yzaguirre what made you

23 suspicious of Mr. Moises Torres?

24     A. No.

25     Q. You didn't tell him that the vehicle that he

Page 120

1 had been given was owned by Mr. Sosa?

2     A. No.

3     Q. You didn't tell him you ran the tags?

4     A. No.

5     Q. You didn't tell him you had seen Mr. Torres

6 leaving paperwork at the front office?

7     A. No.

8     Q. Did he discuss that with you afterwards?

9     A. No.

10     Q. How did he know what you were referring to?

11     A. I guess he would know. He would know. He was

12 there.

13     Q. He was where when?

14     A. He was there -- that was his office.

15     Q. He was in the office?

16     A. That was his office across the hall.

17     Q. Yes. And on each of these occasions, was he at

18 -- these papers were not handed to him, were they, that

19 you saw?

20     A. No.

21     Q. They were left with the receptionist or

22 Ms. Weaver; isn't that what you said?

23     A. Right.

24     Q. Well, how -- from what you could tell, how did

25 he know?

Page 121

1  A.  From what I could tell, unless he had, you
2  know, conversations with these people or --
3  Q.  Okay.  Were you present when he had these
4  conversations?
5  A.  No, no.
6  Q.  Then how did -- well, then why did you assume
7  that he knew that this was happening?
8  A.  Well, they came into his office to look for him
9  and drop these things off for him.
10  Q.  Okay.  Well, do you know that he was there on
11  every occasion?
12  A.  I don't know.
13  Q.  Did he tell you that he was there on these
14  occasions and that he knew that this was going on
15  before you had this conversation with him in the truck,
16  in the vehicle?
17  A.  No.
18  Q.  So you just assumed that he knew what you were
19  talking about?
20  A.  Yes.
21  Q.  Did he ever acknowledge in that conversation
22  any way that he understood that you were talking about
23  him driving this truck and Mr. Torres leaving the
24  paperwork?
25  A.  Restate the question.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 122

1  Q.  Did he ever indicate to you that he understood
2  that you were referring to the loaning of the truck and
3  leaving paperwork at the front desk?
4  A.  No.
5  Q.  Well, is it possible then that Mr. Yzaguirre
6  could have thought that you just personally didn't like
7  Mr. Torres?
8  A.  I don't know.
9  Q.  Well, how was Mr. Yzaguirre supposed to know
10  what you meant?
11  A.  I guess if he didn't understand it, he would
12  have asked me.
13  Q.  Well, so you just imagined that he knew what
14  you meant because you thought he was supposed to ask
15  you what you meant?
16  A.  Well, if he had a doubt, he would have asked
17  me.  If he didn't understand what I -- the statement
18  that I made, he would have asked me.
19  Q.  So you didn't tell him that's what you were
20  referring to, correct?
21       MS. GILSON:  Object; asked and answered
22  several times now.
23  Q.  Well, did you ever make similar statements
24  about Mr. Barreda, Sr., or Mr. Barreda, Jr., to him?
25  Did you tell him that he needed to avoid them?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 123

1  A.  No.
2  Q.  Did you tell him that you had lost confidence
3  in Mr. Barreda, Sr., or Mr. Barreda, Jr., and that he
4  should be careful of them?
5  A.  No.
6  Q.  And did you tell him that you had lost
7  confidence in Ms. Esthela Guerra and that he should be
8  cautious around her?
9  A.  No.
10  Q.  Did you tell him that you had lost confidence
11  in Carlos Torres and that he should be careful of him?
12  A.  No.
13  Q.  And how was Mr. Yzaguirre supposed to know what
14  you meant by "Ten cuido," "Take care" or "Exercise
15  caution"?  How was he supposed to know what you meant?
16  A.  I guess he was supposed to know because the
17  guys had been dealing with him or dropping off papers
18  at his office, and if he had any questions, he should
19  have asked me or he could have asked me back and
20  said, "What do you mean?"
21  Q.  Well, again, how is he supposed to know what
22  you mean if you don't tell him?
23  A.  I don't know.
24  Q.  Okay.  Were you accusing Mr. Yzaguirre that
25  Mr. Yzaguirre was committing a crime or misusing public

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 152

1  look.  I'll show you what's been marked as your
2  Deposition Exhibit No. 5 and ask you to take a look at
3  it.  Let me know when you're through.
4  A.  Yes, sir.
5  Q.  Now, were you -- when this -- shortly after this
6  letter was written, did you see a copy of it?
7  A.  Yes, it was attached to the letter that I got
8  for transfer to the Harlingen office.
9  Q.  Okay.  Now, let's look at what Mr. Yates writes
10  here.  He starts off saying, "My office has conducted
11  several cash audits at the location of your smaller
12  satellite collection sites.  Nothing so far has come to
13  our attention.  Over the past few years we have
14  performed cash counts at the main tax office.  Cash
15  counts may detect irregularities; however, there are
16  more extensive procedures that we should perform."  Do
17  you recall whether the county auditor's office had done
18  cash counts at the satellite offices or in the main
19  offices before this letter?
20  A.  Yes, sir.
21  Q.  Had they been done?
22  A.  Uh-huh.
23       MR. HODGE:  Is that a yes?
24  A.  Yes.
25  Q.  Okay.  Is Mr. Yates correct that cash counts may

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 153

1  detect irregularities but more extensive procedures
2  might be appropriate to find irregularities?  Is that
3  true?
4      A.  That's true.
5      Q.  Now, in the next sentence he says, "In light of
6  the most recent thefts by employees involving automobile
7  transactions, I suggest that you place your top
8  available assistant most familiar with the RTS system in
9  the Harlingen office to review the functionality, the
10 sufficiency of current staffing, and financial controls
11 that ensure the integrity of collections."  Now, had
12 there been -- had there been recent thefts at the
13 Harlingen office?
14     A.  Yes, sir.
15     Q.  Those are the ones you investigated, right?
16     A.  Yes, sir.
17     Q.  And he mentions the RTS system in the Harlingen
18 office.  What is the RTS system?
19     A.  Registration Title System.
20     Q.  Okay.  And for those of us who have never worked
21 in that office or in your office, what is that system
22 and what does it do?
23     A.  It's a computerized system tied into the state
24 computer.  And they do daily work on that system, update
25 it, and it downloads overnight to Austin.

Page 154

1      Q.  Okay.  What information would the employees
2  normally be putting into the RTS?
3      A.  Registration, title registration.
4      Q.  Okay.
5      A.  Registration renewals also.
6      Q.  The two employees who were stealing money, did
7  they use the RTS system?
8      A.  Yes, sir.
9      Q.  How was it -- what did you discover about how
10 they used the RTS system that allowed them to steal
11 money?  What were they doing with the RTS?
12     A.  Like I mentioned earlier, they would print a
13 receipt to you right now, and later on that day they
14 would go back and do a correction to that receipt and
15 show a different receipt.
16     Q.  Okay.  And they would have to use the RTS to do
17 that?
18     A.  Yes, sir.
19     Q.  Okay.  Now, the next thing he says, "I recommend
20 this measure" -- back up.  It says, "I suggest you place
21 your top available assistant most familiar with the RTS
22 system in the Harlingen office."  In order to conduct
23 the investigation we talked about, the earlier, that
24 four-month, did you have to work with the RTS system in
25 Harlingen?

Page 155

1      A.  No.
2      Q.  Okay.  The RTS system, is that the same in every
3  office?
4      A.  Uh-huh.  Yes, sir.
5      Q.  In other words, no matter where the computer is,
6  they all tie into the same system?
7      A.  Right, sir.
8      Q.  So you were -- you were familiar with the RTS
9  system then, right?
10     A.  Well, I learned it from there.
11     Q.  Okay.  And as part of your investigation, you
12 had to look into the financial controls --
13     A.  Uh-huh.
14     Q.  -- that were in that office, right?
15     A.  Right.
16     Q.  And you became familiar with who worked there
17 and who the staff was and what they did there?
18     A.  At the Harlingen office?
19     Q.  Yeah.
20     A.  Yes, sir.
21     Q.  So at -- at the time this letter is written in
22 May of 2002, you would have been one of Mr. Yzaguirre's
23 top assistants, wouldn't you?
24     A.  Yes, sir.
25     Q.  You also would have been very familiar with the

Page 156

1  RTS system, right?
2      A.  Right, sir.
3      Q.  And you would have also been familiar with the
4  staffing and financial controls in the Harlingen office?
5      A.  Right.
6      Q.  Okay.  Now, he finishes by saying, "My office is
7  planning a review of the Harlingen office some time this
8  summer."  Do you recall Mr. Yates or someone from the
9  auditor's office going to the Harlingen office to do a
10 review that summer?
11     A.  No, sir.
12     Q.  You don't?
13     A.  No.
14     Q.  When did they do one?
15     A.  They sent an independent auditor to do that.
16     Q.  Oh, an independent auditor.  Okay.  So I'm going
17 to show you what -- this will be marked as Exhibit --
18 this is Exhibit No. 6.  Do you recognize Exhibit No. 6?
19     A.  Yes, sir.
20     Q.  What is it?
21     A.  Reassignment of office and duties.
22         THE REPORTER:  What was it?
23         THE WITNESS:  Reassignment of office and
24 duties.
25     Q.  Okay.  And so Exhibit 6 had No. 5 as an

Page 157

1  attachment?

2      A.  Right.

3      Q.  That's when it was given to you?

4      A.  Uh-huh.

5      Q.  And you were given instructions to be assigned

6  then, correct?

7      A.  Right.

8      Q.  And did you discuss with Mr. Yzaguirre this

9  assignment?

10      A.  At the time of the memo?

11      Q.  Yes.

12      A.  No.

13      Q.  Now, as you're sitting here now, do you

14  know -- is there some reason Mr. Yates would have

15  written Exhibit No. 5 that's not in that letter?

16      A.  No.

17      Q.  Is there some reason you think that Mr. Yates

18  asked Mr. Yzaguirre to send somebody up to that office

19  other than the reasons he gives in the letter?

20      A.  I wouldn't know.

21      Q.  Okay.  As you sit here now, have you received

22  any information that somehow Mr. Yates was put up to

23  writing this letter for reasons that have nothing to do

24  with the reasons he gives in the letter?

25      A.  No, I don't have that.

Page 160

1      A.  I don't recall where I got it from.

2      Q.  Was there --

3      A.  Probably from other counties, sir.

4      Q.  Okay.  Now, wasn't it the case that the

5  tax -- pardon me, the theft prevention authority in

6  Austin then wrote back after this was submitted that

7  they would not -- they would not allow grant moneys to

8  be used to fund the project coordinator?

