# EXHIBIT NO. 1

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Weaver's
Amendment Speech Claims

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, ET AL      X
                          X
                          X
VS.                       X  CIVIL ACTION NO. B-03-096
                          X
CAMERON COUNTY, ET AL     X
                          X

ORAL DEPOSITION OF RUTH WEAVER McGINNIS
FEBRUARY 9, 2006

Oral deposition of RUTH WEAVER McGINNIS, who resides
In Cameron County, Texas, taken by ROGER W. HUGHES,
Attorney for Defendant Tony Yzaguirre, Tax
Assessor-Collector of Cameron County and Director of
Cameron County Automobile Crimes Enforcement Task Force
in His Individual Capacity, reported by SHELLEY

STINGLEY, Certified Court Reporter in and for the State

of Texas, on FEBRUARY 9, 2006, in the offices of Adams

& Graham, 222 East Van Buren, West Tower, Harlingen,

Texas.

**Page 2**

APPEARANCES

COUNSEL FOR PLAINTIFFS:

     GAY E. GILSON
     LAW OFFICE OF GAY E. GILSON
     719 South Shoreline, Suite 301-A
     Corpus Christi, Texas  78401
     DAVID LEE McGEE
     LAW OFFICES OF DAVID LEE McGEE
     701 Park Avenue
     Corpus Christi, Texas  78401

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR OF
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE IN HIS INDIVIDUAL CAPACITY:

     CRAIG H. VITTITOE
     ROGER W. HUGHES
     ADAMS & GRAHAM
     222 East Van Buren, West Tower
     Harlingen, Texas  78550

COUNSEL FOR CAMERON COUNTY:
     BRUCE HODGE
     CIVIL LITIGATION
     LEGAL DIVISION COMMISSIONERS COURT
     Cameron County Courthouse, 4th Floor
     964 East Harrison Street
     Brownsville, Texas  78520

     CHARLES WILLETTE, JR.
     HEATHER SCOTT
     WILLETTE & GUERRA
     1534 East 6th Street, Suite 200
     Brownsville, Texas 0 78520

ALSO PRESENT:
     Tony Yzaguirre
     Vicenta Cantu
     Diamantina Alvarado
     Felix Munoz

**Page 3**

INDEX

Appearances ..................................... 1
Examination by Mr. Hughes ........................ 4
Examination by Mr. Hodge ......................... 155
Examination by Mr. Hughes ........................ 195
Examination by Mr. Hodge ......................... 203

Errata Sheet/Signature page ...................... 205
Reporter's Certificate ........................... 206

DOCUMENTARY EVIDENCE

Ex. No.Description                          Iden.

    1  8-2-02 Statement by Ruth Weaver ....   103

    2  February 2003 e-mails ..............   147

    3  February 2003 e-mail ...............   148

**Page 4**

1           RUTH WEAVER McGINNIS,
2   having been duly sworn, testified as follows:
3                 EXAMINATION
4   BY MR. HUGHES:
5       Q.  Could you please state your name, please?
6       A.  Ruth A. McGinnis.
7       Q.  And how old are you?
8       A.  39.
9       Q.  And where were you born?
10      A.  Brownsville, Texas.
11      Q.  Brownsville, born and raised?
12      A.  Yes, sir.
13      Q.  Where did you go to high school?
14      A.  In Brownsville.
15      Q.  What school, ma'am?
16      A.  James Pace High School.
17      Q.  When did you graduate?
18      A.  1984.
19      Q.  Did you attend -- get any additional schooling
20  after that, college?
21      A.  Yes.
22      Q.  Could you describe for us what your additional
23  schooling was?
24      A.  At the University of Texas, a legal secretary.
25      Q.  Was that UT Brownsville, ma'am?

Page 20

1  suits -- other than divorce, you have not been involved
2  in any?
3      A.  No, sir.
4      Q.  Okay.  When did you first meet Ms. Cantu?
5      A.  At the tax office.
6      Q.  How did you meet -- how did you know her there?
7      A.  As one of the employees.
8      Q.  I'm sorry.  What?
9      A.  As one of the employees.
10     Q.  Okay.  What office was it that you worked in,
11  what physical office?
12     A.  Administration.
13     Q.  And where did she work?
14     A.  The auto division.
15     Q.  That was across the hall?
16     A.  Yes, sir.
17     Q.  Okay.  Now, for how long were you just a
18  secretary?
19     A.  All the time.
20     Q.  Okay.  Were you ever, like, given the title
21  executive secretary?
22     A.  Yes, sir.
23     Q.  When did that happen?
24     A.  I don't remember the year.
25     Q.  Okay.  Do you recall how it came about?

Page 21

1      A.  Yes.
2      Q.  And how is that?
3      A.  Mr. Yzaguirre called me into his office and
4  said he was promoting me to executive secretary.
5      Q.  Okay.  And what did you understand the
6  executive secretary to be doing?
7      A.  I would be having additional responsibilities.
8      Q.  Which were?
9      A.  I would be in charge of two clerks that were
10  close by where I was sitting at and I would be helping,
11  also, the chief of operations.
12     Q.  Okay.  And who is the chief of operations?
13     A.  Mr. Felix Munoz.
14     Q.  And who were the other two people that you
15  mentioned that you would be supervising?
16     A.  It was Mary Galan and Vicky Saldana.
17     Q.  Okay.  And from the time that you got that job
18  until you were terminated, was it always Ms. Saldana
19  and Ms. Galan or were there other people that you began
20  to supervise?
21     A.  Other people.
22     Q.  Who were they?
23     A.  Minerva Ybarra.  That's the only name I can
24  remember offhand.
25     Q.  And other -- how is it that you -- let me back

Page 22

1  up.  How often -- once you became the executive
2  secretary, how often would you be seeing or working
3  with Mr. Munoz?
4      A.  On a daily basis.
5      Q.  Okay.  And what sort of things would you be
6  meeting with him about?
7      A.  Purchase order numbers, budget amendments,
8  requesting office supplies, if he needed a letter to be
9  typed out or sent out, general office duties.
10     Q.  Okay.  His office was on the other side of the
11  hall?
12     A.  Yes, sir.
13     Q.  And would he normally come over in person to
14  talk to you about these assignments or would he call
15  you or what?
16     A.  Vice versa.
17     Q.  Okay.  And once you became executive secretary,
18  how often would you work with Ms. Cantu?
19     A.  Almost on a daily basis.
20     Q.  And how is it that her job brought you into
21  contact with her?
22     A.  Because later down the line she became part of
23  the task force and she was the titles examiner, and
24  sometimes when there were problems, they needed to go
25  through Mr. Yzaguirre, and when he was not available,

Page 23

1  they would call me to ask when they could come and see
2  him or if he was around.
3      Q.  So when she was the titles examiner, where was
4  her office?
5      A.  Across the hall.
6      Q.  And so your contact is that she would either
7  have to come to you or call you to get to talk to
8  Mr. Yzaguirre?
9      A.  Yes, sir, if Mr. Yzaguirre was not in.
10     Q.  Now, sometime in 2001, you began noticing
11  certain people dropping off paperwork at the front desk
12  in your office?
13     A.  Yes, sir.
14     Q.  What did you notice, ma'am?
15     A.  That Mr. Yzaguirre would call me to tell me
16  that certain individuals would go ahead and come --
17  that they were going to come over and drop off
18  paperwork for him and for me just to make sure that I
19  would receive it.
20     Q.  Okay.  When did this begin, ma'am?
21     A.  I don't remember the dates at the moment.
22     Q.  Was this in 2001?
23     A.  Maybe.  Like I said, I don't remember the dates
24  right now.
25     Q.  Well, do you recall when the first time this

1  occurred was?

2  A. Exactly, no.

3  Q. And when you say Mr. Yzaguirre called, where

4  was he when he called?

5  A. I don't know where he would be calling from.

6  Q. He would call you on the telephone?

7  A. Yes, sir.

8  Q. And who was the first person that you recall

9  bringing this paperwork by?

10  A. Moises Torres.

11  Q. Okay, and what did he bring by?

12  A. Title transfers.

13  Q. Okay. Now, let me back up. Were you ever --

14  did you ever work as an auto clerk?

15  A. No, sir.

16  Q. Were you ever trained to be an auto clerk?

17  A. No, sir.

18  Q. So you never went across the hall and actually

19  were the one who was at the desk receiving the

20  applications?

21  A. No, sir.

22  Q. You didn't go to any training courses about

23  vehicle registration renewal or auto title

24  applications?

25  A. Yes, sir.

---

1  They also showed us about falsified

2  documents, how they are not supposed to be written on

3  the back just with pen or scratched off. They taught

4  us a lot of things.

5  Q. Okay. And the second one, what did you learn?

6  A. Basically the same thing, but now it was a

7  little bit more advanced. They would actually bring in

8  videos about inmates who were already incarcerated

9  serving time because they had been caught doing the

10  wrongdoings and they were showing how they would do the

11  illegal transactions or how they would go ahead and

12  mess with the title transfer forms.

13  Q. Okay. And the next course, what was that

14  about?

15  A. I'm assuming it was basically the same thing.

16  They were just like repetitions, and if they had

17  something new, they would go ahead and let us know what

18  to look for, the updates.

19  Q. Okay, you said you assume. Does that mean you

20  don't remember?

21  A. Offhand right now, I don't remember exactly

22  what the course was about, but I do remember what I did

23  learn off of it.

24  Q. The first person to bring by these documents

25  were Mr. Moises Torres?

---

1  A. Yes.

2  Q. And do you recall what these documents were?

3  A. Title transfers.

4  Q. Were they given to you or to someone else?

5  A. Given to me.

6  Q. And what did you do with them?

7  A. I called Mr. Yzaguirre and told him they were

8  there. And he would either tell me to put them on his

9  desk or to take them to Lupita De Leon in the auto

10  division.

11  Q. On the first occasion, where did he tell you to

12  put them?

13  A. I don't remember.

14  Q. Did you do anything else with the paperwork

15  besides take it to the desk that you were told to take

16  it to?

17  A. No, sir.

18  Q. Did you examine the documents?

19  A. Yes.

20  Q. A moment ago you said you didn't do anything

21  else. So you did?

22  MS. GILSON: Object; mischaracterizes

23  testimony.

24  Q. So you examined them?

25  A. I would not say examined them. I would just

---

1  say browsed through them to make sure that they were

2  filled out correctly.

3  Q. Was it your job to check them out for that?

4  A. No.

5  Q. Why did you do that?

6  A. Because I knew Mr. Yzaguirre liked to have

7  everything in order, and if there was a signature

8  missing or something, I would have to let him know

9  about it.

10  Q. Okay, the first time how did you know that?

11  A. Because if there's signatures missing on the

12  title transaction form, nothing can be processed.

13  Q. That may be the case, but why the first time

14  that they are dropped off did you examine them to see

15  if they were correct?

16  A. It was part of my job because, not only for

17  that title transaction, but for every particular thing

18  that I would do, I would need to double check

19  everything for him just to make sure everything was

20  right. Other than that, it was a waste of time.

21  Q. Okay. First time, as I understand, he just

22  said, "Somebody is bringing it by and I want you to

23  take it somewhere." Was that all he told you to do?

24  A. Yes.

25  Q. The first time he didn't tell you to check it

Page 29

1  over, did he?
2      A.  No.
3      Q.  And it wasn't -- you weren't an auto clerk,
4  right?
5      A.  That's right.
6      Q.  The auto clerks are the ones that check them
7  over, right?
8      A.  That's right.
9      Q.  And you didn't work in that division?
10     A.  No, I did not.
11     Q.  So why, if you're not the auto clerk and it
12 wasn't technically your job, did you examine them to
13 see if they were correct?
14     A.  Because, like I said before, I always had to
15 review all the things for Mr. Yzaguirre to make sure
16 that everything was in order.  Other than that, things
17 were a waste of time.  And if I didn't take care of
18 things, then why was I there for?  If I would see
19 something that was wrong, I needed to take care of it,
20 and I would call him and let him know.
21     Q.  Okay.  But the first time these were brought
22 by, he had not asked you to examine them, had he?
23     A.  No.
24     Q.  Was there any money with them?
25     A.  No, sir.