9      A.  Right.

10      Q.  And so when you finally got it approved, no

11  funds in the grant were approved for the project

12  coordinator?

13      A.  Right, sir.

14      Q.  And so a stipend had to be paid out of the

15  regular budget from the county to pay for it; isn't that

16  what happened?

17      A.  Right, sir.

18      Q.  Okay.  So -- now, in August -- well, in August

19  of 2002 you were questioned by the police, the sheriff's

20  department, rather?

21      A.  Right, sir.

22      Q.  How did that come about?

23      A.  I received a call at the office from Rumaldo,

24  Rumaldo Rodriguez.

25      Q.  Okay.  And when you say at the office, is this

Page 161

1  the Harlingen office?

2      A.  The Harlingen office.

3      Q.  Okay.  How did you know Mr. -- how did you know

4  deputy Rodriguez?

5      A.  I didn't know him -- well, I met him once in a

6  sting operation we did in San Benito.

7      Q.  I'm sorry.  What, sir?

8      A.  I met him once at a sting operation we did in

9  San Benito.

10      Q.  Okay.  And that's with -- a sting operation

11  against whom?

12      A.  GT Motors.

13      Q.  Okay.  And he called you at work?

14      A.  Yes, sir.

15      Q.  Were you expecting a call?

16      A.  No, sir.

17      Q.  This came -- did this come out of the blue for

18  you?

19      A.  Yes, sir.

20      Q.  Had you heard from Ms. Cantu that she was being

21  questioned by the sheriff's department?

22      A.  Yes, I did.

23      Q.  Was this before the call?

24      A.  Before the call.

25      Q.  What did you hear from Ms. Cantu before the

Page 162

1  call?

2      A.  That some deputies had been at her house and

3  were wanting to talk to her.

4      Q.  All right.  How did she come to call you?

5      A.  She called me.

6      Q.  She called you at work?

7      A.  No.

8      Q.  Where did she call you?

9      A.  She probably called me on my cell phone.

10      Q.  Oh, I see.  Ms. Cantu had your personal cell

11  phone number?

12      A.  Yes, sir.

13      Q.  And when she called you, was this like during

14  regular work hours, was this at home, or where?

15      A.  I don't recall.

16      Q.  I'm sorry?

17      A.  I don't recall.

18      Q.  And what -- why -- why do you think she called

19  you?

20      A.  I don't know.

21      Q.  Okay.  Well, you get a call from her, you see

22  it's Bibi.  What did she tell you?

23      A.  That some deputies had been in her house and

24  that they wanted to speak to her.

25      Q.  Okay.  Did she say who the deputies were?

1   A.  No, she never did.

2   Q.  Okay.  So if she tells you the sheriff's

3   deputies came to her house and wanted to speak to her --

4   A.  Right.

5   Q.  -- what do you say?

6   A.  Nothing.

7   Q.  Okay.  Then she said what?  What more did she

8   say?

9   A.  I don't recall what else she said.

10  Q.  Did she say she had been asked to come to the

11  sheriff's office to make a statement?

12  A.  I don't recall that, sir.

13  Q.  Did she talk to you about what she had told the

14  officers?

15  A.  No.

16  Q.  She didn't say why they wanted to talk to her at

17  all?

18  A.  At one point she may have mentioned that they

19  wanted to talk to her about what was going on at the tax

20  office.

21  Q.  Okay.  Did she say what specifically that was

22  going on at the tax office they wanted to talk to her

23  about?

24  A.  No.

25  Q.  Did -- did she say what she told them?

1   A.  No.

2   Q.  Why did she call you?

3   A.  I don't know.

4   Q.  Well, did she ask you for any advice?

5   A.  No.

6   Q.  Did she want to give you any advice?

7   A.  No.

8   Q.  Did she call to tell you that you might be

9   questioned?

10  A.  I don't recall.

11  Q.  Did she say that she had given them a list of

12  names of people who might know something?

13  A.  No.

14  Q.  Was she upset when she called you?

15  A.  No.

16  Q.  Was she -- did she seem distressed or emotional

17  in any way or form?

18  A.  (Moving head side to side)

19  Q.  Did she say who she had talked to?

20      MR. HODGE:  Was that a no?

21  A.  No.

22  Q.  Did she indicate that she would be talking to

23  them again?

24  A.  No, sir.

25  Q.  How much time passed between -- did you give her

1   any advice at all?

2   A.  No.

3   Q.  Did she give you any advice, give you any

4   caution?

5   A.  No.

6   Q.  Did she say -- indicate that she had gotten some

7   word or indication from the sheriff's deputies what it

8   is they want -- what they were investigating?

9   A.  I don't recall that.

10  Q.  Before she calls you, had you ever heard that

11  the sheriff's office was investigating something in the

12  tax assessor-collector's office?

13  A.  No, sir.

14  Q.  No deputy had ever called you before this?

15  A.  No.

16  Q.  You had never gotten any word through any of the

17  employees or through the gossip mill that the sheriff's

18  office was investigating something going on in the tax

19  assessor-collector's office?

20  A.  No, sir.

21  Q.  I'm sorry?

22  A.  No, sir.

23  Q.  All right.  So how many days or weeks passed

24  between the time Ms. Cantu calls you and the day you get

25  a call from this Deputy Rodriguez?

1   A.  Probably a week later.

2   Q.  About a week later?

3   A.  Uh-huh.

4   Q.  And so I'm sure the deputy -- he calls you,

5   right?

6   A.  Uh-huh.

7   Q.  He doesn't come by; he calls?

8   A.  Right.

9   Q.  And he identifies himself and then what does he

10  say?

11  A.  That he wanted to talk to me to discuss some of

12  the matters that were going on at the tax office.

13  Q.  Okay.

14  A.  And I said, "Well, you know, I can't go over

15  there during working hours.  If you'd like, I can meet

16  you there on Saturday morning," which we did.

17  Q.  Okay.  Now, why don't we get this marked?  I'm

18  going to show you what's been marked as Exhibit 8.  Is

19  that a statement you gave the sheriff's office.

20  A.  Yes, sir.

21  Q.  All right.  You say you went there first on a

22  Saturday morning.  My question is, was this statement

23  prepared on that Saturday morning?

24  A.  Right.

25  Q.  All right.  So did Deputy Rodriguez when he

Page 167

1  first called you tell you what precisely it was he was
2  investigating or what people were investigating in that
3  office?
4      A.  No, sir.
5      Q.  All right.  When you go -- between the time you
6  have this call with Deputy Rodriguez and the time you go
7  to the sheriff's department, did you talk to anyone else
8  about this investigation?
9      A.  No, sir.
10     Q.  Okay.  Did you call Mrs. Cantu?
11     A.  No, sir.
12     Q.  Did you talk to Ms. Weaver or Ms. Alvarado?
13     A.  No.
14     Q.  Not at all?
15     A.  (Moving head side to side)
16     Q.  Did you tell anybody that you had been called by
17 the sheriff's office?
18     A.  No.
19     Q.  I mean, between the time you get the call and
20 the time you go there, did you tell anybody you were
21 going to see the sheriff or meet with the sheriff's
22 deputy?
23     A.  No, I don't believe so.
24     Q.  Okay.  What sheriff's office did you go to, sir?
25     A.  The new one on Highway 511.

Page 168

1      Q.  Is that in --
2      A.  In the new sheriff's office.
3      Q.  Okay.  What city is that in?
4      A.  In Brownsville.
5      Q.  In Brownsville.  Okay.  And when you went there,
6  who did you meet?
7      A.  Rumaldo Rodriguez.
8      Q.  Was anyone else present during the interviews?
9      A.  Yes, sir.
10     Q.  Who?
11     A.  Garcia, the attorney.
12     Q.  Attorney Everardo Garcia?
13     A.  Everardo Garcia.
14     Q.  Did he tell you why he was there?
15     A.  No, I called him.
16     Q.  You called Everardo Garcia?
17     A.  Yes, sir.
18     Q.  How did you come to call Everardo Garcia?
19     A.  Well, when I talked to Bibi, she said Everardo
20 Garcia was the attorney that she was going to take with
21 her.
22     Q.  Oh, so she was going -- she told you she was
23 going to take Everardo Garcia?
24     A.  Uh-huh.
25         MR. HODGE:  Was that a yes?

Page 169

1      A.  Yes.
2      Q.  Did you know Mr. Everardo Garcia before that?
3      A.  Yeah, I've known him for many years.
4      Q.  Oh, many years.  Is this just like an
5  acquaintance you've known, or have you used him as a
6  lawyer?
7      A.  No, I've never used him as an attorney.
8      Q.  Okay.  You just happened to know him?
9      A.  Yes.
10     Q.  Just like from school or social circles or
11 anything?
12     A.  No, from there, from the courthouse.
13     Q.  Oh, I see.  Okay.  So did you ask Mr. Garcia to
14 be there?
15     A.  Yes, sir.
16     Q.  When did you ask him to be there?
17     A.  A few days before.
18     Q.  Okay.  So earlier when you said you didn't talk
19 to anyone after Rodriguez called you -- or tell them, so
20 you did call Mr. Everardo Garcia?
21     A.  Everardo Garcia.
22     Q.  Why did you choose Mr. Garcia instead of some
23 other attorney?
24     A.  Just because -- I called him because I knew he
25 was familiar with the case.

Page 170

1      Q.  How did you know he was familiar with the case?
2      A.  Well, Bibi told me that she was going to use
3  him.
4      Q.  Okay.  What case did you think he was familiar
5  with, sir?
6      A.  I don't know.  Whatever was going on.  I just
7  needed legal representation, so I picked up the phone
8  and called him and he said he would be there.
9      Q.  Okay.  Was there something that Deputy Rodriguez
10 said that made you think you needed legal
11 representation?
12     A.  No.
13     Q.  Okay.  You said you thought you needed legal
14 representation.  Without revealing what you said to
15 Mr. Garcia, why did you think you needed legal
16 representation?
17     A.  I didn't know what it was about.  I didn't know
18 what it all entailed, so I just thought I'd have an
19 attorney there.
20     Q.  Okay.  Did you meet with Mr. Garcia before
21 meeting with Rumaldo Rodriguez?
22         MR. HODGE:  It's Rumaldo.
23     Q.  Yes, Deputy Rodriguez.  Did you meet with
24 Attorney Garcia beforehand?
25     A.  Just outside, as we walked into the building.