Page 30

1      Q.  Okay, and you don't recall whether he said to
2  leave them on his desk or take them across the hall the
3  first time?
4      A.  No, I don't remember.
5      Q.  So you don't recall whether the first time you
6  took them across the hall or left them on his desk?
7      A.  That's right, I don't remember that.
8      Q.  Okay.  How soon after that was the next time
9  somebody brought something by?
10     A.  From the first time?  I don't remember.
11     Q.  Okay, who was the next person to bring by
12 documents to be left there?
13     A.  Exact person, I don't remember.
14     Q.  You can't say whether it was Mr. Barreda, Sr.,
15 or Jr. or --
16     A.  No.
17     Q.  -- Mr. Moises Torres?
18     A.  No, I cannot pinpoint a second person.
19     Q.  Okay, did you know Mr. Torres?
20     A.  Yes, sir.
21     Q.  Moises Torres, I mean.  How did you know him?
22     A.  He would go by the office.
23     Q.  Okay.  Were there other members of the public
24 who came by the office?
25     A.  Yes.

Page 31

1      Q.  If people had problems or questions about their
2  transactions, did they come to Mr. Yzaguirre sometimes?
3      A.  Sometimes.
4      Q.  Did they go to Mr. Munoz sometimes?
5      A.  Sometimes.
6      Q.  If Mr. Yzaguirre wasn't there and people came
7  and wanted to talk to the tax assessor, did you refer
8  them to Mr. Munoz?
9      A.  Sometimes.
10     Q.  Okay.  So when was it that Mr. Yzaguirre -- who
11 do you recall, then, in 2001 bringing by paperwork to
12 be left at the front office?
13     A.  Just one person or several people?
14     Q.  Well, who do you recall doing it?
15     A.  Moises Torres, Enrique Barreda, Jr., and
16 Enrique Barreda, Sr., Esthela Guerra, and Aaron Torres.
17     Q.  I'm sorry, who?
18     A.  Aaron Torres.
19     Q.  Okay, who is Aaron Torres?
20     A.  Moises Torres' brother.
21     Q.  Okay.  So the five individuals you saw bringing
22 by paper in 2001 were Aaron Torres, Moises Torres,
23 Enrique Barreda, Sr., Enrique Barreda, Jr., and
24 Ms. Esthela Guerra?
25     A.  Yes, sir.

Page 32

1      Q.  On any of these occasions, did this paperwork
2  have money with them?
3      A.  No.
4      Q.  Did they have checks with them?
5      A.  I didn't see anything like that.
6      Q.  Okay, who did these individuals leave paperwork
7  with?
8      A.  Sometimes me, sometimes with Vicky Saldana.
9      Q.  Okay.  Did you ever ask Mr. Torres about this
10 paperwork?
11     A.  No.
12     Q.  You never asked him about it?
13     A.  No.
14     Q.  And what paper was Ms. Guerra bringing by in
15 2001?
16     A.  She would bring several papers.
17     Q.  What sort of things would she be bringing by?
18     A.  Title transfers.
19     Q.  And you examined them?
20     A.  Not all the time.
21     Q.  Sometimes?
22     A.  Sometimes, yes.
23     Q.  Would you say that most of the time you
24 examined the documents she brought by or not most of
25 the time?

Page 33

1    A.   Not most of the time.

2    Q.   Now, what did you notice about those

3  ones that you did examine?

4    A.   They were given to me with no envelopes and

5  some of them portrayed the same handwriting and

6  signature on the back of the title documents and the

7  title transfer form.

8    Q.   Okay.  Did you see when they were signed?

9    A.   No.

10   Q.   And when you saw these signatures, what did you

11 do?

12   A.   Nothing.

13   Q.   Nothing?

14   A.   Nothing.

15   Q.   Did you ask Ms. Guerra about them?

16   A.   No.

17   Q.   You didn't ask her about them at all?

18   A.   No.

19   Q.   Did you ask Mr. Yzaguirre about these

20 signatures on the back?

21   A.   No.

22   Q.   Did you see the persons who signed them?

23   A.   No.

24   Q.   You didn't see when they were executed?

25   A.   No.

Page 34

1    Q.   Did you speak to Mr. Munoz about these

2  signatures on the back of the documents that Ms. Guerra

3  was bringing by in 2001?

4    A.   No.

5    Q.   Did you speak to Ms. Cantu?

6    A.   No.

7    Q.   Did Mr. Yzaguirre talk to you at all about the

8  documents that Ms. Guerra was bringing by?

9    A.   Not all the time.

10   Q.   Okay.  What did he tell you about the documents

11 in 2001?

12   A.   That she would be dropping some documents over

13 and for me to take them to Lupita De Leon.

14   Q.   Okay, now, the documents she brought by, would

15 she leave them always with you or with somebody else?

16   A.   I don't know if she left them with anybody else

17 or only me.  I don't know that.

18        MR. HODGE:  What was that?  I'm sorry.  I

19 missed that.

20        THE WITNESS:  That I don't know if she

21 only left them with me or she would leave them with

22 someone else.  I don't know that.

23        MR. HODGE:  Okay.

24   Q.   Well, the ones that she left with you, other

25 than look at them, did you do anything else with them?

Page 35

1    A.   No, sir.

2    Q.   And what would you do with them when you got

3  them?

4    A.   I would go ahead and abide to what

5  Mr. Yzaguirre would tell me to do.

6    Q.   Which was?

7    A.   Take them to Lupita De Leon to get them

8  processed.

9    Q.   Okay, other than these signatures on the back,

10 did you notice anything unusual about them?

11   A.   They were all matching the same handwriting.

12   Q.   Okay.

13   A.   But that's it.

14   Q.   That's it?  That's the only thing unusual that

15 you saw?

16   A.   Yes.

17   Q.   Now, the paperwork that Aaron Torres brought

18 by, would he leave them with you all the time or would

19 he leave them with various people?

20   A.   I don't know if he would only leave it with me

21 or other people.

22   Q.   Okay.  And what sort of documents would he

23 leave with you?

24   A.   Title transfers.

25   Q.   Just title transfers?

Page 36

1    A.   Yes, sir.

2    Q.   Did you examine any of them that --

3    A.   Sometimes.

4    Q.   -- he -- I'm sorry.  I didn't mean to cut you

5  off.  Go ahead.

6    A.   Sometimes.

7    Q.   So Mr. Aaron Torres was bringing by title

8  transfers and leaving them sometimes with you in 2001?

9    A.   I'm assuming.

10   Q.   Well, did he leave them with you in 2001?

11   A.   I guess.  I'm not sure about the year, if it

12 was only that.

13   Q.   Okay.  And you examined them?

14   A.   Glanced at them.

15   Q.   Glanced at them.  And what did you see?

16   A.   If sometimes they were missing signatures,

17 also.

18   Q.   Did you tell him about that?

19   A.   Yes.

20   Q.   And what did he say?

21   A.   That he would obtain the signature.

22   Q.   Did he take the paperwork back?  Did you give

23 it to him for that purpose?

24   A.   Yes.

25   Q.   Okay.  So on those occasions when you would

1  tell him that there was a signature missing or there
2  was some irregularity, you would give it back to him
3  and he would take it?
4      A.  Yes, sir.
5      Q.  The ones that you didn't note a signature was
6  missing, did you notice anything unusual about those?
7      A.  Yes.
8      Q.  What?
9      A.  Sometimes they had liquid paper on the back.
10     Q.  I'm sorry?
11     A.  Sometimes there was liquid paper on the back
12 where they had scratched off names and they had signed
13 over in ink.
14     Q.  Okay.
15     A.  Which was something that wasn't supposed to
16 have been happening.
17     Q.  Okay.  And what did you do with those?
18     A.  I just abided to what Mr. Yzaguirre would tell
19 me.
20     Q.  Okay, what did Mr. Yzaguirre tell you to do
21 with the titles that had names scratched out or whited
22 over?
23     A.  To take them to Lupita De Leon to get them
24 processed.
25     Q.  Okay.  He didn't tell you to make a decision on

1  someone else?
2      A.  With me and someone else, also.
3      Q.  Who else did he leave them with?
4      A.  With Vicky Saldana.
5      Q.  Okay.  And what did you notice about the title
6  application -- were they just title applications that
7  Mr. Moises Torres would drop off?
8      A.  Yes.
9      Q.  They were only title applications?
10     A.  Title transactions.
11     Q.  Okay.  And what did you notice about them?
12     A.  The same thing as the ones that Aaron Torres
13 would drop by.
14     Q.  Okay.  And if you noticed a signature missing
15 on one that Mr. Torres brought by, you would hand it
16 back to him?
17     A.  I would actually -- if I would have missed it,
18 Lupita would go and give it back to him anyway.
19     Q.  Okay.
20     A.  Or I would have.
21     Q.  So if there was a signature missing, you
22 believed a signature missing, you would hand it back to
23 him?
24     A.  Yes.
25     Q.  And he would take it and leave; he wouldn't try

1  to protest in any way?
2      A.  No.
3      Q.  And what would happen if you noticed a
4  scratch-out or a marking?
5      A.  Nothing.
6      Q.  Okay.  You went ahead and took those?
7      A.  I just was doing what Mr. Yzaguirre would tell
8  me to do, just take them to Lupita.
9      Q.  I'm getting ahead of myself.  You said -- let
10 me ask, did you say that sometimes the documents
11 Mr. Moises Torres brought in lacked a signature?
12     A.  Yes.
13     Q.  Those, you gave back to him?
14     A.  Sometimes.
15     Q.  Sometimes.  Would Ms. Saldana do the same?
16     A.  I don't know.
17     Q.  You didn't see one way or the other?
18     A.  No, sir.
19     Q.  What other things besides missing signatures
20 did you notice on his paper?
21     A.  The white-outs.
22     Q.  White-outs and scratch-outs?
23     A.  Yes, sir.
24     Q.  Okay.  So you've mentioned some missing
25 signatures, white-outs and scratch-outs.  Is there

1  anything else you noted unusual about the paperwork
2  that he would bring in?
3      A.  I don't remember offhand.
4      Q.  Don't remember anything else unusual, out of
5  the ordinary?
6      A.  No, sir.
7      Q.  Okay.  Other than either give the documents
8  back to Mr. Moises Torres, what would you do with them?
9  You examined them, of course, but what else?
10     A.  Give them to Lupita.
11     Q.  You would give them to Ms. De Leon?
12     A.  Yes.
13     Q.  And did you do anything else with them besides
14 examine them and give them to Ms. De Leon?
15     A.  No.
16     Q.  Okay, the documents that Mr. Barreda, Sr.,
17 brought by, what unusual things did you notice about
18 them?
19     A.  White-outs.
20     Q.  White-outs?
21     A.  Yes, sir.
22     Q.  Anything else besides white-outs that you
23 remember unusual about the title applications that
24 Mr. Barreda, Sr., brought by?
25     A.  Signatures.

Page 45

1    Q.  Signatures what, ma'am?

2    A.  How can I say this?

3    Q.  Take your time.

4    A.  That didn't match.

5    Q.  Okay.

6    A.  Like very -- signatures that were very -- they

7  looked kind of falsified.

8    Q.  Okay.  So you noticed white-outs, signatures

9  that didn't match.  What would you do if you saw a

10  signature that didn't match?

11    A.  Nothing.

12    Q.  Okay.  Did you see anything else unusual about

13  the -- let me ask this:  Did he bring by other

14  documents and drop off other documents and title

15  applications or title documents?

16    A.  Yes.

17    Q.  What?

18    A.  No, he would only go ahead and bring title

19  transactions.

20    Q.  So you noticed signatures that, to you, did not

21  match, scratch-outs and white-outs.  Did you notice

22  anything else unusual about the paperwork that

23  Mr. Barreda, Sr., would bring by?

24    A.  No.

25    Q.  Did he give them just to you or did he give --

Page 46

1        MR. HODGE:  Excuse me just a minute.  Did

2  you say "No" to that last question?