**Page 170**

1  Q.  How did you know he was familiar with the case?
2  A.  Well, Bibi told me that she was going to use
3  him.
4  Q.  Okay.  What case did you think he was familiar
5  with, sir?
6  A.  I don't know.  Whatever was going on.  I just
7  needed legal representation, so I picked up the phone
8  and called him and he said he would be there.
9  Q.  Okay.  Was there something that Deputy Rodriguez
10 said that made you think you needed legal
11 representation?
12 A.  No.
13 Q.  Okay.  You said you thought you needed legal
14 representation.  Without revealing what you said to
15 Mr. Garcia, why did you think you needed legal
16 representation?
17 A.  I didn't know what it was about.  I didn't know
18 what it all entailed, so I just thought I'd have an
19 attorney there.
20 Q.  Okay.  Did you meet with Mr. Garcia before
21 meeting with Rumaldo Rodriguez?
22     MR. HODGE:  It's Rumaldo.
23 Q.  Yes, Deputy Rodriguez.  Did you meet with
24 Attorney Garcia beforehand?
25 A.  Just outside, as we walked into the building.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

**Page 171**

1  Q.  Okay.  So was Mr. Garcia doing this for free?
2  A.  I don't know.  I asked him if I owed him
3  anything, and he said no.
4  Q.  I'm sorry, what?
5  A.  I asked him if I owed him anything, and he said
6  no.
7  Q.  Okay.  When did you ask him?
8  A.  After we came out.
9  Q.  When you -- so without going into exactly what
10 was said, you had not discussed fees or remuneration
11 from him before meeting with Deputy Rodriguez at all?
12 A.  No, sir.
13 Q.  Had Mr. -- had you ever obtained free legal
14 services from Mr. Garcia before?
15 A.  No, sir.
16 Q.  Okay.  So you met -- was there something about
17 this situation that bothered you that made you think you
18 needed legal advice?  And, again, I'm not asking what
19 Mr. Garcia may have eventually told you.  I'm only
20 concerned about what you were thinking, what may have
21 been your concern when you went there.  Was there
22 something that concerned you that made you think you
23 might need the advice of counsel?
24 A.  Nothing that I can think of, no, sir.
25 Q.  Okay.  When you went there that morning, did you

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

**Page 172**

1  think -- in any way were you suspecting that somebody
2  was investigating you?
3  A.  No, sir.
4  Q.  All right.  So you go in, you and Mr. Garcia
5  meet with Deputy Rodriguez.  What does he tell you first
6  off?
7  A.  That they were conducting an investigation into
8  the office as to wrongdoing with title transfers and
9  paperwork.
10 Q.  Okay.  Did they tell you what they thought was
11 the wrongdoing?
12 A.  No, sir.
13 Q.  All right.  So what kind of questions did he
14 start off asking you?
15 A.  That if I knew anything about that.
16 Q.  Okay.  Knew anything about what?
17 A.  About what may be going on at the tax office.
18 Q.  Did he ask you about specific transactions?
19 A.  No, sir.
20 Q.  Did he ask you about specific persons who
21 brought the transactions in?
22 A.  Yes, he asked me.
23 Q.  What -- who did he ask you about, sir?
24 A.  Just who the people were who were coming into
25 the office.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

**Page 173**

1  Q.  Okay.  So he didn't have a list of names saying,
2  "Do you know something about Mr. Smith or Mr. Jones"?
3  A.  No.
4  Q.  He just kind of asked a broad, open-ended
5  question?
6  A.  Right.
7  Q.  And you were the one that gave him the names?
8  A.  Uh-huh.
9      MR. HODGE:  Is that a yes?
10 A.  Yes.
11 Q.  And what did you tell him that you had seen?
12 A.  Just what it says right here.
13 Q.  Okay.  Well, before we get to writing, what do
14 you recall telling him that you had seen?
15 A.  That I had seen people come into the office and
16 across the hallway in a foyer exchanging transactions
17 and moneys.
18 Q.  Okay.  And how does this statement get written?
19 A.  He typed it up.
20 Q.  He typed it himself?
21 A.  Uh-huh.
22 Q.  He had like a word processor, or an electric
23 typewriter?
24     MR. HODGE:  Hold on.  Was that a yes?
25     THE WITNESS:  What was that question?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 174

1        MR. HODGE:  He typed it himself?

2        THE WITNESS:  Yes.

3     Q.  Was he using a word processor or was he using a

4  type -- mechanical-type -- you know, one of those

5  electric typewriters?

6        MS. GILSON:  I didn't know they still have

7  those.

8        MR. HUGHES:  I think I've got a mechanical

9  one at home.

10    A.  I don't remember, sir.

11    Q.  Okay.

12    A.  I think it was a typewriter.

13    Q.  He didn't bring in like a secretary or a

14 stenographer to do it?

15    A.  No, no.  He did it himself.

16    Q.  And what did -- what did you understand the

17 purpose of the written statement to be?

18    A.  Just a declaration of any wrongdoing that I

19 foresaw at the office.

20    Q.  All right.  And do you know how long -- how long

21 was the interview overall, from the time you got there

22 until the time you left?

23    A.  I don't know exactly, but I'm going to say no

24 more than 45 minutes.

25    Q.  Okay.  Now, you understood you were talking to a

Page 175

1  law enforcement officer, right?

2     A.  Right.

3     Q.  And he was investigating something, right?

4     A.  Right.

5     Q.  Did you think it was important to tell him

6  everything you knew?

7     A.  Yes, sir.

8     Q.  Was there anything that you were holding back?

9     A.  No, sir.

10    Q.  Was -- did you feel this was a situation that if

11 they don't ask, you shouldn't tell them?

12    A.  No, sir.

13    Q.  So you wanted to be completely candid with them

14 in everything you knew?

15    A.  As far as I knew or thought that I could

16 remember at the time.

17    Q.  Right.  At any time -- at any time did Deputy

18 Rodriguez tell you what it was exactly that he was

19 investigating?

20    A.  No.

21    Q.  So did he tell you that he had talked to anyone

22 else -- that anyone else had been interviewed or anyone

23 else had been interviewed besides Ms. Cantu?

24    A.  I don't recall.

25    Q.  Well, I know sometimes deputies, to get people

Page 176

1  talking, they'll say, "Well, I've already talked to

2  so-and-so, so you can just tell me the truth."  Whether

3  they have or not, they'll still do that.  They didn't do

4  that?

5     A.  No.

6     Q.  At this time -- I know later on you got some

7  certification as a peace officer.  Were you taking

8  courses at this time?

9     A.  I was going through the academy at night.

10    Q.  Okay.

11    A.  Night academy.

12    Q.  During this time?

13    A.  This was in 2002 -- yes, sir.

14    Q.  Okay.  What academy was that?

15    A.  UTB-Brownsville.

16    Q.  I see.  Were there any sheriff's deputies who

17 were instructors at your academy?

18    A.  Sheriff's deputy?  No.

19    Q.  Okay.  Well, now, I see in the very last

20 sentence that you write or that -- well, let me ask you

21 this before we get to this.  Did you read this statement

22 before you signed it?

23    A.  Yes, sir.

24    Q.  Did you have an opportunity to make corrections

25 beforehand?

Page 177

1     A.  I believe so.

2     Q.  Did you make any corrections before you signed

3  it?

4     A.  I don't recall.

5     Q.  Were there any questions -- were there any

6  changes or alterations you wanted made that were not

7  made?

8     A.  (Moving head side to side)

9     Q.  I'm sorry?

10    A.  No.

11    Q.  The last sentence you wrote here, "Everything

12 that I know has been told to me by personnel that are in

13 the office."  Was that statement true?

14    A.  As far as I never knew the extent of the

15 processing that has been done on the title paperwork --

16       THE REPORTER:  I can't hear you.  "As far

17 as I never knew" what?

18    A.  The extent of the processing that has been done

19 to the title paperwork.

20    Q.  Okay.  But the sentence says, "Everything that I

21 know has been told to me by personnel that are in the

22 office."  Who chose the word "everything"?

23    A.  I don't remember.

24    Q.  Okay.  But you signed this under oath, right?

25    A.  Right.

Page 182

1  came in with paperwork and I saw Lupita counting money
2  in the open.  I could not say if Moises gave her the
3  money when he first brought the paperwork or after the
4  paperwork."  Okay.  Do you say here that you actually
5  saw him give her money, that money?
6      A.  He was standing right next to her and she was
7  counting the money.
8      Q.  Okay.  But you didn't see him -- you didn't see
9  him give her the money?
10     A.  No.
11     Q.  And you don't describe what kind of paperwork
12  here it is, right?
13     A.  No.
14     Q.  Now, the beginning of the last paragraph, "I
15  never knew the extent of the processing that was being
16  done to the title paperwork that these people would
17  bring."  You were -- so as of August, you were telling
18  the officer that you never knew the extent.  That's what
19  you told him, right?
20     A.  Right.
21     Q.  Okay.  The next sentence, "Only recently when I
22  had several conversations with Vicenta Cantu did I
23  become informed of the type of processing that was being
24  done on the paperwork."  That's the word -- did you pick
25  that word, "only recently"?  Was that the word you used

Page 183

1  that day?
2      A.  Probably.
3      Q.  Okay.  You certainly didn't ask to change that
4  before you signed it, did you?
5      A.  No.
6      Q.  Okay.  It says, "Only recently when I had
7  several conversations" -- what was recently here, like
8  two weeks, a month?
9      A.  Two weeks, probably.
10     Q.  Okay.  So what you told the officer was that
11  the -- that it was only within the two weeks before this
12  statement, when you were talking to Ms. Cantu, did you
13  become informed of the type of processing that was being
14  done on that paperwork.  That's what you told the
15  officer, right?
16     A.  Uh-huh, right.
17     Q.  And you swore to it, right?
18     A.  Right.
19     Q.  See, he's a police officer and he has notarial
20  powers.  He can swear you to the same.
21     A.  Right.
22     Q.  So it was only recently that you learned what
23  type of processing was being done and you learned that
24  only from Mrs. Cantu; is that correct?
25     A.  Right.