3        THE WITNESS:  Yes, sir.

4        MR. HODGE:  Thank you.

5    Q.  Did he give them only to you or did he give

6  them to other people in that office?

7    A.  I don't know.

8    Q.  Okay.  Can you recall him giving any to

9  Ms. Saldana?

10    A.  I don't know.

11    Q.  Okay, you can't recall?

12    A.  I don't know.

13    Q.  Okay.  On those occasions when he gave them to

14  you, what did you do with them?

15    A.  Give them to Lupita De Leon in the auto

16  division.

17    Q.  You would take them straight from your office

18  over to Lupita?

19    A.  Yes, sir.

20    Q.  Ms. De Leon.  All right.  Do you recall whether

21  on these occasions Mr. Barreda, Sr., would bring by

22  money to process the applications?

23    A.  Can you repeat the question?

24    Q.  Okay.  Did he bring by money, as in cash or

25  checks, to go with the applications that he was

Page 47

1  leaving?

2    A.  No.

3    Q.  Okay.  Now, on any of these occasions when you

4  noticed scratch-outs, white-outs, or signatures that

5  didn't look right, didn't match, in the paperwork from

6  Ms. Guerra, Mr. Aaron Torres, Mr. Moises Torres, or

7  Mr. Barreda, Sr., did you bring this to Lupita's

8  attention?

9    A.  No.

10    Q.  You didn't say, "I looked at these and there's

11  a problem here," or "This looks suspicious," to her?

12    A.  No.

13    Q.  You didn't tell her any of that?

14    A.  No.

15    Q.  Did she ever ask you your opinion about whether

16  there was any problems with the paperwork?

17    A.  Yes.

18    Q.  She did?

19    A.  Yes.

20    Q.  When did she ask you?

21    A.  On several occasions.  I don't remember dates.

22    Q.  Okay, was this in 2001?

23    A.  Maybe.

24    Q.  Okay.  What things did she ask you?

25    A.  That why were there scratch-offs on the back,

Page 48

1  why was there a line written on someone's signature and

2  then another signature above it.

3    Q.  Okay.

4    A.  And --

5    Q.  So she would question you about that?

6    A.  Yes.

7    Q.  What would you tell her?

8    A.  That I wouldn't know.

9    Q.  Okay.  And what did she say about that?

10    A.  That she was going to call Mr. Yzaguirre.

11    Q.  Okay.  Do you know what happened on those

12  occasions after she said, "I'm going to call him"?

13    A.  The only thing I know is that the transactions

14  were still processed.

15    Q.  Okay.  Were you there when she talked to

16  Mr. Yzaguirre about any of these?

17    A.  No.

18    Q.  Were you, like, standing by while she called

19  him on the phone so that you might hear one side of the

20  conversation?

21    A.  No.

22    Q.  Okay.  And the processing of auto titles, it's

23  not done in your office?

24    A.  No, sir.

25    Q.  So whatever she or Mr. Hernandez or Ms. Cantu

Page 49

1    did with these titles, you wouldn't have been there to

2    see?

3        A.  No, sir.

4        Q.  And so you would not have known on any of these

5    occasions when questions were raised about

6    obliterations, scratch-outs, white-outs, or signatures,

7    what documents Mr. Moises or Aaron Torres or

8    Mr. Barreda Sr., or Ms. Guerra brought by to explain

9    these things?

10       A.  Not me.

11       Q.  Well, did you ever talk to Mr. Hernandez or

12   Ms. De Leon to find out what investigation they did

13   into these titles and why they might have been

14   approving them?

15       A.  No.

16       Q.  Okay.  In 2001, Mr. Barreda, Jr., did he bring

17   by titles to that office?

18       A.  I'm assuming.

19       Q.  Okay.  Do you recall him --

20       A.  I'm not sure about the date.

21       Q.  Okay.  And on those occasions, did he leave

22   them with you or other persons?

23       A.  He left them -- he left some with me.  If he

24   left some with other people, I don't know.

25       Q.  Okay, what documents did he leave with you,

Page 50

1    ma'am?

2        A.  Title transactions.

3        Q.  Okay.  Did he leave any money with you?

4        A.  No, sir.

5        Q.  Now, when I say money, I mean cash or checks.

6    None of that?

7        A.  No, sir.

8        Q.  And on these occasions, did you notice anything

9    unusual about the documents that Mr. Barreda, Jr., was

10   bringing by?

11       A.  The same thing as before as the other people.

12       Q.  Okay, if you saw them with missing signatures,

13   what would you do?

14       A.  I would not do anything.

15       Q.  You wouldn't give them back to him?

16       A.  No.

17       Q.  Okay, now, the other ones you said you did.

18   Why was he different?

19       A.  Because Lupita liked to deal with him directly.

20       Q.  Mr. Barreda, Jr., directly?

21       A.  Yes.

22       Q.  So if there were missing signatures, would you

23   tell him to take -- what would you tell him to do with

24   the paperwork or what would you do with it?

25       A.  Most of the time when he would come over,

Page 51

1    that's when Mr. Yzaguirre was in the office waiting for

2    him.

3        Q.  Mr. Barreda, Jr.?

4        A.  Yes, sir.

5        Q.  Okay.  Now, when he came by with the paperwork,

6    he would give it -- who did he give this paperwork?

7        A.  He would go ahead and give it to me.

8        Q.  Yes.

9        A.  And then I would go ahead and give it to

10   Mr. Yzaguirre if I knew that he was in the office.  If

11   not, I would just leave it on top of his desk if

12   Mr. Yzaguirre wasn't there.

13       Q.  Okay.  So you didn't take the documents to

14   Ms. De Leon?

15       A.  Unless Mr. Yzaguirre would call me and tell me

16   to do it.  Then I would.

17       Q.  This was with Mr. Barreda, Jr.?

18       A.  Yes.

19       Q.  So when you received the paperwork from

20   Mr. Barreda, Jr., you would always take them to

21   Mr. Yzaguirre if he was there?

22       A.  Or Mr. Yzaguirre would just go ahead and greet

23   Mr. Barreda and walk him into his office.

24       Q.  Okay.  And on other occasions you took them to

25   Ms. De Leon?

Page 52

1        A.  Yes.

2        Q.  Directly to Ms. De Leon?

3        A.  Yes, sir.

4        Q.  And on those occasions when you took the

5    documents, did you do anything with them besides

6    examine them and take them to Ms. De Leon --

7        A.  No.

8        Q.  -- or give them to Mr. Yzaguirre?

9        A.  No.

10       Q.  Okay.  Now, on the paperwork of Mr. Barreda,

11   Jr., you noticed white-outs and scratch-outs?

12       A.  Yes.

13       Q.  What else did you notice was unusual about his

14   paperwork?

15       A.  That's all I can remember right now.

16       Q.  Just white-outs and scratch-outs.  That's all

17   you remember unusual?

18       A.  Yes.

19       Q.  On any of the title applications -- I think

20   they are called U-130s -- that either Ms. Guerra

21   submitted, Mr. Barreda, Sr., or Mr. Barreda, Jr.,

22   submitted, that Mr. Moises Torres submitted, or that

23   Aaron Torres submitted, did you notice anything about

24   the U-130s?

25       A.  Yes.

Page 53

1    Q.  What did you notice?

2    A.  Signatures looked the same as the buyer and the

3 seller.

4    Q.  Okay.  So signatures looked suspicious to you?

5    A.  Yes.

6    Q.  That they should be different and they appeared

7 not to be different?

8    A.  Exactly.

9    Q.  Okay.  What else did you notice on the form

10 U-130s?

11    A.  Sometimes they weren't filled out.

12    Q.  Okay.  They were incomplete?

13    A.  Yes.

14    Q.  So the signatures looked suspicious or

15 incomplete.  What else did you notice about the form

16 U-130s from these individuals?

17    A.  Sometimes the buyer's information wasn't filled

18 out or the seller's information wasn't filled out,

19 either.

20    Q.  So that information was incomplete.  What else

21 did you notice about the form U-130s that would be

22 dropped off by Ms. Guerra, by Moises Torres, by Aaron

23 Torres, Mr. Barreda, Sr., or Mr. Barreda, Jr.?

24    A.  Sometimes the area where you're supposed to put

25 the odometer reading or the amount of selling of the

Page 54

1 vehicle, it wasn't filled out, either.

2    Q.  Okay.  What else besides that on the form

3 U-130s did you notice that struck you as unusual?

4    A.  That would be about it that I can remember

5 right now.

6    Q.  Okay.  Now, did you ever talk to Mr. Yzaguirre

7 about the discrepancies that you were noticing in the

8 title application documents and the U-130 forms that

9 you were seeing?

10    A.  Yes.

11    Q.  Okay, what did you tell him?

12    A.  That the word was out there that he would do

13 crooked titles, you know, for certain -- only -- you

14 know, certain friends of his only.

15    Q.  Okay, hold that thought.  What I meant was did

16 you tell him that you were observing these things in

17 these documents?

18    A.  I don't remember if I did.

19    Q.  Okay.  So as you're sitting here now, you do

20 not recall telling Mr. Yzaguirre that you personally

21 noticed missing signatures, incomplete forms,

22 suspicious signatures, obliterations, or white-outs in

23 any of the documents that you were receiving from

24 Ms. Guerra, from Mr. Aaron Torres, Mr. Moises Torres,

25 Mr. Barreda, Sr., or Mr. Barreda, Jr.?  You did not

Page 55

1 tell him that?

2    A.  I would not tell him personally.  I would tell

3 him on the phone, "I went ahead and noticed a certain

4 document of" whoever one of those people were, "that it

5 did not have a signature so we went ahead and gave it

6 back and he/she is going to obtain it at a later date."

7    Q.  So you would tell him when the documents had

8 been returned to them for further completion?

9    A.  Yes, sir.

10    Q.  Did you tell him about the suspicious

11 signatures or obliterations?

12    A.  No, sir.

13    Q.  You didn't tell him about those?

14    A.  No, sir.

15    Q.  Is there a reason you did not tell him about

16 them?

17    A.  Because he would tell me to just go ahead and

18 take them to Lupita De Leon.

19    Q.  Okay, let me understand this.  You didn't tell

20 him that you had observed those things, right?

21    A.  No, sir.

22    Q.  So he had never told you to take them to Lupita

23 if they had white-outs, strike-outs, or suspicious

24 signatures?

25    A.  All he told me was to take the title

Page 56

1 transactions to Lupita De Leon --

2    Q.  Right.

3    A.  -- to process.

4    Q.  Okay.  But you never told him that the

5 documents that you were taking over to Ms. De Leon had

6 strike-outs, white-outs, obliterations, or suspicious

7 signatures?

8    A.  She would tell him.

9    Q.  Okay, did you tell him?

10    A.  No.  Like I said before, no, I didn't.

11    Q.  Okay.  And so you were present when she

12 discussed this with him, when Ms. De Leon discussed

13 them with him?

14    A.  No.

15    Q.  Okay.  So how is it that you know she told him

16 about those things?

17    A.  She would tell me.

18    Q.  She would tell you?

19    A.  Yes.

20    Q.  But you weren't there when she had these

21 discussions -- when Ms. De Leon talked about these

22 things with Mr. Yzaguirre?

23    A.  No, sir.

24    Q.  And what did she tell you Mr. Yzaguirre said

25 when she told him about this?

1 would help you remember when it was?

2    A. Exactly right now, I don't remember the exact

3 date.

4    Q. Okay. Well, do you remember whether it was

5 like in the first quarter of 2002 or the second quarter

6 of 2002?

7    A. Right now, I don't.

8    Q. Okay. And what brought this conversation

9 about, ma'am?

10    A. Because I remember it was Ms. Guerra's, Esthela

11 Guerra's, birthday and she had come in in the morning

12 very happy looking for Mr. Yzaguirre and he was not in.

13 And then she had mentioned, "Oh, it's my birthday. I'm

14 going to do this, do that."

15       And later on, that's when she went ahead

16 and said, "Would you believe that they are saying that

17 Tony is doing a lot of favors for me? I don't know why

18 they are saying those things. Of course he does do

19 them for me, but I don't know who actually went ahead

20 and is blabbing all of those things out on the street.