Page 185

1  Ms. Cantu to process titles regardless of the problems
2  that they might have on them?
3      A.  No, sir.
4      Q.  You didn't tell him anything about that?
5      A.  No, sir.
6      Q.  In fact, the very --
7          MR. HUGHES:  Sure.  I'll be through with
8  this.
9      Q.  The only thing you've said, "So as far as I knew
10  and what stands out was the processing that was being
11  done was on these titles of vehicle that were stamped
12  'sold for export.'"  That was the only thing you told
13  him about.  That was the only impropriety; that and the
14  statement from Mr. Gonzalez, right?
15     A.  Yes, sir.
16     Q.  And when you say, "So as far as I knew and what
17  stands out was the processing that was being done," that
18  came entirely from Ms. Cantu, didn't it?
19     A.  Right.
20     Q.  And you don't mention anywhere in this statement
21  that Ms. Weaver told you anything.
22     A.  Right.
23     Q.  And you don't mention Ms. -- that you told
24  anything by Ms. Alvarado, correct?
25     A.  Correct.

Page 186

1      Q.  Now, was there a reason that none of those
2  things were mentioned in this statement?
3      A.  No reason, sir.
4      Q.  Were you holding that back?
5      A.  No, sir.
6      Q.  Could it be that you just didn't know that at
7  that time?
8      A.  I don't recall.
9      Q.  Well, you were -- you understood that the
10  officer there was to investigate something, right?
11     A.  Yes, sir.
12     Q.  You wanted to tell him everything you knew?  I'm
13  sorry, did you want to tell him everything you knew?
14     A.  Yes, sir.  As far as I could recall, yes.
15     Q.  Because you had nothing to hide, did you?
16     A.  No, sir.
17     Q.  And you told him everything you knew?
18     A.  Uh-huh.
19          MR. HODGE:  Is that a yes?
20     A.  Yes.
21     Q.  And everything you knew is contained in this
22  statement?
23     A.  Yes.
24     Q.  You didn't want to hold anything back?
25     A.  No.

Page 187

1   Q. Okay. Now, are there any other written
2 statements that you gave anyone in the sheriff's
3 department?
4   A. No, sir.
5   Q. Are there any other written statements that you
6 gave to the FBI?
7   A. No, sir.
8   Q. Are there any other written statements that you
9 gave either U.S. Customs or the Internal Revenue
10 Service?
11   A. No, sir.
12   Q. Okay. Now, a couple more questions, then we can
13 take a break. After you gave this statement, who did
14 you tell that you had given this statement? Of course,
15 Mr. Garcia was there and he knew. Who else?
16   A. Nobody else, other than that if I commented it
17 to Bibi.
18   Q. I'm sorry, what?
19   A. Unless I made a comment to Bibi, but nobody
20 else.
21   Q. So maybe you might have mentioned it to
22 Mrs. Cantu?
23   A. Uh-huh.
24   Q. Did you mention it to anyone who works
25 in -- besides Ms. Cantu -- pardon me. Did you mention

Page 188

1 it to anyone in the tax assessor-collector's office?
2   A. No.
3   Q. Did Mr. -- did Deputy Rodriguez indicate to you
4 that this was a confidential investigation?
5   A. I don't recall.
6   Q. You were taking courses at the police academy,
7 right?
8   A. Right.
9   Q. So had you been taught that usually when you're
10 conducting an investigation into something, it's best to
11 keep it all confidential?
12   A. Yes, sir.
13   Q. Well, as you sit here now, do you have any
14 information about how Mr. Yzaguirre would have found out
15 that you made this statement to the police or the
16 sheriff's department?
17   A. How he found out?
18   Q. Yeah.
19   A. I don't know.
20   Q. Well, I mean, it was attached to one of your
21 pleadings. I can tell you that.
22   A. Right.
23   Q. But before that, do you know who told him that
24 you had made this statement?
25   A. No, I don't know.

Page 189

1   Q. Do you think -- do you have any information or
2 hearsay, rumor, gossip that someone at the sheriff's
3 department alerted him that you had been interviewed and
4 gave a statement?
5   A. No, sir.
6   Q. Do you -- all right.
7     MR. HUGHES: We'll take a break now.
8     (Brief recess)
9   Q. Okay. Now, I'm going to show you what's been
10 marked as Exhibit No. 9. Do you recall receiving that?
11   A. No, sir.
12   Q. You don't recall receiving that?
13   A. No.
14   Q. Even though it was directed to you?
15   A. Right, sir.
16   Q. And did you -- when did you stop getting paid
17 the stipend?
18   A. October.
19   Q. In October?
20   A. Uh-huh.
21   Q. So you stopped getting it in October?
22   A. Right.
23   Q. And the stipend was $500 a month?
24   A. No, sir.
25   Q. How much was it?

Page 190

1   A. I think it was 250 a month.
2   Q. $250 a month?
3   A. Uh-huh.
4   Q. And that was for being project coordinator for
5 the task force?
6   A. Right. Right, sir.
7   Q. And you saw, from the job description in the
8 very first grant proposal, that the job required you to
9 supervise the task force in Brownsville, right?
10   A. Right, sir.
11   Q. You weren't there, were you?
12   A. No, sir.
13   Q. So from May until the beginning of October, you
14 weren't there, right? You weren't in the Brownsville
15 office at all?
16   A. No, sir.
17   Q. And any time during that period, had you
18 requested to be returned to the Brownsville office?
19   A. No, sir.
20   Q. When you stopped getting the $250 a month
21 stipend, did you ask to be returned to the Brownsville
22 office so that you could be the project coordinator
23 again?
24   A. No, sir.
25   Q. Were you doing the job of a project coordinator

Page 210

1    Q.  Okay.

2    A.  He would come in and pay them, but he would come

3  in to the office and sit down and say "I'm going to pay

4  some taxes."  And I would run his statements for him,

5  "Here is how much you owe."  He would give me the money,

6  I would take it over to the clerk, the clerk would post

7  the money, I would give him the receipt, and he was on

8  his way.

9    Q.  Okay.  But normally it would be the clerks at

10  the front desk that would do that, right?

11    A.  Right, sir.

12    Q.  But the sheriff comes in and he wants the chief

13  deputy to handle this matter personally?

14    A.  Right.

15    Q.  In other words, not an ordinary clerk.  He wants

16  the chief deputy, who was you.

17    A.  Right.

18    Q.  Did you know him from before this?

19    A.  I knew him since he was constable.

20    Q.  Okay.  How did you know him?

21    A.  From parties or political parties.

22    Q.  Okay.  Now, didn't you also get this in your

23  office from Deputy Rumaldo Rodriguez?

24    A.  No, sir.

25    Q.  No?

Page 211

1    A.  Never.

2    Q.  Okay.  Now, as you discussed earlier, money is

3  kept behind the desk, right?

4    A.  In the vault.

5    Q.  Yes.  So, for example, when the clerks at the

6  front desk collected money, they then turned it in to

7  the head teller, right?

8    A.  The head cashier.

9    Q.  Head cashier.  Thank you.  And the cashier in

10  the Harlingen office would sit where?

11    A.  Over there with Ms. Barbosa.

12    Q.  Okay.  So until the money goes in the vault,

13  it's either with the clerks or with the head cashier,

14  right?

15    A.  It's either in the vault or in the cashier's

16  box.

17    Q.  Okay.  So when people come behind the desk, as

18  it were, potentially they have -- they are in the area

19  where the money is, aren't they?

20    A.  Not in the immediate area, because everybody has

21  got their money secured.

22    Q.  Okay.  But if money disappears, then you

23  would -- then you would have to talk -- you would have

24  to be concerned about whoever was in the area, right?

25    A.  Right.

Page 212

1    Q.  Okay.  Now, at any time in 2003 did you ask to

2  have Mr. Yzaguirre return you to work in the Brownsville

3  office?

4    A.  No, sir.

5    Q.  At any time in 2004 did you ask him or write a

6  letter to return you to the Brownsville office?

7    A.  No, sir.

8    Q.  Okay.  You gave Mrs. Barbosa a written

9  reprimand?

10    A.  Right, sir.

11    Q.  At any time before the written reprimand did you

12  ask to be returned to the Brownsville office?

13    A.  No, sir.

14    Q.  Why did you give Ms. Barbosa a written

15  reprimand?

16    A.  Because she wouldn't answer my questions as far

17  as I would ask her, you know, "I'm the chief deputy.

18  Why are you assigning me to the front teller to do auto

19  clerk work?"  And she wouldn't answer me.

20    Q.  Okay.  That was the only reason you gave her a

21  reprimand?

22    A.  I don't recall exactly all the other reasons,

23  but reasons leading up to her reprimand was, you know,

24  she wouldn't communicate with me.  She was my

25  subordinate -- or I was supposed to be working alongside

Page 213

1  with her and she wouldn't communicate with me.

2    Q.  Okay.  What other things would she not

3  communicate with you about, sir?

4    A.  About problems in the office or things we needed

5  to do, or whatever.

6    Q.  Okay.  What were the problems in the office that

7  she would not communicate?

8    A.  Personnel -- personnel problems.

9    Q.  What personnel problems, sir?

10    A.  Like with Yvonne Franco.  She never communicated

11  with me any problems with her, and the next thing I know

12  she's gone.

13    Q.  Okay.

14    A.  Some other employees have problems, and the next

15  thing I know they're gone.  I said, "What's going on?"

16    Q.  Okay.  Now, you mentioned three employees -- or

17  a couple of employees.  Any other employee problems that

18  she wouldn't communicate with you about?

19    A.  No.

20    Q.  What were the other matters besides employee

21  matters that she wouldn't communicate with you about?

22    A.  I don't recall anything else.

23    Q.  Okay.  Now, normally, a written reprimand is

24  placed in the personnel file of the employee, right?

25    A.  Right.

Page 214

1    Q.   And then it stays there, right?

2    A.   Right.

3    Q.   So whether you put a letter of reprimand in an

4    employee's personnel file is pretty important, isn't it?

5    A.   Right.

6    Q.   Those are what are considered when it comes time

7    for advancement and pay raises, right?

8    A.   Right.

9    Q.   So, potentially, a letter of -- a formal letter

10   of reprimand in a person's personnel file can have

11   serious repercussions on advancement in pay; right;

12   isn't that correct?

13   A.   Could be, yes.

14   Q.   So before you wrote this letter of reprimand --

15   well, let me ask you this.  What part of the

16   personnel -- county's personnel manual allows you to put

17   a -- a formal letter of reprimand in an employee's file?