21 Now the rest of the notaries won't even talk to me."

22       And I just said, "Well, I don't know."

23 And that was it.

24    Q. Okay. Was this conversation in English or

25 Spanish?

1 authority as to whether it is to be accepted or not?

2    A. No, I do not understand that.

3    Q. Okay. So what you found out from what was

4 going on was you heard from Ms. De Leon as to whether

5 or not the titles were approved or not?

6    A. Yes.

7    Q. Did you hear that from anyone else?

8    A. No.

9    Q. Only Ms. De Leon?

10    A. Yes.

11    Q. Okay. But on this occasion where she said, "He

12 does me favors," you just assumed she was speaking of

13 those other occasions?

14    A. No, she told me it was title transactions.

15    Q. Okay. When she came in to you that morning of

16 her birthday and said, "He does me favors," you just

17 assumed that that referred to the earlier occasions?

18    A. Yes.

19    Q. You didn't ask her if that was the case?

20    A. No, because it was self-explanatory because she

21 mentioned the names of the other notaries and the other

22 notaries would come in also for the same thing.

23    Q. What other notaries did she give that morning?

24    A. I'm sorry?

25    Q. You said she gave the names of the other

1 notaries.

2    A. No, I didn't say she gave names of the other

3 notaries. I said that she came in for the same thing

4 as the other notaries because she went ahead and said

5 that "The other notaries are not even talking to me

6 anymore."

7    Q. Okay. And that morning, did she tell you the

8 names of the other notaries that weren't talking to

9 her?

10    A. No, no.

11    Q. Okay, and did you discuss this conversation

12 with Mr. Yzaguirre?

13    A. Yes, sir.

14    Q. And when was that?

15    A. That same day.

16    Q. That same day on her birthday?

17    A. Yes, sir.

18    Q. And how did you inform him of it?

19    A. He walked into my office to check if he had any

20 messages, etc., and that's when I told him that

21 Ms. Guerra had come by and had said the word was out on

22 the street that he was doing favors only for her,

23 special favors, things like that.

24    Q. Okay. Now, let's stop right there for a

25 second. You at this time were his executive secretary?

1    A. Yes, sir.

2    Q. And one of the things that would -- correct me

3 if I'm wrong. You were the executive secretary. Your

4 job was to screen his calls and visitors, right?

5    A. Yes, sir.

6    Q. To find out what they wanted?

7    A. Yes, sir.

8    Q. And why they wanted to see him, right?

9    A. Yes, sir.

10    Q. And it would be then part of your job to tell

11 him who came by or who called to see him. That would

12 be part of your job, right?

13    A. Yes, sir.

14    Q. And it would have been part of your normal job

15 description, to save him the time and trouble of trying

16 to figure out who to see and who to return calls to, to

17 give him a description of what that person said they

18 wanted to see him about?

19    A. Yes, sir.

20    Q. And that's why you told him that?

21    A. Yes, sir.

22    Q. And that was the only reason you told him that?

23    A. Yes, sir.

24    Q. Now, when you told him that, what did he do,

25 ma'am? Or what happened next, I should say?

Page 69

1    A.  He didn't say anything.  He just made a frown
2  and he just turned red on his face and just walked out
3  of my office and went into his office.
4    Q.  Okay.  But you were just the messenger, right?
5    A.  Yes, sir.
6    Q.  You weren't trying to communicate to him
7  anything else than somebody wanted to see him and what
8  the subject matter of their visit was, right?
9    A.  I told him that Ms. Guerra wanted to see him.
10    Q.  Yes.
11    A.  And that she had told me what I just mentioned.
12    Q.  Yes.  And all you were trying to communicate to
13  him was that she wanted to see him and what she said
14  she wanted to see him about?
15    A.  Yes.
16    Q.  That was the only -- that was all you wanted
17  him to understand?
18    A.  That's all I told him.
19    Q.  As they say, don't shoot the messenger, right?
20  Okay, I'm sorry, I'll strike that question.
21    All right, what happened next?
22    A.  The next thing I know, Ms. Guerra came in
23  wanting to see him and she went straight into his
24  office, and from there on, I just heard like loud
25  voices on behalf of Mr. Yzaguirre saying that he was no

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020
db2abba7-fd22-43cd-a4e5-850eff2fb2b8

Page 71

1  who was covering for the other two during the break?
2    A.  Yes.
3    Q.  And you do not remember that lady's name?
4    A.  No, I don't.
5    Q.  And later did the other two -- your other two
6  officemates, if you will, come back from break?
7    A.  Yes.
8    Q.  But this was after Ms. Guerra had left?
9    A.  Yes.
10    Q.  Did you discuss the conversation that you had
11  overheard with them?
12    A.  No, sir.
13    Q.  Who were these two people, ma'am, who came back
14  from break?
15    A.  Mary Galan and Vicky Saldana.
16    Q.  Okay.  And you did not discuss this
17  conversation with Ms. Galan or Ms. Saldana?
18    A.  No, sir.
19    Q.  Who did you discuss it with?
20    A.  Nobody.
21    Q.  No one, okay.  Did you ask Mr. Yzaguirre about
22  this conversation?
23    A.  No, sir.
24    Q.  Now, in that office there was -- I don't know
25  quite how to phrase it -- a coffee fund, a kitty for

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020
db2abba7-fd22-43cd-a4e5-850eff2fb2b8

Page 72

1  birthdays and coffee money?
2    A.  Yes.
3    Q.  Can you tell me how that came about?
4    A.  I don't know.  It was already there when I was
5  hired.
6    Q.  Okay.  When did you become in charge of the
7  money, ma'am?
8    A.  I don't remember the date.
9    Q.  But you did become in charge of it at one
10  point?
11    A.  Not fully in charge.
12    Q.  Well, how did it come to any extent under your
13  charge?
14    A.  There was missing monies and the employees kept
15  complaining about it, that they were missing monies
16  because they would put it in a jar.  The jar did not
17  have a lock, didn't have anything.  It was just
18  something that they would just screw in and out and
19  that's it.
20    And it got to the point that it was
21  brought to my attention that somebody -- an employee
22  had taken money out to go buy Halloween or Christmas
23  things without notifying, apparently, anybody.  And
24  then it was decided to go ahead and order a money box
25  that had a lock on it.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020
db2abba7-fd22-43cd-a4e5-850eff2fb2b8

Page 73

1    So, okay, fine.  By then it was already
2  decided that the coffee room was going to be shut down
3  because we needed more space for the investigators.  I
4  remember I had asked Mr. Yzaguirre about that and if we
5  should continue buying or not the things, the coffee,
6  jelly, etc., if he was really thinking of closing it.
7    And he says, "Well" -- he goes, "Is it
8  being kept clean?"
9    And I go, "No," because we were having a
10  problem with that, too.
11    And he goes, "No, just leave everything
12  like it is.  We're just going to shut it down."  So it
13  was left that way.
14    Q.  Okay, let's back up.  At one time there was a
15  jar with money in it?
16    A.  Yes.
17    Q.  How was the money raised?
18    A.  The employees would go put a quarter for the
19  coffee or pennies or -- I don't know.
20    Q.  Who would contribute?
21    A.  Yeah.
22    Q.  Who would contribute, ma'am?
23    A.  I don't know.
24    Q.  Money just appeared?
25    A.  I do not know the names of the individuals who

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755   Brownsville (956) 542-1020
db2abba7-fd22-43cd-a4e5-850eff2fb2b8

Page 74

1   would contribute.

2       Q.  Did you contribute money to the jar?

3       A.  Yes, I did.

4       Q.  And how would you decide when and where to

5   contribute money?

6       A.  I would ask the girls, the ones that had been

7   there the longest, "If you want a piece of bread with

8   butter and jelly, how much do you need to put in

9   there," and they would tell me, so I would do that and

10  get my piece of bread and take it to my desk.

11      Q.  Okay.  So what sort of things -- when the money

12  was in a jar, what sort of things was the money spent

13  on?

14      A.  It would be on coffee, cups, paper plates,

15  napkins, forks, knives.

16      Q.  Okay.  Who decided how to spend the money?

17      A.  The girls did.

18      Q.  Who are "the girls"?

19      A.  The only ones that I would know of would

20  actually be Mary Galan and Anita Llorente and Lupita De

21  Leon.

22      Q.  So Ms. De Leon, Ms. Galan and Ms. -- how did

23  you pronounce the name, ma'am?

24      A.  Anita Llorente.

25      Q.  Ms. Llorente, okay.  They would decide how to

Page 75

1   spend the money?

2       A.  They were basically -- like if something was

3   lacking, from within themselves, they would decide who

4   would go to the store and buy it.

5       Q.  Okay, you didn't get involved in deciding how

6   to spend the money that was in the jar?

7       A.  Later -- part -- when I got with Mr. Yzaguirre

8   to ask him about it -- when money started to get

9   missed, that's when I asked him.  That's when I started

10  getting involved in it, when monies were missing.

11      Q.  Okay, my question was when did you get involved

12  in deciding how to spend the money?

13      A.  I don't remember the date.

14      Q.  But you did at some point?

15      A.  Towards the end, yes.

16      Q.  Okay, where was the money jar kept?

17      A.  In the back in the employee lounge.

18      Q.  Where was it kept there?

19      A.  On top of a table next to the refrigerator in

20  full view.

21      Q.  Okay.  And at some point a lock box was

22  purchased?

23      A.  Yes.

24      Q.  And the reason is money was missing?

25      A.  Yes.

Page 76

1       Q.  Who complained?

2       A.  The girls in the front.

3       Q.  Which ones do you recall?

4       A.  It was Vicky and Mary Galan.

5       Q.  And did you talk to them about why they thought

6   it was missing?

7       A.  Yes, and they mentioned to me that Ms. Llorente

8   had admitted that she had taken some money so she could

9   go buy decorations.

10      Q.  Okay.  Did you talk to Ms. Llorente?

11      A.  No.

12      Q.  Did anyone talk to Ms. Llorente to find out if

13  she had taken money?

14      A.  Ms. De Leon did.

15      Q.  Okay, and she's the one that told you that's

16  what had happened?

17      A.  Yes.

18      Q.  So at this particular point, when people have

19  complained and Ms. Llorente has admitted taking some

20  money, was there any money left or was it all gone in

21  the money jar?

22      A.  No, there was money left.  There was money

23  left.

24      Q.  Do you have an idea how much?

25      A.  No, I don't.

Page 77

1       Q.  Was anybody keeping tabs?

2       A.  I don't know.

3       Q.  Was there any kind of, for want of a better

4   term, a written record of when money was spent to

5   figure out -- and when money was put in the jar to

6   figure out how much should be there?

7       A.  They had told me Mary Galan was -- whenever she

8   would go buy things, that she would put the receipt

9   back in the box --

10      Q.  Okay.

11      A.  -- with whatever money was left and she would

12  put it back in there.

13      Q.  Okay.  But did anyone else keep a written

14  record of how much money went in or out?

15      A.  Not that I'm aware of, no.

16      Q.  Okay, who bought the lock box?

17      A.  The county did from the tax office budget.

18      Q.  Okay.  Who went out and bought it?

19      A.  I'm assume -- no, it was delivered because we

20  ordered it through Corporate Express.

21      Q.  Okay.  Who ordered it through Corporate

22  Express?

23      A.  I think it was Ms. Saldana.

24      Q.  Ms. Vicky Saldana ordered it?

25      A.  Yes.

Page 78

1   Q.  Okay.  And since it's a lock box, I guess it --
2   what kind of lock was it?  A key lock or combination?
3   A.  No, a key lock.
4   Q.  And who kept the key, ma'am?
5   A.  After that, I went ahead and kept it.
6   Q.  And was money transferred into the lock box?
7   A.  Yes, the girls went ahead and put the money in
8   there.
9   Q.  And do you recall when this was?
10  A.  No, I don't.
11  Q.  Do you know how much money was put in the lock
12  box?
13  A.  No.
14  Q.  And you kept the key to the lock box?
15  A.  Yes.
16  Q.  Did anyone else have a duplicate?
17  A.  Not that I'm aware of.
18  Q.  Was there a duplicate key or was there only
19  one?
20  A.  No, sir, there were two keys.
21  Q.  And you had both of them?
22  A.  Yes.
23  Q.  Did you keep a record of how much money went in
24  or out of the lock box?
25  A.  No.