18   A.   Under job descriptions.

19   Q.   Say what?

20   A.   Duties and descriptions.

21   Q.   Say again?

22   A.   Under my job description, under duties.

23   Q.   Your job description for what?

24   A.   For chief deputy.

25   Q.   Your job description for chief deputy?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 215

1    A.   Uh-huh.

2    Q.   Okay.

3         MR. HUGHES:   Do we have the Munoz exhibits

4    here?  No, these are Alvarado.  Could we have the

5    exhibits for his deposition, for Munoz's deposition?

6         THE REPORTER:   They should all be there.

7         MR. HODGE:   The old ones, from the last

8    time?

9    Q.   Okay.  Okay.  Exhibit No. 1, could you point me

10   here where it says you can put a letter of reprimand in

11   someone's file?

12   A.   "Administers routine personnel matters affecting

13   subordinates, including scheduling, granting leave,

14   conducting performance appraisals and initiating

15   appropriate disciplinary actions."

16   Q.   Okay.  That's it?

17   A.   Uh-huh.

18   Q.   Okay.  Let's see.  Initiating appropriate

19   disciplinary actions?

20   A.   Uh-huh.

21   Q.   Now, the letter you wrote was -- was this -- you

22   intended the letter to go into the -- her personnel file

23   right then, right?

24   A.   I carbon copied Mr. Yzaguirre on it.

25   Q.   Yes, I'm seeing that.  But what more was left to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 216

1    be done after you wrote this letter?

2    A.   What else was left?

3    Q.   Yeah, what else?  You said this is initiating

4    appropriate disciplinary actions.  So what more was left

5    to be done if this was initiating something?

6    A.   To be placed in her personnel file.

7    Q.   Yeah.  So you -- did you ask Mr. Yzaguirre about

8    this before you did it?

9    A.   No, I didn't.

10   Q.   You didn't get his permission?

11   A.   No, sir.

12   Q.   Now, you remember back when Linda Garcia wanted

13   to give Eniel Barreda a letter of reprimand, right?

14   A.   Right.

15   Q.   And she showed you that letter of reprimand

16   before she signed it, didn't she?

17   A.   Right.

18   Q.   And she, in fact, showed it to Mr. Yzaguirre

19   before she signed it?

20   A.   Uh-huh.

21   Q.   In other words, she went all the way up her

22   chain of command, through you and Mr. Yzaguirre, before

23   she signed the letter, right?

24   A.   Right.

25   Q.   And she showed it to you and she showed it to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 217

1    Mr. Yzaguirre before she signed the letter, correct?

2         MS. GILSON:   Object.  Assumes facts not in

3    evidence.

4    Q.   Well, she showed it to you, didn't she?

5    A.   Right.

6    Q.   Okay.  So did you show this letter to

7    Mr. Yzaguirre beforehand?

8    A.   No, I didn't.

9    Q.   Did you ask his permission beforehand?

10   A.   No.

11   Q.   Okay.  You realized a letter like this would

12   have substantial repercussions for Ms. Barreda in her

13   file, right?

14   A.   Barbosa.

15   Q.   I'm sorry?

16   A.   Barbosa

17   Q.   Ms. Barbosa, right?  In fact, the letter hinted

18   broadly that if she didn't change she'd be fired, right?

19   A.   That what?

20   Q.   She'd be fired, right?  That's -- that's what

21   your letter hinted at.

22   A.   Uh-huh, right.

23   Q.   You can't fire any -- you don't have the

24   authority to terminate anyone, do you?

25   A.   Huh-uh.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 218

1    Q.  Okay.  You've read the county personnel manual,

2  right?

3    A.  Right.

4    Q.  And the manual says that only the elected

5  officeholder decides whether or not the letters go in

6  the file.

7    A.  Right.

8       MS. GILSON:  Object, assumes facts not in

9  evidence.

10   Q.  So I can understand how suggesting or requesting

11  a letter would be initiating an appropriate disciplinary

12  action, but can you explain to me how actually signing a

13  letter and causing it to be put in the file is

14  initiating a disciplinary action?

15   A.  Well, it was initiated.  It's up to

16  Mr. Yzaguirre to accept it or not.

17   Q.  Well, you signed the letter, right?

18   A.  Right.

19   Q.  And you gave it to her?

20   A.  Right.

21   Q.  And the only thing left to do was to put it in

22  her file?

23   A.  It's up to the tax collector.

24   Q.  Well, where did you send the letter?

25   A.  Which one?

Page 219

1    Q.  I'm saying where did you send the letter when

2  you signed it?

3    A.  A copy to Mr. Yzaguirre and a copy to --

4    Q.  And it would be a copy to his office, right?

5    A.  Right.

6    Q.  And if nothing happened, it would be routed to

7  her file, wouldn't it?

8    A.  Right.

9    Q.  And you did this -- you didn't -- you didn't

10  tell Ms. Barbosa, "I'm only going to ask permission from

11  Mr. Yzaguirre to give you a letter of reprimand."  You

12  signed it and you gave it to her.

13   A.  Right.

14   Q.  Did you send anything with the letter to

15  Mr. Yzaguirre's office saying, "This is a trial balloon.

16  If you don't like it, tear it up and don't put it in her

17  file and tell her that she can -- she can shred it"?

18   A.  No.

19   Q.  Was there anything that went to the front -- to

20  the Brownsville office that indicated that your letter

21  was tentative or uncertain or they could -- they could

22  disregard it?

23   A.  No.

24   Q.  Who else did you tell that you wrote this

25  letter?

Page 220

1    A.  Nobody.

2    Q.  You didn't tell anybody at the local office that

3  you had written the letter?

4    A.  No.

5    Q.  Okay.  So you then received a -- you received a

6  letter from Mr. Yzaguirre that you were being demoted?

7    A.  Right.

8    Q.  And he also told you in the letter that even

9  though you would be not entitled to file a grievance

10  against him so that it could be looked at by the

11  grievance committee, he would allow you to file a

12  grievance and he would abide by the decision of the

13  grievance committee.  You got that, didn't you?

14   A.  Right.

15   Q.  And you understood that you could file a

16  grievance?

17   A.  Right.

18   Q.  So you did file a grievance?

19   A.  Right.

20   Q.  And is there anything in the grievance that you

21  filed -- put it this way.  Did you withhold anything

22  from the grievance?

23   A.  No.

24   Q.  Did you put in everything in the grievance that

25  you thought was appropriate or relevant or helpful to

Page 221

1  your position whatsoever?

2    A.  I thought I did.

3    Q.  And do you recall who were -- who were the

4  county officials that were the grievance committee?

5    A.  Pete Sepulveda, but he never attended.

6    Q.  Okay.

7    A.  And the health lady -- Salinas -- and the other

8  guy was from the probation office, but I don't recall

9  his name.

10   Q.  Okay.  Did you know these people from before?

11   A.  Just by sight.

12   Q.  Okay.  Had you had any dealings with them?

13   A.  No.

14   Q.  Your grievance was submitted to the committee?

15   A.  Right.

16   Q.  Do you have any reason now, as you sit here, to

17  think, or have you heard anything that would give you

18  any information that your grievance was treated

19  differently from any other grievance submitted to the

20  committee?

21   A.  No, I don't have anything.

22   Q.  Did you submit everything to the committee you

23  wanted?

24   A.  Yes.

25   Q.  Do you have any information now, as you sit

## Page 222

1  here, that any of the committee members were biased
2  against you or had prejudged your case before you made
3  your submission?
4      A.  No.
5      Q.  Do you have any information that any of them
6  were influenced in any way in reviewing your grievance;
7  that is, influenced by anything outside what was
8  submitted to them?
9      A.  I don't have anything else.
10     Q.  Do you have any information, as you sit here
11 now, that the committee members reached their decision
12 based on anything other than what was submitted to them
13 through the grievance system?
14     A.  No, I don't have any information.
15     Q.  Okay.  And what was the outcome of your
16 grievance?
17     A.  It was denied, I guess.  Because I never
18 understood completely the correspondence as it was
19 written out.
20     Q.  Okay.  And so how long after that was it that
21 you resigned?
22     A.  Probably a month, a month and a half.
23     Q.  Okay.  Why did you resign?
24     A.  I resigned because I couldn't -- I couldn't
25 exist on that kind of salary.

## Page 223

1      Q.  Okay.  So salary.  And is there any other reason
2  you resigned?
3      A.  The work environment.
4      Q.  Okay.  What about the work environment?
5      A.  I wasn't happy from being a chief deputy to
6  being up in the -- a front teller doing title work.
7      Q.  Okay.  Why were you unhappy doing title work?
8      A.  It's not the type of work that I was used to
9  doing.
10     Q.  Okay.  You weren't used to that kind of work.
11 Is that why you were unhappy?
12     A.  And the salary, you know.
13     Q.  Okay.  So the salary and the type of work were
14 unhappy.  What else made you unhappy?
15     A.  The travel was excessive.
16     Q.  Travel.
17     A.  The fuel cost.
18     Q.  Okay.  Were you ever given mileage?
19     A.  Before, I was, yes.
20     Q.  When did you stop getting mileage?
21     A.  When I was demoted.
22     Q.  Okay.  So before that, you had been getting
23 mileage?
24     A.  Right.
25     Q.  And in that new position you would not be paid

## Page 191

1  while you were in Harlingen?
2      A.  No, sir.
3      Q.  But you understood that's what the stipend was
4  for, right?
5      A.  Right.
6      Q.  The stipend came from the county, right?
7      A.  Right.
8      Q.  And when you stopped getting the stipend, what
9  did you do about it?
10     A.  Nothing.
11     Q.  Were you told that the reason you weren't
12 getting it was that you weren't in Brownsville and
13 therefore you weren't doing the project coordinator job
14 anymore?
15     A.  No, sir, I wasn't told.
16     Q.  Did you ask anybody at all about it?
17     A.  I called the personnel -- I called the -- not
18 the personnel, but it's in the purchasing office.
19     Q.  Yeah.
20     A.  I called the payroll clerk.
21     Q.  Okay.
22     A.  And she said it had been taken off.
23     Q.  Okay.
24     A.  But I asked her, "Do I -- am I supposed to get
25 something in writing?"  And she said, "No, you don't get