Page 79

1   Q.  Where was the lock box kept?
2   A.  In the lounge area.
3   Q.  Okay.  It was kept in the lounge but you had
4   the key; is that it?
5   A.  Yes.
6   Q.  Where did you keep the key?
7   A.  In a binder where the rest of the -- all --
8   where all the office keys were kept for all the doors.
9   Q.  Okay.  You say a binder.  What do you mean,
10  ma'am?
11  A.  It's a black binder and then it's got hard
12  plastic inserts and you can go ahead and put different
13  keys on it.
14  Q.  Okay.
15  A.  And you can label your keys and keep them all
16  organized in there.
17  Q.  And where was the binder kept, ma'am?
18  A.  In my office.
19  Q.  Okay, where in your office?
20  A.  In my desk.
21  Q.  Okay.  Where in your desk was it kept?
22  A.  In one of the drawers.
23  Q.  Okay.  Since I'm not familiar with what your
24  desk looks like, is it one of those ones where there's
25  like a drawer in the middle above your legs?

Page 83

1   buy supplies for the lounge area, which included the
2   bread, the coffee, all those things.  And since I did
3   not have time to be doing those things, I went ahead
4   and gave her the key so that way they could -- between
5   her and Mary Galan, they could go and buy whatever it
6   is that they needed and just bring back the receipt and
7   the change so that that could be put back into the box.
8   Q.  Okay.  Now, I understand in 2002 you had to go
9   on a -- you were put on leave to use up your leave
10  time?
11  A.  Yes.
12  Q.  How much leave time did you have coming to you?
13  A.  I'm sorry?
14  Q.  How much leave time did you have?
15  A.  Mr. Yzaguirre mentioned to me close to three
16  months.
17  Q.  Okay.  So, to your memory now, when is it that
18  you went on leave in 2002?
19  A.  I don't remember offhand.
20  Q.  Okay.  When you left on leave, where was the
21  binder with the key in it?
22  A.  In my office.
23  Q.  Now, at that time, did you have any sense of
24  whether there was or was not money in the lock box?
25  A.  No, I don't.

Page 84

1   Q.  You have no idea how much money was in there?
2   A.  No, sir.
3   Q.  Well, since you had the key and the key was in
4   your desk, did you ever get the idea it might be a good
5   idea to start keeping a written record of the amount of
6   money?
7   A.  No.
8   Q.  Anybody ever ask you to do that?
9   A.  No.
10  Q.  And you never thought it would be a good idea?
11  A.  No, I did not.
12  Q.  Even though the whole purpose of the lock box
13  was started because money had been missing or someone
14  said money had been missing?
15  A.  Yes, but I was following Mr. Yzaguirre's orders
16  not to buy anything because he was going to shut down
17  the coffee area anyway.
18  Q.  Okay.  Did he direct or suggest that you not
19  keep records of the money?
20  A.  He never mentioned anything to me.
21  Q.  Okay.
22      MR. HODGE:  It's about break time, isn't
23  it?
24      MR. HUGHES:  I'm sorry.  I get to
25  working --

Page 85

1       MS. GILSON: We're moving pretty well,

2 aren't we?

3       MR. HUGHES: I'm going to work with your

4 witness' time constraints.

5       (Brief recess)

6   Q. Ma'am, thinking back to when -- you were

7 describing the discussion or argument that Ms. Guerra

8 was having with Mr. Yzaguirre in his office. Was

9 anyone else present in his office that you're aware of?

10   A. Not that I know of.

11   Q. Do you know of any reason that Anita Llorente

12 would have to say that money was missing from the lock

13 box while it was under your charge?

14   A. No.

15   Q. Do you have any reason why she would want to

16 accuse you falsely of losing the money or taking it?

17       MS. GILSON: Object; assumes facts not in

18 evidence.

19   Q. Do you know of any reason, as you sit here

20 right now, of why she might want to give a false

21 statement to that effect?

22   A. No.

23   Q. Do you know who -- who is Mary Ramos?

24   A. Yes.

25   Q. Who is she or was she?

Page 86

1   A. Mary Galan.

2   Q. I'm sorry, again?

3   A. Mary Galan.

4   Q. Oh. Did you get along with her well?

5   A. Yes.

6   Q. Do you have any reason, as you sit here now, to

7 think that she might have -- that she would make a

8 false or mistaken statement that money disappeared from

9 the lock box while it was under your charge?

10   A. Not that I'm aware of.

11   Q. Okay. Did you get along well with Vicky

12 Saldana?

13   A. I hope so.

14   Q. Do you have any information as you sit here now

15 or reason to suspect why it is she might make a false

16 or mistaken statement that money disappeared from the

17 lock box while it was in your charge?

18       MS. GILSON: Object; assumes facts not in

19 evidence.

20   Q. Do you know of any reason why she would have to

21 give either a false statement or a mistaken statement

22 that money disappeared from that box while it was under

23 your care?

24   A. No, I don't know.

25   Q. Okay. Do you know Linda Vallejo?

Page 104

1   A. At the sheriff's office.

2   Q. Now, this particular statement, was it given

3 while you were on leave?

4   A. Yes.

5   Q. Do you have any idea how long you had been on

6 leave before you gave that statement?

7   A. I'm not sure.

8   Q. And how is it that you came to give that

9 statement, ma'am?

10   A. The sheriff's office called me.

11   Q. The sheriff's office called you?

12   A. Yes.

13   Q. Were you expecting the call?

14   A. No.

15   Q. Did you know that they might be calling you?

16   A. No.

17   Q. Had anyone told you that the sheriff's office

18 was investigating something?

19   A. No.

20   Q. So the call came as a bolt from the blue?

21   A. I would say so, if you want to put it that way.

22   Q. Well, as a complete surprise?

23   A. Yes.

24   Q. And who called you?

25   A. It was an attorney. I don't remember his name

Page 105

1 Everardo Garcia.

2   Q. Everardo Garcia?

3   A. Uh-huh, yes.

4   Q. And he was with the sheriff's --

5   A. No, he just called me and said that the

6 sheriff's office wanted to take a statement and that if

7 I was willing to go ahead and give one.

8   Q. Okay.

9   A. Because they were doing an investigation on

10 Mr. Yzaguirre, on some complaints that they had

11 received.

12   Q. Okay. Well, Mr. Garcia, if it's the Everardo

13 Garcia I know of is -- at least he's part -- in

14 practice part-time. Did he say what his connection

15 with the sheriff's department or this investigation

16 was?

17   A. No.

18   Q. Did he say who he was counsel for?

19   A. I don't remember.

20   Q. Okay. So was this the same day as the

21 statement or was it before then?

22   A. I don't remember.

23   Q. Okay, so what happened next? You get a call to

24 come into the sheriff's department. What happens next?

25   A. I go ahead and give the statement and --

Page 106

```
1    Q.  Well, no, I mean did you go to the sheriff's
2  office?
3    A.  Yes.
4    Q.  That day or later?
5    A.  I guess on another date.
6    Q.  Okay.  Did anyone go with you?
7    A.  No.
8    Q.  You went by yourself?
9    A.  With Mr. Garcia.
10   Q.  Everardo Garcia?
11   A.  Yes.
12   Q.  Where did you meet him?
13   A.  There at the sheriff's office.
14   Q.  Okay.  So you drove to the sheriff's office by
15 yourself or you went there by yourself?
16   A.  Yes.
17   Q.  Okay, so you met him -- you met Mr. Garcia at
18 the sheriff's office?
19   A.  Yes.
20   Q.  Was anyone else there when you met him?
21   A.  With Mr. Garcia?
22   Q.  Yes.
23   A.  No.
24   Q.  And what happened when you met with him?
25   A.  We walked into a room.
```

Page 107

```
1    Q.  Okay.  And did he ask you questions or did
2  someone else ask you questions?
3    A.  I don't remember how it came out to be.
4    Q.  Okay, did someone explain to you while you were
5  there why someone wanted to talk to you?
6    A.  Yes.
7    Q.  Who was that, ma'am?
8    A.  I don't remember the man's name.
9    Q.  Was he in plainclothes or did he have a
10 uniform?
11   A.  No, he was in plainclothes.  He didn't have a
12 uniform.
13   Q.  Did he refer to himself as an investigator or
14 detective?
15   A.  I remember he gave me his name, but I don't
16 recall his name right now.
17   Q.  Okay.  Did he say he was with the sheriff's
18 department or some --
19   A.  Yes.
20   Q.  Okay.  Was Mr. Garcia there then?
21   A.  Yes.
22   Q.  So how long did this meeting go on with the
23 three of you?
24   A.  Not long.
25   Q.  Well, is that ten minutes, an hour, what?
```

Page 108

```
1    A.  I don't know, but it was not long.
2    Q.  Okay, what happened at the end of the meeting?
3    A.  They called in the notary so she could go ahead
4  and sign the form with me signing in front of her and
5  give me a copy of it, and that was it.
6    Q.  Okay.  From the time that you went into the
7  room with these two individuals until the notary was
8  finished, do you have a sense of how much time passed?
9    A.  No, but it was not long, like I said.
10   Q.  Well, again, is -- was it more than half an
11 hour or less than half an hour, ma'am?
12   A.  I don't remember.
13   Q.  Do you recall the time of day it was that you
14 arrived there?
15   A.  No.
16   Q.  Do you know what time it was when you left?
17   A.  No.
18   Q.  I don't mean to be impertinent, but do you
19 carry a wristwatch or a watch?
20   A.  Yes.
21   Q.  Did you have any sense of whether this
22 interview or this matter went on for an hour, as long
23 as an hour?
24   A.  I didn't keep track of the time.
25   Q.  Okay.  Well, let me back up then.  You were in
```

Page 109

```
1  a room with this gentleman whose name you can't
2  remember and Mr. Garcia?
3    A.  Yes.
4    Q.  Did anyone else come or go besides the notary
5  to take the statement?
6    A.  No.
7    Q.  So it was just you, Mr. Garcia, and the
8  gentleman's name who you can't remember?
9    A.  Yes.
10   Q.  Did someone tell you why they wanted to talk to
11 you?
12   A.  Yes.
13   Q.  And why was that?
14   A.  Because that person said that there was several
15 complaints against Mr. Yzaguirre --
16   Q.  Okay.
17   A.  -- in reference to people dropping off title
18 transactions and that they were still being processed
19 when they were not supposed to.  They wanted to know
20 what it was that I knew of.  That's why I just gave a
21 statement.
22   Q.  Okay.  Did they tell you who made those
23 complaints?
24   A.  No.
25   Q.  Do you know who made those complaints?
```

Page 110

1    A.  No, I don't.

2    Q.  Have you since learned who made those

3  complaints?

4    A.  No.

5    Q.  You have no idea who it was that made these

6  statements?  You called them -- pardon me.  Did they

7  refer to them as complaints?

8    A.  Yes.

9    Q.  Okay.  So you do not know who it was that made

10  whatever they referred to as a complaint?

11    A.  No, I don't recall at this moment.

12    Q.  Okay.  Before you went to the police -- between

13  the time you got a call from Mr. Everardo Garcia and

14  the time you went to the police department, did you

15  call or speak to anyone about the fact that you had

16  been summoned to the police department?

17    A.  No.

18    Q.  Okay.  You didn't call Ms. Cantu or your sister

19  or Mr. Munoz?

20    A.  I did talk to Mr. Munoz.

21    Q.  Before you went?

22    A.  No, after.

23    Q.  Okay, not before?

24    A.  No.

25    Q.  Now, did they tell you anything other than

Page 111

1  about these complaints about the paperwork being --

2  that these -- okay, what were the nature of the

3  complaints that they said they were investigating?