## Page 192

1  anything in writing."  So I didn't question it any
2  further.
3      Q.  So all you did was just talk to the payroll
4  clerk and that's it?
5      A.  Yes.
6      Q.  You didn't call Mr. Garcia or Mr. Yzaguirre?
7      A.  No.
8      Q.  Now, between the time you gave the statement to
9  Deputy Rodriguez and the time your stipend was stopped,
10 do you have anything -- are you aware of any evidence or
11 any information that shows that somehow during that
12 period Mr. Yzaguirre learned that you had been talking
13 to the police or talking to the sheriff?
14     A.  No, sir.
15     Q.  Do you have any evidence or any information now,
16 as you sit here, about when Mr. Yzaguirre learned
17 that -- what the contents of your written statement to
18 the sheriff's department was?
19     A.  No, sir.
20     Q.  Now, after the statement in August of 2002, did
21 you have any other meetings or interrogations with the
22 deputy or the sheriff's department about Mr. Yzaguirre's
23 office?
24     A.  No, sir.
25     Q.  You -- okay.  Just so I'm clear -- because I

Page 274

1  just Esthela Guerra or Mr. Torres or the Barredas that
2  would sometimes get a little help, let's say, with their
3  transactions there at the office, right, in Brownsville;
4  is that correct?
5      A. Right.
6      Q. It would be judges sometimes, right?
7      A. Right.
8      Q. Did you ever help any of the district judges or
9  county court at law judges yourself?
10     A. Probably one of them.
11     Q. Is there anything wrong with that?
12     A. No.
13     Q. Is -- do you remember ever seeing the Honorable
14  Reynaldo Garza there at the office?
15     A. No.
16     Q. Do you know who I'm talking about?
17     A. Yes, sir.
18     Q. The Fifth Circuit Court of Appeals judge?
19     A. Yes, sir.
20     Q. But you wouldn't be surprised if Mr. Garza came
21  in, Judge Garza -- or Justice Garza, as we say at the
22  appellate level, Justice Garza -- that he might get a
23  little help from Tony, would you? You wouldn't be
24  surprised, would you?
25     A. No.

Page 275

1      Q. Nothing wrong with that, right?
2      A. Nothing wrong.
3      Q. So if I understand your testimony, Mr. Munoz,
4  while you may have had some suspicions, when it comes
5  right down to it, you never really saw personally
6  anything that Mr. Yzaguirre did wrong, fair enough?
7      A. Fair enough.
8          MR. HODGE: Pass the witness.
9              EXAMINATION
10  BY MR. HUGHES:
11     Q. Yes, sir. If you had not been demoted, how many
12  more years would it have been before you retired from
13  your position?
14     A. Probably another -- I would have liked to go to
15  62.
16     Q. Say again.
17     A. Another eight years.
18     Q. Another eight years?
19     A. Eight or nine years.
20     Q. So you would have retired when?
21     A. About 62.
22     Q. And how would that have -- what would have been
23  the difference between the retirement pay at that point
24  and what you get now?
25     A. I'm going to say it would probably be about 17

Page 276

1  or $1,800.
2      Q. Instead of the $1,200 a month?
3      A. No, it would be about 3,000-something; 3,200
4  versus 1,200. It would be about $2,000 more.
5      Q. Okay. Now, have you ever given an employee in
6  the tax assessor-collector's office a letter of
7  reprimand without first clearing it with Mr. Yzaguirre?
8      A. No, sir.
9      Q. Not before Ms. Barbosa?
10     A. No, sir.
11     Q. Now, you heard Mrs. Cantu telling about there
12  were certain car titles that had the symbol asterisk Y
13  or the word Moy or the words Enrique Barreda or Barreda
14  on the back of the titles; you heard that, right?
15     A. Yes.
16     Q. Do you know how that was getting written there?
17     A. I guess the auto clerk was writing it in, the
18  auto clerk that did the transfer, did the paperwork.
19     Q. Okay. How did you find this out?
20     A. I heard Elida mention that once, that she would
21  put an asterisk and Y in the back.
22     Q. Who?
23     A. Elida Barbosa.
24     Q. I see. She told you that?
25     A. Uh-huh.

Page 277

1      Q. When did she tell you that?
2      A. Years ago.
3      Q. Did she say why she was doing it?
4      A. Because Mr. Yzaguirre had asked her to do that
5  transaction and she would log it in the back.
6      Q. I see. Did anyone else do that, to your
7  knowledge?
8      A. I don't know who else would do it.
9      Q. Okay. Now, before Mrs. Cantu was terminated,
10  did she tell you about -- that title applications were
11  coming in that shouldn't be processed?
12     A. About some transfers that shouldn't be
13  processed?
14     Q. Yes.
15     A. Yes, I'm sure she did.
16     Q. Do you recall any specific ones?
17     A. No, sir.
18     Q. Did she tell you why?
19     A. She would have explained -- she would have
20  explained to me the reason why.
21     Q. But you can't recall any specific ones now, as
22  you sit here, that she mentioned?
23     A. No, sir.
24     Q. Did she -- do you recall any specific criticism
25  she had at the -- of any of them?

9d44e4fa-b1fb-4b45-beb1-3293332530b6

Page 281

1    BY MR. HODGE:

2        Q.  There was one other thing -- oh, yeah.  Would

3    you agree with me that a tax assessor-collector

4    officeholder like Mr. Yzaguirre ought to be able to

5    trust his chief deputy?

6        A.  Yes, sir.

7        Q.  Am I right to say that a chief deputy would, at

8    least in part of his daily job duties, be required to

9    enforce the policies set by the tax assessor-collector?

10       A.  Yes, sir.

11       Q.  And if you were the tax assessor-collector,

12   would you want someone in your trust?

13       A.  Yes, sir.

14       Q.  That you trusted in that position?

15       A.  Yes, sir.

16       Q.  All right.  Do you think, Mr. Munoz, that you

17   listened too much to Ms. Cantu during all of this?

18       A.  No, sir.

19       Q.  You don't think that really it was her that was

20   primarily responsible for spoiling the relationship that

21   you had with your compadre?

22       A.  No, sir.

23       Q.  Do you accept whatever responsibility there may

24   be of yours in spoiling that relationship?

25       A.  Yes, sir.

# EXHIBIT NO. 2

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims



# Cameron County

---

**CLASSIFICATION TITLE:** **PROJECT COORDINATOR**
**TAX ASSESSOR-COLLECTOR'S OFFICE**

---

Class Code:                         Pay Table:
Civil Service Status:               Pay Grade
EEO Category:                       FLSA Status: Non-Exempt
Classification Series:

---

## SECTION I-JOB DESCRIPTION

**SUMMARY:** (*State Purpose and General Responsibilities*) Under general supervision, performs administrative and supervisory work assisting in coordinating and directing an effective and comprehensive Auto Titles and Registration Theft Division for the Office of the Tax Assessor-Collector. Work involves scheduling, assigning coordinating and supervising subordinate employees in the administration of the Auto Titles and Registration Theft Division. Employee is also responsible for personnel administration, functions pertaining to subordinates, and for overseeing the Auto Titles and Registration Theft Division, including assisting in training, establishing, processing and assignment of duties. Employee maintains a current knowledge and regulations, and assists the Tax Assessor-Collector with implementing procedures to be in compliance with state laws. Reports to the Tax Assessor-Collector.

---

**ESSENTIAL FUNCTIONS:** (*State the fundamental duties and tasty*)

1. Directly supervises the operations of the Automobile Titles and Registration Auto Theft Division at the Office of the Tax Assessor-Collector Brownsville Main Office, including computer system operations, ensuring adherence to established laws, ordinance, policies and procedures in the registration of motor vehicle and fees; assists and advises subordinates as necessary, resolving problems as non-routine situations arise; trains and oversees training of newly hired personnel.

2. Administers routine personnel matters affecting subordinates, including scheduling and granting leave, conducting performance appraisals and initiating appropriate disciplinary actions; assisting in recruiting, interviewing and hiring of full-time personnel; hires part-time personnel.

3. Confers with computer software vendors to determine necessary updates to office computer system software to comply with office needs and state requirements.

4. Assists in preparation of annual departmental budget proposal and administration of allocated funds.

5. Supervises and participates in the preparation of periodic reports of historical data and prepares daily, weekly, monthly, and annual reports of the Auto Titles and Registration Theft Division.

6. Assists County outside auditors in examination of the Auto Titles and Registration Theft Division and reports.

7. Maybe required to perform other duties to insure that the overall function of the County Tax Office does not fail in it's commitment as required by the Tax Assessor-Collector.

## SECTION II-JOB REQUIREMENTS

**EDUCATION AND EXPERIENCE:** (State the minimum requirements for formal education and job related experience.) Graduation from high school, preferably supplemented by an Associates Degree in Business Administration, Accounting, Law Enforcement, Tax Office Administration, or a related field, at least 5 years of experience in Business Administration, including supervisory experience; or any equivalent combination of training and experience which provides the required knowledge, skill and abilities.

**KNOWLEDGE, SKILLS, AND ABILITIES:** *(As utilized in the performance of the Essential Functions of the job.)*

Has thorough knowledge of state and local laws and ordinances pertaining to the regulations of the Department of Motor Vehicles and titling of motor vehicles, sales taxes and charges for privilege licenses.

Has thorough knowledge of the ethical guidelines applicable to the position as outlined by professional standard and/or federal, state or local laws, rules and regulations.

Has thorough knowledge of laws and ruling of the State Comptroller's Office.

Has considerable knowledge of modern office practices and procedures.

Has knowledge of the standard accepted principles and practices of bookkeeping and accounting.

Has considerable knowledge of the principles of supervision, organization and administration.

Has considerable knowledge of the current literature, trends and developments in the field of the motor vehicle registration.

Has general knowledge of various available computer equipment, software, supplies and maintenance services.

Is able to collect information from a variety of sources and compile concise reports from them.

Is able to use common office machines, including popular computer-driven word processing, spreadsheet and file maintenance programs.

Is able to coordinate and supervise activities of the Auto Title and Registration Theft Division in the Office of the Tax Assessor-Collector.

Is able to prepare financial statements and reports.

Is able to exercise considerable independent judgment and initiative in applying standards to a variety of work situations.

Is able to effectively express ideas orally and in written form.

Is able to exercise tact and courtesy in contact with the public, attorneys, business representatives, and the employees.

Is able to exercise firmness and fairness in adjusting complaints and explaining laws and policies.

Is able to establish and maintain effective working relationships as necessitated by work assignments.

**SPECIAL REQUIREMENTS:** *(Special licenses and other requirements necessary to obtain or retain the position.)*

Must be bondable.

Valid Texas Motor Vehicle Operators License or available alternate means of transportation.