4    A.  They were talking, again, about signatures, if

5  I had seen any of those and if it was true that Enrique

6  Barreda, Sr., and Enrique Barreda, Jr., were going and

7  Moises Torres were going and, well, yes, they were.

8    Q.  Okay.  Then what else did they ask about?

9    A.  That what was my involvement in it, and I told

10  them none, only that I was just following orders from

11  Mr. Yzaguirre.

12    Q.  Okay.  So they wanted to know what your

13  involvement was in this.

14    A.  Uh-huh.

15    Q.  Okay, did they indicate --

16        MR. HODGE:  That was a "Yes"?

17        THE WITNESS:  Yes.

18    Q.  Did they indicate to you when they said "your

19  involvement" that they suspected that you were part of

20  this somehow?

21    A.  They didn't indicate anything.

22    Q.  Did it occur to you that they thought that you

23  were a part of this somehow?

24    A.  Oh, yes.

25    Q.  In other words, you thought suspicion might be

Page 112

1  on yourself?

2    A.  I didn't see it that way.

3    Q.  Well, you did gather they thought you were part

4  of it?

5    A.  Yes, of course.

6    Q.  And you gathered that they were investigating

7  complaints about documents that came into your hands?

8    A.  Yes.

9    Q.  And about how they were processed?

10    A.  Yes.

11    Q.  And, as you said earlier, you did examine these

12  documents to see whether they were proper?

13    A.  Yes.

14    Q.  So you wanted to be sure and explain to them

15  that you had done nothing wrong?

16    A.  Because I didn't.

17    Q.  Okay.  So you wanted to explain that to them?

18    A.  They asked me to give a statement and I did.

19    Q.  And you wanted to explain to them so they would

20  know that you had done nothing wrong?

21    A.  They asked me to give a statement and I did

22  that.

23    Q.  I heard that, but my question was, you wanted

24  them to understand that you had done nothing wrong?

25    A.  Because I didn't.

Page 113

1    Q.  Okay.  But that's what you wanted them to

2  understand?

3    A.  That's why I gave the statement.

4    Q.  Okay.  That was the purpose of your statement.

5  Now, was your memory when you wrote this statement

6  better than it is now?

7    A.  Yes.

8    Q.  Okay.  Who -- this is typewritten, ma'am, and I

9  know you're a typist, so my question is, did you type

10  this or did someone else type it for you?

11    A.  No, someone else did.

12    Q.  And who was that, ma'am?

13    A.  That person that I -- I don't remember his

14  name.

15    Q.  Okay.  Now, did the person who typed it have a

16  machine like the lady here who is typing down your

17  words and mine?

18    A.  No.

19    Q.  Okay.  What did they do, bring in like a

20  typewriter?  Did they have a word processor or what?

21    A.  They did it on their personal computer.

22    Q.  Okay, there was already like a PC in the room?

23    A.  Yes.

24    Q.  Okay.  And do you have a sense of how long they

25  talked to you before they started writing out the

Page 120

Q. So because they didn't ask about Ms. Guerra, you weren't going to tell them?

A. They only asked me about those individuals that are on the statement.

Q. So as long as they didn't ask you about Ms. Guerra, you weren't going to tell them?

A. They didn't ask me.

Q. Okay. And so because -- are you saying then, because they did not ask you, you would not tell them?

A. If they did not ask me, no.

Q. You weren't going to volunteer any information?

A. No.

Q. Even though that was precisely the same kind of information they said they were looking for?

A. They did not specify her name.

Q. Okay. But they specified those sorts of transactions that came through your hands?

A. With those names of those individuals only.

Q. Okay. Now, I don't see anywhere in this affidavit where you mentioned what Ms. Cantu told you.

A. They did not ask me anything about Ms. Cantu.

Q. Okay. And you weren't going to volunteer what she said?

A. No.

Q. Why not?

Page 121

A. Because I'm not her.

Q. Well, now, this statement has a lot of what you were told by Lupita De Leon in it, doesn't it?

A. Yes.

Q. Okay. At several points here you repeat things that you heard Ms. Lupita De Leon say or things that you saw her do or Mr. Hernandez do, right?

A. Yes.

Q. But you don't repeat any of the things that Ms. Cantu told you.

A. No.

Q. And you weren't going to volunteer it?

A. No.

Q. She was your friend, wasn't she?

A. Yes.

Q. And you weren't going to volunteer anything about your friend.

A. Not in particular, because she would have given a statement, also.

Q. How did you know that?

A. She told me.

Q. She told you she gave a statement to the police department?

A. The sheriff's office.

Q. She did?

Page 122

A. Yes.

Q. When did she give a statement?

A. I don't know.

Q. Well, the only statement we have was signed two years later.

MS. GILSON: Object; assumes facts not in evidence.

MR. HUGHES: Well, there's only one that's been produced, and it's dated 2004.

Q. When did she tell you she made --

MS. GILSON: No, assumes facts not in evidence.

Q. When did she tell you she that made a written statement to the sheriff's department?

A. I don't remember the date.

Q. Did you know that when you were there with them?

A. No.

Q. So you didn't know what Ms. Cantu was saying?

A. No.

Q. And because they didn't ask about what Ms. Cantu had told you, you didn't volunteer it?

A. No.

Q. But you did volunteer what Ms. Lupita De Leon was telling you?

Page 123

A. Because that's what I saw.

Q. Okay. And you also -- well, you didn't -- you heard what she said, right?

A. Sometimes I was in the auto division when Ms. De Leon was directing herself to Mr. Hernandez.

Q. Okay. And sometimes you just heard what she said without seeing if it was true or not?

A. Well, the reason I went ahead and stated it on this statement is because I would go ahead and see Ms. De Leon addressing herself to Mr. Hernandez when I would walk to the auto division.

Q. Okay. So you -- but you weren't going to -- you didn't tell them anything about what Ms. Cantu had to say?

A. No.

Q. You didn't think she had done anything wrong, did you?

A. I don't know what she would have said.

Q. Okay, you didn't know what she was going to say?

A. I don't know what she would have or might have. I don't know what she said.

Q. So you didn't want to tell them about what she had told you because you didn't know what she was going to say about that?

Page 124

1    A.  I don't know anything about what she even
2  mentioned.
3    Q.  Okay.  Well, you didn't mention to the
4  sheriff's officer -- pardon me, to Mr. Garcia and the
5  gentleman from the sheriff's department anything about
6  what Ms. Cantu said?
7    A.  No.
8    Q.  You didn't even think it would be helpful for
9  them to understand it?
10    A.  They did not ask me.
11    Q.  Did you think it would be helpful for them to
12  know about it?
13    A.  I don't know because I don't know what the
14  complaints were about.  I don't know exact details.  I
15  didn't know anything.
16    Q.  So Ms. Cantu tells you that illegal paperwork
17  is being processed, she uses the word "illegal," a
18  gentleman from the sheriff's department and an attorney
19  are asking you questions about illegal paperwork that's
20  being processed through Mr. Yzaguirre's department, and
21  you did not think as you sat there that it would even
22  be helpful for them to understand what Ms. Cantu was
23  saying?
24    A.  I'm not an investigator.
25    Q.  Okay.  So it didn't occur to you to even tell

Page 125

1  them that?
2    A.  No, it did not occur to me.
3    Q.  You didn't think it was even important?
4    A.  I'm not an investigator.  I was not doing the
5  investigation on Mr. Yzaguirre.
6    Q.  Okay, did you mention to them the things that
7  Mr. Munoz said?
8    A.  No.
9    Q.  You didn't mention those, either?
10    A.  No.
11    Q.  You didn't think it would be helpful for them
12  to know?
13    A.  I was not doing that investigation, sir.
14    Q.  Okay.
15    A.  That's why I didn't mention anything.
16    Q.  So unless they asked you point blank about what
17  somebody told you, you weren't going to tell them?
18    A.  They were the ones that called me in.
19    Q.  So they had to ask you point blank, "Have you
20  heard anything from anyone else," before you would
21  mention what Ms. Cantu or Mr. Munoz had told you?
22    A.  They were the ones that had a lot of questions
23  for me.
24    Q.  I'm sorry?
25    A.  They were the ones that had the questions for

Page 126

1  me.
2    Q.  I understand that, but --
3        MR. HODGE:  Let me object to unresponsive.
4  Go ahead.
5    Q.  So you weren't going to tell them unless they
6  asked?
7    A.  Well, yes.
8    Q.  And how would they know to ask if you didn't
9  tell them?
10        MS. GILSON:  Object; calls for
11  speculation.
12    Q.  I mean, you were called to provide information,
13  correct?
14        MS. GILSON:  Object; asked and answered
15  now several times.
16    Q.  So the only way you would have told them that
17  day about what you had heard from Ms. Cantu or
18  Mr. Munoz is if they had asked you point blank?
19    A.  Yes.
20    Q.  Now, after you left and you had signed the
21  statement, who did you tell that you had made a
22  statement to the police?
23    A.  Nobody.
24    Q.  Didn't you say you called Mr. Munoz?
25    A.  I mean, you're talking about right after.  No,

Page 127

1  I didn't tell anybody.  Later on, a couple of days, I
2  did.
3    Q.  Okay, who did you tell?
4    A.  I called Mr. Munoz.
5    Q.  Why?
6    A.  Just to let him know that they had called me
7  and they had asked me about that.
8    Q.  Why did you think he needed to know?
9    A.  Because since we had been talking about the
10  same problems in our lunches before, it was all in
11  relation to the same thing.
12    Q.  And who else did you tell that you gave the
13  statement to the sheriff's department?
14    A.  My sister Tina.
15    Q.  Okay.  And who else?
16    A.  I also went ahead and told Bibi about it,
17  Vicenta.
18    Q.  Okay.  Why did you tell your sister Tina?
19    A.  Because she's my sister.  I just -- I tell her
20  things.
21    Q.  What did you tell her?
22    A.  That they had -- all the things that they had
23  asked me and what I had mentioned.
24    Q.  Okay.  Did Mr. Munoz tell you when you spoke to
25  him that he had also made a statement?

Page 130

1  room with him or the person who took this statement --
2  MR. HODGE: You mean Mr. Garcia.
3  MR. HUGHES: Thank you.
4  Q. Mr. Garcia, did he tell you whether you should
5  talk to other people about the statement you made?
6  A. No.
7  Q. And advise you that they prefer you not discuss
8  it with anyone?
9  A. No.
10  Q. So they didn't give you any idea that this was
11  confidential in any manner whatsoever?
12  A. They did.
13  Q. Oh, they did. How did they --
14  A. They did tell me that this was very
15  confidential and that was basically it. I mean, they
16  didn't go much into detail about anything.
17  Q. Okay. So then a couple of days later you
18  called to discuss this confidential matter with
19  Mr. Munoz?
20  A. Yes.
21  Q. And then you called to discuss this
22  confidential matter with your sister?
23  A. Yes.
24  Q. And then you called Ms. Cantu to discuss this
25  confidential matter?

Page 131

1  A. Yes.
2  Q. And before you were terminated, who else did
3  you --
4  A. That's it.
5  Q. -- did you mention this to?
6  A. Nobody else.
7  Q. No one else?
8  A. No.
9  Q. Did the -- did Mr. Garcia or the sheriff's
10  personnel that you were talking to or the person who
11  typed up your statement somehow give you the idea that
12  Mr. Yzaguirre knew about this investigation?
13  A. I don't know.
14  Q. Did they indicate in any way that they were
15  going to share your statement with Mr. Yzaguirre?
16  A. No.
17  Q. So do you have any information now that between
18  the time you gave the statement to the sheriff's
19  department and the time you were terminated someone
20  told Mr. Yzaguirre that you had been questioned by the
21  police or the sheriff's department?
22  A. I don't know.
23  Q. You have no such information?
24  A. No.
25  Q. Do you have any information that Mr. Yzaguirre,

Page 132

1  before he terminated you, learned what was in the
2  written statement or what you had told the sheriff's
3  department?
4  A. I don't know.
5  Q. You know of no such information?
6  A. No.
7  Q. Do you have any information, as you sit here
8  now, that he somehow learned of this statement that you
9  gave the sheriff's department and that was the reason
10  you were terminated?
11  A. It makes me understand that.
12  Q. Okay, so what information do you have that he
13  learned that you had made a statement and what the
14  contents of that statement were?
15  A. Only thing I heard was that someone had called
16  him from the sheriff's office to tell him.
17  Q. Okay, who told you that?
18  A. I don't remember at this time who it was, but
19  somebody called me and told me that.
20  Q. Who --
21  A. And the next -- I don't remember that.
22  Q. When?
23  A. It was after this.
24  Q. It was after when?
25  A. After the statement.