May be assigned to work in any one of the County Tax Branch Offices.

**PHYSICAL DEMANDS:** *(State the physical requirements associated with the performance of the Essential Functions.)*

Physical Requirements: Must be physically able to operate a variety of machinery and equipment including computers, typewriters, calculators, copiers, facsimile machines, etc. Must be able to exert up to 50 pounds of force occasionally, and or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects. Physical demand requirements are rated for Light Work.

Data Conception: Requires the ability to compare and/or judge the readily observable, functional, structural or composite characteristics (whether similar or divergent from obvious standards) of data, people or things.

Interpersonal Communication: Requires the ability to speak and/or signal people to convey or exchange information. Includes giving instructions, assignments or directions to subordinates or assistants.

Language Ability: Requires the ability to read a variety of reports, correspondence, financial statements, contracts, forms, checks, etc. Requires the ability to prepare correspondence, reports, forms, checks, receipts, etc. using prescribed formats and conforming to all rules of punctuation, grammar, diction and style. Requires the ability to speak to people with poise, voice control and confidence.

Intelligence: Requires the ability to apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions; to interpret an extensive variety of technical instructions in mathematical or diagrammatic font; and to deal with several abstract and concrete variables.

Verbal Aptitude: Requires the ability to record and deliver information, to explain procedures, to follow oral and written instructions. Must be able to communicate effectively and efficiently in a variety of technical or professional languages including legal and tax terminology.

Numerical Aptitude: Requires the ability to utilize mathematical formulas; to add and subtract; multiply and divide; utilize decimals and percentages; understand and apply the theories of statistic.

Motor Coordination: Requires the ability to coordinate hands and eyes rapidly and accurately in using office equipment.

**Manual Dexterity**: Requires the ability to handle a variety of items such as office equipment. Must have minimal levels of eye/hand/foot coordination.

**Color Discrimination**: Requires the ability to differentiate between colors and shades of color.

**Interpersonal Temperament**: Requires the ability to deal with people beyond giving and receiving instructions. Must be adaptable to performing under stress and when confronted with persons acting under stress.

**Physical Communication**: Requires the ability to talk and hear: (Talking: expressing or exchanging ideas by means of spoken words. Hearing: perceiving nature of sounds by ear.) Must be able to communicate via telephone.

## SECTION III-JOB DIMENSIONS

**CONTACTS**: *(Nature of contacts, external relationships, and internal relationships.)* Utilize tact and diplomacy in dealing with subordinates, the general public, and other elected and appointed officials.

**External Contacts**: Frequent contact is with the car dealers, public notaries, Texas Department of Public
Safety Agents, Police Officers, the general public, state and city elected or appointed officials.
Communication is primarily face to face, via telephone, or written correspondence.

**Internal contacts**: Constant contact with subordinates, Branch Managers, co-workers, Head Cashier, Auto
Bookkeeping Supervisor, Sheriff Deputies, Tax Assessor-Collector, Chief Deputy of Operations, Chief
Deputy of Administration and Executive Secretary. Communication is primarily face to face, via telephone, and through written correspondence.

**RESPONSIBILITY**: *(Supervision given, accountability, safety, budgeting, spending authority and confidentiality.)* Must be able to maintain the day to day functions and responsibilities of the Motor Vehicle Division in the Brownsville Main Office for the Office of the Tax Assessor-Collector. Is also responsible for keeping confidential files, implement safety rules and regulations, and assist with yearly budget proposals.

**DIFFICULTY**: *(Judgment, initiative, and decision-making.)* Must be able to handle Motor Vehicle collection fee difficulties and inquiries over the counter with tact and diplomacy in order to avoid any unpleasant difficulties and line congestion.

**GUIDANCE**: *(Supervision received and level of independence.)* Handles the day to day functions and responsibilities of the Automobile Tides and Registration Auto Theft Division in the collection of data and fees.

**WORKING CONDITION**: *(Describe working environment and other conditions. of employment.)* Working conditions are primarily in an office environment.



## CAMERON COUNTY JOB DESCRIPTION

## JOB TITLE: CHIEF DEPUTY OF OPERATIONS
## TAX ASSESSOR/COLLECTOR'S OFFICE

### GENERAL STATEMENT OF JOB

Under general supervision, performs administrative and supervisory work assisting in coordinating and directing an effective and comprehensive tax collection program for the County Tax Assessor/Collector's Office. Work involves scheduling, assigning coordinating, and supervising subordinate employees in the collection of taxes and fees. Employee is responsible for assisting the general public, lawyers, banks, mortgage companies, social services agencies and other related organizations in obtaining necessary tax information; preparing various collections reports; and authorizing payment of tax refunds. Employee is also responsible for personnel administration functions pertaining to subordinates, and for overseeing office computer system administration, including assisting in software updates. Employee maintains a current knowledge tax related laws and regulations, and assists the Tax Assessor/Collector with implementing new procedures to be in compliance with new laws. Employee assumes duties of the Tax Assessor/Collector in his or her absence. Reports to the Tax Assessor/Collector.

### SPECIFIC DUTIES AND RESPONSIBILITIES

### ESSENTIAL JOB FUNCTIONS

Oversees activities of the Tax Assessor/Collector's Office, including collections and computer system operations, ensuring adherence to established laws, ordinance, policies and procedures in the collection of motor vehicle and ad valorem taxes and fees; assists and advises subordinates, as necessary, resolving problems as non-routine situations arise; trains or oversees training of newly hired personnel.

Administers routine personnel matters affecting subordinates, including scheduling, granting leave, conducting performance appraisals, and initiating appropriate disciplinary actions; assists in recruiting, interviewing and hiring of full-time personnel; hires part-time personnel.

Supervises and participates in the collection of unpaid taxes, conferring with taxpayers and assisting clerks in complex or unusual tax problems.

Confers with computer software vendors to determine necessary updates to office computer system software to comply with office needs and state requirements.

Assists in preparation of annual departmental budget proposal and administration of allocated funds.

Supervises and participates in the preparation of periodic reports of money collected; assists with balancing and reconciling receipts, and prepares daily, weekly, monthly and annual reports of tax collections.

## CHIEF DEPUTY OF OPERATIONS
## TAX ASSESSOR/COLLECTOR

Assists County and outside auditors in examiniation of tax records and reports.

Assumes duties of Tax Assessor/Collector in his or her absence, including attending Commissioners Court meetings to assist and advise court on matters pertaining to tax collections.

Monitors inventory and supplies.

Works with all taxing entities on the tax rate and assists in the data entry on IBM terminal to produce the yearly tax statements.

Works with the Laser Printing company assure timely printing of all tax statements throughout the year.

## ADDITIONAL JOB FUNCTIONS

Attends seminars, workshops, classes, lectures, etc., as appropriate, to enhance and maintain knowledge of trends and developments in the field of  tax collection.

Performs other related work as required.

## MINIMUM TRAINING AND EXPERIENCE

Associates degree, supplemented by college-level courses  in accounting, business administration, Real Estate, Tax Office Administration, or a related field, and 3 to 5 years of experience in tax collection work, including supervisory experience; or any equivalent combination of training and experience which provides the required knowledge, skills and abilities.

## SPECIAL REQUIREMENT

Certification by the Texas Board of Tax Professional Examiners.  Must be bondable.  RTA, RPA, RTC, preferred but not required to hold CTA designation.  Must have a valid drivers license.

## MINIMUM QUALIFICATIONS OR STANDARDS REQUIRED
## TO PERFORM ESSENTIAL JOB FUNCTIONS

**Physical Requirements:** Must be physically able to operate a variety of machinery and equipment including computers, typewriters, calculators, copiers, facsimile machines, etc.  Must be able to exert up to 50 pounds of force occasionally, and or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects.  Physical demand requirements are rated for Light Work.

**Data Conception:** Requires the ability to compare and/or judge the readily observable, functional, structural or composite characteristics (whether similar or divergent from obvious standards) of data, people or things.

**Interpersonal Communication:** Requires the ability to speak and/or signal people to convey or exchange information.  Includes giving instructions, assignments or directions to subordinates or assistants

## CHIEF DEPUTY OF OPERATIONS
## TAX ASSESSOR/COLLECTOR

**Language Ability:** Requires the ability to read a variety of reports, correspondence, financial statements, contracts, forms, checks, etc. Requires the ability to prepare correspondence, reports, forms, checks, receipts, etc. using prescribed formats and conforming to all rules of punctuation, grammar, diction and style. Requires the ability to speak to people with poise, voice control and confidence.

**Intelligence:** Requires the ability to apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions; to interpret an extensive variety of technical instructions in mathematical or diagrammatic form; and to deal with several abstract and concrete variables.

**Verbal Aptitude:** Requires the ability to record and deliver information, to explain procedures, to follow oral and written instructions. Must be able to communicate effectively and efficiently in a variety of technical or professional languages including legal and tax terminology.

**Numerical Aptitude:** Requires the ability to utilize mathematical formulas; to add and subtract; multiply and divide; utilize decimals and percentages; understand and apply the theories of statistice.

**Motor Coordination:** Requires the ability to coordinate hands and eyes rapidly and accurately in using office equipment.

**Manual Dexterity:** Requires the ability to handle a variety of items such as office equipment . Must have minimal levels of eye/hand/foot coordination.

**Color Discrimination:** Requires the ability to differentiate between colors and shades of color.

**Interpersonal Temperament:** Requires the ability to deal with people beyond giving and receiving instructions. Must be adaptable to performing under stress and when confronted with persons acting under stress.

**Physical Communication:** Requires the ability to talk and hear: (Talking: expressing or exchanging ideas by means of spoken words. Hearing: perceiving nature of sounds by ear.) Must be able to communicate via telephone.

## KNOWLEDGE, SKILLS AND ABILITIES

Has thorough knowledge of state and local laws and ordinances pertaining to the collection of personal property taxes, sales taxes and charges for privilege licenses.

Has thorough knowledge of the ethical guidelines applicable to the position as outlined by professional standard and/or federal, state orlocal laws, rules and regulations.

Has thorough knowledge of tax laws and ruling of the State Comptroller's Office.

Has considerable knowledge of modern office prcatices and procedures, including the handling and accounting of large sums of money.

Has considerable knowledge of the standared accepted principles and practices of bookkeeping and accounting.

## CHIEF DEPUTY OF OPERARTIONS
## TAX ASSESSOR/COLLECOTR

Has considerable knowledge of the principles of supervision, organization and administration.