Page 133

1  Q. It was after the statement --
2  A. And I was still out.
3  Q. And you were still out?
4  A. Yes.
5  Q. And somebody called you?
6  A. Yes.
7  Q. Male or female?
8  A. I don't remember who it was.
9  Q. You don't remember?
10  A. No. Because I would take everything as gossip.
11  Q. Did you know this person when they called you?
12  A. Yes.
13  Q. So you knew who it was that called you?
14  A. Yes.
15  Q. You just can't recall the name?
16  A. No, I don't remember who it was.
17  Q. Who did this person work for?
18  A. I don't remember.
19  Q. How did this person find it out?
20  A. I don't know.
21  Q. Who at the sheriff's office would provide such
22  information to Mr. Yzaguirre?
23  A. I don't know.
24  Q. Did you believe it?
25  A. No.

Page 157

1  Q.  Okay.  In other words, as you sit here today,
2  under oath, you have no information that there was any
3  offense against the laws of the state of Texas
4  springing from the execution of those documents?
5  A.  I do know they were processed wrongly.
6  Q.  Okay.  And when you say wrongly, can you
7  identify a rule or regulation that was violated during
8  the process?
9  A.  For example, the documents are not supposed to
10  be tampered with and they were, but the transactions
11  were still processed anyway.
12  Q.  When you say tampered with, I take it you're
13  talking about the scratch-out and the white-out?
14  A.  Yes, sir.
15  Q.  Okay, that would be something different from a
16  kind of looked like falsified signature, right?
17  A.  Well, I'm talking about signatures, also.
18  Q.  Okay.  So the falsified signatures you would
19  group within this group of documents that you would
20  call tampered with?
21  A.  Yes.
22  Q.  So just so we're on the same wavelength,
23  when you say these documents were tampered with, we're
24  talking about signature issues and white-out issues and
25  scratch-out issues?

Page 158

1  A.  Yes, sir.
2  Q.  Anything else we're talking about?
3  A.  The amount of value on the vehicles, also.
4  They were decreased in order to pay less taxes.
5  Q.  Okay.  And do you think that would meet this
6  "tampered with" definition we just discussed?
7  A.  Yes.
8  Q.  Okay.  Here again, this conclusion that you
9  drew about they kind of looked falsified or tampered
10  with comes from your training --
11  A.  Yes, sir.
12  Q.  -- is that right?  But, again, sitting here
13  today, you cannot point to any single set of documents
14  or one or more sets of documents and say that in fact
15  there was some illegal transaction that occurred as a
16  result of the processing of those documents, can you?
17        MS. GILSON:  Object.  Assumes facts not in
18  evidence.  Mischaracterizes her testimony.
19  Q.  Can you?
20  A.  I don't understand the question.
21  Q.  Let me try it again.  Sitting here today under
22  oath, you are unaware of any information, wherever it
23  came from, that there was ever a criminal offense or a
24  violation of a state rule or regulation springing from
25  the processing of these documents that you say were

Page 195

1        MR. HODGE:  I think that's all I have of
2  you, ma'am.  I'll pass the witness.
3        MS. GILSON:  We will reserve our
4  questions.
5        MR. HUGHES:  I have some.
6        MS. GILSON:  Okay.
7              EXAMINATION
8  BY MR. HUGHES:
9  Q.  The gentleman at the police department whose
10  name you didn't remember who was there that interviewed
11  you, that was Rumaldo Rodriguez, wasn't it?
12  A.  Yes, yes, that's his name.  You're right.
13  Q.  Okay.  He was the same one who was sentenced by
14  the federal court for federal racketeering charges?
15        MS. GILSON:  Object; asks for speculation.
16  Q.  He was the same one that was convicted with
17  your former employer, Mr. Cantu, in federal court?
18        MS. GILSON:  Object --
19  A.  Yes.
20        MS. GILSON:  -- asks for speculation.
21  Q.  Okay.  Now, a moment ago, you described going
22  into Mr. Yzaguirre's office to give him an important
23  message and seeing money; is that it?
24  A.  Yes.
25  Q.  And whose hands was the money in?

Page 202

1  GT Motors, do you know what he may know about the case?
2     A.  No.
3     Q.  And Mr. Alex Flores has been listed as a
4  witness.  Do you know what he may know about the case?
5     A.  No.
6     Q.  A Mr. Joseph Strands at the FBI has been listed
7  as a witness.  Do you know what he may know about the
8  case?
9     A.  No.
10     Q.  Were you ever interviewed by Mr. Strands?
11     A.  I don't think so.
12     Q.  A John Cruz Villarreal has been listed as a
13  witness.  Do you know what he might know about the
14  case?
15     A.  No.
16     Q.  A Mr. Victor Alvarado has been listed as a
17  potential witness.  What might he know about the case?
18     A.  I don't know.
19     Q.  A Mr. Maz Martinez has been listed as a
20  potential witness.  Do you know what he may know about
21  the case?
22     A.  No.
23        MR. HUGHES:  Pass the witness.
24
25

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 204

1  was going on at the tax assessor-collector's office,
2  did you?
3     A.  No, sir.
4        MR. HODGE:  That's all I have.  Thanks.
5        MS. GILSON:  We'll reserve our questions.
6        (Deposition concluded)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 203

1              EXAMINATION
2  BY MR. HODGE:
3     Q.  Did you know the people in the human resources
4  department up on the second floor at the courthouse?
5     A.  Yes.
6     Q.  Did you ever go and talk to them about your
7  conversations with Mr. Munoz and Ms. Cantu and your
8  sister?
9     A.  No.
10     Q.  You knew Manny Villarreal up there, right?
11     A.  Yes.
12     Q.  Did you ever go talk to him about it?
13     A.  No.
14     Q.  Ever go up on the fourth floor and report it to
15  the attorneys up there?
16     A.  No.
17     Q.  Ever go to the DA's office and report it there?
18     A.  No.
19     Q.  Or the judge, Judge Hinojosa, or any of the
20  commissioners?
21     A.  No.
22     Q.  Okay.  So in terms of the county administration
23  there in the building there at 964 East Harrison,
24  Brownsville, Texas, you never went and told them
25  anything about your suspicions or concerns about what

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 205

1              ERRATA SHEET/SIGNATURE PAGE
2  PAGE LINE CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  I, RUTH WEAVER McGINNIS, have read the foregoing
   transcript and hereby affix my signature that same is
15  true and correct, except as noted above.
16  _____
            RUTH WEAVER McGINNIS
17
18  THE STATE OF TEXAS
19  COUNTY OF CAMERON
20        SUBSCRIBED AND SWORN TO BEFORE ME, the
21  undersigned authority on this the _____ day of
22  _____, 2006.
23
24  _____
            Notary Public in and for
25            The State of Texas

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

# EXHIBIT NO. 2

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Weaver's
Amendment Speech Claims

**THE STATE OF TEXAS** )(
**COUNTY OF CAMERON** )(

**BEFORE ME** the undersigned authority on this <u>02nd</u> day of _____ <u>August</u> _____,

<u>2002</u> personally appeared _____ <u>Ruth Weaver</u> _____ who after being by me duly sworn did depose and say: My name is Ruth A. Weaver, I am 35 years old and I live at 718 Balboa in Rancho Viejo, Texas. I am currently employed as Executive Secretary for Tax Collector Tony Yzaguirre. I began my employment with Mr. Yzaguirre February 1994 as a Secretary. I believe within a year Mr. Yzaguirre made me his Executive Secretary. My duties were supervise and maintain general office procedures, and I would answer to Mr. Yzaguirre.

About a year ago in 2001 I started receiving title paperwork from Enrique Barrera Sr. and Enrique Barrera Jr., Moise Torres, and his brother whose name I don't know, under the instructions of my boss Tony Yzaguirre. My instruction were to take the title paperwork and deliever them to Lupita DeLeon. If Lupita was not in the office, I was to take the title paperwork to Julio Hernandez, as per Mr. Yzaguirre's instructions. Most of the time Moises Torres or his brother and Enrique Barrera Sr. or Enrique Barrera Jr. would come in carrying paperwork to see Mr. Yzaguirre. Mr. Yzaguirre would then hand me the paperwork to take to Lupita who would take care of the process or what ever needed to be done. Sometimes when I would be given the paperwork I would notice that the paperwork were titles. In some of these title's that I would be handed, I notice that there were some irregularties. A title is not suppose to have any kind of alterations like white-out marks, interlenation on the names which appeared on the title as per employee training. Most of the time I would be handed from 5 to 10 titles a day to hand over to Lupita or Julio. It was rare that I would receive one title to be handed over. On several ocassions I would over hear Lupita tell Julio to process the title paperwork for Mr. Yzaguirre. So I knew that the title paperwork was going to be processed. Moises Torres, Moises' brother, Enrique Barrera Sr, Enrique Barrera Jr. would wait for the title paperwork to be processed. If Mr. Yzaguirre was present, Lupita would hand over the processed title paperwork to him. Then Mr. Yzaguirre would give the processed title paperwork to who ever it was that was waiting for the paperwork. Sometimes Mr. Yzaguirre would call them into his office to give them the paperwork. If Mr. Yzaguirre was in a hurry, he would handed over the paperwork to them outside of his office. If Mr. Yzaguirre was not present then Lupita would hand over the processeed title paperwork to whom ever it was that was waiting. Sometimes Mr. Yzaguirre would tell these men to go and pick up the processed title paperwork at the dealers section, which was with Julio Hernandez. It was very important to Mr. Yzaguirre to know how many titles were brought in by either of these people that I have named. Mr. Yzaguirre would ask to give him a count of each of them.

**THIS IS A TRUE AND CORRECT STATEMENT TO THE BEST OF KNOWLEDGE AND MEMORY.**

_signature_

**SUBSCRIBED AND SWORN** to me on this 2 day of August 2002 A.D.

_signature_

**NOTARY PUBLIC IN AND FOR CAMERON COUNTY, TEXAS.**

GRACIE L PAREDES
Notary Public
STATE OF TEXAS
My Comm. Exp. 04 - 26 - 2005

# EXHIBIT NO. 3

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Weaver's
Amendment Speech Claims

THE STATE OF TEXAS     §
COUNTY OF CAMERON   §

     BEFORE ME, the undersigned authority in and for Cameron County, Texas, on
__Tuesday_ this the _11_ day of __July__ , 2002, A.D., did personally appear, __Anita
Llorente__ , who after being duly sworn did depose and say: My name is __Anita Llorente.__
I am _55_ years old. My date of birth is _01-21-47_ . I reside at _205 Avenida De La Plata
Brownsville_ , Texas Cameron County. My telephone number is _(956) 542-0472_ . I
am employed by Cameron County Tax-Office and the telephone number is (956) 544-
0800 .

     I was called by Mr. Victor Alvarado to ask me several questions about the money that
was inside the box that we have at the break room. The money that was deposit was to
buy food supplies when needed. The coffee was for .25 cents, two slices of bread for 25
cents well I Anita Llorente was in charge of preparing the coffee in the mornings, and
was also in charge of making a list of the food supplies needed for example bread, cream,
coffee. Sugar, butter and other stuff. How much I would get out of the box was more less
$25.00 dollars to $25.00 dollars and as far as how much money was left inside the box I
remember me and Norma or sometimes Maribel and Linda we would count the money
and about $40.00 dollars to $50.00 dollars was left, and that was without counting the
money that was taken out to buy the food supplies that were needed. After the food
supplies were bought we would put the receipt inside the small can which did not have a
key but was secured with a small piece of paper a scotch tape and that was all that would
secure the money.