Has considerable knowledge of the current literature, trends and developments in the field of tax collection administraton.

Has general knowledge of various available computer equipment, software, supplies and maintenance services.

Is able to collect information from a variety of sources and compile concise reports from them.

Is able to collect taxes in an efficient and complete manner.

Is able to use common office machines, including popular computer-driven word processing, spreadsheet and file maintenance programs.

Is able to coordinate and supervise activities of the Tax Assessor/Collector's Office.

Is able to prepare financial statements and reports.

Is able to exercise considerable independent judgment and initiative in applying standards to a variety of work situations.

Is able to effectively express ideas orally and in written form.

Is able to exercise tact and courtesy in contact with taxpayers, attorneys, business representatives and the general public.

Is able to exercise firmness and fairness in adjusting complaints and explaining tax laws and policies.

Is able to establish and maintain effective working relationships as necessitated by work assignments.

# EXHIBIT NO. 3

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

**COUNTY AUDITOR**
**CAMERON COUNTY, TEXAS**
**P.O. Box 3846**
**Brownsville, Texas 78523**
**(956) 544-0822**

RECEIVED
MAY 2 2 2002
CAMERON COUNTY TAX OFFICE
BROWNSVILLE

Mark A. YATES
**COUNTY AUDITOR**

May 21, 2002

Antonio Yzaguirre, Jr.
Cameron County Tax Assessor-Collector
964 E. Harrison
Brownsville, TX 78520

RE: Operations at the Harlingen Tax Office

Dear Mr. Yzaguirre:

My office has conducted several cash counts at the locations of your smaller satellite collection sites nothing so far has come to our attention. Over the past few years we have performed cash counts at the main tax office. Cash counts may detect irregularities, however there are more extensive procedures that we should perform. In light of the most recent thefts by employees involving automobile transactions, I suggest that you place your top available assistant most familiar with the RTS System in the Harlingen Office to review the functionality, the sufficiency of current staffing, and financial controls that insure the integrity of your collections. I recommend this measure to bolster your request for additional staffing at the Harlingen Office. My office is planning a review of the Harlingen Office some time late Summer. If your have any questions please feel free to call.

Sincerely,

Mark A. Yates
Cameron County Auditor

Cc:        County Sheriff
           Personnel/Human Resources

# EXHIBIT NO. 4

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

# OFFICE OF THE
# TAX ASSESSOR-COLLECTOR
P. O. BOX 952    BROWNSVILLE, TEXAS 78522-0952

**TONY YZAGUIRRE, JR.**
TAX ASSESSOR-COLLECTOR
RPA,RTA,CTA,CSTA



**FELIX R. MUNOZ**
CHIEF DEPUTY - OPERATIONS

**JESSE GARCIA, JR.**
CHIEF DEPUTY - ADMINISTRATION

# MEMO

To:      Mr. Felix R. Munoz
         Chief Deputy of Operations

From:    Tony Yzaguirre, Jr.
         Tax Assessor-Collector/Director - CCACETF

Subject: Reassignment of office and duties

Date:    May 23, 2002

This office has received correspondence from the Cameron County Auditor Mark A. Yates recommending a top assistant familiar with the tax office operation and the RTS systems to review functionality, current staffing, and financial controls of the Harlingen Tax Branch Office.

As you well know this office has always worked hand in hand with the county auditor's office in different functions and implementations of various programs. Therefore after careful consideration I have decided that you would be the best possible individual to take on this task.

Effective tomorrow, Friday May 24, 2002 you are to report to the Harlingen Tax Branch Office until further notice to ensure that the above mentioned subjects be implemented or resolved.

Along with the task of following up on the day-to-day operations of this office you are to submit a report of security measures that may be needed. I would like for you to also get together with Mr. Roger Ortiz and/or Marcelino, Building Maintenance Department to come up with a recommendation as to how we can improve and possibly remodel the Harlingen Tax Branch Office to include the interior (workstations) and exterior (drive-up windows).

In an effort to alleviate congestion in our offices we will be implementing the Dealer Title Application Software System. Once the system is implemented you are to make sure the system is working properly with the new car dealers in the Harlingen area.

Lt. Joe Mireles will assume your existing duties regarding the ATPA Program in the period of your absence. Any equipment used for ATPA operation, please hand over to Lt. Mireles; ATPA office keys, cell phone, portable radio, etc..

This memorandum will supersede the memorandum dated March 19, 2002 (Offices changes in policies). Mr. Garcia will continue to perform the employee performance evaluations for Tax Office personnel, and Mr. Mireles will complete the employee performance evaluations of auto-theft personnel. Mr. Garcia, Mr. Camarillo, and I will be working on the Tax office 2002-2003 Budget to include all branch offices.

The ATPA budget has been completed and submitted, Mr. Garcia and I will continue to do the weekly visits to all the branch offices. Mr. Garcia will continue to work with districts that need ad-valorem tax collection consolidation. Mr. Garcia, and I will work with Mr. Jorge Saldana, Office Manager of the delinquent tax firm on the various tax collection needs. These reduced duties should allow you to concentrate on the Harlingen Tax Office operations as Mr. Yates has mentioned in his correspondence.

I look forward to having these assignments and reassignments followed closely and trust these changes will meet the county auditors expectations. The various changes that have been implemented in the last 12 months have improved the operation of this office. Thank you in advance for your continued support to this department.

x.c.:    Mark A. Yates, County Auditor
         Lt. Joe Mireles, Chief of Investigations
         Jesse Garcia, Jr., Chief Deputy of Administration
         File

# EXHIBIT NO. 5

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

THE STATE OF TEXAS    )(
COUNTY OF CAMERON    )(

BEFORE ME the undersigned authority on this 3rd day of _____ August _____,

2002 personally appeared _____ Felix Munoz _____ who after being by me duly

sworn did depose and say: My name is Felix R. Munoz, I am 52 years old, and I live at 3815 Coffee Port Road in Brownsville, Texas. I am employed by the Cameron County Tax Assessor Collector as Chief Deputy of Operations, for Tax Assessor Collector Tony Yzaguirre, assigned to the Harlingen office.

In October of 2001, I began noticing people named Moises Torres, Enrique Barrera Sr, Enrique Barrera Jr, and Estella Guerra come in to the office. Each of these people projected to me of having a questionable background. I remember once telling Mr. Yzaguirre that he needed to stay away from Moises Torres. They would come in the front office foyer one at a time on different occasions. If Tony Yzaguirre was present he would pass these people into his office. Most of the time Mr. Yzaguirre would not be in, so these people would go to either Lupita DeLeon or Ruth Weaver. Each time that one of these people that I have named carried a stack of paperwork. It was my impression that the paperwork was title registration paperwork. Because when the paperwork would be handed over to Ruth or Lupita, the paperwork would be given to Julio and the title process would begin. I recall one time when Moises came in with paperwork and I saw Lupita counting money in the open. I could not say if Moises gave her the money when he first brought the paperwork or after the paperwork was done. I did mention to Lupita that it looked bad for her to be counting money in the open. I remembered that on one occasion a person named Alfredo Gonzalez told me that every time that he would go to Mr. Yzaguirre's office it would cost him money.

I never knew the extent of the processing that was being done to the title paperwork that these people would bring. Only recently when I had several conversations with Vincenta B. Cantu did I become informed of the type of processing was being done on the paperwork. So as far as I knew and what stands out was the processing that was being done was on those titles of vehicle that were stamped, sold for export. Everything that I know has been told to me by personnel that are in the office.

**THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.**

_Felix R Munoz_

SUBSCRIBED AND SWORN to me on this 3rd day of _August_
2002 A.D.

_Rumaldo Rodriguez_
NOTARY PUBLIC IN AND FOR
CAMERON COUNTY, TEXAS.
Texas Peace Officer

# EXHIBIT NO. 6

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

# OFFICE OF THE
# TAX ASSESSOR-COLLECTOR
### P. O. BOX 952    BROWNSVILLE, TEXAS 78522-0952

**TONY YZAGUIRRE, JR.**
TAX ASSESSOR-COLLECTOR
RPA,RTA,CTA,CSTA



**FELIX R. MUNOZ**
CHIEF DEPUTY - OPERATIONS

**JESSE GARCIA, JR.**
CHIEF DEPUTY - ADMINISTRATION

# MEMO

**To:**       Felix Muñoz,
            Chief Deputy of Operations

**From:**     Tony Yzaguirre, Jr.,
            Tax Assessor-Collector

**Subject:**  Salary

**Date:**     September 26, 2002

Even though you were transferred on May 23, 2002 to the Harlingen Tax Office to oversee the day-today operations of said office, and no longer Project Coordinator for the Automobile Crimes Enforcement Task Force, I wish to inform you that the $3,000.00 Annual Supplemental can not be justified as of October 1, 2002.

If you have any questions or concerns, please don't hesitate to let me know as soon as possible.

cc:   Jesse Garcia, Jr., Chief Deputy of Administration
      File

| AIN OFFICE | SOUTHMOST BRANCH | BRANCH OFFICE | BRANCH OFFICE | BRANCH OFFICE | BRANCH OFFICE | BRANCH OFFICE | BRANCH OFFICE |
| ROWNSVILLE | BROWNSVILLE | HARLINGEN | SAN BENITO | LOS FRESNOS | POWT ISABEL | LA FERIA | RIO HONDO |
| 4 E. HARRISON | 2900 SOUTHMOST RD | 602 E. HARRISON | 650 E. HIGHWAY 77 | 105 OCEAN BLVD | 313 QUEEN ISABELLA | 126 WEST 1ST | 130 COLORADO |
| 56) 544-0800 | (956) 986-6228 | (956) 427-8013 | (956) 361-8231 | (956) 233-4494 | (956) 943-8101 | (956) 797-3075 | (956) 748-2345 |
| X: 544-0808 | FAX: 986-6228 | | | | | | |

# EXHIBIT NO. 7

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Munoz's
Amendment Speech Claims

DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS

COUNTY OF CAMERON

"I declare under penalty of perjury under the laws of the United States of America

that the attached Exh. 1 are true and correct copies of pages from the deposition of

Plaintiff Felix Munoz taken in this case.  The attached Exhs. 2, 3, 4, 5 and 6 are true and

correct copies of deposition Exhs. 1-3, 5-6, and 8-9 to Munoz's deposition.  I declare

under penalty of perjury that the foregoing is true and correct."

Executed on March 1, 2006.

ROGER W. HUGHES