     I was then told that I was no longer in charge of making the coffee because I needed to
be in the front line where taxes were paid, and since then I know that is the amount that
should be inside the box ($40.00 to $50.00 dollars/month) which has a key. I think the
reason for the box was because there was an incident that happened which I feel ashamed
of telling but I think it is necessary for me to say. I got $20.00 dollars to buy stuff that
was needed, between Maribel and me who at the time worked with us, we got $20.00
dollars, and made a comment to Maribel that what ever change was left over, I was going
to buy Halloween decorations. I do not remember how much money was left but I
remember I bought about $15.00 dollars or more, and I put money out of my own. I was
then told by Mary Galan that I needed to return the money that I had taken out of the box
because that money was not for other things other than food supplies. That incident

caused that my supervisor (Lupita) get in trouble because apparently, she had been the one that had approved for me to take money out, and because of that I felt bad because it had been my fault and I had caused a lot of problems for something that was insignificant of things that were bought for the office. I then went ahead and deposited $20.00 dollars that had been taken out and because of that incident a box with a lock was placed so no one would take money out.

P.S. This for me is very embarrassing because we are all adults and we are acting like little kids not from kinder but like pre- kinder. I do not want to get no one in trouble you ask me what happened that is what happened

I would like to state that I give this statement under my own free will. I have not been threatened or promised anything in return for my statement. I have read my statement and I find it to be true and correct to the best of my knowledge and ability.

*Anita R. Clemente*

**Victim**

This Statement was translated from Spanish to English to the best of my ability.

Sworn and subscribed to before me on this the **11** day of **June, 2002,** A.D.

**Texas Peace Officer**

THE STATE OF TEXAS    §
COUNTY OF CAMERON    §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on Friday this the _31_ day of _May_, 2002, A.D., did personally appear, _Vickie Saldana_ , who after being duly sworn did depose and say: My name is _Vickie Saldana_ . I am _27_ years old. My date of birth is _10-25-1972_ . My work address is _954 E. Harrison St._ _Brownsville_ , Texas Cameron County. My telephone number is _____. I am employed by _Cameron County Tax-Office and the phone number is (956) 544-0800_ .

Most of us auto-tax office employees at the Brownsville Main office started pitching in money for food supplies, such as coffee, loaf of bread, sugar, cream, jelly, cups, plastic utensils and napkins about 4-5 years ago. The money was being put on an empty small coffee jar that had a plastic lid with a small opening on the top so money could easily be inserted whether it be bills of coins. This jar had approximately $40.00 to $60.00 dollars on a monthly basis. To buy the food supplies Linda Vallejo, Mary Galan Ramos, Anita Llorente or myself Virginia Saldana would always get a witness to see either one of us count the money being removed from then coffee jar which was always no more than $25.00 dollars to buy supplies needed. We would then count the money, take it, and buy the supplies needed, and bring back the change together with a receipt. Both were always placed in the money jar and everything was kept well organized , up until last year around October or November 2001 that an incident happened. Anita Llorente had bought some Halloween decorations to decorate the auto department, she was going to buy more stuff and while commenting this to Lupita De Leon, Automobile Registration Supervisor, she then okayed for Anita Llorente to get some money out of the jar to buy whatever else she needed to finish her decorating. Now before I go on, Lupita De Leon is also a contributor for food supplies and as per Anita Llorente, Lupita would give her either $5.00 dollars a week or $10.00 dollars on payday as her contribution. When several employees learned about this, they were very upset . The amount that Mrs. Llorente had used to purchase those decorations was no more than $20.00 dollars. Ruth Weaver and myself we heard about such incident and then Ruth Weaver told me to start looking at the Corporate Express catalogue to see if I could find a moneybox with a key lock so we could purchase it. I then found a good sturdy metal box and it was ordered. When we received the box we thought of having a small opening drilled at the top so money could be inserted in there. I then called Mr. Javier Shears of the Maintenance Department and he was able to take the metal box and drill it for us before we would put it back at the

coffee break area. When Mr. Shears brought the box back, I then suggested to Ruth Weaver that we should give Mary Galan Ramos one of the two keys so she could have control of the box and the money. At that point Ruth Weaver told me that "as per Mr. Yzaguirre" she was now going to be in control of both keys so that no money would be out of that box without approval.

The first time she went to buy food supplies she got Mary Galan Ramos as a witness of the $40.00 dollars she got to buy supplies, something we would never do because $40.00 dollars was too much money for what we would get. Ruth Weaver never showed the receipt where she had gotten the supplies much the less the change she should have gotten back. After that time, she never got any witnesses to see her count the money before taking it to buy supplies or even show any receipts after purchases were done. Employees started getting very upset about this whole situation because they would put in money and she would not buy the supplies needed, and if you would tell her that we were running out of supplies, like Linda Vallejo did in an occasion, she told Linda that she could not be stopping at HEB on a weekly basis just to buy a loaf of bread or two. For a while we'd spend weeks without any food supplies at the coffee break. It was not until Ruth Weaver had a chance or wanted to go to the store and buy the supplies needed for all of us. Several occasions Mary Galan Ramos made a list of the supplies needed, and even offered to go buy the stuff but Ruth Weaver would then coincidentally tell her that, for that day she had to do some grocery shopping for her house so she would bring the food supplies for us by the following day. About a week ago, Mr. Yzaguirre started making some office changes. I then approached him and asked him about the moneybox we had in the back at the break area. He then told me that "he did not know what I was talking about, that he was not aware of that moneybox, much the less put Ruth Weaver in charge of it."

On May 30, 2002, the cash box was opened by Sergeant Victor Alvarado in front of Linda Vallejo and Mary Galan Ramos and myself at his office. To our astonishing surprise, we found $8.00 dollars and some cents with only one receipt dated 5-10-02. I think this very unfair, because that moneybox should have had more than that amount. I would roughly say about $115.00 to $120.00 dollars. The way I calculate this is, if on a monthly basis $40.00 dollars are collected minus $25.00 dollars or less to buy food supplies starting on December 2001 to May 2002, that leaves me with the above mentioned amount. I am still in shock of such finding. This should have never been done to us employees. Ruth Weaver had no business getting that moneybox because in the first place she had never gone to the store to buy food supplies for us before. I guess we all trusted her because since she said Mr. Yzaguirre had put her in charge of that box,

we then couldn't say much about it. And all this only to later find out she had lied to us all along.

I would like to state that I give this statement under my own free will. I have not been threatened or promised anything in return for my statement. I have read my statement and I find it to be true and correct to the best of my knowledge and ability.

_____
Victim

Sworn and subscribed to before me on this the 31 day of May, 2002, A.D.

_____
Texas Peace Officer

THE STATE OF TEXAS    §
COUNTY OF CAMERON    §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on
___Monday_ this the _03_ day of _June_, 2002, A.D., did personally appear, _Linda Vallejo_, who after
being duly sworn did depose and say: My name is _Linda Vallejo_. I am _39_ years old. My date of birth
is _08-27-62_. I reside at _4906 Las Palomas Brownsville_, Texas Cameron County. My telephone number
is _(956) 546-4208_. I am employed by _Cameron County Tax-Office and the phone number is (956)544-
0800_.


Here the co-workers here at work started sometime ago to collect money to buy bread and stuff so we could eat
breakfast here at the office so we put a coffee can and pitched in and we would buy coffee, bread, butter, and jelly
charging .25 cents for 2 slices and .25 cents for coffee cup and whatever was collected we would just keep buying the
items as needed. Anita, Mary, or Vickie would usually take out money, always with a witness (so no problems would
arise) we would take about $20.00 and buy the stuff and always bring back a receipt and put it in the coffee can. We
usually had in the coffee can approximately $100.00 or more per month.

Early October of 2001 Anita Llorente took out $20.00 dollars out of the coffee money and bought Halloween
decorations to decorate the office. Anita was going to put the money back on payday. Since that incident Ruth Weaver
took over the bread money. She brought a money box which had a hole done on it so the money could be deposited in
and no one would take money and she would be the only one in charge of the key and stated, that "As per Mr.
Yzaguirre, she was in charge." The first time she took over and she brought supplies Mary Galan was the one that she
called to witness, she Ruth took over $40.00 to buy supplies and brought only about $10.00 worth of stuff and did not
bring back a receipt. Since then we have only had her bring bread maybe 4 times and no one was ever called to verify
as to how much money the box had. I would also phone her to remind her on getting bread and she would say, "She
did not have the time."

I would like to state that I give this statement under my own free will. I have not been threatened or
promised anything in return for my statement. I have read my statement and I find it to be true and correct to the best
of my knowledge and ability.

_Linda Vallejo_
Victim


Sworn and subscribed to before me on this the _3_ day of _June_, 2002, A.D.

Texas Peace Officer

THE STATE OF TEXAS  §
COUNTY OF CAMERON  §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on
 Tuesday this the  11 day of   June , 2002, A.D., did personally appear,  Mary Galan
Ramos , who after being duly sworn did depose and say: My name is  Mary Galan
Ramos . I am  27 years old. My date of birth is  08-29-1974 . I reside at  375 Billy
Mitchell Apartment # 310 Brownsville , Texas Cameron County. My home telephone
number is  (956) 986-0435 . I am employed by Cameron County Tax-Office and the
phone number is (956) 544-0800.


On May 30, 2002, investigator Victor Alvarado called Linda Vallejo  Vickie Saldana,
and myself to his office. He asked us about the moneybox that was in the storage used
for buying groceries like coffee, napkins, cups, and etc. I explained to him that we used
to have an open container, before the lock box and everybody would pay 0.25 cents for 2
slices of bread and .25 cents for a cup of coffee and the persons usually bringing the
groceries would be Vickie Saldana, Anita Llorente, Linda Vallejo, or myself. We would
usually get about $20.00 to buy groceries needed and we would always have a witness at
the time we would get money out of the container and at the time we would bring back
the receipt with whatever change was left and were placed inside the container.

On October 2001, Anita Llorente got $20.00 out of the container to purchase
Halloween decorations for the automobile department, but people started complaining
that it was not fair for her to use the coffee break money to buy decorations. Anita
Llorente paid the $20.00 back and the problem was settled. After the incident happened,
Ruth Weaver told us that as per Mr. Yzaguirre, they were going to buy a lock box and it
would be used instead of the container we had so the money would be in a safe place and
that as per Mr. Yzaguirre she would be in charge of the key and of buying the groceries.
Ruth Weaver called me once to witness and count the money in the box because she was
going to go buy groceries that were needed. I remember that she took out about $40.00 to
buy the groceries, but she did not call me to witness how much she had spent and if she
brought back a receipt. Vickie Saldana and Linda Vallejo asked me if she had brought
back a receipt and I told them that she did not call me to witness how much she had spent.
I then asked them if she had called them and they told me she had not called them either.

Apparently when investigator Victor Alvarado called us to ask us about the moneybox,
he counted the money inside the box and only eight dollars and some cents with only one

*Mary Galan Ramos*

receipt were inside the box. That can't be because when we used to have a regular opened container, we would always have around $50.00 to $75.00 dollars and now that we have a lock box we only have eight dollars and cents since the lock box was purchased sometime back in November of 2001.

I would like to state that I give this statement under my own free will. I have not been threatened or promised anything in return for my statement. I have read my statement and I find it to be true and correct to the best of my knowledge and ability.

Mary Colom Ramos
**Victim**

**Sworn and subscribed to before me on this the** _11_ **day of** _June_ ,
2002, A.D.

Det. Victor Almarez
**Texas Peace Officer**

# EXHIBIT NO. 4

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Weaver's
Amendment Speech Claims

DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS

COUNTY OF CAMERON

"I declare under penalty of perjury under the laws of the United States of America that the attached Exh. 1 is a true and correct copy of pages from the deposition of Plaintiff Ruth Weaver McGinnis. The attached Exh. 2 is a true and correct copy of Exh. 1 to her deposition. The attached Exh. 3 are copies of statements provided by Defendant Yzaguirre in discovery. I declare under penalty of perjury that the foregoing is true and correct."

Executed on March 1, 2006.

ROGER W. HUGHES