# EXHIBIT NO. 1

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

VICENTA CANTU, ET AL          X
                              X
                              X
VS.                           X   CIVIL ACTION NO. B-03-096
                              X
                              X
CAMERON COUNTY, ET AL         X

---

ORAL DEPOSITION OF VICENTA CANTU
FEBRUARY 7, 2006
VOLUME 1

---

Volume 1 of the Oral Deposition of VICENTA CANTU,

who resides in Cameron County, Texas, taken by Craig

Vittitoe, Attorney for Defendant Tony Yzaguirre, Tax

Assessor-Collector of Cameron County and Director of

Cameron County Automobile Crimes Enforcement Task Force

in His Individual Capacity, reported by SHELLEY

STINGLEY, Certified Court Reporter in and for the State

of Texas, on FEBRUARY 7, 2006, in the offices of Adams

& Graham, 222 East Van Buren, West Tower, Harlingen,

Texas.

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:

GAY E. GILSON
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301-A
Corpus Christi, Texas 78401
DAVID LEE McGEE
LAW OFFICES OF DAVID LEE McGEE
701 Park Avenue
Corpus Christi, Texas 78401

COUNSEL FOR DEFENDANT TONY YZAGUIRRE, TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR OF
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE IN HIS INDIVIDUAL CAPACITY:

CRAIG H. VITTITOE
ROGER W. HUGHES
ADAMS & GRAHAM
222 East Van Buren, West Tower
Harlingen, Texas 78550

COUNSEL FOR CAMERON COUNTY:
BRUCE HODGE
CIVIL LITIGATION
LEGAL DIVISION COMMISSIONERS COURT
Cameron County Courthouse, 4th Floor
964 East Harrison Street
Brownsville, Texas 78520

CHARLES WILLETTE, JR.
HEATHER SCOTT
WILLETTE & GUERRA
1534 East 6th Street, Suite 200
Brownsville, Texas 0 78520

ALSO PRESENT:
Tony Yzaguirre
Felix Munoz

## BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 4

19  Transaction for customer Leticia
    Garcia ........................... --

20  Transaction No. 03120037117141437    --

21  Transaction for customers Rosa Maria
    and Alejandro Garza ................ --
22  Transaction for customer Gerardo
    Gonzalez ........................... --

23  Transaction No. 03100737069163653    --

24  Transaction for customer Charlene
    Townsend ........................... --
25  Affidavit of Felix Munoz .......... --
26  Memorandum to Felix Munoz from Tony
    Yzaguirre .......................... --

27  Memorandum to Cameron County Tax
    Assessor-Collector's Office Personnel
    from Tony Yzaguirre dated 6-26-03 ... --

28  Memorandum to Eniel Barreda from Linda
    Garcia dated 5-23-03 .............. --
29  Photocopy of Ms. Cantu's calendar
    for 2001 ...................... 277

30  Photocopy of Ms. Cantu's calendar
    for 2002 ...................... 277
31  Handwritten note dated 1-9-01 ....... 278

INFORMATION REQUESTED FOR WITNESS TO PRODUCE:

1  Anything inappropriate by Luzceros
   Motors ................................ 157
2  Any other written documentation
   regarding the tax assessor's office or
   Mr. Yzaguirre regarding lawsuit ....... 282
3  Original spiral notebook and original
   calendars ......................... 284

## BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 3

INDEX - VOLUME 1

Appearances ........................................1
Examination by Mr. Vittitoe ....................5
Errata Sheet/Signature page .....................304
Reporter's Certificate ..........................305

DOCUMENTARY EVIDENCE

Ex. No. Description                        Iden.
1  Transaction No. 03110136550154532    230
2  Transaction No. 03100036551135724    242
3  Transaction No. 03120136562114118    251
4  Transaction No. 03130536684145304    269
5  Transaction No. 03120036766083710    --
6  Transaction No. 03100736788133454    --
7  Transaction No. 03100736799155501    --
8  Transaction No. 03100736799150035    --
9  Transaction No. 03100736821144746    --
10 Transaction No. 03100736837140526    --
11 Transaction No. 03100736848112715    --
12 Transaction No. 03100736859151920    --
13 Transaction No. 03100036862141246    --
14 Transaction No. 03120037054083537    --
15 Transaction No. 03100736878154042    --
16 Transaction No. 03120037278111141    --
17 Transaction No. 03100036911104513    --
18 Transaction for customer Elizabeth
   De Leon ............................ --

## BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 5

```
 1              VICENTA CANTU,
 2  having been duly sworn, testified as follows:
 3              EXAMINATION
 4  BY MR. VITTITOE:
 5      Q. Please state your name.
 6      A. Vicenta Barajas Cantu.
 7      Q. Mrs. Cantu, how old a woman are you?
 8      A. I'm 41.
 9      Q. Okay.  And what's your date of birth?
10      A. December 15th, 1964.
11      Q. And where were you born?
12      A. In Matamoros.
13      Q. Did you go to school in Matamoros?
14      A. No.
15      Q. Where did you go to school?
16      A. Elementary was Annie S. Putegnat; middle school
17  was Faulk; and high school was Porter.
18      Q. All in Brownsville, Texas?
19      A. Yes, sir.
20      Q. Did you graduate from high school?
21      A. Yes, I did.
22      Q. What year did you graduate from high school?
23      A. 1984.
24      Q. Could you say that again?
25      A. 1984.
```

## BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 6

1    Q.  And you graduated from what school?
2    A.  Porter High School.
3    Q.  Okay.  And after that did you further your
4    education?
5    A.  I went to college for a semester.
6    Q.  Where did you go to college for a semester?
7    A.  Southmost, Texas Southmost College.
8    Q.  In Brownsville?
9    A.  In Brownsville.
10   Q.  What year did you go to college for a semester?
11   A.  I graduated in '84, in May, and I went for the
12   summer semester of '84.  Then I dropped out.  I didn't
13   continue.
14   Q.  So you went the summer semester of 1984 to
15   Southmost?
16   A.  '84, yes.
17   Q.  Did you complete any of the credit hours at
18   that time?
19   A.  I don't even remember.
20   Q.  Did you drop out?
21   A.  Yes.
22   Q.  Okay.  Now, did you go to work thereafter?
23   A.  Well, I applied at the county and I got a job.
24   That's the reason why I quit school, was to start
25   working.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 7

1    Q.  Okay.  Prior to dropping out of college in the
2    summer of '84, did you work outside of the home?
3    A.  I had like a part-time job with a pediatrician,
4    with a doctor.
5    Q.  Okay, who was that?
6    A.  Horacio Mendiola.  It was just like for three
7    weeks or something like that.
8    Q.  What did you do for the pediatrician?
9    A.  I would just like give appointments to the
10   kids, to the patients.
11   Q.  Did you do this while you were a senior in high
12   school?
13   A.  No, I would go to college and then I would
14   work.
15   Q.  Okay, so you worked for the pediatrician while
16   you were going to Southmost for that summer session,
17   correct?
18   A.  Yes.
19   Q.  Other than that, did you have any other gainful
20   employment --
21   A.  No, sir.
22   Q.  -- prior to going to work for the county?
23   A.  No, sir.
24   Q.  Now, who are your parents?
25   A.  My mom is Rosa Araguz Barajas.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 8

1    Q.  Okay.
2    A.  She's deceased.
3    Q.  Okay.
4    A.  And my dad is Margarito Barajas Rosales.
5    Q.  Are you related to Leo Araguz from Harlingen,
6    our famous football player?
7    A.  No.
8    Q.  Okay.  You're not?
9    A.  No.
10   Q.  Okay, I notice you frowned so obviously you
11   didn't know who he was, but he's kind of famous up
12   here.
13   A.  Oh.
14   Q.  Okay, so your mother is deceased and your dad
15   is living; is that right?
16   A.  Yes.
17   Q.  What's your dad's name again?
18   A.  Margarito Barajas Rosales.
19   Q.  Okay.  And where does your dad live?
20   A.  In Matamoros, Mexico.
21   Q.  In Matamoros, Texas?
22   A.  Matamoros, Mexico.
23   Q.  Matamoros, Mexico.  Sometimes I wonder.  We're
24   so close here on the border.  Has he ever resided in
25   the United States of America?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 9

1    A.  No, sir.
2    Q.  So he is a Mexican citizen to this day?
3    A.  Yes, sir.
4    Q.  Okay, and I would assume that you've gained
5    your citizenship to the United States of America,
6    correct?
7    A.  My mom was a U.S. citizen.
8    Q.  Okay.  So you are a citizen of the United
9    States of America?
10   A.  Yes, sir.
11   Q.  Okay.  And when did you become a citizen of the
12   United States of America?
13   A.  I had the resident alien card since I was a
14   little girl and then I got my citizenship like in '9 --
15   1989, I think.
16   Q.  1999?
17   A.  '89.
18   Q.  1989?
19   A.  Uh-huh.
20   Q.  Did you go to a ceremony where you were sworn
21   in?
22   A.  Yes, I did.
23   Q.  Where did you go?
24   A.  It was in Brownsville, the civic center.
25   Q.  And who presided?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    A. I was the only one.
2    Q. Okay. Did people report to you? Were you a
3  supervisor at any time of anyone during that period of
4  time?
5    A. I wasn't a supervisor.
6    Q. You were not a supervisor?
7    A. No.
8    Q. In other words, you had performed your duties
9  as clerk and you were promoted to head clerk, which was
10  with a change in pay, but the job basically remained
11  the same?
12    A. I was responsible for the money. I was
13  responsible for books. I was responsible that
14  everybody balanced, turned in their money before the
15  end of the day. That's what I would do.
16    Q. Okay, so your job duties did change from clerk
17  to head clerk?
18    A. I had more responsibilities.
19    Q. But you never engaged in the role of being a
20  supervisor of anyone else, correct?
21    A. Yes, sir.
22    Q. That's correct. Now, back from '93 to 1999,
23  you as head clerk and other title auto clerks reported
24  to Lupita de Leon, correct?
25    A. Yes, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    Q. Anyone else other than the head clerk and auto
2  clerks report to Lupita de Leon during that period of
3  time?
4    A. Can you repeat the question?
5    Q. Yes, ma'am. What I'm trying to determine and
6  understand is about 15 people reported to Lupita de
7  Leon. Were they all auto clerks and you the head
8  clerk?
9    A. They were auto clerks and I was just the title
10  -- the head cashier.
11    Q. Head cashier. So your title was head cashier,
12  correct?
13    A. Yeah, that was my title.
14    Q. I think my question is were there any other job
15  titles that reported to Lupita de Leon during that
16  period of time other than you as the head cashier and
17  the auto clerks?
18    A. I don't -- no, I don't think so.
19    Q. Okay. When you became head cashier, what
20  additional responsibilities did you have for the pay
21  increase?
22    A. I was responsible to do the title report, get
23  all the titles, make sure that they were all counted
24  in, and then fixed up the way Austin wanted them
25  and send them to Austin.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    Q. Okay. Anything else?
2    A. That was it.
3    Q. Well, I thought you said you had to make
4  certain that the money --
5    A. I would count the money, issue back -- pick up
6  the money at the end of the day, make the deposit in
7  the mornings.
8    Q. Okay.
9    A. Have it ready for the armored car to pick it up
10  and get the title prepared, make the title report.
11    Q. Okay. Prior to that time, what were your
12  day-to-day duties that were different?
13    A. Before I was the head cashier?
14    Q. Yes.
15    A. I was a title clerk -- auto clerk. I would do
16  transfers, sell stickers, issue plates, help the
17  customers.
18    Q. Did you --
19    A. Answer the phone.
20    Q. Did you also do those duties when you became
21  head cashier?
22    A. No.
23    Q. You did not. So your duties actually changed?
24    A. They changed.
25    Q. And you didn't do the things that you were

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  doing before because you had different duties, correct?
2    A. Yes, sir.
3    Q. All right. And that relationship as head
4  cashier continued how long?
5    A. Until like '99, I think.
6    Q. Okay. Then what happened in 1999?
7    A. I was the title examiner.
8    Q. Okay, you were promoted to title examiner?
9    A. To be title examiner.
10    Q. Okay. Prior to your promotion to title
11  examiner, who was the title examiner?
12    A. There was no title examiner.
13    Q. Okay. So was this just a new position that was
14  created to accommodate you or what?
15    A. No, Lupita de Leon would check the titles, the
16  automobile supervisor, and then from there they would
17  go to me, the head cashier, and I would like check them
18  over before I sent them to Austin.
19    Q. I think my question is, until 1999, as I
20  understand it, there was not the position of title
21  examiner, correct?
22    A. There was no specific title examiner.
23    Q. Okay. What brought about, to your
24  understanding, this new position of title examiner?
25    A. For me to be promoted as title examiner?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    Q. Yes.
2    A. Okay, the experience I had with checking
3  titles.
4    Q. I don't think that's the question. Do you know
5  how this new position was created?
6    A. They applied for the grant and they got an auto
7  crime task force.
8    Q. Okay. Okay, so there became a grant that was
9  issued through the state, correct?
10   A. Yes, sir.
11   Q. And that state money provided what?
12   A. A grant to do the auto crime task force.
13   Q. Okay. And the purpose of the auto crime task
14 force was to prevent, as best you could, stolen
15 vehicles?
16   A. Stolen vehicles, fraud on paperwork.
17   Q. In other words, the purpose was to prevent
18 theft and stolen vehicles in connection with auto
19 sales; is that correct?
20   A. Yes, and --
21   Q. Okay. And this was a program that the state
22 made available, and the county, through the tax
23 assessor, applied for the grant monies and received an
24 award back in sometime around 1999, correct?
25   A. Yes.

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    Q. Okay. And, at that point in time, you were
2  assigned to the position of title examiner and part of
3  your pay came from the grant funds, correct?
4    A. Yes.
5    Q. Did all of your pay come from the grant funds
6  or do you know?
7    A. That, I don't know.
8    Q. Okay. Were there additional employees that
9  were hired to administer this grant?
10   A. Yes.
11   Q. Okay. And so at that point in time that you
12 became the head title examiner -- or, rather, the title
13 examiner, correct?
14   A. Yes, sir.
15   Q. You got a pay promotion, correct?
16   A. Yes.
17   Q. Mr. Yzaguirre gave you that pay promotion,
18 correct?
19   A. Yes.
20   Q. And what did you do?
21   A. I was responsible for checking each one of the
22 titles, the transactions processed in Cameron County.
23   Q. So each and every title transfer came across
24 your desk?
25   A. Yes, sir.

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    Q. About how many title transactions did Cameron
2  County typically have in 1999, 2000, 2001, 2002?
3    A. I would say over 200 titles a day from all the
4  branch offices.
5    Q. Okay.
6    A. Between like 250 to three or something like
7  that.
8    Q. So every title transaction came across your
9  desk?
10   A. Yes, sir.
11   Q. Would you say that there were literally
12 thousands?
13   A. A week probably, but not a day.
14   Q. Okay. Do you have any idea how many title
15 transactions are processed by the tax assessor each
16 year?
17   A. No.
18   Q. In other words, could you tell us whether it
19 was a thousand a week or a thousand a month?
20   A. A week, I would say over a thousand.
21   Q. Okay. So if there's 52 weeks in a year, you
22 would say there's about 52,000 transactions?
23      MS. GILSON: Object; form.
24   A. Probably, yes.
25   Q. I think that's my question. Do you know?

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1    A. I don't know the exact number.
2    Q. Do you know even close?
3    A. Probably you're right.
4    Q. In other words, I think my question is -- in
5  the year 1999, 2000, 2001, 2002, when you were the
6  title examiner, you testified that every title came
7  across your desk, correct?
8    A. They all did.
9    Q. They all did. But you can't tell us how many
10 came across your desk for any given year, can you?
11   A. It's not a specific number.
12   Q. Okay.
13   A. I can tell you a day maybe -- all days were
14 different.
15   Q. That's fair. I think my question to you,
16 ma'am, is do you know whether it's 10,000, 25,000,
17 50,000 or 100,000 or more titles a year? Do you know?
18   A. Probably 40, 45.
19   Q. Is that a guess?
20   A. Yes. I don't know the exact number.
21   Q. Okay. But you think that probably 200 titles
22 came across your desk on a given --
23   A. Daily.
24   Q. -- day, correct?
25   A. Daily.

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 50

1    Q. And when we say 200 titles a day, that doesn't
2  mean 200 pieces of paper, does it?
3    A. It's 200 transactions. Each transaction has a
4  title.
5    Q. Okay. And what you're saying is you estimate
6  that during that period of time about 200 transactions
7  would come across your desk, correct?
8    A. Yes.
9    Q. And the transactions would be multiple -- each
10 transaction had multiple pieces of paper --
11   A. Yes.
12   Q. -- correct? In other words, each transaction
13 was supposed to have certain documentation, correct?
14   A. Yes, sir.
15   Q. What sort of documentation would a typical
16 transaction have?
17   A. A title.
18   Q. Okay.
19   A. A 130-U form.
20   Q. That's a form by the state?
21   A. An application to apply for a title.
22   Q. Okay, an application. What else?
23   A. And a bill of sale.
24   Q. Bill of sale. Did you have to have a bill of
25 sale back in 1989?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 51

1    A. Not in '89 -- '99.
2    Q. Okay, did you have to have one in '99?
3    A. It was an office policy we had to have one.
4    Q. Was -- I think my question to you is did the
5  required documentation change over the passage of
6  years?
7    A. It changed.
8    Q. Okay. And back in '89, a bill of sale was not
9  required?
10   A. No.
11   Q. It wasn't required by the state, correct?
12   A. No.
13   Q. And in '99, was it required?
14   A. It was required.
15   Q. Was it required by the state?
16   A. It was an office policy.
17   Q. My question to you, ma'am, is was it required
18 by the state?
19   A. No.
20   Q. Okay. When did it become a requirement of the
21 state, if any -- or ever?
22   A. It was an office policy.
23      MR. VITTITOE: I'll move nonresponsive.
24   Q. Did it ever become a requirement of the State
25 of Texas during your time period at the tax assessor's

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 52

1  office?
2    A. Not when I was there.
3    Q. Okay. Now, who set office policy in the tax
4  assessor's office?
5    A. Mr. Yzaguirre.
6    Q. Mr. Yzaguirre could set policy and he could
7  change policy, couldn't he?
8    A. Yes.
9    Q. Did he do that?
10   A. Yes.
11   Q. Okay. Did anyone else have the authority
12 within the office to set policy or change policy other
13 than Mr. Yzaguirre while he was tax assessor?
14   A. He was the only one.
15   Q. Okay. So, again, back to the transactions, the
16 200 transactions, you and I would agree that each
17 transaction would require multiple pieces of paper --
18   A. Yes.
19   Q. -- correct? Now, the auto clerks at the
20 Brownsville office would not handle -- each of them
21 would not handle 200 transactions a day, would they?
22   A. Can you repeat the question?
23   Q. Yes, ma'am. Each of the auto clerks at the
24 Brownsville office would not handle 200 transactions a
25 day, would they?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 53

1    A. No.
2    Q. About how many would each --
3    A. Each of them?
4    Q. -- auto clerk handle?
5    A. It varied. 25, 20, 15.
6    Q. And that's based on your experience of being an
7  auto clerk yourself back in the '80s, correct?
8    A. Well, I would know because I would get a report
9  at the end of the day.
10   Q. Okay, that's helpful. So the auto clerks,
11 during the time that you were the title examiner,
12 commencing in 1999, would prepare reports, correct?
13   A. At the end of the day, they would get a status
14 report and it would say how many titles they processed
15 that day.
16   Q. So your testimony that they would handle 15 or
17 20 or 25, depending on the flow for a given day, is
18 based on your personal knowledge of the information in
19 those reports, correct?
20   A. Yes.
21   Q. Okay. But you would actually review about 200
22 transactions a day?
23   A. Yes.
24   Q. Okay. Did anyone else have your duties in 1999
25 when you became title examiner?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 202

1  demotion was that you lost your title; is that what
2  you're saying?
3      A. I lost my title. I was demoted to the front to
4  sell stickers.
5      Q. Okay. So you're telling me that he took away
6  your job description, your title, of title examiner?
7  Is that what you're saying?
8      A. He would harass me at work, too.
9          MR. VITTITOE: Object; nonresponsive.
10     Q. I want to make sure that I'm understanding.
11  Are you saying that he took away your job title of
12  title examiner at any time before you were terminated?
13     A. I kept the title but took off the duties.
14     Q. Okay. So you're saying that you didn't lose
15  your title; your duties changed?
16     A. Yes.
17     Q. Okay. And when did your duties change?
18     A. Lupita became the chief title examiner.
19     Q. Okay.
20          MR. VITTITOE: Objection; nonresponsive.
21     Q. When did your duties change?
22     A. Like November of 2001.
23     Q. Okay. I thought you said December.
24     A. November or December.
25     Q. Okay. November/December 2001 --

Page 203

1      A. I don't remember the exact month.
2      Q. Okay. Could it have been earlier than that?
3      A. No, it was around that time. It was November
4  or December.
5      Q. Well, that's pretty exact, November or December
6  of 2001. You believe your duties changed, correct?
7      A. Yes.
8      Q. Okay. And at that point in time, you're
9  telling us that Lupita de Leon took over the general
10  duties of title examiner, correct?
11     A. Correct.
12     Q. Now, she had been your supervisor for all these
13  many years, correct?
14     A. Correct.
15     Q. Okay. But you went, what, to the front, as I
16  understand it?
17     A. To sell stickers.
18     Q. Okay, to sell stickers. Did you handle any
19  more title examination work after November or December?
20     A. No.
21     Q. No. So until you were terminated, you handled
22  nothing but stickers?
23     A. The last -- no, the beginning of May, he sent
24  me to sell stickers. The last -- the other months, I
25  would just like help Marisol, whatever she needed, or

Page 204

1  -- but titles, I would check no more titles.
2          MR. VITTITOE: Okay. Object;
3  nonresponsive.
4      Q. My question is when did you end doing title
5  examiner's work as you understood it?
6      A. November or December of 2001.
7      Q. Okay. When did you start selling stickers?
8      A. The last week of April, the first week of May.
9  It was around that time, 2002.
10     Q. 2002. And when were you terminated?
11     A. May 17, 2002.
12     Q. Okay. What did you do between November and
13  December and April of 2002?
14     A. I would help Marisol, the data analyst. We
15  would put files. We would just be there because, I
16  mean, I couldn't check titles no more.
17     Q. Okay. So you remained in the same office
18  assisting Maricel?
19     A. Marisol.
20     Q. Marisol.
21     A. Correct.
22     Q. And what sort of things would you do with her?
23     A. We would do files for the reports. We would do
24  the status report -- that's if Lupita would reject any
25  titles -- answer the phone, give appointments.

Page 205

1      Q. Okay. So, as I understand what you're saying,
2  is that in November or December, you were told that
3  Lupita de Leon was going to undertake the
4  responsibility of handling the title examinations,
5  correct?
6      A. Correct.
7      Q. And were you told what you were going to be
8  doing at that time?
9      A. No.
10     Q. Okay. Who told you that you were no longer
11  going to handle the title examination role?
12     A. We got a memo, a letter.
13     Q. Okay. A memo that went out to the staff?
14     A. I got a copy. I don't know if it was given to
15  each one of the employees. Lupita -- I don't remember
16  if I got one or Lupita showed me hers, but there was a
17  memo saying that she was going to be the chief title
18  examiner.
19     Q. Say that again.
20     A. That she was going to be the chief title
21  examiner, Lupita de Leon.
22     Q. Okay, okay. Prior to Lupita undertaking the
23  role of chief title examiner, was there a chief title
24  examiner in the office?
25     A. No.

5c56540d-fb50-4f6b-acd1-9b806de51088

Page 230

1  documents in front of you that have been marked as
2  Exhibits 1 through 28? And also I'll represent for the
3  record that each individual document under an exhibit
4  number is Bates stamped. For example, the document
5  right after exhibit -- that's marked after Exhibit 1
6  constitutes Bates stamp 001. Do you understand that?
7      A. Oh, the one on the bottom, okay.
8      Q. See the Bates stamping at the --
9      A. At the bottom part.
10     Q. And if you will notice that documents marked
11 001 through and inclusive of 17 are all under Exhibit 1
12 and so forth. Do you understand that?
13     A. Yes, I do.
14     Q. Okay. Would you take a look at Exhibit 1,
15 which is Bates 1 through 17, and see if that can
16 refresh your recollection?
17         MS. GILSON: Just for the record, I
18 believe those marked No. 25, 26, 27, 28 are documents
19 that are not transactions. Those are other documents
20 which supported our claim that are not actually
21 transactions, just to make sure --
22         MR. VITTITOE: Okay. Exhibits 1 through
23 24 are auto transaction documents that are referenced
24 in the 7(a), correct?
25         MS. GILSON: Yes, I stipulate that, yes.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 231

1          MR. VITTITOE: We'll accept that
2  stipulation.
3      Q. All right.
4      A. Okay, that Exhibit 1 --
5      Q. What is 1 through 17? Have you looked at
6  Exhibits 1 through 17? No, no, no, I'm talking about
7  Bates 1 through 17.
8      A. Oh, okay.
9      Q. Maybe I need to clarify that. My
10 understanding, Bates 1 through 17 refer to Exhibit 1,
11 which is Transaction No. 03110136550154532; is that
12 correct?
13     A. Yeah, it's right here. That's correct.
14     Q. Okay. Did you talk about this particular
15 transaction, Exhibit 1, with Mr. Yzaguirre?
16     A. Yes, I did.
17     Q. What did you talk to him about?
18     A. This transaction, the paperwork was on hold
19 because it was sold for export.
20     Q. Okay.
21     A. The customer came in and we stamped the title
22 "Sold for export." Investigator Eli Tella stamped it
23 and signed it saying that it was sold for export and
24 gave it back to the customer.
25         Months later, the same transaction comes,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 232

1  the same vehicle, but with a Louisiana title. When we
2  put it in the computer, automatically it said that it
3  was already a rejection. It was a title that was on
4  pending files. We had it in the pending files. That's
5  what we call it. And I -- Julio brought me this. I
6  think it was Julio -- I don't remember who gave it to
7  me, but when we got it, we said, "We can't do it
8  because it shows that it was sold for export."
9      Q. Okay, so you're saying that the documents that
10 are Bates stamped 1 through 17 show that it was sold
11 for export?
12     A. The original title, yes.
13     Q. Okay.
14     A. The first title that they brought into the
15 office, which was a Louisiana title, it was sold for
16 export.
17     Q. Okay. But my question to you is, does any of
18 the documentation that you have in front of you, Bates
19 1 through 17, indicate that it was sold for export?
20     A. We have a purchase order showing that the
21 vehicle was sold to somebody in Reynosa, Mexico.
22     Q. Okay. And that is Bates stamped 11?
23     A. 11. And 12 tells you that it was sold for
24 export only.
25     Q. Do you know who prepared 11 and 12?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 233

1      A. The dealer.
2      Q. The dealer did? And where was the dealer from?
3  Keep the documents in order, if you could.
4      A. Yes. This was coming from Copart. It's an
5  auction place in McAllen. It's like -- they make
6  auctions. You know, they sell cars.
7      Q. So you're saying that the documentation shown
8  as Exhibit 1, Bates 1 through 17, was never processed
9  for title transfer at that time; is that correct?
10     A. In January of 2000, Ms. Valdes, Eshel Valdes
11 came and applied for a title.
12     Q. No, no, just answer my question. Was the
13 transaction, these documents, Bates 1 through 17,
14 processed for title transfer and was there a title
15 transfer issued at that time?
16     A. Okay, let me explain. That's what I'm trying
17 to explain you. In 2000 they came and applied for a
18 title. That was the title --
19     Q. And that's these documents in front of us?
20     A. It's this right here.
21     Q. Okay.
22     A. Okay. They issued a title. It was done in one
23 of the branch offices. They processed the title, but
24 when it got to the task force and they didn't have a
25 bill of sale so in the back it said, "Jose Luis

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

1  Aguilar," saying that he bought it from Louisiana. He
2  didn't have no bill of sale from Louisiana over to his
3  name.
4      Q. Okay.
5      A. So what we did, I traced -- okay, "Jose Luis
6  Aguilar Auto Sales." That's what they have on the
7  bottom, "Auto Sales," "Aguilar Auto Sales." There was
8  no dealer with that name in the State of Texas.
9      Q. Who was the applicant for title transfer?
10     A. Valdes, Eshel Valdes.
11     Q. Okay.
12     A. And the title was assigned to Jose Luis
13 Aguilar, and he gave her a bill of sale, but it's just
14 a regular bill of sale. It wasn't a purchase order.
15     Q. But at any rate, you believe that the title
16 documentation was not proper, correct?
17     A. It wasn't proper because that's not a purchase
18 order nor a bill of sale.
19     Q. Okay. And your objection to Exhibit 1 was
20 what?
21     A. That the seller, Mr. Aguilar, he wasn't a
22 dealer.
23     Q. Okay, now, are you keeping these in order?
24     A. They are in order.
25     Q. Okay. So your objection to the documentation

1  was that Mr. Aguilar was not a dealer?
2      A. He is not a dealer.
3      Q. And what else?
4      A. That he needed to provide her with a purchase
5  order.
6      Q. Are you also -- do you also have an objection
7  because it was for export only?
8      A. It was for export only.
9      Q. And because of that, you couldn't, in your
10 opinion, process the title in Cameron County?
11     A. We got a memo from Mr. Rios stating that any
12 vehicle sold for export needed to be registered in
13 Mexico or in order for them to bring it back, we needed
14 an invoice, a Tarjeta Inpedimentos, an HS Form 7 from
15 Customs --
16     Q. Now, where was the title at the time that this
17 documentation came to you, from what state?
18     A. It was a Louisiana title.
19     Q. Okay, a Louisiana title and you had a
20 Brownsville applicant wanting a title, correct?
21     A. Exactly.
22     Q. But under the state law, the Brownsville
23 applicant could apply for the title and pay the tax,
24 could he not?
25     A. No, because he didn't have a purchase order.

1  We needed a purchase order or a bill of sale from the
2  dealer, from Mr. Aguilar, saying that he sold it to
3  Ms. Valdes so we can collect sales tax.
4      Q. But that's not required by state law, is it,
5  and was it at the time?
6      A. A purchase order?
7      Q. Yes.
8      A. I think it was -- it was an office policy which
9  Mr. Yzaguirre implemented.
10     Q. Okay. But my question is, at the time of this
11 transaction, it was not required by state law?
12     A. Not by the state, but as an office policy, yes.
13         MR. VITTITOE: Okay. Object;
14 nonresponsive.
15     Q. My question to you, though, is at -- when was
16 this title transaction, Exhibit 1, when did it come to
17 your attention?
18     A. 2000. In 2000.
19     Q. Okay. And your objection is, in your opinion,
20 Mr. Jose L. Aguilar was not a licensed dealer, correct?
21     A. Correct.
22     Q. And, secondly, the transaction documents
23 indicated that it was to be sold for export only,
24 correct?
25     A. Correct.

1      Q. Correct. But notwithstanding, the applicant
2  came to you requesting a title to be issued in Texas
3  and wanted to pay the tax, correct?
4      A. Correct, but we needed a purchase order or a
5  bill of sale.
6      Q. Pursuant to office policy?
7      A. As per office policy.
8      Q. Okay. But other than for office policy, there
9  was no impediment for you processing the paperwork,
10 correct?
11     A. The bill of sale you needed, even if you would
12 bring it in from another state. The state requires one
13 because we were told that.
14     Q. Okay.
15     A. So we can collect sales tax.
16     Q. Okay. So, in your opinion, you brought these
17 deficiencies to the attention of Mr. Yzaguirre,
18 correct?
19     A. When the paperwork is put on hold, we put it on
20 hold. Then months later, somebody else comes -- the
21 title is rejected, "Sold for export." The lady comes
22 into the office and she tells us, "Yes, I bought it
23 from somebody from Matamoros." So the investigator
24 stamps the title, "Sold for export," and gives it back
25 to the lady. She takes the title.

Page 238

1    Months later, that same vehicle comes back
2  through our office with another title from Arkansas.
3  It's a different title. I don't know what they did
4  with the title. We gave it back to the lady.
5    Q. Okay.
6    A. Months later, it's the same vehicle with an
7  Arkansas title and it's from Rolando Garza, R. Garza
8  Motors.
9    Q. Okay.
10   A. So when Julio brings it over and tells me,
11 "Hey, you know they are trying to" --
12   Q. Is it Julio Hernandez?
13   A. Julio Hernandez. And I said, "You can't do it.
14 It pops up on the computer that, you know, we rejected
15 it because it was sold for export."
16   So he goes, "What do I tell them?"
17   "We can't do it."
18   So Mr. Yzaguirre calls me and tells
19 me, "Why did you reject it?"
20   And I said -- I told him the reason why.
21   Q. Okay, and --
22   A. "Just process it."
23   Q. What you're telling us is that originally the
24 title came to your attention as a Louisiana title?
25   A. It's a Louisiana title.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 239

1    Q. You found some deficiencies and the title work
2  was not processed at that time, correct?
3    A. It was processed but it was put on hold.
4    Q. Okay, that's what I meant.
5    A. Okay.
6    Q. It was put on hold. The title was never
7  cleared through the state, correct?
8    A. The person never got an original title.
9    Q. In other words, your office never sent the
10 paperwork to Austin?
11   A. It was put on hold.
12   Q. It was put on hold. And then the paperwork was
13 given back, I take it, to the applicant, correct?
14   A. The applicant comes, the lady, Ms. Valdes, and
15 the investigator stamps the title, "Sold for export,"
16 and gives it back to the lady.
17   Q. And then months later, time passes, and another
18 title comes in from another state on the same vehicle,
19 correct?
20   A. On the same vehicle.
21   Q. And this time the title is transferred from the
22 State of Arkansas?
23   A. From Arkansas.
24   Q. Okay. But the title appeared to be, other than
25 that, in order, correct?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 240

1    A. It came from R. Garza over to somebody else,
2  another lady.
3    Q. Okay.
4    A. Another Valdez lady, Laura Elena Valdez.
5    Q. Okay. And at that point, Ms. Valdez is the
6  applicant for title, correct?
7    A. Applicant for the title.
8    Q. And she's applying -- requested a title
9  transfer from a title issued out of the State of
10 Arkansas, correct?
11   A. It's an Arkansas title, wants a Texas title.
12   Q. And on the face of the Arkansas title, it
13 appears to be proper, correct?
14   A. Correct.
15   Q. All right. You brought that whole issue to the
16 attention of Mr. Yzaguirre, correct?
17   A. I did.
18   Q. Okay. Did you bring it to the attention of
19 anyone else in the department?
20   A. Julio.
21   Q. Okay. Other than Julio and Mr. Yzaguirre, did
22 you bring it to the attention of anyone else?
23   A. No.
24   Q. Okay. After you brought what you believed to
25 be discrepancies to Mr. Yzaguirre, what did he tell you

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 241

1  to do, if anything?
2    A. "Do it."
3    Q. Okay, go ahead and process it?
4    A. "Process it."
5    Q. Did you do that?
6    A. Yes.
7    Q. And did you make copies for yourself at that
8  time?
9    A. Yes, I did.
10   Q. Okay, all right. So from what I can tell is in
11 the year 2000, you started making copies?
12   A. Yes.
13   Q. For your own personal use, correct?
14   A. Yes.
15   Q. All right. Had you made copies before this
16 time for your own personal use?
17   A. No.
18   Q. Okay. Was this the first transaction that
19 caused you to make copies for your own personal use?
20   A. I don't remember. They all have different
21 dates. I'm not going to say this was the first one
22 because I don't remember.
23   Q. That seemed to be my impression of your answer
24 that maybe this was the first one. You just don't
25 know?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 242

1    A. I don't know.
2    Q. Probably one of the first?
3    A. Maybe.
4    Q. Okay.
5    A. Because they have different dates.
6    Q. All right. But at any rate, the title,
7    ultimately Mr. Yzaguirre said, "Process it," it was
8    sent to Austin. As far as you know, the title work was
9    cleared in Austin, correct?
10    A. Yes.
11    Q. All right. Let's go to the next one, which
12    would be Exhibit No. 2. And would you look at those
13    documents, the Bates stamped documents, and confirm to
14    me that we're looking at Transaction No. -- the last
15    five digits saying, "35724"?
16    A. 24, 25 -- on this one, I have 26, up to 26.
17    Q. Well, maybe it was typed wrong on the response.
18    Does this pertain to a transaction with Jose Angel
19    Mireles?
20    A. Yes, that's the name.
21    Q. Okay, all right. Would you look at the Bates
22    stamp pages for Exhibit 2?
23    A. Yes.
24    Q. And could you tell us for the record what those
25    Bates stamp numbers are, in other words what --

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 243

1    A. 0 -- I'm sorry. 000018.
2    Q. Okay. So 18 to where?
3    A. Through 000026.
4    Q. Okay. Let's just shorten it for purposes of
5    the testimony today, 18 through what?
6    A. 26.
7    Q. 26, all right. We'll use the last two digits
8    or three, as the case may be. So Bates 18 through 26
9    are transaction documents under Exhibit 2, correct?
10    A. Correct.
11    Q. All right. Take your time and look at those
12    documents and tell us what, if anything, you believe to
13    be defective or in error or wrong?
14    A. Okay, on this one, first of all, the thing that
15    caught my attention was that it was a Mercury -- a
16    Cougar, a four door. There's no Cougars that are four
17    door. They are all two door.
18    Q. Well, so what are you referring, that --
19    A. The body, body style of the vehicle.
20    Q. Okay, and you're referring to Exhibit 2?
21    A. Exhibit 2, 18.
22    Q. Okay. Okay, you're referring up on the top of
23    page 18 where someone has typed in the description as
24    being a Mercury four door but later --
25    A. On the title you can see it's a four door.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 244

1    Q. Right. But here in the body of Exhibit 18 it
2    refers to it as a Cougar two door?
3    A. Four door. Everything says four door.
4    Q. Well, no. It says, "2 door" right here.
5    A. When I saw the paperwork, the first thing I
6    would look at was the title.
7    Q. Well, who prepared this, Exhibit 18?
8    A. Marisol. She would type it.
9    Q. And it refers to it as a two door, correct?
10    A. It's a two door.
11    Q. Okay. Are Mercurys two doors or four doors? I
12    thought they were both.
13    A. No, not Cougars.
14    Q. Okay.
15    A. They are two doors.
16    Q. But at any rate, somebody somewhere made a
17    clerical error, correct?
18    A. It's correct. It's a two door.
19    Q. Okay, so the title is correct? It's a two
20    door?
21    A. The title says four door.
22    Q. All right.
23    A. But the Cougar is a two door.
24    Q. Okay, so someone somewhere prepared that in
25    error obviously?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 245

1    A. Yeah.
2    Q. Okay, so it's a minor error.
3    A. Okay, well, not that.
4    Q. That's not something that's major, is it?
5    A. No. The thing is when I got the paperwork and
6    I started looking at the paperwork, on the back of the
7    title -- on the front of the title it said it was
8    missing a release of lien saying the vehicle wasn't
9    paid off yet.
10    Q. So it was missing a release of lien, all right.
11    A. And the dealer is in La Porte, Texas.
12    Q. That's up in the Houston area?
13    A. And I keep looking at the paperwork and I have
14    a repossess affidavit signed by Esthela Guerra.
15    Q. Okay, what's improper about that?
16    A. I don't think a dealer from Houston is going to
17    come just to sign a repossess affidavit in Brownsville.
18    Q. But you don't know that, do you?
19    A. Well, no, I don't know, but I put it on hold
20    and I told the lady to bring me a bill of sale because
21    it was coming from a dealer from out of town.
22    Q. In La Porte, which is up by Houston. You know
23    that, right?
24    A. Yes, La Porte, sold it to J & M. It was from
25    La Porte, Steven or Steve's, over to J & M, and then

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 246

1  J & M over to Jose Angel Mireles.
2      Q. Okay, what other problems did you see with the
3  title?
4      A. I told Mr. Mireles, "Do you have a purchase
5  order?"
6          And he goes, "No, but I'll get you one."
7      Q. Okay.
8      A. So next time he brings me this, this one.
9      Q. Okay. And what does that purchase order show?
10     A. That he bought it from J & M.
11     Q. Okay, so logic dictates at one time this
12 vehicle was sold in La Porte and then ultimately it was
13 sold to a dealer in Brownsville, correct?
14     A. The original owner was from La Porte, missing a
15 repossess affidavit, which we have one signed by
16 Esthela Guerra.
17         I called the dealer and asked him, "Can
18 you fax me a copy of your repossess affidavit?"
19         And he tells me, "I don't have one because
20 I didn't repossess the vehicle. Well, I did," he goes,
21 "But I'm not going to fax you one because I have the
22 vehicle here and I sold it for export. What do you
23 need it for?"
24     Q. Okay. What else do you see wrong with this?
25     A. Well, when I was talking to the dealer, he

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 247

1  tells me, "I never sold it to that dealer, whatever
2  name you're telling me. This vehicle I sold to
3  somebody in Mexico. I had one of those wholesalers" --
4  they call them wholesalers, the people that go up North
5  or in Texas and they are pulling all those towing cars.
6  He said, "I sold it to a wholesaler to take it to
7  Mexico. I can even fax you a copy of my purchase
8  order, of my bill of sale."
9      Q. Okay.
10     A. This is what he faxed me.
11     Q. Okay.
12     A. He tells me, "That's the person I sold the
13 vehicle to."
14         MS. GILSON: For purposes of the record,
15 when you say, "This," can you refer to the document
16 number, please?
17         THE WITNESS: Okay, I'm sorry.
18     A. No. 25.
19     Q. Okay. You're talking about Bates 25, correct?
20     A. Bates 25.
21     Q. Bates 25. So what you're saying is you saw
22 some documentation showing a number of different
23 transactions involving this vehicle originating out of
24 La Porte; is that fair?
25     A. It's fair.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 248

1      Q. Okay. And you brought that to Mr. Yzaguirre's
2  attention?
3      A. No, it was pulled -- we made a file. Marisol
4  made a copy of the status report and it was in pending
5  files. One day he comes and asks me, "Where is the
6  paperwork? I need the file."
7      Q. Okay.
8      A. And I told him what was wrong and he just took
9  the file.
10     Q. Did he say anything to you?
11     A. He said, "Just give it to me."
12     Q. Okay, just --
13     A. I gave it.
14     Q. Okay.
15     A. And then on July 25th, he released the
16 paperwork.
17     Q. Okay, Mr. Yzaguirre released the paperwork?
18     A. Mr. Yzaguirre released the paperwork.
19     Q. In other words, when you say, "Released the
20 paperwork," he approved it to go to Austin to record
21 the title?
22     A. Yes, paperwork was given to Mr. Yzaguirre.
23     Q. Okay.
24     A. And he released it.
25     Q. Okay. What criticisms do you have of him for

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 249

1  doing that?
2      A. Can you repeat me the question?
3      Q. Yes, ma'am. What criticisms do you have of
4  your boss for approving the paperwork?
5      A. Well, when they are telling you what's wrong,
6  that it was sold for export, that the dealer is stating
7  that he never signed that repossess affidavit, that
8  somebody falsified his signature.
9      Q. But you don't know that for a fact?
10     A. Yes, I do, because I talked to the dealer.
11     Q. Well, you're not a handwriting expert, right?
12     A. But if the dealer is stating --
13         MR. VITTITOE: Object; nonresponsive.
14     Q. You're not a handwriting expert?
15     A. No, I'm not.
16     Q. And you have to filter through a lot of
17 information, correct?
18     A. Repeat me the question.
19     Q. You have to filter through a lot of
20 information, some of it which is reliable and some
21 which may not be reliable, correct?
22     A. I'm sure it was reliable. I got his phone
23 number from TxDOT, from his dealer license, his phone
24 number, his address, and the owner's name.
25     Q. Well, what we do know is that this particular

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 250

1   vehicle went through more than one car dealer, correct?
2   Right?
3      A. Well, Mr. Steven -- Steve sold it to this guy,
4   Jose Lara.
5      Q. Right, and then who did Lara sell it to?
6      A. J & M.
7      Q. Okay. Then who did J & M sell it to?
8      A. To Jose Mireles.
9      Q. Okay. So we have a number of different
10  transactions over a different period of time, correct?
11     A. Correct.
12     Q. All right. But at any rate, Mr. Yzaguirre
13  looked at the paperwork after he obtained it from your
14  office, and it's your understanding that he approved
15  the paperwork to go to Austin, correct?
16     A. He approved it.
17     Q. Did you ever protest or say, "You're wrong in
18  doing that"?
19     A. Not that he was wrong. Like you said, he was
20  the boss. But I would tell him when things were wrong.
21  And if the --
22     Q. No, I understand you would tell him when things
23  were wrong. I'm talking about this transaction,
24  Exhibit No. 2, Bates 18 through 26.
25     A. Through 26.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 251

1      Q. Did you ever at that time disagree with him or
2   say that he was doing wrong?
3      A. Yes, I did.
4      Q. You did? I thought you told me just a moment
5   ago that he came in and got the file --
6      A. No, he came in and he asked for the file. When
7   he asked for the file, I told him what was wrong with
8   the paperwork.
9      Q. Okay, I understand that.
10     A. And he just walked and took the file and I
11  never saw it again.
12     Q. Did you tell him that he was doing anything
13  wrong in connection with the handling of that
14  transaction, that he, Tony Yzaguirre?
15     A. Not on this file.
16     Q. Okay. Did you on any of these files?
17     A. The Angeles guy, I did.
18     Q. Okay, we'll talk about that --
19     A. When we get there.
20     Q. All right. Let's go to the next one, if you
21  could, Mrs. Cantu. We're talking about Exhibit No. 3.
22  And if you would tell me the Bates pages, where do they
23  begin?
24     A. 27.
25     Q. That would be 27 through what?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 252

1      A. Through -- I have 39.
2      Q. I'm sorry?
3      A. No. 39, 039.
4      Q. 27 through 39.
5      A. 39.
6      Q. Bates 27 through 39 is Exhibit 3. Take your
7   time and tell us what problems, if any, or deficits or
8   missing things, or whatever was wrong with the title
9   transaction.
10     A. Okay. In Exhibit 27 --
11     Q. Are you talking about Exhibit 3, Bates page 27,
12  correct?
13     A. 27, correct. On this transaction, Alfonso
14  Garcia and the seller -- it was from the original owner
15  over to Gunnels in Houston, and then from Gunnels over
16  to Charlie's, which had Liquid Papered the original
17  title.
18     Q. Had what?
19     A. Liquid Paper. The back of the title was
20  altered.
21     Q. The back of the title was altered?
22     A. Yeah, the second assignment.
23     Q. Where the endorsements are made?
24     A. Well, the assignment.
25     Q. That's not unusual, is it?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 253

1      A. Well, what do you -- yes, it is. Well, they
2   make mistakes, but they have to provide it with an
3   affidavit to a fact.
4      Q. In other words, people make mistakes sometimes.
5   In endorsing, they may not write the correct name or
6   their full name and they may make changes, whiteouts
7   and blackouts --
8      A. You just have to provide it with an affidavit
9   to a fact.
10     Q. Right, okay.
11     A. Which we do have an affidavit. Okay, then it
12  was sold from Charlie's over to Alfonso Garcia.
13     Q. That's correct.
14     A. Okay. When I got the -- when I saw the
15  affidavit -- and you're going to say I'm not an expert,
16  but I wasn't blind -- the signature on the title and
17  the affidavit to a fact, it's not the same.
18     Q. Okay, so in your opinion, you believe that the
19  signatures are forged; is that what you're saying?
20     A. Yes.
21     Q. But you're not an expert?
22     A. I'm not an expert so what I did, I called the
23  dealer --
24     Q. Ma'am, in your opinion, though, you believe the
25  signatures were forged?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 254

1    A. Yes, I do.
2    Q. Okay. Which signature was forged?
3    A. The Gunnels -- Karen -- the -- wait. I lost
4  it. Hold on. Okay, Karen Denner, the lienholder.
5    Q. I thought you said, "Gunnels."
6    A. Okay, no, I'm sorry, I've got it. Gunnels. I
7  called Gunnels and told him to fax me if he had sold it
8  to Charlie's.
9        MR. VITTITOE: Object; nonresponsive.
10   Q. What led you on the face of the documentation
11 to determine that the Gunnels' signature was a forgery?
12   A. The affidavit to a fact, Exhibit 37 --
13   Q. Let me see. Bates 37. You're talking about
14 Bates 37, correct?
15   A. Bates 37.
16   Q. All right. You're talking about the signature
17 on Bates 37?
18   A. And the one on the back of the title which is
19 Bates 35.
20   Q. It does not match, according to your testimony,
21 Exhibit 35, and you're talking about the signature up
22 here at the top of L.E. Gunnel on 35 as well as the
23 signature of L.E. Gunnel on 37, correct?
24   A. Correct.
25   Q. They look the same to me, but in your opinion,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 255

1  you don't believe they are the same?
2    A. No, so I called the dealer. I called Gunnel.
3    Q. Okay. All right, now, let me ask you, what
4  else on the face of the documentation did you believe
5  caused you some concern?
6    A. On the face of the title?
7    Q. Uh-huh.
8    A. The front? Nothing. It was the back, the
9  assignment.
10   Q. Okay, show me what you're talking about.
11   A. The Liquid Paper.
12   Q. Bates stamp 35, what did you see?
13   A. The second assignment, this part, where it's
14 assigned to Charlie's Auto Sales or Charlie's --
15 whatever his name is.
16   Q. Okay, what did you see wrong with that?
17   A. The affidavit of a fact he had, it didn't look
18 the same as the signature on the back of the title.
19   Q. So you're saying not only was the Gunnel
20 signature --
21   A. It's a Gunnel signature that I was -- I had a
22 doubt on Gunnels' signature.
23   Q. Did you have a doubt on anybody else's
24 signature?
25   A. Well, not just on this transaction.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 256

1    Q. That's what we're talking about, this
2  Exhibit 3.
3    A. Yes, I did.
4    Q. Okay, what other signature did you have a
5  problem with?
6    A. I already showed you the affidavit.
7    Q. No, I know that. Maybe I'm not asking the
8  question right. Other than the Gunnel signature on two
9  places, 35 and 37, Bates 35 and 37, did you have a
10 problem with any other signature?
11   A. No, not with the signature.
12   Q. Okay, then what's the problem with this on
13 Bates 35? Just the signature of Gunnel?
14   A. The signature of Gunnel.
15   Q. Okay. And you're saying that it's not the same
16 as shown on 37?
17   A. Exactly.
18   Q. Okay. Anything else?
19   A. Well, I called the dealer and he told me
20 that --
21   Q. No, no, anything else on the face of the
22 documents?
23   A. That's it. Just that.
24   Q. All right. Did you talk to Mr. Yzaguirre or
25 Lupita de Leon about those documents which are under

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 257

1  Exhibit 3?
2    A. Not at that moment.
3    Q. I didn't ask you about that moment. I'm saying
4  did you talk to Mr. Yzaguirre --
5    A. When he came to the office and asked for the
6  file, yes, I did.
7    Q. Okay.
8    A. And I explained him what was wrong with the
9  paperwork.
10   Q. Is there any way that you can tell us from
11 looking at the documentation within Exhibit 3 how long
12 the title transaction was on hold at the office?
13   A. Just the -- well, actually, just a couple of
14 days.
15   Q. Okay. So Mr. Yzaguirre, did he come to you or
16 did you bring this transaction to his attention?
17   A. He came to the office.
18   Q. All right. He came to your office, correct?
19   A. Correct.
20   Q. And what did he say to you or ask you or what?
21   A. If he could have the transfer -- the paperwork
22 for Alfonso Garcia.
23   Q. Did he ask you what was the problem with the
24 transaction?
25   A. He asked.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 258

1    Q. Did he say, "Why aren't you processing the
2  title," or what?
3    A. "Why are you holding the transfer?"
4    Q. Okay. And did you tell him?
5    A. I told him.
6    Q. What did you tell him, that the documentation
7  appeared to be forged?
8    A. I went one by one and told him, "This is what
9  we have. It's the dealer saying that he didn't sell it
10  to Charlie, that it was sold for export." Charlie
11  already came in, which was the owner of the car lot.
12  He came into the office, he talked to me. I explained
13  the owner of the car lot what was wrong and he said,
14  "Well, I'll give the customer the money back or he can
15  go by my car lot and I'll give him another car if he
16  wants to."
17    Q. Okay. But at any rate, somebody apparently
18  contacted Mr. Yzaguirre after that, after you told him
19  to return the money, right?
20    A. Four days later.
21    Q. Okay. And Mr. Yzaguirre came into your office
22  and said, "Why are you holding up this transaction?"
23    A. And I explained him.
24    Q. Okay, and what did he say?
25    A. To process the paperwork.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 259

1    Q. Did you accuse him of any wrongdoing or
2  anything improper in that transaction?
3    A. I told him what was wrong and I explained to
4  him.
5      MR. VITTITOE: Object; nonresponsive.
6    Q. Did you tell Mr. Yzaguirre that he wasn't
7  complying with the law or doing anything wrong?
8    A. On this one, I did. I told him that he wasn't
9  supposed to be approved, that it was wrong.
10    Q. Okay, what did you specifically tell him?
11    A. That this transfer was wrong, it couldn't be
12  approved because it was sold for export. It couldn't
13  be registered in the State of Texas.
14    Q. Okay, my question is this: Did you tell
15  Mr. Yzaguirre if somehow he cleared or had or caused to
16  clear this title work to Austin, that he would be
17  breaking the law, Mr. Yzaguirre would be breaking the
18  law?
19    A. I didn't tell him he was breaking the law.
20    Q. Did you ever tell him that?
21    A. I recall telling him, but I don't know on which
22  one, but I did call him.
23    Q. How many times?
24    A. At least like three or four.
25    Q. Okay, three or four times you told

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 260

1  Mr. Yzaguirre to his face that, in your opinion, he was
2  breaking the law?
3    A. Yes.
4    Q. Okay, let's go through those three or four
5  times.
6    A. I'm not going to remember the names. One of
7  them, I do remember, which was Angel. It's the time
8  that he threatened me.
9    Q. Okay. And what did you tell him with this
10  Angeles transaction, in which you say that
11  Mr. Yzaguirre threatened you? How did he threaten you?
12    A. He told me just to approve it, "It's none of
13  your business."
14    Q. Okay.
15    A. "Just do it. I'm telling you to do it. And if
16  you don't do it, you know what's going to happen to
17  you."
18    Q. And you -- that was the threat?
19    A. And I said, "What's going to happen to me?"
20      "Well, you know."
21      And I said, "Well, what's going to
22  happen?"
23    Q. Was that the threat? Was that the extent of
24  the threat?
25    A. For me, it was.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 261

1    Q. Okay. Did he threaten your life or your job or
2  anything like that?
3      MS. GILSON: Object; assumes facts not in
4  evidence.
5    A. Well, I'm not dumb. What do you think -- I
6  knew he was going to probably fire me because I wasn't
7  doing what he was telling me.
8      MR. VITTITOE: Object; nonresponsive.
9    Q. I'm asking you, is that the extent of the
10  threat, that he said, "You know what's going to happen
11  to you"?
12    A. At that time, yes.
13    Q. Okay. That's what we're asking about. We're
14  asking about each of the conversations that you had,
15  all right?
16    A. Several times he said, "If you don't do the
17  job, there's a lot of people that can do your job."
18      MR. VITTITOE: Object; nonresponsive.
19    Q. I'm talking about the Angeles transaction.
20  That's what we're talking about right now. And you
21  said that he said that, "You know what will happen with
22  you," and you consider that a threat, correct?
23    A. I consider that a threat.
24    Q. All right, all right. Did you tell him that he
25  would be breaking the law on the Angeles transaction?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 262

1    A. On that one, I told him -- I didn't tell him
2  specifically what you're saying.
3    Q. No, I want to know what you're saying.
4    A. I told him that it was the law, that's the
5  reason why the paper was on hold, and that he was doing
6  wrong.
7    Q. Okay. You told him specifically that he was
8  doing wrong?
9    A. He was doing wrong.
10   Q. In doing what?
11   A. In approving the paperwork.
12   Q. Okay. Did you tell him why he was doing wrong
13 in approving the paperwork?
14   A. Yes. Well, I explained him everything on the
15 paperwork --
16   Q. Okay.
17   A. -- what was wrong.
18   Q. Okay.
19   A. And I told him, "This is the reason why it's on
20 hold. The seller Fed Ex'ed everything overnight. They
21 don't want for us to process the paperwork."
22       And he goes, "Well, just do it."
23       And I said, "Well, it's wrong."
24   Q. Okay.
25   A. "That's not the law."

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 263

1        And he said, "Well, just do it or you know
2  what's going to happen to you."
3    Q. Okay. And are you saying that it happened on
4  -- I believe you said about --
5    A. Angeles.
6    Q. It happened on Angeles.
7    A. Angeles.
8    Q. Okay, and that was a transaction involving
9  Mr. or Mrs. Angeles?
10   A. I think it's a guy.
11   Q. A guy? You mean a customer?
12   A. A customer.
13   Q. All right.
14   A. His first name --
15   Q. It wasn't with a notary or with a used car
16 dealer?
17   A. I need to see the paperwork.
18   Q. All right. But you also told me that on a
19 couple of other occasions, as I understood you to say,
20 that you told Mr. Yzaguirre that if he approved the
21 paperwork, as I understood it, if he approved the
22 paperwork, that Mr. Yzaguirre would be violating the
23 law. Did you do that?
24   A. I think I did on one occasion, but not in those
25 words, like I'm telling you.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 264

1    Q. Okay, one more occasion besides Angeles?
2    A. I told him like -- yeah.
3    Q. Okay, what did you tell him?
4    A. That he was wrong, what he was doing.
5    Q. Okay, that he was wrong with what he was doing?
6    A. Approving the paperwork, that it wasn't
7  complying.
8    Q. Okay. You had your opinion and he obviously
9  had a difference of opinion you didn't agree with,
10 right?
11   A. Yes.
12   Q. And you would be forceful enough in your
13 opinion to say, "Mr. Yzaguirre, I believe so heartily
14 in my opinion that what you want to do is against the
15 law." Is that what you were saying? Or would you just
16 say it's wrong?
17   A. One time I told him it was against the law,
18 what he was doing.
19   Q. Okay. When was that one time and do you
20 remember the transaction?
21   A. I don't remember the transaction.
22   Q. You don't remember the transaction?
23   A. I don't remember the transaction.
24   Q. Do you remember the year?
25   A. No, I don't remember the year.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 265

1    Q. Do you remember if anyone else was present?
2    A. Well, most of the time Marisol was there. I'm
3  not going to remember years and names. I mean, you're
4  talking about -- it was so often --
5    Q. I don't think you do, either, but that's why
6  I'm asking the questions. I don't know how you would
7  remember, either, but I'm just asking the questions.
8  See, I don't know. I wasn't there. That's why I'm
9  asking these questions.
10       Did you ever -- what precise language did
11 you use in talking to Mr. Yzaguirre on the two
12 occasions where you accused him of violating the law?
13 One you told us was Angeles, and then there was another
14 transaction that you don't remember what the name was
15 or when it happened. I'm trying to ask you to tell me
16 exactly what you told this man right here to my left,
17 Tony Yzaguirre.
18   A. On the Angeles, yes, I remember telling him
19 that what he was doing was wrong, it was against the
20 law, and that it wasn't supposed to be approved.
21   Q. Okay.
22   A. He goes, "Just approve it."
23   Q. Is that the extent of what you told him and
24 what he told you about him violating the law?
25   A. Yes, because I never screamed at him like he

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 266

1  would scream at me.
2      Q. Okay. All right, on the other transaction that
3  you cannot recall the subject matter of the transaction
4  or the date or the year, what precisely do you recall
5  telling Mr. Tony Yzaguirre about the law if he approved
6  the transaction?
7      A. One was the dealers, too. I remember when he
8  came to my office and told me that I couldn't fax no
9  complaints. That, I don't remember the date, either.
10         MR. VITTITOE: Okay. All right, let me
11  object as nonresponsive.
12     Q. I have to make these objections. Within the
13  last few minutes you've talked about another
14  transaction other than the Angeles transaction. And in
15  this other transaction, you don't remember the year or
16  the date or the transaction subject matter, but you
17  recall confronting Mr. Yzaguirre with something about
18  if he approved the paperwork that he would be violating
19  the law. My question to you is this: What
20  specifically did you tell Mr. Tony Yzaguirre at that
21  time about him violating the law?
22     A. I told him that he was violating -- it was
23  wrong, what he was doing, that the paperwork wasn't
24  complying with the law and that I had to put it on hold
25  and if he was approving it, he was doing wrong.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 267

1      Q. Okay. Is that the extent of what you told him?
2  Do you understand what I mean by the word "precise"? I
3  mean, I want to know what you told him.
4      A. That's what I'm telling you.
5      Q. Okay, what did you tell him in your own
6  language?
7      A. In my own language?
8      Q. Did you tell him in English or Spanish?
9      A. In English.
10     Q. Okay. I want to know what you told him, as
11  best as you can remember.
12     A. I'm trying to.
13     Q. I understand. Are you saying -- I don't want
14  to put words in your mouth. Are you telling us here
15  today that you told him that if he approved the
16  paperwork that was wrong and he would be violating
17  the law?
18     A. I told him that.
19     Q. Okay. Would you tell us in your own language,
20  in your own words, what you told him that day?
21     A. I told him, "Sir, it's wrong. I'm explaining
22  you the reason why we have it on hold. It doesn't
23  comply with the rules and regulations we have."
24         He goes, "Just give it." I gave it to
25  him.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 268

1      Q. Okay.
2      A. I go, "You're doing wrong, Mr. Yzaguirre."
3      Q. Do you know what he did with the paperwork?
4      A. He took it.
5      Q. Okay, after he took the paperwork on Exhibit 3,
6  do you know what he did with it?
7      A. They were approved.
8      Q. I know it was approved, but do you know what
9  additional work --
10     A. What he did?
11     Q. -- he did or anyone else did in your office in
12  connection with Exhibit 3?
13     A. Probably just given to Lupita and sent it to
14  Austin.
15         MR. VITTITOE: Strike -- objection.
16     Q. Do you have personal knowledge of what happened
17  to the paperwork after you gave it to Mr. Yzaguirre?
18     A. When he would take the paperwork from our
19  office, it was just given to Lupita.
20     Q. Okay. And that's what I'm asking you. On
21  Exhibit 3, did you see him do that?
22     A. Not on this one. I mean, I'm not saying that I
23  would see him on all of them. I didn't see him on
24  this.
25     Q. That's what I'm asking you. And I don't want

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 269

1  you to guess. I want you to know.
2      A. I'm not guessing that.
3      Q. Okay, on this transaction, Exhibit 3, you don't
4  know what happened to the paperwork after it left your
5  custody or control other than knowing it was approved,
6  correct?
7      A. Yes, sir.
8      Q. The same is probably true with Exhibit 2,
9  correct?
10     A. Yes.
11     Q. Okay. Let's move to Exhibit 4, if I may.
12  Exhibit 4, I show, involved a transaction with Gerardo
13  Leal, and the last four digits of the transaction ID
14  are 45304. Would you please verify that for me?
15     A. 49 -- Exhibit 40 through 49.
16     Q. So you're referring to Bates numbers 40 through
17  49 under Exhibit 4, correct?
18     A. Yes, correct.
19     Q. Now, again, my understanding, that Bates 40
20  through 49, Exhibit No. 4, pertain to Transaction ID
21  No. -- and I'm shortening it to the last five digits --
22  45304; is that correct?
23     A. That's correct.
24     Q. And it pertains to a transaction with Gerardo
25  Leal.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 270

1    A. Okay.
2    Q. Correct?
3    A. Correct.
4    Q. Would you take a look at that documentation and
5  tell us why that documentation was put on hold by you?
6    A. It was put on hold because when you give a car
7  as a trade-in, the vehicle has to be under your name if
8  you're giving it as a trade-in. We had to check.
9  Whenever there was a transaction, we would put the VIN
10  number -- on that 130-U form, there's a line, No. 20,
11  where you put the vehicle, the VIN number and the
12  description of the vehicle you traded in. We had to
13  check the VIN number, that it was registered to the
14  person that was buying the car.
15    Q. Okay.
16    A. So we would give them credit for the sales tax,
17  so they wouldn't pay sales tax on that amount of money.
18    Q. Okay.
19    A. And when I ran the plate number, the VIN number
20  to that vehicle, it came out to the seller's name, to
21  Ramirez Used Cars. Ramirez was selling the car to
22  Gerardo Leal, and in the paperwork they have a $14,000
23  trade-in. When you put the VIN number, the trade-in
24  comes to Ramirez Used Cars' name, not Gerardo Leal.
25    Q. Maybe I just don't understand it. You're

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 271

1  saying the trade-in vehicle shown on that transaction
2  was shown in the computer as belonging to Ramirez Used
3  Cars?
4    A. Yes.
5    Q. And the documentation indicated some other
6  name?
7    A. On No. 20, Gerardo is saying that he gave that
8  vehicle as a trade-in and he is the owner, but when you
9  run the VIN number, it doesn't show him as an owner of
10  that vehicle.
11    Q. So you're saying that the problem there is
12  someone was taking credit to reduce the sales tax
13  exposure?
14    A. Not to pay sales tax on $14,000.
15    Q. Okay.
16    A. He called for an appointment and we told
17  him, you know, "Yeah, just come in and bring us proof."
18      He said, "Well, it's my vehicle."
19      "Well, just bring proof that the vehicle
20  is under your name or that, you know, at one time it
21  was your vehicle and we'll give you credit for that
22  amount of money so you don't have to pay your sales
23  tax."
24      And he said that --
25    Q. Did you talk about that transaction, which is

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 272

1  Exhibit 4, Bates 40 through 49, with either Lupita,
2  your supervisor, or anyone else in the office,
3  including Tony Yzaguirre?
4    A. Mr. Yzaguirre talked to him until he came to
5  the office.
6    Q. Talked to who?
7    A. I talked to him in January when he came to the
8  office. Before that, no.
9    Q. You talked with who?
10    A. Mr. Yzaguirre.
11    Q. Okay, so he came to your office to talk to you
12  about this transaction?
13    A. Yes, sir.
14    Q. All right. And when did you talk to him?
15    A. The day that he came in.
16    Q. What day was that?
17    A. January 25th of 2002.
18    Q. And how do you know that? Because you prepared
19  a memo?
20    A. No, because he would -- he would put the dates.
21  He would ask for the transfers and he would put his
22  notes.
23    Q. And you're saying whenever he would take the
24  paperwork, that he would enter into the documentation
25  the date that he took the paperwork? Is that what

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 273

1  you're saying?
2    A. Yes, he did.
3    Q. Okay, what did you tell him on that day about
4  this transaction?
5    A. It was the same thing he asked me, why was it
6  on hold. He even asked Bennett because Bennett knew
7  about this one.
8    Q. Okay.
9    A. And when he asked me, I explained him the same
10  thing, that it was the $14,000, that it wasn't under
11  the customer's name, that, you know, that's why we were
12  holding it.
13    Q. Sure.
14    A. And he just said, "Just release it."
15    Q. Okay. Did you release it or did you give the
16  paperwork to Mr. Yzaguirre?
17    A. No, that time he just left it there and we sent
18  it to Austin.
19    Q. Okay, so you went ahead and followed his
20  direction to go ahead and release it?
21    A. Just sent it to Austin.
22    Q. Did he tell you why in his opinion the
23  documentation should be released?
24    A. No.
25    Q. Did he, to your recollection, examine any of

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

1 the documentation?

2    A. Can you repeat me the question?

3    Q. Did Mr. Yzaguirre in your presence look at any

4 of the documentation that was in Exhibit 4?

5    A. He would always look at the paperwork because I

6 would, like, open the file and go one by one and

7 explain him and tell him about the status report.

8    Q. Other than following his instructions to go

9 ahead and process the paperwork to Austin, did you make

10 any further complaints to Mr. Yzaguirre about this

11 transaction?

12    A. I told him it was wrong.

13    Q. Okay. Is this one of the times that you

14 said, "Hey, it's wrong and you're violating the law,"

15 or you just didn't agree with his determination?

16    A. I didn't agree on this one because I knew he

17 was wrong.

18    Q. Okay.

19    A. And I told him he was wrong.

20    Q. And you told him he was wrong?

21    A. He was wrong.

22    Q. How did you say that, "Mr. Yzaguirre, you're

23 just wrong," or, "Sir, this is wrong"?

24    A. I said, "Sir, this is -- you're wrong. This is

25 wrong. That's the reason why we're holding it."

1    Q. And what he said is, "Hey, go ahead and process

2 it"?

3    A. "Just release it."

4    Q. "Just release it," okay.

5    A. There was times, you know, that -- all the time

6 when he would walk into the office, I would explain him

7 thing by thing.

8    Q. No, I understand that. I understand that. I

9 understand that's what you're saying.

10       What I would like to do is, because it's

11 late in the day, I would like to jump into some other

12 subject matter, if I may, if you don't mind,

13 Mrs. Cantu.

14    A. I don't mind.

15    Q. Because it's late in the day.

16    A. Do you want me to mark them where we're at

17 or --

18    Q. No, we will just go ahead and put them all back

19 together and somehow we will go through these whenever

20 we have some more time. So we stopped at Exhibit 4 and

21 we'll start with Exhibit 5 whenever we can.

22       My understanding is in connection with

23 this lawsuit you produced some notes that you took in

24 connection with your grievances against Mr. Yzaguirre;

25 is that correct?

1    A. Yes.

2    Q. Okay. And are these the notes that you took

3 and have produced in this case? And we will mark them

4 in a minute if those are the notes.

5      MS. GILSON: I think I've produced those

6 twice. I think I might have scanned them more

7 recently. I think I might have produced several things

8 more than once.

9      MR. VITTITOE: There's lots of paper here.

10    A. Yeah, all of that is my notes.

11    Q. Okay, those are your notes. There's also what

12 appear to be some calendars that have been produced for

13 2001 and 2002. Would you take a look at these

14 documents for me?

15    A. Yeah, this is mine.

16    Q. Okay. Those are yours and you've produced

17 them. Are there any other calendars that have been

18 produced in this case other than those?

19    A. No, sir.

20    Q. Okay, all right. Let me ask the court reporter

21 to mark those, if I could, Mrs. Cantu. Thank you very

22 much. What I would like to do is mark this one as

23 Exhibit 29.

24      MS. GILSON: What's on the back of that?

25 It looks like something that's not related.

1      MR. VITTITOE: Really? I don't know.

2      MS. GILSON: It looks like something like

3 an unacknowledged correspondence to Mr. Munoz. It

4 looked like one of my calendars from my office.

5      MR. VITTITOE: Is this yours?

6      MS. GILSON: No, it's not, but it's

7 Mr. Munoz' apparently.

8      MR. VITTITOE: But it's not part of the

9 exhibit, then?

10      MS. GILSON: I don't think that's part of

11 that, no.

12      MR. VITTITOE: I think you're right. The

13 advances of photocopy machines. Okay. I'm sorry. I

14 took it away from you. 29, 30 and 31.

15    Q. Mrs. Cantu, would you please look at Exhibits

16 29 and 30 and confirm for my information that those are

17 photocopies of your calendars, your personal calendar,

18 for years 2001 and 2002?

19    A. Yeah, this is mine.

20    Q. Okay. Were Exhibits 29 and 30 calendars made

21 available to you at the office or at home?

22    A. This calendar?

23    Q. Yes, ma'am.

24    A. It was given to me by my doctor.

25    Q. Okay. So it was your personal calendar or did

Page 278

1  you have it at the office?
2      A. No, it was my personal calendar. Sometimes I
3  would leave it at the office or --
4      Q. Do you still have the original calendar for
5  both of those years?
6      A. Yes, I do.
7      Q. 29 and 30?
8      A. Yes, I do.
9      Q. Are they little daily planners?
10     A. They are small, yeah.
11     Q. How small are they?
12     A. This size.
13     Q. Okay. They are not very big, are they?
14     A. No.
15     Q. And is the handwriting in both 29 and 30 your
16  handwriting or is it anyone else's handwriting?
17     A. No, it looks like my handwriting. Probably
18  like one of them my sister wrote a phone number, but
19  not on the rest of the stuff.
20     Q. So the handwriting in Exhibits 29 and 30 is
21  yours, other than maybe a phone number that your sister
22  wrote, correct?
23     A. Correct.
24     Q. All right. And is there anything in 29 or 30
25  that is of significance pertaining to this lawsuit

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 279

1  against Tony Yzaguirre and the county?
2      A. My notes that I wrote there, just what I have
3  there, like the times he would upset me, he was like
4  very upset, he would go, scream at me, tell me things.
5      Q. Okay, we will go through that in a minute.
6  Exhibit 31 appears to be in your handwriting; is that
7  correct?
8      A. That's my handwriting.
9      Q. And each page there on 31 is for a different
10  date, correct?
11     A. Yeah.
12     Q. When were these -- when was exhibit -- when
13  were these documents prepared? When were each of these
14  prepared?
15     A. This was a notebook that I had at home.
16     Q. Okay. I think my question is, like this top
17  one on Exhibit No. 31 is dated, what, January 9th,
18  2001.
19     A. 2001.
20     Q. When did you prepare that?
21     A. I don't know if I wrote it that same day
22  because usually I would write it on the small calendar
23  and then when I would remember, I would go to my
24  notebook and just write.
25     Q. Okay. Where is that notebook now?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 280

1      A. I think I have it at home.
2      Q. Okay.
3      A. I'm not sure on this one if I threw it away or
4  I have it. Those, I do. I have them, this one.
5      Q. Okay. Just for the record here, you have the
6  originals of 29 and 30, correct?
7      A. My small ones, yes.
8      Q. You don't know whether you have the original of
9  the notebook, which is 31, correct?
10     A. Correct.
11     Q. And I take it it was a spiral --
12     A. Yeah, a spiral notebook.
13     Q. -- looseleaf notebook where you could tear
14  pages out?
15     A. Yes, from my daughter's.
16     Q. These entries here that are dated, did you
17  prepare them on the day that is indicated or did you
18  prepare them later?
19     A. No, like I'm telling you, some I would go and
20  like do them, but when I was -- you know, we would have
21  confrontations. He would come and scream at me and all
22  that. I would write it down. It was like my journal.
23  But sometimes I wouldn't do it that same day, like I
24  told you. I would like wait a week, three days, two
25  days, whatever, and then I would start writing it down.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 281

1      Q. So these entries here, like this first page,
2  January 9, 2001, do you know whether it was made on
3  January 9, 2001?
4      A. The day I wrote it on the calendar?
5      Q. No, I'm talking about 31.
6      A. That's what I'm saying. The date that it has,
7  that's the day that things happened.
8      Q. Because you would have had it on your calendar
9  here, correct, 29 or 30?
10     A. I had that one and the one at home. I'm
11  telling you.
12     Q. Okay, so there's other calendars?
13     A. No, this notebook, not calendar. Notebook.
14     Q. Okay. I think my question is, these entries
15  have dates on Exhibit 31. Do you notice that?
16     A. Yes, I do.
17     Q. January 9, 2001, June 29, 2001, etc., etc.,
18  etc., correct?
19     A. Correct.
20     Q. Did you make entries on any other dates that we
21  do not have?
22     A. I think I did on that notebook. Sometimes
23  during the day when he was just like mean and start
24  screaming and I had confrontations, I didn't even --
25  sometimes I didn't write it in my little notebook. I

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 282

1  would wait until I would get home and I would do it.
2      MR. VITTITOE: Okay, let me object as
3  nonresponsive.
4      Q. I think my question is this: Other than your
5  notes that are shown on Exhibit 31, are there any other
6  notes that you've prepared that have anything to do
7  with this lawsuit?
8      A. I would have to check my notebook because I
9  have a lot of stuff at home. I'm not going to tell you
10  yes or no right now.
11      Q. Well, why don't you check this evening?
12      A. Okay.
13      Q. And find out if you have any other
14  documentation where you've written things about the
15  office or about Mr. Yzaguirre that have anything to do
16  with this lawsuit?
17      A. Okay, I'll check.
18      Q. So the next time we visit we can find out.
19      A. Okay.
20      Q. Okay. And just thumbing through Exhibit 31,
21  these various dates here, like January 12, 2001,
22  December 13, 2001, we go over here and there might be
23  an earlier date that says July 30, 2001. Were these
24  things that you wrote -- did you write them on the day
25  that it's dated or did you write them a week or a few

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 283

1  days thereafter? When did you write the information
2  that's provided for the date?
3      A. As I recall, the days are the day that things
4  happened.
5      Q. Okay. The days are for the dates that things
6  happened, but the body that you would write, the
7  information that you would write for the day, did you
8  write it on that day or other days?
9      A. It was like that day or the following day.
10      Q. Okay. So if you made an entry and dated it
11  January the 9th, you would have written the information
12  on that day or within a few days thereafter?
13      A. Correct.
14      Q. In other words, you didn't just wait a week or
15  two or a month to write the information down?
16      A. Not a month.
17      Q. Okay. Is that your answer?
18      A. That I would do it like one or two days later
19  but that's it.
20      Q. And Exhibit 31 wasn't all prepared at the same
21  time, was it?
22      A. No.
23      Q. Okay. In other words, as you had something
24  happen, you would write it down --
25      A. Yes, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 284

1      Q. -- and have it dated, correct?
2      A. Yes, sir.
3      Q. Did you reference at any time any information
4  on your calendars?
5      A. If I had time at work or I would do it on my
6  lunch hour, I would write it on my small calendar and
7  then I would put it on my notebook. I would write it
8  in my notebook. Sometimes -- like I'm telling you, I
9  have different stuff at home. Sometimes I wouldn't
10  write it on my calendar but I would write it on my
11  notebook.
12      Q. Okay. But at any rate, after we take a break
13  and after we recess this deposition, you will see if
14  there's any other notes that you've written --
15      A. I'll check my house.
16      Q. -- other than as shown on Exhibit 31?
17      A. Yes, sir, I'll check.
18      Q. And, also, see if you can bring the original
19  spiral notebook, if you would, and also bring the
20  original calendars which are 29 and 30.
21      A. Okay, sir.
22      Q. As well as the spiral, which is 31, okay?
23      A. Okay. Okay, sir.
24      Q. Now, just a few more minutes today, trying to
25  get some things done.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 285

1      Did you ever see Mr. Yzaguirre take any
2  money that he shouldn't have taken for anything?
3      A. Money?
4      Q. Yes.
5      A. No, sir.
6      Q. Did you see him request any money that, in your
7  opinion, he shouldn't have requested for anything?
8      A. Like hear him asking for money?
9      Q. Yes.
10      A. No.
11      Q. Did anyone ever tell you that they were paying
12  Mr. Yzaguirre any money to do anything improper?
13      A. Lupita.
14      Q. Lupita de Leon told you --
15      A. Lupita de Leon.
16      Q. And that's the times that you have already
17  testified to, right?
18      A. Yes, sir.
19      Q. She said that Barreda --
20      A. Would give him a hundred dollars per hearing
21  that she would do for him.
22      Q. Okay. So Lupita told you on more than one
23  occasion that Enrique Barreda, El Toque, The Troll --
24      A. Toque.
25      Q. -- was giving a hundred dollars to --

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 286

1    A. Mr. Yzaguirre.
2    Q. -- Mr. Yzaguirre?
3    A. Per hearing.
4    Q. Okay. Did anyone else say that?
5    A. No.
6    Q. Your answer is no?
7    A. It's no.
8    Q. Did anyone else say or indicate to you that
9  Mr. Yzaguirre was receiving any money for doing
10  anything improper at the tax assessor's office?
11   A. Julio was one of them. He would make comments.
12   Q. Okay. Anyone else?
13   A. That's it.
14   Q. Your answer is no?
15   A. That's it.
16   Q. What did Julio say that Mr. Yzaguirre was doing
17  wrong pertaining to money?
18   A. When he would come with transfers, Julio would
19  come to my office and ask me, "Hey, I got this, but I
20  know it's wrong, but, you know, it's the boss and, you
21  know, it's the friends."
22   Q. Okay, maybe I didn't ask the right question.
23  Other than Lupita saying that Enrique Barreda was
24  paying a hundred dollars to Mr. Yzaguirre for a
25  hearing --

Page 287

1    A. Per hearing.
2    Q. -- did anyone else tell you that they were
3  paying or knew of people that were paying money to
4  Mr. Yzaguirre to do anything improper at the tax
5  assessor's office?
6    A. Like I'm saying, Julio would make comments,
7  something like, "You know, it's wrong, but I have to do
8  it. You know, it's the friends, the boss's friends,
9  los amigos del patron."
10   Q. Okay. But there's nothing in his comments
11  saying that any money was being exchanged, was there?
12   A. No.
13   Q. Your answer is no?
14   A. No.
15   Q. Okay. Did anyone other than Lupita de Leon say
16  that any money was being paid or any benefit was being
17  paid to Tony Yzaguirre in connection with his work as
18  the elected official running the tax office?
19   A. No, just Lupita would make comments. That's
20  about it.
21   Q. Okay. Do you know of anyone taking any money
22  at the tax office at any time when they shouldn't have
23  taken money at the tax office?
24   A. I never saw anybody.
25   Q. Did you ever hear of anyone taking any money or

Page 288

1  receiving any economic benefit at the tax office?
2    A. Lupita.
3    Q. Okay. And what did you see her receive or ask
4  for at the tax office?
5    A. The girls from the front line would always say
6  stuff like, "Oh, Lupita's friends, they give her this,
7  they give her that. She asks for this, she asks for
8  that."
9        MR. VITTITOE: Okay. Object;
10  nonresponsive.
11   Q. My question is what do you know within your
12  personal knowledge -- that's what we're talking about
13  here today -- where you can point to someone paying any
14  money or paying a benefit, an economic benefit, to
15  anyone at the tax office? Do you have any personal
16  knowledge of that?
17   A. Repeat me the question.
18   Q. Yes, ma'am. Do you know personally based on
19  what you heard or saw of anyone getting any money at
20  the tax office that was improper?
21   A. Well, hear, it was just Lupita saying that
22  Mr. Yzaguirre, and, hear, it was the girls from the
23  front line saying that Lupita was getting like
24  perfumes, money, you know, but it's just hearsay. I'm
25  not going to tell you I saw because I never saw that.

Page 289

1    Q. Okay, that's what I need to know. You never
2  saw anyone make or receive an improper payment at the
3  clerk's office?
4    A. I never saw them getting any money.
5    Q. Okay. Did you ever see any of Mr. Yzaguirre's
6  so-called friends or acquaintances give him any
7  economic benefit?
8    A. I never saw them give him money. They would go
9  to his office. His office is across the hall.
10   Q. Okay. So you never saw anyone give any money
11  to Mr. Yzaguirre?
12   A. No.
13   Q. Did you ever see or hear that Mel Sosa or
14  anyone connected with Mel Sosa Used Cars made any
15  improper payments or gave any improper monetary
16  benefits to the tax assessor?
17   A. Repeat me the question.
18   Q. Did any of these used car dealers, to your
19  personal knowledge, make any payments or did
20  Mr. Yzaguirre request any payments or monetary benefits
21  from any of the used car dealers, to your personal
22  knowledge?
23   A. I never saw them give him money.
24   Q. Did you ever hear that from anybody?
25   A. You hear a lot of stuff at the office, but I

Page 290

1  can be all day telling you everything I heard.
2    Q. It's just hearsay, right? You never saw
3  Mr. Yzaguirre indicate that he wanted a payment or a
4  benefit --
5    A. I never saw him getting money from them.
6    Q. Okay. And you never saw him request any
7  economic benefit or receive any money, did you?
8    A. No.
9    Q. From any of the used car dealers or from
10 anybody, for that matter?
11   A. I never heard.
12   Q. You never saw?
13   A. I never saw.
14   Q. Same thing with the notaries that you've talked
15 to us about today? You never saw within your own eyes
16 or heard within your own ears Mr. Yzaguirre request any
17 improper payments from any of the notary publics?
18   A. I just remember one thing. At one time he took
19 me into his office because Esthela Guerra complained to
20 him that we were holding her paperwork. And I was
21 there and she was there, and that day I remember
22 because it was her birthday. And he took us both into
23 the office and he started telling me, why was I holding
24 her paperwork. And I explained him the reason why I
25 was holding Esthela's paperwork.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 291

1      And she tells me, "Well, you just want to
2  get me out of business."
3      And I said, "I don't want to get you out
4  of business. I'm just doing my job."
5      And Mr. Yzaguirre told me to leave her
6  alone.
7      And when I walked out of that office, I
8  was -- I mean, I was walking out of the office and
9  Mr. Garcia was coming in and I bumped into him. And he
10 said, "What happened? Why are you upset?"
11     And I said, "I'm not upset. It's just" --
12 he goes, "I heard everything. He was screaming and
13 Esthela was screaming. But just go with the flow."
14     MR. VITTITOE: Okay, object;
15 nonresponsive.
16   Q. My question, Mrs. Cantu, did you ever see
17 Mr. Yzaguirre or hear Mr. Yzaguirre request any
18 monetary benefit or money to be paid to him or at his
19 direction for anything at the tax office that, in your
20 mind, you considered improper?
21   A. No.
22   Q. Okay. Did you ever, within your personal
23 knowledge, see any of these notaries or any of these
24 car dealers, for that matter, make any improper illegal
25 payment or promise any improper payment or benefit to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 292

1  Mr. Yzaguirre or anyone at his direction?
2    A. No, because like I'm telling you, his office is
3  across the hall.
4    Q. Okay. So your answer is no?
5    A. No.
6    Q. Now, you heard Lupita de Leon say on more than
7  one occasion --
8    A. Yes.
9    Q. -- that Enrique Barreda was paying a hundred
10 dollars for a hearing, correct?
11   A. Yes.
12   Q. Do you know -- did she tell you in what -- do
13 you understand what the word "context" is? Let me ask
14 you. Did she tell you why the hundred dollars was
15 being paid?
16   A. She said, "He gets a hundred dollars for every
17 hearing we approve to GT Motors."
18   Q. Okay. Who gets the hundred dollars?
19   A. Mr. Yzaguirre, because she said, "I'm tired of
20 doing hearings for this old man. I'm tired."
21     I said, "Well, just say no, you can't do
22 them."
23   Q. Was it your understanding that she said that
24 Mr. Barreda was paid a hundred dollars for doing the
25 hearings?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 293

1    A. No, that El Toque was giving Mr. Yzaguirre a
2  hundred dollars per every hearing that was approved.
3    Q. Okay. Did she say how the payment was being
4  facilitated?
5    A. No, no, she didn't say.
6    Q. Okay. When you heard that, did it surprise
7  you? Did it --
8    A. I just said, "Well, tell them no, you can't do
9  the hearing."
10     And she said the same thing like everybody
11 else, "He's the boss."
12   Q. Okay. Did you ever talk to Mr. Yzaguirre at
13 any time about this information that you had received
14 from Lupita de Leon that he was getting improper
15 payments from Mr. Barreda?
16   A. I never mentioned that.
17   Q. Why not?
18   A. Why not?
19   Q. Yes.
20   A. Because he was going to tell me, "Who told
21 you?"
22   Q. Okay, before you were terminated from your
23 employment back in -- when -- May?
24   A. May 2002.
25   Q. -- did you ever talk to anyone in law

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 391

1    Q.  And on page 2 of your narrative, there is an
2  entry that says, "On June 29, 2001 at 12:00 o'clock
3  Mr. Yzaguirre and Rick Camarillo went to Mr. Yzaguirre's
4  ranch to feed the animals."
5    A.  Why?
6    Q.  Yes.
7    A.  Because Rick was making fun of us.  He was like
8  throwing it -- like saying, "I feel sorry for you that
9  you guys have to work.  I'm taking off with the boss."
10    Q.  Okay.  So Rick Camarillo was an employee?
11    A.  He's an employee with the tax office.
12    Q.  And he was going out to Yzaguirre's to feed the
13  animals?
14    A.  That's what he told us.
15    Q.  That's what Rick told you?
16    A.  That's what Rick told us.
17    Q.  And he was -- he was -- I gather from your
18  comments that he was making a big deal out of he was
19  going off with the boss and he wasn't going to have to
20  work?
21    A.  He was going to be gone for the day.
22    Q.  And so you thought that was inappropriate and
23  you didn't like it?
24    A.  Well, I didn't.  Yeah.
25    Q.  Okay.  Then it says, "Rick went to ACETF office

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 392

1  and told Bibi and Marizol," right?  I'm talking about --
2  I'm looking at your original document, which is Exhibit
3  No. 32.
4    A.  Yes.
5    Q.  What's -- what's significant about that entry?
6    A.  It's the same thing.  Marizol and I, we were the
7  ones that we were there at the office when he started
8  making those comments.  "I'm going to be gone for the
9  day," and --
10    Q.  You didn't like what Rick said?
11    A.  I -- no.
12    Q.  Was there anything that Mr. Yzaguirre did that
13  was inappropriate?
14    A.  When, at that time?
15    Q.  Yes.
16    A.  No, just Rick making comments, "I'm going on
17  county time.  I'm going to be gone for the day with the
18  boss."  And --
19    Q.  And you just thought that was inappropriate?
20    A.  It was inappropriate.
21    Q.  So did you make both of these entries that are
22  shown on this page on the same day?  I'm talking
23  about --
24    A.  Yes.
25    Q.  -- when you wrote them down in your narrative.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 393

1    A.  I'm sure.
2    Q.  Or did you write them weeks or months later?
3    A.  No.  I -- I don't remember when I wrote them,
4  but it must have been close to that time.
5    Q.  Let's go to the next page.  Flip -- flip to the
6  next page.  The next page is dated about a month later,
7  correct?
8    A.  July the 30th.
9    Q.  And you believe that whatever happened on
10  July 30, 2001 was significant, correct?
11    A.  Yes, it was.
12    Q.  And that's what -- because it was significant,
13  you wrote it down in your calendar and on the narrative
14  which is shown on this exhibit.  Again, I keep looking
15  at it because my brain is slow today -- 32, correct?
16    A.  Correct.
17    Q.  What is significant about the entry for
18  July 30th, 2001?
19    A.  Okay.  When I came back -- I was -- I had gone
20  on vacation for a week, I think, and when I came back he
21  was very upset at me.  He walked into my office --
22    Q.  He was upset with you because, what, you were
23  faxing stuff to Austin?
24    A.  I was faxing the complaints to Austin of dealers
25  releasing titles to customers, paperwork that was wrong,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 394

1  the dealers weren't complying with what they were
2  supposed to be doing.
3    Q.  So, at any rate, you wrote this down saying that
4  he came into your office on July 30 after you got back
5  from vacation and he told you to stop faxing
6  complaints --
7    A.  To Austin.  To Rayna's office.
8    Q.  -- to Austin effective immediately?
9    A.  Yes.
10    Q.  Correct?
11    A.  Yes, sir.
12    Q.  But he also told you if you intended to do
13  anything like that, that you needed to go through him
14  for approval?
15    A.  He had to approve it.
16    Q.  Okay.  Do you know whether he was getting
17  complaints from Austin about you faxing information to
18  Austin?  Do you know one way or the other, yes or no?
19    A.  I don't know.
20    Q.  Okay.  But, at any rate, he, as the ultimate
21  boss in the office, told you to quit faxing stuff to
22  Austin unless you cleared it with him?
23    A.  Yes.
24    Q.  And you didn't like that.  It made you upset?
25    A.  Well, because I would ask him on some dealers,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 403

1    A. On and off, I would say.
2    Q. On and off. Okay. Let's go to the next entry
3  on 32, December the 12th, 2001. That's when you
4  received the memo from your boss, Mr. Yzaguirre, stating
5  that Lupita de Leon was going to be the chief title
6  examiner and that she was receiving a $3,000 raise,
7  correct?
8    A. Correct.
9    Q. Now, was the $3,000 raise in the memo?
10   A. No.
11   Q. All right. Are you telling us that you received
12 the memo on that date, or you received a memo and the
13 additional information about this $3,000 raise from some
14 other source?
15   A. Lupita told me.
16   Q. Okay. Now, is there a calendar entry for that
17 in your calendar?
18   A. Yes, sir.
19   Q. What do you find offensive about that or
20 upsetting about that other than the fact that she's
21 getting a $3,000 raise and she gets the title of chief
22 title examiner? What do you find offensive about that?
23   A. I don't find nothing offensive, but for me, this
24 was -- like every time I would talk to him and I would
25 speak up and tell him that there was something

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 404

1  wrong -- I had been doing titles for many years, and he
2  decides that I'm going to -- you know, somebody is going
3  to do that.
4    Q. Okay. But from what I've heard you say on the
5  7th and today, at all times Lupita de Leon was your
6  supervisor; at all times.
7    A. She was my supervisor.
8    Q. So at all times she was your chief?
9    A. From '99 to --
10   Q. At all times, all relevant times that we're
11 talking about, she was your chief?
12   A. Yes, she was.
13   Q. She had the ultimate say on the title examiner
14 work other than if she was vetoed by Mr. Yzaguirre; is
15 that right?
16   A. No, because when ATPA started, she had no right.
17 She had -- the lieutenant would decide if the paperwork
18 would go or not, not her.
19   Q. Okay. But at some point in time that changed?
20   A. Yes, it did.
21   Q. And when did that change?
22   A. When he gave that memo.
23   Q. Okay. No. Before that. You told us on the 7th
24 that Lupita de Leon had ultimate authority --
25   A. Well, she did.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 405

1    Q. -- over your title examiner work. There is no
2  doubt about that?
3    A. Yes.
4    Q. Okay. I think what I'm hearing you really upset
5  about is she got a $3,000 raise per information that
6  Lupita told you, right?
7      MS. GILSON: Object. Assumes facts not in
8  evidence.
9    A. Lupita said she got a $3,000 raise. She rubbed
10 it in my face.
11   Q. Okay. That's what I'm hearing you're upset
12 about, is Lupita came up and talked to you about the
13 memo and said, "I'm getting a $3,000 raise"; is that
14 right?
15   A. Well, she said. I said, "Fine."
16   Q. Okay. But you didn't like that?
17   A. For me, I was used to doing the titles and --
18   Q. Did you interpret Lupita as pushing that in your
19 face?
20   A. Not really. She would make more money than me,
21 so --
22   Q. Has she always made more money than you?
23   A. Yes.
24   Q. Okay. So she's always --
25   A. That didn't bother me.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 406

1    Q. -- made more money.
2    A. That didn't bother me.
3    Q. All right. Didn't bother you, not at all?
4    A. (Moving head side to side)
5    Q. Do you know whether or not Lupita got a $3,000
6  raise?
7    A. I don't know. I never asked.
8    Q. Could it be true that she didn't get a $3,000
9  raise?
10   A. I don't know; maybe yes, maybe no. I don't
11 know.
12   Q. Do you have any proof that she got a $3,000
13 raise?
14   A. Oh, no. I don't know. I never asked. That's
15 what I'm saying. I left it at that.
16   Q. Could Lupita, your boss, have been pulling your
17 leg or you misunderstood what she said?
18   A. I understood what she said, but I don't know if
19 she got it or not. I never asked. I left it at that.
20   Q. But I gather from the testimony that you gave us
21 the day before, you always had a cordial working
22 relationship with Lupita.
23   A. Yes, I did.
24   Q. A professional relationship.
25   A. Yes, professional. Of course.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 411

1  you a raise.
2      Q. I don't want to beat this issue to death, but
3  what you're telling me is it didn't upset you a bit that
4  she was getting a $3,000 raise, that you didn't have any
5  jealousy about that at all?
6      A. No, because I knew she made more money than me.
7      Q. And you knew she had been there longer and you
8  knew that she was your superior and you knew she was
9  very qualified and experienced and you had a
10  professional relationship with her?
11     A. We would get along.
12     Q. Go to the next entry. In fact, that's the very
13  next day. Did you have a calendar entry for that,
14  December 13th, 2001 at noon, 12:00 p.m.
15     A. December 13th, yeah.
16     Q. So you have a calendar entry for that entry?
17     A. Yes, I have one.
18     Q. And then you wrote that narrative on 32 dated
19  December 13th, 2001. You understand what I mean by
20  narrative, right?
21     A. No, sir.
22     Q. That's your handwriting?
23     A. On the calendar, on the spiral notebook.
24     Q. Did you write that on about the same day -- that
25  same day or within a few days thereafter?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 412

1      A. I don't remember when I wrote it, but I did
2  wrote it.
3      Q. You would have used your calendar entry to help
4  you with the information that you wrote on 32?
5      A. Sometimes, sometimes I would just like
6  remember, but most of the time.
7      Q. Just kind of like remember. Is there anything
8  about this -- what's the significance of this entry on
9  December 13th, 2001?
10     A. That the titles were no longer going to go
11  through the crime task force. He called us into the
12  office and told us that the titles were no longer going
13  to be checked with the auto crime task force, Lupita was
14  going to do it, and then from there they were going to
15  be given to Susana and she was going to send them to
16  Austin.
17     Q. Okay. And so that was a meeting that you had
18  with Mr. Yzaguirre in his offices on December 13th,
19  2001?
20     A. Yes, sir.
21     Q. How did he treat you on that day?
22     A. He just --
23     Q. Professionally?
24     A. Professionally. I just sat there and he told us
25  and we left and that's it.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 413

1      Q. And that's the meeting that you had, I take it,
2  in -- consistent with and in follow-up of his memo
3  that's been discussed, interoffice memo?
4      A. Yes, sir.
5      Q. All right. Is there anything in this memo that
6  you wanted to record on December the 13th, 2001 that you
7  thought was improper at all or that has anything to do
8  with this lawsuit?
9      A. The only thing I thought was funny is why would
10  Susana do the titles. She didn't have the experience of
11  doing titles.
12     Q. Say that again.
13     A. Why would the head cashier, Susana, would do the
14  titles. She didn't have that much experience in
15  checking titles.
16     Q. So you just didn't like the administrative
17  decision that was --
18     A. No, I mean --
19     Q. -- being made at that time? You know that there
20  was a problem in that office at that time of title work
21  being backed up in the office. No doubt about that.
22         MS. GILSON: Object, assumes facts not in
23  evidence.
24     A. Not only that department. The head cashier was
25  always behind.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 414

1      Q. There was a problem with the office --
2      A. The titles --
3      Q. -- in clearing the titles in and out of the tax
4  assessor's office?
5      A. Yeah. The titles --
6      Q. No doubt about that? No doubt about that?
7      A. Repeat me the question.
8      Q. Yes, ma'am. You knew, as a worker, coworker,
9  employee of the tax office, that there was a problem
10  with titles being cleared through the office. In other
11  words, people were complaining about their title work
12  not being processed by the tax assessor's office.
13     A. Well, but --
14     Q. You knew that, didn't you?
15     A. I --
16     Q. Yes or no?
17     A. No.
18     Q. Okay. So your testimony is that you didn't know
19  that there was a problem at the tax assessor's office
20  with clearing titles and people were complaining?
21     A. They were --
22     Q. That's your testimony?
23     A. No, wait. They were on hold --
24     Q. I'll give you a chance to change it.
25         MS. GILSON: Mr. Vittitoe, she'd like to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  answer the question.
2      Q. Go ahead.
3      A. Okay. There were -- a lot of them were on hold
4  because there was something wrong with the paperwork in
5  the auto crime task force. And in the head cashier they
6  were also behind because the head cashier wouldn't send
7  the title reports to Austin on time. So it wasn't just
8  the auto crime task force, it was also the lady that
9  would send the titles to Austin.
10     Q. That's my understanding, that there were lots of
11 problems in the tax assessor's office with title
12 transfers not being processed. Whether it was the
13 titles at the task force or whatever, there was just a
14 problem in the office, wasn't there? And people were
15 upset about it. You knew that. You disagree with that?
16     A. No, I don't disagree with that.
17     Q. Okay. You do not disagree with it?
18     A. I don't.
19     Q. And you understand that Mr. Yzaguirre, whether
20 you agree with him or not, was trying to change that
21 within the office to try and get those transactions
22 moving in and out of that office to do the public
23 service that he's supposed to do as the tax assessor?
24        MS. GILSON: Object, asks for speculation.
25     Q. You understand that, don't you?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1        MS. GILSON: Object, speculation.
2      A. I understand.
3      Q. And that's what he was doing, from your
4  observation. You might not have agreed with what he did
5  as far as his decisions and the personnel changes, but
6  that's what he was doing?
7        MS. GILSON: Object, asks for speculation.
8      A. Yes.
9      Q. All right. Let's go to the next entry, the next
10 day. Boy, I'll tell, we're getting them. What happened
11 on December the 14th? Do you have a calendar entry for
12 that on December 14th, 2001 that's recorded on
13 Exhibit 32?
14     A. Yes, there is a note.
15     Q. You do?
16     A. Yes.
17     Q. All right. This is a memo that you prepared on
18 December 14th, 2001 from your recollection and/or your
19 calendar; am I correct?
20     A. Yes.
21     Q. This is the team work memo, right? And what is
22 significant about this memo? I'm talking about your
23 memo of December 14th, 2001. What's significant about
24 this to cause you to write this down at or about
25 December 14th, 2001 at 5:00 p.m.?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1      A. Well, one, we stayed after work.
2      Q. Okay.
3      A. Mireles and I came back to the office.
4      Q. Okay. I understand -- why did you write this
5  down? What is significant about this that -- you told
6  me you wrote these things down because you wanted to
7  make sure everybody knew that you were doing your job,
8  right?
9      A. Uh-huh.
10     Q. So I want to know what is significant about this
11 memo. Do you understand what I'm asking?
12     A. Yes, I'm thinking.
13     Q. Okay.
14     A. I'm trying to go back. I mean, it's been --
15     Q. Maybe I'm rushing you. Please take your time
16 and look at this memo and then tell me today what comes
17 to your mind.
18     A. Okay. Yeah, I remember this one.
19     Q. All right. What -- why did you think what
20 happened at that meeting on December 14th, 2001 was so
21 important that you needed to write it down in 32?
22     A. Okay. Mireles and I, we stayed after work,
23 after the meeting, and we started discussing it. And we
24 were talking about it and Mireles was like, "Hey, if she
25 doesn't know the titles, she doesn't know what you were

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  doing, how is she going to do it?" And I said, "Well,
2  that's what the meeting was about." We just had a
3  conversation. And he goes, "Well, now we have to be
4  team players." And I said, "Yes, Mireles, we need to
5  start doing that." And, you know -- I mean, yeah, we
6  discussed it, Mireles and I, and that's why I wrote it
7  down.
8      Q. Okay.
9      A. Because one of the things, Mireles didn't agree
10 with that.
11     Q. Okay.
12     A. But then again --
13     Q. But you don't say that in your memo, that
14 Mireles didn't agree with being part of the team --
15     A. I didn't.
16     Q. -- do you?
17     A. No, I didn't put it there.
18     Q. Your memo actually says -- let me read it with
19 you and you disagree -- if you disagree, you tell me.
20 December 14th, 2001 at 5:00 p.m., "Mr. Yzaguirre called
21 Lt. Joe Mireles, Lupita de Leon and Bibi Cantu." That's
22 you.
23     A. Yes.
24     Q. "Mr. Yzaguirre told Bibi" -- meaning you -- "and
25 Joe Mireles that we need to be a team and to help Lupita

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 419

1  de Leon because Lupita de Leon did not know about my
2  job," meaning your job. "She didn't know what I was
3  doing" -- that's what you wrote -- "but that she was the
4  chief title examiner and that I still had to do what I
5  was doing (except check the titles). But anything I was
6  going to do, I needed to tell Lupita everything I was
7  doing. So why was she getting a $3,000 raise if I was
8  still going to do the work?"
9      A. Yes, that's what Mireles and I discussed.
10     Q. You were upset about the $3,000 raise. That's
11  why you wrote this memo on December the 14th, 2001?
12     A. No.
13     Q. So I'm reading your language. This is in your
14  handwriting. "So why was she getting a $3,000 raise if
15  I was still going to do the work?"
16     A. That's what Mireles -- I told Mireles about the
17  $3,000, and Mireles was mad. He was like, "Oh, she got
18  a raise?"
19        "That's what she said."
20     Q. Well, none -- none of that, of saying what
21  Mireles said, is in this memo of December 14th. This is
22  what you wrote about what was in your head on that day.
23     A. No, not in my head. I wrote it like a week
24  later or a couple of days after that.
25     Q. Okay. It was in your head a week later?

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 421

1      A. It didn't bother me because I knew she was
2  making more money and I knew that she was always going
3  to make more money than me.
4        MR. VITTITOE: Pass the witness -- on that
5  issue.
6        MS. GILSON: I was getting excited there
7  for a second with "pass the witness."
8        MR. VITTITOE: I wanted to see who was
9  awake in the room.
10       MS. GILSON: My heart started beating fast.
11     Q. Going to the next memo of March 19th, 2002 on
12  your -- on 32.
13     A. I don't have the calendar you want me to check.
14  I don't -- it was another year and I don't have the
15  calendar.
16     Q. Okay. Incidentally, I want to ask you while
17  your attorney is looking for that in your calendar,
18  going back to this last meeting on December the 14th,
19  2001 where you wrote, "So why was she getting a $3,000
20  raise if I was still going to do the work," my question
21  to you is you've already told us that you never asked
22  Mr. Yzaguirre or anyone in supervisory authority whether
23  or not she did get a raise, correct?
24     A. I didn't ask.
25     Q. All right. Why didn't you ask Mr. Yzaguirre, if

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 420

1      A. A couple of days. I don't remember how many
2  days.
3      Q. You referred to Mr. Yzaguirre had a meeting. He
4  said, "I want you fellows, employees, to be a team and
5  to help Lupita de Leon."
6      A. I've always helped her.
7        MR. VITTITOE: Object, nonresponsive.
8      Q. On December 14th you had a meeting with your
9  ultimate boss?
10     A. Yes, sir.
11     Q. And that meeting included some coworkers. And
12  your ultimate boss, Mr. Yzaguirre, told you to work as a
13  team, told all of you to work as a team, correct?
14     A. Correct.
15     Q. And you decided, after talking with Mireles,
16  that it just galled you that this lady, who had been
17  your supervisor for years, who was a long-time employee
18  of the tax office, was getting a $3,000 raise. And you
19  didn't like it. That's why you wrote this memo.
20     A. No.
21     Q. You're going to have to tell 12 jurors that.
22  And you're telling me, for the last time on this memo,
23  that it didn't bother you that she was getting a $3,000
24  raise?
25       MS. GILSON: Object, asked and answered.

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 422

1  it bothered you?
2      A. What was I going to tell him, "Give me a raise
3  too"?
4      Q. Why not?
5      A. No.
6      Q. Did you ever ask him?
7      A. I never asked him.
8      Q. Why not?
9      A. I never asked him. I just left it at that.
10  When she said she got it, fine. If she didn't -- if she
11  was telling the truth, fine; if she was lying, fine, you
12  know. I mean, I left it at that.
13     Q. All right. Going to the March 19, 2002 entry on
14  Exhibit 32, is that shown -- do you have notes
15  reflecting that in your calendar which is marked as
16  Exhibit 35?
17     A. Oh, yes, I remember that one.
18     Q. Is the -- you wrote a memo sometime around
19  March 19, 2002, correct?
20     A. Yes.
21     Q. And is this memo prepared based on information
22  Mr. Mireles, Lt. Joe Mireles gave you, or information
23  from Mr. Yzaguirre?
24     A. No, Mr. Mireles.
25     Q. So Mireles told you that he needed -- that

**BRYANT & STINGLEY, INC.**
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 451

1    Q. In fact, I thought you told me earlier that all
2  the significant things that happened that you really
3  thought that were really important, that you would write
4  in your notes.
5    A. If I were to write everything, all the
6  discussions I had with Mr. Yzaguirre -- they were like
7  more than 20 -- I would need a lot of notebooks.
8    Q. Well, that's -- that's -- the real pertinent
9  point in my question is you've told us that these notes
10 were very important. You've said that several times
11 here today and you said that previously.
12   A. They're important. Yes, they're important.
13   Q. But you're also saying there were other things
14 really important to you that you just didn't write down.
15 So the jury is going to have to wonder why you didn't
16 write it down.
17      MS. GILSON: Object. Asks for speculation
18 about what the jury will say.
19   Q. Can you tell us why you didn't write that down
20 if you thought it was important at that time?
21   A. I didn't write it down.
22   Q. But you did write things down. You wrote things
23 down on December the 12th, December the 13th, and then
24 think you even wrote the day before -- well, the week
25 before, December the 5th. Nowhere is there any

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 452

1  complaint about this memo anywhere. Can you explain
2  that?
3    A. I'm telling you. I didn't write down every,
4  every, every thing.
5    Q. So you can't explain why you did not write it
6  down if you thought it was important?
7    A. I thought about it and it was in my head.
8    Q. But you just kept it in your head?
9    A. I would say so.
10   Q. Now, if we could, ma'am, I want to direct your
11 attention back on Exhibit No. 1. Go to tab 5.
12   A. Which one?
13   Q. Go to tab 5.
14   A. Okay.
15   Q. And look at Bates 50 at the bottom right-hand
16 corner.
17   A. Do you need this or not?
18   Q. I'm sorry? That's enough. We can just set that
19 down. Go ahead and go to Exhibit 1, tab 5, and go to
20 Bates 50. Did you prepare that document or did you have
21 anything to do with preparing Bates 50 under tab 5 on
22 Exhibit 1?
23   A. The top part was prepared by the data analyst.
24   Q. And this is the title status report?
25   A. Yes, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 453

1    Q. Okay. Does it tell you anywhere there why the
2  title work was being kept for further investigation?
3    A. "Noe Infante needs an invoice from Summit
4  Wholesalers."
5    Q. So somebody determined that there needed to be
6  an invoice?
7    A. When you bring a vehicle from another state and
8  you purchase it out of state, we need an invoice, a bill
9  of sale or something so we can collect 6.25 sales tax.
10   Q. But apparently on -- somebody wrote -- is that
11 your handwriting there on August the 30th, 2001?
12   A. That's my handwriting.
13   Q. "Replace file and issue sticker," is that your
14 handwriting?
15   A. No, that's Mr. Yzaguirre's handwriting.
16   Q. Okay. So Mr. Yzaguirre wrote "replace file and
17 issue sticker"?
18   A. "Release."
19   Q. Is that right?
20   A. "Release file and issue sticker."
21   Q. Yes. Is that -- whose handwriting is that? If
22 you know. If you don't know, just say "I don't know."
23   A. That, I don't know. It was given to us by
24 Lupita.
25   Q. Okay. Which -- you said certain of that was in

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 454

1  Mr. Yzaguirre's handwriting; which, where?
2    A. The bottom part, I wrote it. That's my
3  handwriting.
4      MS. GILSON: For the record, what is the
5  bottom?
6    A. I'm sorry. "As per Mr. Yzaguirre, August
7  the 30th, 2001."
8      MR. VITTITOE: Object, nonresponsive.
9    Q. My question is you earlier said that
10 Mr. Yzaguirre wrote on Bates stamp 50. What language
11 did he write, or what words or what numbers or what did
12 he write? And if you made a mistake, just tell me.
13   A. I think -- I don't know on that part. I just
14 know --
15   Q. Okay. So you don't know if Mr. Yzaguirre's
16 writing is on there or not? Yes or no?
17   A. I don't know.
18   Q. All right. Looking at the rest of the papers on
19 this transaction, do you see anything wrong with it
20 other than you're telling us that it didn't have an
21 invoice? And I'm referring, for the record, from Bates
22 50 through Bates 57 under tab 5.
23   A. Just the invoice.
24   Q. Just the invoice?
25   A. It needs an invoice.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 455

1   Q. Do you know how long that transaction was held
2  up?
3   A. I don't know, sir.
4   Q. Do you know whether it was months or years?
5   A. Well, it was -- I'll tell you. It was faxed in
6  2000, August the 30th, and it was released on August
7  the 30th, 2001.
8   Q. So it was kept how many months?
9   A. A year.
10   Q. About a year?
11   A. Uh-huh.
12   Q. Wouldn't you agree with me that's ridiculous?
13   A. Well, all the rest of the customers -- all the
14  customers needed to the bring a purchase order. So why
15  would this be different than the other ones?
16   Q. My question is it's ridiculous that a title be
17  in the office for a year.
18      MS. GILSON: Object, assumes facts.
19   Q. Wouldn't you agree, as a general rule of things?
20   A. Well, if the customer didn't bring what was
21  required by the office, why would you release the title?
22   Q. Okay. At any rate, do you see any evidence that
23  vehicle was stolen?
24   A. No.
25   Q. In all of these, 1 through 24, is there any

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 456

1  evidence there that any of these vehicles were stolen?
2   A. Stolen, no.
3   Q. Okay. Go to tab 6.
4   A. Okay.
5   Q. Page 58, Bates 58.
6   A. Uh-huh.
7   Q. And looking at the status report.
8   A. Okay.
9   Q. Do you see any handwriting there that is
10  Mr. Yzaguirre's? Yes or no?
11   A. I would say the top part, "title work okay to
12  process."
13   Q. Are you sure, or are you just guessing?
14      MR. HODGE: Which tab are you on, Craig?
15  I'm sorry.
16      MR. VITTITOE: Tab 6, Bates 58, for the
17  record.
18      MR. HODGE: Thank you.
19      MR. VITTITOE: Thanks for keeping me
20  straight on the record, Mr. Hodge.
21      MR. HODGE: I just -- I got lost there.
22  I'm sorry.
23   Q. Yes or no? Do you know whether it is or are you
24  guessing? I don't want you to guess. I want you to say
25  you know, with all respect. We're going to be here a

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 457

1  while if you don't start moving.
2   A. Yeah, that's his signature.
3   Q. That's Mr. Yzaguirre's signature?
4   A. I would say that's his signature.
5   Q. Okay. And apparently the title work was held up
6  because the signatures did not match, in your opinion?
7   A. Yes, sir.
8   Q. But apparently at some point in time the title
9  work was okayed by Mr. Yzaguirre, according to you?
10   A. Yes, sir.
11   Q. How long was this title work held up?
12   A. From September of 2000 to June 2001.
13   Q. About nine months?
14   A. I would -- yes.
15   Q. Okay. What signatures didn't match, in your
16  opinion?
17   A. In my opinion? The seller's.
18   Q. Which Bates page are you looking at?
19   A. I'm sorry.
20   Q. You're doing fine.
21   A. Bates 60.
22   Q. 60?
23   A. And 62.
24   Q. 60 and 62. You're talking about Mr. Ortiz or
25  Mr. Keating?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 458

1   A. Seller. I'm sorry. No. 22, Bates 60, line or
2  No. 22. Right here. The one I have in my --
3   Q. Okay. So you're talking about -- what's his
4  name?
5   A. A Robert -- let me check the title -- Robert --
6   Q. Keating?
7   A. Keating.
8   Q. Anything else that you believe is questionable?
9   A. Well, he doesn't have a bill of sale, but --
10   Q. Anything else?
11   A. That's it.
12   Q. All right. Let's go to the next one, which is
13  tab 7, Bates 63. And this is -- the title status report
14  says you needed an invoice, right?
15   A. Yes, sir.
16   Q. From the Louisiana sales yard?
17   A. Yes, sir.
18   Q. And apparently somebody increased the sales
19  price, right?
20   A. Yes, sir.
21   Q. Whose handwriting is that?
22   A. It looks like Mr. Yzaguirre's.
23   Q. And how long was the title work held up here?
24   A. Since October to June.
25   Q. Ten months?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 459

1    A. Eight months. From October to June.
2    Q. Eight months. Correct. And so what -- in your
3  opinion, what needed to have -- a document was missing,
4  the invoice, and apparently the price was not high
5  enough according to the documents, but the tax
6  was -- but the amount was determined to be 2,000 and
7  that's what -- the tax that was paid on it?
8    A. Yes, sir. If you look at the handwriting
9  and -- the one we're checking, which is Bates 65, and
10  Bates 60, it's the same handwriting.
11    Q. In your opinion?
12    A. In my opinion.
13    Q. And which --
14    A. On the -- both 130-U forms.
15    Q. So you're referring to Bates 65?
16    A. Bates 65 and Bates 60.
17    Q. Bates 65 and Bates 60, which number?
18    A. The whole 130-U form, the application for Texas
19  certificate of title.
20    Q. So you're saying the signatures didn't match, in
21  your opinion?
22    A. No, I'm just saying that they're two different
23  transactions, but it was handwritten by the same person,
24  it's the same handwriting.
25    Q. Okay.

Page 460

1    A. And both needed an invoice.
2    Q. Okay. All right. Do you recall specifically
3  talking to Mr. Yzaguirre about that or anyone in the
4  office?
5    A. On this one -- well, like I told you before,
6  when he would come and request to see files, I would
7  explain him what was wrong with them, what they needed,
8  what the customer needed to do -- just to bring an
9  invoice, we'd give him an appointment, or just bring an
10  invoice or call and we would tell him. And he would
11  always get upset at me.
12    Q. Because he wanted you to work on the stolen
13  cases?
14    A. I don't think so. I think he was just upset
15  that I would always ask questions and I was just doing
16  my job.
17    Q. In your opinion. But he wanted you to work on
18  the stolen cases, right? Isn't that what you wrote down
19  on your memo in 32?
20    A. He just told me that one time. But if we would
21  do -- we would require an invoice from any other citizen
22  of this county -- every time they would bring a car, to
23  bring us an invoice. And they would provide us with an
24  invoice and we would do the transfer. I mean, these
25  people just needed an invoice. That's all they needed.

Page 461

1    Q. Okay.
2    MR. VITTITOE: Object, nonresponsive.
3    Q. Let's go to No. -- Bates -- let's go to tab 8,
4  Bates 70 on Exhibit 1. Looking at the title status
5  report, what was wrong, in your opinion or your
6  understanding, with this transaction?
7    A. Can I say what I see?
8    Q. Uh-huh.
9    A. Okay. It's the same handwriting as the other
10  two, Bates 60 and Bates 65. Okay. Same handwriting on
11  the 130-U form.
12    Q. So are you saying the handwriting didn't match?
13  Is that what you're saying?
14    A. No, no. I'm just telling you what I see, okay?
15    Q. I'm trying to understand what --
16    A. He needed a purchase order. The customer,
17  Isauro Garza, needed a purchase order. And when I
18  called the dealer, he was a wholesaler. Wholesalers are
19  people that buy the cars and take them to Mexico. They
20  don't pay sales tax. They release the title, and they
21  need to take it and get it registered in Mexico.
22    Q. Okay. But they were registering the vehicle
23  here in Cameron County, right?
24    A. He was trying to get it registered.
25    Q. Right. And was it ultimately registered in

Page 462

1  Cameron County?
2    A. No, they gave them plates -- can I explain how
3  it worked?
4    Q. Sure. Go ahead.
5    A. Okay. The clerk in the front line does the
6  paperwork. At the end of the day they would give the
7  titles to Lupita and Lupita would check them. If she
8  had any questions or any doubt, she would put me notes
9  or something and -- or they would fill out a form when
10  they would see some paperwork from the customer. They
11  would give them to me. So until I got the original
12  paperwork, then I would call the dealer, I would check
13  what I had to do. But it wasn't until after I
14  physically had the titles in front of me.
15    Q. Okay. So, again, on Bates 70, what did
16  Mr. Yzaguirre authorize you to do or what did he do?
17    A. On this paperwork?
18    Q. It says "okay by Mr. Yzaguirre." What did he
19  approve?
20    A. To process it and send it to Austin.
21    Q. Process the title recording in Cameron County?
22    A. The title registered in Cameron County, even
23  though it was missing paperwork, it was sold for export,
24  yes, he told me to process it.
25    Q. Okay. Where do you show that it was sold for

372a6808-ba53-477d-b5b7-71e427ba6c6d

1  export on this document?
2      A. You probably can read the invoice. I called the
3  dealer.
4      Q. No, on the paperwork, where does it say it was
5  sold for export?
6      A. On the paperwork or on the --
7      Q. Yes, ma'am.
8      A. On the invoice.
9      Q. And where's -- that's Bates what?
10     A. Bates 76. You probably can't read it from this
11 one.
12     Q. That's my question. It appears to be a consumer
13 credit disclosure installment contract. Are you saying
14 on that page it's showing it to be sold to export?
15     A. The dealer.
16     Q. Well, isn't there a Brownsville address shown on
17 the buyer, on Bates 76 where it says buyer and has a
18 Brownsville address?
19     A. I'm sure that on this part on payment due, there
20 is something.
21     Q. I don't --
22     A. Well, you can't see it. You don't have the
23 original. I had the original or a fax of the original.
24     Q. Well, isn't it true that Louisiana titles don't
25 have marked on the face of the title whether the vehicle

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  was sold to export?
2      A. A lot of the states have their legal --
3      Q. I'm talking about Louisiana.
4      A. I don't recall. I don't remember.
5      Q. Well, I'll tell you they don't.
6      A. Okay. You're telling me.
7      Q. Okay. Now, Texas does, right?
8          MS. GILSON: I object to the extent that
9  Counsel is testifying.
10         MR. VITTITOE: Well, I'm just asking her.
11     Q. Do you understand that?
12         MS. GILSON: Well, you just --
13     Q. Maybe I'm not being fair. Is there anything in
14 the paperwork that we have in front of us that indicates
15 that this transaction involved a purchase in Louisiana
16 for export out of the United States?
17     A. I'm sure this part right here, the buyer, Garza,
18 Garza's Auto Sales. I mean, you can see the auto sales
19 right next to it, AS. Isauro Garza --
20     Q. It says Brownsville, Texas, doesn't it?
21     A. No, no, no, no. Right next to it, on the
22 buyer's name, "Isauro Garza AS," auto sales.
23     Q. Okay. What does that mean?
24     A. A wholesaler.
25     Q. Well, but there is nowhere on the face of the

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  title documents --
2      A. You don't get it on the title, sir. I mean, you
3  get a copy of the purchase order they give the buyer. I
4  mean --
5      Q. Well, you're referring to 76. There is nothing
6  on 76, Bates 76, that says that this is an export
7  transaction.
8      A. Well, Isauro Garza's Auto Sales, and when you
9  call the dealer with a phone number and they tell you
10 and they send you a fax telling you that he is a
11 wholesaler and the vehicle is sold for export only.
12         MR. VITTITOE: Objection, nonresponsive.
13     Q. Is there anything in tab No. --
14         MR. HODGE: 8.
15     Q. -- 8, on the face of the documents, that says
16 that it's an export sale?
17     A. Not on the documents. Just --
18     Q. Yes or no?
19     A. Not on the documents, just the purchase order.
20     Q. The answer is no, correct?
21         MS. GILSON: Object. She's stated that it
22 was faxed and it wasn't faxed too clearly. It
23 might -- I mean, she's testified to that.
24     Q. Well, what I'm asking you about is on the face
25 of these documents, which are the only documents that we

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

1  can rely on.
2      A. Well, like I'm telling you, I'm trying to
3  explain to you, when you deal and you do titles for so
4  long, you get to know what each thing means, okay?
5  Isauro Garza's Auto Sales, I called the dealer, I have
6  the phone number. I spoke to the dealer.
7      Q. I know you said that, but, see, I'm not
8  interested in that. What I'm interested in knowing is
9  on the face of the documents, what the documents say, is
10 there anything on the face of the documents -- not what
11 you were told over the phone or what you -- whatever --
12 on the face of the document indicates to you that this
13 is a vehicle that cannot be registered in Cameron
14 County, Texas?
15     A. I have a purchase order. For me --
16     Q. Okay. For you. And you're referring to
17 Exhibit 76?
18     A. 76.
19     Q. I can see how that might have been a problem in
20 the office.
21     A. Doing my job.
22     Q. Yes.
23         MS. GILSON: I object to Counsel's comment.
24         MR. HODGE: Before you go ahead, Craig, I'm
25 confused. You said Exhibit 76. Do you mean --

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 467

1    MR. VITTITOE: Bates 76.
2    MR. HODGE: Bates 76, just for the record.
3    MR. VITTITOE: Excuse me. Bates 76 is part
4  of tab No. 9.
5    MR. HODGE: No, 8.
6    MR. VITTITOE: It's part of tab No. 8 in
7  Exhibit 1.
8    THE WITNESS: And I'm sorry. It's that I
9  know you're not used to dealing with titles. You know,
10  I'm sorry if I --
11    MR. HODGE: You don't have to explain
12  anything to me.
13    MR. VITTITOE: He's trying to clear up
14  my --
15    MR. HODGE: My comment was only about the
16  record.
17    MS. GILSON: And I just want to make sure
18  that -- I'm objecting to Counsel's comments about the
19  confusion in the office. I think that's --
20    MR. VITTITOE: And that's probably a
21  sidebar. I agree.
22    MS. GILSON: Okay. I want to make sure the
23  objection is on the record.
24    MR. VITTITOE: Okay.
25   A. I'll try to go slow.

Page 468

1   Q. No, no. I'm trying to move this along.
2   A. Well, and I'm trying to explain you the best
3  that I can, the easier --
4   Q. No, I know you're trying to explain, but that
5  may be the problem. I just want you to answer the
6  question. And your attorney can --
7    MS. GILSON: You'll get your day in court.
8   Q. You'll get your day in court.
9   A. Okay. Okay. I just don't want to agree to
10  something that --
11   Q. On the face of any of the documents under tab 8,
12  there is nothing in writing that says it's an export
13  transaction?
14   A. Which one did you say?
15   Q. The one we've just been talking about.
16   A. What did -- ask me -- repeat me the question,
17  please. I was sorting the other one. That's why.
18   Q. Under tab No. 8 --
19   A. Okay.
20   Q. -- that commences with the Bates pages 71
21  through 76, isn't it true that there is not any document
22  that in writing says it's for an export transaction
23  only?
24   A. No, it doesn't say it was export.
25   Q. Thank you, ma'am. Go to tab No. 9. And,

Page 469

1  incidentally, before I -- how long was this transaction
2  held up on tab 8? About eight months?
3   A. Probably. Well, yeah, we had said eight months.
4   Q. About eight months. Okay. Let's go to tab
5  No. 9. Look at Bates 77 under Exhibit 1.
6   A. Yes, sir.
7   Q. Apparently, this matter came to your attention
8  on 10/24 of 2000, correct?
9   A. Yes, sir.
10   Q. And it was held up because there needs to be an
11  invoice, correct?
12   A. Yes, sir.
13   Q. And, in your opinion, the price was too low,
14  correct?
15   A. Yes, sir.
16   Q. Anything else?
17   A. The bill of sale.
18   Q. I'm sorry?
19   A. The bill of sale.
20   Q. Is that the same thing as the invoice?
21   A. It's a purchase -- yeah, an invoice.
22   Q. Okay.
23   A. Invoice --
24   Q. Invoice, and the price was too low, right?
25   A. Can I say invoice and bill of sale are

Page 470

1  different, or no?
2   Q. Well, okay. Maybe I'm -- the Bates memo 77 says
3  it needed an invoice and the price was too low.
4   A. Okay. Invoice is with the name -- the name, the
5  phone number and everything, address of the dealership
6  The bill of sale is just this. If you buy it from a
7  dealer you need a bill of sale -- I mean, an invoice.
8   Q. But, at any rate, who determined the price was
9  too low?
10   A. We had a book or Marizol would look at it in the
11  computer and -- or even the investigators.
12   Q. And apparently the price was adjusted to $2,000?
13   A. Mr. Yzaguirre put that price.
14   Q. And it was approved?
15   A. He approved it.
16   Q. He has that authority under the law to do that?
17   A. Yes, but I was the title examiner, and I was
18  just doing my job.
19    MR. VITTITOE: Object, nonresponsive.
20   Q. He adjusted the price and the transaction
21  cleared, correct?
22   A. Yes.
23   Q. And how long was it held up?
24   A. About eight months or something.
25   Q. Okay. Let's go to the next transaction --

372a6808-ba53-477d-b5b7-71e427ba6c6d

Page 471

1    MR. HUGHES: What was the answer?
2    MR. YZAGUIRRE: Eight months.
3    Q. Go to the next transaction, tab 10 under Exhibit
4  1, and go to Bates 86.
5    A. Okay.
6    Q. This is a transaction that came to your
7  attention in November of 2000, correct?
8    A. Correct.
9    Q. In your opinion, looking at Bates 86, what was
10 wrong with the title documentation?
11   A. Well, the back of the title was altered.
12   Q. How was it altered?
13   A. Well, it was erased. It was scratched out, and
14 it was from a dealer.
15   Q. Okay. You think the title was -- there was some
16 discrepancy on the back of the title where the
17 endorsement is done?
18   A. Yes, sir.
19   Q. And that caused you some concern?
20   A. It did.
21   Q. What page, Bates page?
22   A. Page 94. Well, I'm sorry Bates 80 -- 90.
23   Q. Okay.
24   A. Bates 90. The second assignment, the second
25 dealership assignment. The second dealership, second

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 472

1  assignment.
2    Q. Okay.
3    A. Yes. And I called the dealer to verify if they
4  had signed that affidavit. I mean, being a dealer, they
5  don't release the paperwork to a customer, especially in
6  the state of Texas.
7    Q. What else is wrong with the transaction, in your
8  opinion?
9    A. I called the dealer. They FedExed overnight
10 paperwork, copies, statements saying that they never
11 signed that paperwork, that affidavit, and for us not to
12 process the paperwork.
13   Q. Say it again.
14   A. For us not to process the transaction.
15   Q. Where is that paperwork?
16   A. The copies are right here.
17   Q. Which Bates?
18   A. I'm sorry. Bates 94, fraudulent affidavit.
19   Q. Okay. But, at any rate, this transaction was
20 approved by Mr. Yzaguirre?
21   A. Yes, he approved it.
22   Q. When did he approve it?
23   A. He approved it on November the 27th, 2001.
24   Q. Did he tell you why he approved it?
25   A. No, he didn't tell me. That's one -- that's

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 473

1  probably the Angeles one that we really got into it that
2  I told him he was not -- he was breaking the law, he was
3  not doing --
4    Q. You told him he was breaking the law in doing
5  what?
6    A. The paperwork was wrong. We had a statement
7  from an Enterprise dealer, rental car, a big company,
8  stating that they had falsified their signature, and he
9  still approved it. And I had -- I showed him --
10   Q. And you actually told him that he was breaking
11 the law? Is that what you're telling me?
12   A. Well, I told him he was doing it wrong. The
13 paperwork was not complying with the requirements we
14 had.
15   Q. I understood you to say that last time. From
16 time to time you would say, "I disagree with you for
17 this reason. I believe you're wrong." And that's what
18 you said on this time? You never accused him of
19 violating the law, did you?
20   A. I told him that the paperwork was not complying
21 with the requirements we had, and he was approving it.
22   Q. Yes. But my specific question to you, so make
23 sure you understand this, did you ever accuse him of
24 violating the law?
25   MS. GILSON: In relation to this

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 474

1  transaction?
2    Q. Yes, in relation to this transaction.
3    A. The paperwork?
4    Q. Or any transaction.
5    A. Yes, because the rest of the customers would
6  have to bring what was required.
7    MR. VITTITOE: Objection, nonresponsive.
8    Q. Did you, germane to this transaction, ever
9  accuse him of violating the law? I understand that you
10 disagreed with him, that you told him it was wrong, but
11 did you ever tell him that he was violating the law?
12   MS. GILSON: Regarding this transaction.
13   Q. Yes.
14   A. Okay. I thought you were saying something else.
15 I was like --
16   Q. That's what I'm asking you. Did you ever say,
17 "Hey, boss, Mr. Yzaguirre, you're violating the law"?
18   A. I don't remember if I told him violating the law
19 or not complying with the requirements we had.
20   Q. The reason I ask you that is the last time you
21 said that you would tell him that he was wrong, you
22 disagreed with him and you would show him, but you told
23 us last time that you never accused him of violating the
24 law.
25   MS. GILSON: Objection. Assumes facts not

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 475

1  in evidence.
2      A. Like I'm saying, we would argue a lot, sir,
3  every time he would request something.
4      Q. But what I'm asking you, ma'am, and I asked you
5  this several times last time and you told me you never
6  accused him of violating the law.
7          MS. GILSON: Object. Assumes facts not in
8  evidence.
9      Q. And your counsel is continuing to interrupt the
10  deposition. I'm asking you again. Did you ever accuse
11  him of violating the law germane to this transaction?
12  You're under oath.
13     A. I don't remember.
14     Q. Did you at any time before you left the office
15  as an employee ever accuse him of violating the law?
16  And you're under oath.
17     A. I know I'm under oath.
18     Q. Ever? Ever accuse him of violating the law?
19     A. I think I told him once or twice, but --
20     Q. You think you told him once or twice. When?
21     A. I don't remember dates, sir. I mean, you're
22  talking to me about -- this is six years ago.
23     Q. That's exactly right. You brought a lawsuit.
24  And I want to know, did you ever accuse him of violating
25  the law? And then the next question is what law? Did

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 476

1  you ever accuse him of violating the law in any
2  conversation that you ever had with him when you worked
3  for him? Yes or no?
4      A. I don't remember.
5      Q. That's what I understood. Let's go to the
6  next -- oh, incidentally, how long was this transaction
7  held up?
8      A. From November to November, a year.
9      Q. Did you have any evidence that this vehicle was
10  stolen?
11     A. Not that it was stolen, just that --
12     Q. Let's go to tab 10. That's the one we just did.
13  Let's go to 11. Bates 106, looking at the title status
14  report, this vehicle was held up on November the 20th,
15  2000, as I understand it; am I correct?
16     A. Yes, sir.
17     Q. What was wrong with this transaction that caused
18  it to be held up?
19     A. On this one, the purchase order was a copy.
20     Q. The purchase order was a copy?
21     A. Was a copy.
22     Q. So you're telling us that you required an
23  original purchase order?
24     A. Most of the people would bring one, but if it
25  was a copy, I was supposed to call and check that -- if

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 477

1  it was an original.
2      Q. What other problems, if any, or discrepancies
3  did you see in this transaction which is tabbed 11,
4  commencing on page 106?
5      A. Okay. I'm sorry, 112. When I called the
6  dealer, the dealer told me that they had never sold this
7  vehicle to this person, that it was sold to an Eloy
8  Rubalcaba from Mexico for $700.
9      Q. Is there anything on the face of the documents
10  under Bates 106 through 114 that indicates that this was
11  an export transaction form?
12     A. No, it doesn't say, sir.
13     Q. Mr. Yzaguirre approved it on -- for recording in
14  Cameron County through the state on February the 6th,
15  2002?
16     A. "Release, car sold already."
17     Q. And that was held up, what, about over a year
18  and a half?
19     A. Yes.
20     Q. In fact, longer than a year and a half, right?
21     A. Yes.
22     Q. A year and eight months?
23     A. Probably.
24     Q. Go to tab No. 12. Commencing on Bates 115 on
25  Exhibit 1, refer to the title status report. This

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 478

1  vehicle came to your attention on or about November --
2  excuse me, December the 1st of 2000. Why was this
3  transaction held up?
4      A. The thing that caught my attention was that they
5  used the incorrect dealer number.
6      Q. Anything else?
7      A. We had -- we had a problem with B&M.
8      Q. You had a problem with what?
9      A. B&M, the dealer; the B&M wholesaler.
10     Q. What was the problem?
11     A. The problem was that this dealer was saying that
12  they were in Harlingen. And one of the investigators
13  went to the place; there was no dealer at that address.
14  The registered owner was from Corpus. The man came over
15  and gave us a letter saying that he didn't want for us
16  to process that paperwork, that he had closed his
17  dealership, he had canceled his dealer license with the
18  state, and that he didn't want for us to process no more
19  paperwork coming from B&M, that it was Nick Abusalah, an
20  Arabian guy, or Abusalah, whatever, he was using his
21  dealership. And --
22     Q. Was this transaction approved by Mr. Yzaguirre?
23     A. Yes, by Mr. Yzaguirre.
24     Q. On when?
25     A. November the -- January the 8th, 2002.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 479

1    Q. January the 8th, 2002?
2    A. Pardon me?
3    Q. 2002?
4    A. 2002.
5    Q. So it was held up what?
6    A. A year and --
7    Q. A year and a couple of months?
8    A. (Moving head up and down)
9        MR. HODGE: Is that a yes?
10   A. Yes.
11   Q. Going to tab 13, Bates 122 on Exhibit 1. This
12   came to your attention on December the 4th, 2000; am I
13   correct?
14   A. Yes, sir.
15   Q. And why was it held up?
16   A. It needed an invoice.
17   Q. Is that it?
18   A. Yeah, it just needed an invoice.
19   Q. And Mr. Yzaguirre apparently approved the
20   transaction to go through on February the 8th, 2002?
21   A. 2002.
22   Q. Is that correct? Your answer is yes?
23   A. Yes, sir, correct.
24   Q. And so it was held up, what, a year and a couple
25   of months?

Page 480

1    A. Yes.
2    Q. Tab 14, Bates 129 through Bates 136, document
3    what? And the reason I say that, I didn't see a title.
4    A. Because it's something different.
5    Q. Okay. Could you tell me what this is, 129
6    through 136?
7    A. Yes, sir. We had -- Lupita had made some forms
8    when they would see the paperwork from the customer.
9    It's an auto crime -- it's a force -- or Mireles did it
10   or Lupita. I don't recall who did that form.
11   Q. Okay.
12   A. And they were in the front with the supervisor.
13   Every time somebody would do something wrong, like a
14   dealer release the paperwork that by law they can't
15   release it, or -- the people in the front line would
16   take -- take away the paperwork from the customer and go
17   talk to the supervisor and the supervisor had to approve
18   it, if she thought they had a good reason to take away
19   the paperwork from the customer or not. And on this
20   one, Elida, the supervisor approved it because the
21   dealer released the paperwork to the customer, which was
22   a $500 fine.
23       MR. VITTITOE: Object, nonresponsive.
24   Q. Is this a title transfer documentation or --
25   A. That's what I'm trying to --

Page 481

1    Q. I just have -- I guess I'm just slow.
2    A. No, no, no. That's why I'm trying to --
3    Q. And you're explaining it, but I would stipulate
4    that I'm slow.
5    A. No, no, no, no. Well, now you --
6    Q. Was the title work being held up for anything?
7    A. That's what I was telling you. If something was
8    wrong, they would take away your title.
9    Q. Who would take away the title?
10   A. The clerk and the supervisor from the front
11   line.
12   Q. Okay. Did Mr. Yzaguirre have anything to do
13   with this transaction --
14   A. This was from --
15   Q. -- other than being the tax assessor-collector?
16   A. Okay. On this one, this is the complaints or
17   problems I had to fax to Austin. And -- like when the
18   dealer released the paperwork, I had to fax it to
19   Austin, to Rayna Squires, and send out faxes of
20   everything.
21   Q. Okay. Let me ask you. On Bates 129 through 136
22   under tab 14, you're telling me you faxed this
23   documentation to Austin, correct?
24   A. I don't think I ever did that, because he
25   approved it. So I don't remember.

Page 482

1    Q. Okay.
2    A. I don't remember, sir.
3    Q. Did you talk about this transaction with
4    Mr. Yzaguirre?
5    A. On this one I talked to Elida when she brought
6    it, because they would give it to me at the end of the
7    day.
8        MR. VITTITOE: Object, nonresponsive.
9    Q. Did you ever talk to Mr. Yzaguirre?
10   A. Not to -- Mr. Yzaguirre? Hold on. I don't
11   remember on this one.
12   Q. Okay. That's fair. Why were you -- while we're
13   at that point, why were you faxing documents to Rayna
14   Squires?
15   A. Why?
16   Q. Yes.
17   A. When they would come to the conferences, they
18   would give us classes and all that. As per her and
19   there was another lady that would come -- or
20   Mr. Barbosa, Juan Barbosa -- every time a dealer would
21   do something they weren't supposed to do like release
22   paperwork, we were supposed to fax them the paperwork so
23   they would get like a ticket or fine. It was like a
24   $500 fine for this.
25   Q. Oh, so they wanted you to police the dealers for

Page 483

1  them?
2      A. No, we wouldn't do that.
3      Q. Okay. What were you doing for them?
4      A. Well, we would just fax the paperwork and they
5  would take care of whatever they had to do.
6      Q. Okay. Were you faxing a lot of paperwork to
7  Shawna (sic) Squires?
8      A. Just when it was necessary, whatever was --
9      Q. When a dealers number was wrong or they were
10 operating under --
11     A. No.
12     Q. I think I'm trying to understand as to what sort
13 of paperwork were you faxing up to her?
14     A. Okay. Like I told you, dealers by law, they're
15 not supposed to release the paperwork to a buyer. The
16 dealer is responsible to go do the transfer, okay, or
17 send a runner or whoever they want to send, but somebody
18 from the dealership. They're not allowed to give the
19 paperwork to the purchaser. And in this case this
20 gentleman purchased the car from the dealership, from JC
21 Motors and the person showed up at the tax office with
22 the title.
23     Q. You're talking about the consumer did, the
24 purchaser?
25     A. The purchaser, I'm sorry the purchaser. The

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 484

1  person that bought the car.
2      Q. The customer. I think you call them a customer.
3      A. Customer. Well, the customer.
4      Q. Customer showed up and, in your opinion, the
5  customer shouldn't have showed up with the paperwork?
6      A. Not only my opinion, even the supervisor and the
7  clerks knew that.
8      Q. I'm just asking about your opinion, though.
9  But, at any rate, because of that you advised Shawna
10 Squires that this dealer was not doing it right?
11     A. I just let her know and I didn't take it away.
12 It was the supervisor in the front.
13     Q. I'm sorry?
14     A. I didn't take it away from the customer. It was
15 the supervisor.
16     Q. I understand that. Were you faxing anything
17 else to Shawna Squires other than those types
18 of things?
19     A. Rayna.
20        MS. GILSON: Rayna.
21     A. Rayna.
22     Q. Rayna.
23     A. Rayna. Rayna Squires.
24     Q. Rayna Squires? Were you faxing anything else to
25 her other than these discrepancies with dealers?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 485

1      A. Like I'm saying, just whatever it was wrong or
2  whatever they needed, you know.
3      Q. See, I don't know.
4      A. I can't tell you.
5      Q. Was Shawna Squires asking you to fax particular
6  types of transactions, or just anything that you thought
7  she ought to --
8      A. Rayna.
9        MS. GILSON: Rayna.
10     A. Rayna.
11     Q. Rayna Squires instead of Shawna, yes --
12 Sha-na-na. Was -- was Rayna Squires asking you to fax
13 to her any particular types of transactions?
14     A. There were several, yeah, particular -- there
15 were several. One of them was like when they would
16 release the title to the purchaser or the --
17     Q. What other types were there?
18     A. When they had an expired license.
19     Q. The dealer had an expired license?
20     A. Dealer expired license.
21     Q. Okay.
22     A. And they were still selling cars.
23     Q. Okay. What else? Next.
24     A. If a customer had purchased the car and they
25 didn't do the transfer in 20 working days, they wouldn't

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 486

1  provide the purchaser with their plates and their
2  paperwork.
3      Q. Okay.
4      A. That was another one.
5      Q. Next?
6      A. There were more. I can't remember. Probably --
7  if I start thinking, I'll probably have you longer, but
8  I can't think -- if I remember, I'll --
9      Q. About how many faxes did you -- different faxes
10 do you estimate that you did to Rayna Squires --
11     A. Rayna Squires. I don't remember.
12     Q. -- throughout the years?
13     A. I don't remember.
14     Q. Would it be five, ten, 500?
15     A. No, not 500. I don't remember, sir. Honestly,
16 I don't.
17     Q. All right. Going to tab 15, under Bates 137,
18 would you look at that title status report and tell us
19 what this transaction was about?
20     A. Okay. We had an office policy which -- we had
21 several of them, okay? One of them was if -- when you
22 bought a car and you would bring up a --
23     Q. Let me just object. Let's don't talk about all
24 this policy. Why was this transaction held up?
25 Just was -- No. 1, the price was too low? Is that what

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 487

1 it says on Bates 137, correct?
2   A. Yes, sir.
3   Q. And, secondly, it was a Louisiana title and the
4 bill of sale was notarized in Texas?
5   A. Was notarized in Texas.
6   Q. And anything else that caused you any
7 discrepancy on this transaction?
8   A. Well, it says that -- what it says next, that it
9 was from out of state; they needed to bring us a copy of
10 the seller's driver's license and the phone number.
11   Q. All right. This transaction came to your
12 attention on --
13   A. 2000.
14   Q. December 20th of 2000, correct?
15   A. 2000, yes, sir.
16   Q. But, at any rate, you recall talking this over
17 with Mr. Yzaguirre and, for whatever reason, he approved
18 it, right?
19   A. He approved it, yes, sir.
20   Q. So the documentation was sent to Austin on June
21 the 8th, 2001, right?
22   A. Yes, sir. We discussed it and it was approved.
23   Q. It was held up for about, what, a year and six
24 months -- no, six months, right?
25   A. Yes, six months.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 488

1   Q. Okay. Do you remember anything in particular
2 about that transaction other than what you just told us?
3   A. Not at this moment.
4   Q. Is Bates -- excuse me, tab 16, Bates 145 through
5 160, another Rayna Squires matter?
6   A. Yes, sir.
7   Q. What was the discrepancy that you found here
8 with the dealer?
9   A. The supervisor and the clerk in the front -- it
10 was an open title. That was one of the other things.
11 You could not have an open title.
12   Q. So you were basically intending to fax
13 documentation to Rayna Squires?
14   A. Yes, sir.
15   Q. Was the documentation faxed to her attention or
16 not?
17   A. I don't remember right now, sir.
18   Q. What is significant in this case about Bates 145
19 through 160 as it pertains to Mr. Yzaguirre?
20   A. Okay. Okay. Popular Motors, it's a dealership
21 in Houston giving an open title, one thing. When I
22 called the dealer, told them why, it's --
23   Q. I know all that, but I'm trying to understand
24 what did Mr. Yzaguirre --
25   A. Do you want to read the other part, the

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 489

1 second -- there's another status report right next to
2 it.
3   Q. Yeah. Tell me what -- what you did with
4 Mr. Yzaguirre or that Mr. Yzaguirre had to do with this
5 transaction under tab 16.
6   A. Okay. He asked me for the paperwork. I told
7 him what was wrong, that it was sold for export. I had
8 copies of everything. And --
9   Q. I understand that. Then what happened?
10   A. Well, I told him that it couldn't be done. I
11 showed him. I explained him. And I told him we
12 couldn't do it, it was sold for export, it had to be
13 taken to Mexico.
14   Q. Okay. And what did he do?
15   A. He approved it.
16   Q. Okay. And where is that shown? On Bates
17 what -- Bates 155?
18   A. It's missing the other part.
19   Q. Is it Bates 155?
20   A. Hold on. Yeah, 155.
21   Q. Okay. Is there anywhere on the documentation
22 Bates 145 through 160 that the transaction was for
23 export only on the face of the documentation?
24   A. The investigator -- the investigator said the
25 title was for export.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 490

1   Q. Say that again.
2   A. The investigator.
3   Q. I'm talking about the face of the transaction.
4   A. Oh, the title needs to be sold -- the title
5 needs to be stamped "sold for export."
6   Q. If it's a Texas title?
7   A. Even if it is -- no, we -- Mr. Yzaguirre had
8 ordered some stamps that said "sold for export." We
9 would stamp the titles on the front.
10   Q. So you're saying that that was the problem with
11 it, it needed to be stamped for export?
12   A. It was sold to -- it was purchased to be taken
13 to Mexico.
14   Q. But if it was sold for export, it couldn't be
15 registered here, thus the tax couldn't be collected
16 here, correct?
17   A. If it was sold for export, they had to take it
18 to Mexico and have a Customs clearance --
19   Q. Right.
20   A. -- to bring it back and --
21   Q. In the real world what that would mean also is
22 that tax would not be coming in to the Cameron County
23 tax office, right?
24   A. It was because there were no sales taxes.
25   Q. Is that right or not?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 491

1      A.  No, that's right.
2      Q.  Tab 17 under -- under Exhibit 1, Bates 161
3  through 166, look at the title status report.  And what
4  was wrong with this transaction?
5      A.  What it says.  She needs an invoice, and there
6  is no current dealer -- there is no dealer with that
7  name, Daniel Brothers.  The dealer they used didn't
8  exist.  I believe this affidavit wasn't notarized.
9      Q.  Mr. Yzaguirre approved it on June 8, 2001?
10      A.  Yes, sir.
11      Q.  Do you remember that?  You do or don't?
12      A.  If I have it in my status report, yes.  If I
13  have it in my status report, yes, I do.
14      Q.  You mean if it's typed in?
15      A.  If it's typed in.  Marizol would type -- we
16  would type everything in at that moment.
17      Q.  No, I'm saying you remembered it then but you
18  don't necessarily remember it now; is that fair?  That's
19  fair?
20      A.  Yes.
21      Q.  Okay.  Thank you.  Let's go to tab 18, Exhibit
22  1, Bates 167 through 171.
23      A.  Uh-huh.
24      Q.  This transaction came to the office's attention
25  on 3/28 of '01.  What discrepancies did it have, in your

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366        Harlingen (956) 428-0755        Brownsville (956) 542-1020

Page 492

1  opinion, to the title work, title paperwork?
2      A.  Junior's Used Cars -- Junior's Used Cars --
3      Q.  Okay.
4      A.  -- released the paperwork to the lady.
5      Q.  It shouldn't have done that, in your opinion?
6      A.  They shouldn't have.  Well, not mine, the state.
7      Q.  Okay.
8          MR. VITTITOE:  Object, nonresponsive.
9      Q.  But, at any rate, in your -- what else was wrong
10  with this transaction, in your opinion?
11      A.  Well, it had to be sent to Austin.  The title
12  was not assigned to the buyer.
13      Q.  Okay.
14      A.  And Mr. Yzaguirre, on this one, he came, he was
15  upset.  I gave him the paperwork.
16      Q.  You remember that he was upset?
17      A.  He was always upset, sir, when he would go and
18  ask me for a title.
19      Q.  So -- okay.  So this transaction was approved on
20  April the 11th, 2001?
21      A.  Yes, sir.
22      Q.  Okay.  So tab 19 --
23      A.  And he wrote the note on the bottom of that.
24      Q.  What did he say?
25      A.  "Original" -- "original" -- "give original to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366        Harlingen (956) 428-0755        Brownsville (956) 542-1020

Page 493

1  Enrique, Sr. to give to Junior's to take care of."
2      Q.  Okay.  And that's on Bates what?
3      A.  Bates 167.
4      Q.  Okay.  Go to the next tab, 19, Bates 172 through
5  183.  This is another export transaction, in your
6  opinion, at the time?
7      A.  Yes.
8      Q.  Okay.
9      A.  Let me look at the paperwork.  It was one that
10  had to be faxed to Rayna Squires.
11      Q.  Say it again.
12      A.  It had to be faxed to Rayna Squires.
13      Q.  Let's go back.  If you would, look at 167 for
14  me, Bates 167 on the prior tab.
15      A.  Okay.
16      Q.  Who wrote that at the bottom of the page, "gave
17  original to Enrique, Sr."?
18      A.  Mr. Yzaguirre.
19      Q.  Say that again.
20      A.  Mr. Yzaguirre.
21      Q.  Mr. Yzaguirre indicates to me that that's not
22  his handwriting.  Do you know whose that is?
23          MS. GILSON:  Object.  Testimony from
24  someone who hasn't testified yet.
25          MR. VITTITOE:  No, I'm just telling her

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366        Harlingen (956) 428-0755        Brownsville (956) 542-1020

Page 494

1  that he says it's not his.  And I'm asking her --
2          THE WITNESS:  He signed in front of me.
3          MS. GILSON:  I'd like for him to testify to
4  that.  So it assumes facts not in evidence.
5      Q.  Do you know whose handwriting that is?
6      A.  His.
7      Q.  Okay.  In your opinion, it's his?
8      A.  I saw him.
9      Q.  Say that again.
10      A.  I saw him.
11      Q.  Okay.  You saw him write that?
12      A.  Yes.  He would write his notes in front of me.
13      Q.  Okay.  So you actually -- as you sit here today,
14  you remember that he signed that transaction back in
15  2001?  You remember that?
16          MR. HODGE:  Let me object to the form of
17  that question.  You don't mean he signed the
18  transaction?
19          THE WITNESS:  No, the note.
20          MR. HODGE:  What was your question?  I
21  don't think she --
22      Q.  You actually remember that Mr. Yzaguirre wrote
23  the -- on the bottom of Bates 167, "gave original to
24  Enrique, Sr.," et cetera, et cetera in his own
25  handwriting on that day?  You remember that as you sit

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366        Harlingen (956) 428-0755        Brownsville (956) 542-1020

Page 495

1  here today?
2      A. He signed it in front of me, sir.
3      Q. And as you sit here today, you remember that he
4  wrote that down?
5      A. Yes, sir.
6      Q. And you're absolutely sure about that?
7      A. Yes, sir.
8      Q. And we're referring to the very bottom of Bates
9  167 under tab 18?
10     A. Yes, sir.
11     Q. Okay. So you're telling me under tab 19 that
12 Bates 172 through 183 were faxed to --
13     A. Rayna Squires. Rayna.
14     Q. Rayna Saenz?
15     A. No, Rayna Squires. Rayna.
16     Q. Rayna Squires?
17         MR. HODGE: I think everybody needs to take
18 a little break and move around a little bit. Everybody
19 is getting tired.
20     (Brief recess)
21     Q. I want to go over one thing, if I could, while I
22 have everybody's mind fresh on it. Mrs. Cantu, on tab
23 18 of Exhibit 1, Bates 167, I'm going to show you --
24     A. I have it here.
25     Q. -- that page. Look at the very bottom of the

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 496

1  title status report. Are you saying that all of that
2  handwriting is in the hand of Tony Yzaguirre?
3      A. Yes, sir.
4      Q. Are you saying that what appear to be initials
5  on --
6      A. On the end.
7      Q. Are you saying those marks on the right side of
8  that language at the bottom of Bates 167 is
9  Mr. Yzaguirre's initials?
10     A. Yes, sir. He would make them different
11 sometimes, but yes.
12     Q. Your testimony is that the words "gave original
13 to Enrique, Sr. to give to Junior to take car" --
14     A. "Care."
15     Q. "To take car" or "care"?
16     A. "Take care."
17     Q. "To take care," plus the initials, is all in the
18 handwriting of Tony Yzaguirre?
19     A. Yes, he would sign -- yes, sir.
20     Q. Are you saying that you remember him signing
21 that, as you sit here today, back on about April
22 the 11th, 2001?
23     A. Yes, sir, he would sign in front of me the
24 notes. He would do his notes in front of me.
25     Q. I know. But listen to my question. Do you know

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 497

1  when that language, "gave original to Enrique, Sr. to
2  give to Junior to take care," with the initials, was put
3  on that form?
4      A. I don't remember the date.
5      Q. Do you remember him, as you sit here today,
6  actually signing and completing the document, "gave
7  original to Enrique, Sr.," in front of you?
8      A. Yes, sir.
9      Q. You actually sit here and remember that?
10     A. Yes, sir.
11     Q. Or are you saying that you -- differently, that
12 you're familiar with his handwriting? What are you
13 saying?
14     A. Can I talk? Yes, every time he would go to my
15 office, he would make his notes. He would put his notes
16 on the paperwork and either just write the notes and
17 give me back the file, or there was times he would sign
18 the notes, give them to Lupita, and Lupita would bring
19 it back.
20     Q. The reason I ask you that, that handwriting
21 appears to me to be different.
22     A. No.
23     Q. In your opinion it's not?
24     A. No, sir.
25     Q. But are you telling us that you remember him

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 498

1  actually signing it, as you sit there, or are you
2  telling us that you recognize his handwriting, or both?
3      A. I'm sure he signed it. And, like I'm telling
4  you, every time he would get a file, he would sign his
5  notes in front of us, in front of me. He would get to
6  file, explain it, grab it, and just -- and throw it back
7  at me again. Or he would walk -- it was -- all the time
8  it was different.
9      Q. And that's -- again, what I'm really asking you
10 is, as you sit here today on February the 10th, 2006,
11 which is five years -- about five years and some months
12 away, you actually remember him writing that sentence
13         MS. GILSON: I object to the five years. I
14 don't think it's quite five years.
15     Q. Okay. Over four years.
16     A. Yes, sir, he would always make notes on my
17 paperwork.
18     Q. I'm talking about this specific transaction.
19     A. Yes, sir. Yes, sir.
20     Q. Where on that day, what day of the week was it,
21 and what time of the day?
22     A. I'm not going to remember the day nor the time.
23     Q. Okay. But not knowing the day or the time, you
24 can still say that you remember him actually signing the
25 original of Bates 167 in your presence?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 512

APPEARANCES
COUNSEL FOR PLAINTIFFS:
GAY E. GILSON
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301A
Corpus Christi, Texas 78401
(361) 887-0552
DAVID LEE McGEE
LAW OFFICES OF DAVID LEE McGEE
701 Park Avenue
Corpus Christi, Texas 78401
(361) 888-6489
COUNSEL FOR DEFENDANT CAMERON COUNTY:
BRUCE W. HODGE
CIVIL LITIGATION
LEGAL DIVISION COMMISSIONERS COURT
Cameron County Courthouse
964 East Harrison, 4nd Floor
Brownsville, Texas 78520
(956) 550-1345
COUNSEL FOR DEFENDANT TONY YZAGUIRRE, JR., TAX
ASSESSOR-COLLECTOR OF CAMERON COUNTY AND DIRECTOR,
CAMERON COUNTY AUTOMOBILE CRIMES ENFORCEMENT TASK
FORCE, IN HIS INDIVIDUAL CAPACITY:

CRAIG H. VITTITOE
ADAMS & GRAHAM, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550
(956) 428-7495

ALSO PRESENT:

Tony Yzaguirre, Jr.
Felix Munoz

BRYANT & STINGLEY, INC.

---

Page 513

INDEX

PAGE
Appearances .................................... 512

VICENTA B. CANTU
Examination by Mr. Vittitoe .................. 514
Examination by Mr. Hodge ................... 578
Examination by Ms. Gilson .................... 647
Examination by Mr. Hodge ................... 648
Examination by Mr. Vittitoe .................. 660
Errata Sheet/Signature Page ................. 668
Reporter's Certificate ......................... 669
Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE
NUMBER DESCRIPTION                          IDEN.
38  Memo dated January 2, 2002 from Lupita
    De Leon and Bibi Cantu to Tony
    Yzaguirre, Jr. ...................... 569
39  Letter dated May 17, 2002 from Tony
    Yzaguirre, Jr. To Vicenta Cantu ....... 573

REQUESTED DOCUMENTS/INFORMATION

NUMBER  DESCRIPTION                    PAGE

1   Tax Returns for Years 1999, 2000, 2001
    and 2002 ........................... 635

BRYANT & STINGLEY, INC.

---

Page 514

1           VICENTA B. CANTU,
2   having previously been duly sworn, testified as follows
3           EXAMINATION (Cont.)
4   BY MR. VITTITOE:
5       Q. We're on the record. It's 8:38 a.m. on February
6   the 16th. And, Mrs. Cantu, would you please state your
7   name?
8       A. Vicenta Cantu.
9       Q. Mrs. Cantu, do you understand that your
10  deposition is continuing this morning with the
11  anticipation of it concluding sometime this morning?
12      A. Yes, sir.
13      Q. You understand also that you remain under oath
14  as regarding your testimony today?
15      A. Yes, sir.
16      Q. Did you have the opportunity to bring the tape?
17      A. I did. I looked for it. I didn't find it.
18  So --
19      Q. So the tape is missing?
20      A. I had a copy. I didn't find it. I looked for
21  it and I went through my notes, and nothing. I didn't
22  find nothing else.
23      Q. Okay. Did you look for any additional memos or
24  notes that you have prepared that have any relevance to
25  this case?

BRYANT & STINGLEY, INC.

---

Page 515

1       A. That's what I told you. I looked for notes,
2   copies, everything.
3       Q. Did you find any additional notes or memos that
4   have any relevance to this case?
5       A. No.
6       Q. Did you look for any additional title
7   documentation that has not been produced previously?
8       A. I didn't find anything, sir.
9       Q. Okay. But you did look, correct?
10      A. I did, sir, I did.
11      Q. So it's fair to say that we have all of the
12  documents, notes and memos that are germane to this
13  case?
14      A. Yes, sir.
15      Q. All right. Thank you, ma'am, for doing that.
16      A. You're welcome. I promised you I was going to
17  look, and I did.
18      Q. Thank you, and I appreciate that. Let's go
19  to Exhibit 1 to your deposition, tab No. 19, which
20  commences on Bates stamp 172 through 183.
21      A. 19, right?
22      Q. Yes, ma'am. What I'd ask you to do is study tab
23  19 under Exhibit 1 because I have a few questions of
24  you.
25      A. Yes, sir.

BRYANT & STINGLEY, INC.

086565b0-17fb-4e10-9099-a0093c799959

Page 516

1    Q.  Okay.  You ready so I can ask you a few
2  questions?
3    A.  No, I'm still going over them.  I'm ready, sir.
4    Q.  The documentation under tab 19, which commences
5  on Bates 172, came to your attention on, what, April the
6  19th, 2001?
7    A.  Yes, it was withheld from one of the clerks at
8  the office.
9    Q.  And then it's my understanding that someone made
10  the determination that the transaction was an export
11  sale only?
12    A.  Okay.  First of all, when they -- they
13  confiscated because the dealer released documents and it
14  was an open title, okay?  So when they gave it back to
15  me, that's what one of the notes said.  So I called the
16  dealer.  It was an open title.  It wasn't assigned to
17  nobody.  I called the dealer and asked them who they had
18  sold the vehicle to, who was the purchaser on this
19  vehicle, and it's when they sent a note stating that the
20  vehicle was sold to a wholesaler, somebody from Mexico.
21    Q.  Okay.  Who made the determination that it was an
22  export sale only?
23    A.  Okay.  We had a memo given to us from Mr. Rios
24  like in 2000, 2001, something like that, I don't
25  remember the year, and it was as per Mr. Yzaguirre we

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 517

1  couldn't export them.  He even ordered stamps that said
2  "sold for export."
3    MR. VITTITOE:  Let me object,
4  nonresponsive.
5    Q.  My question is, who made the determination?  Did
6  you make the determination that this was an export sale
7  only?
8    A.  Not me, the memo.
9    Q.  Okay.  My understanding, though, from this note
10  is that you looked at the documentation and determined
11  that it was an export transaction, correct?
12    A.  Well, there is a copy of the letter from the --
13  a statement from the dealer where they're saying that it
14  was sold for export.
15    Q.  But the title was not marked when it came to
16  your attention initially for export only, was it?
17    A.  No, it wasn't marked.
18    Q.  Okay.  But based on your inquiry of the
19  wholesaler, you made a determination that it was an
20  export sale only, correct?
21    A.  Me and the investigator, the lieutenant.
22    Q.  And later this transaction was approved by
23  Mr. Yzaguirre and the title was recorded?
24    A.  Well, the title was stamped "sold for export"
25  and it was given back to the customer.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 518

1    Q.  In other words, your office marked the title
2  "for export only"?
3    A.  Yeah, the lieutenant did, Mr. Pena.
4    Q.  Okay.  And then, subsequently, the title came
5  back for processing through the office and Mr. Yzaguirre
6  approved it for recording in Austin?
7    A.  Yes, sir.
8    Q.  Okay.  Anything else about this title
9  transaction that in your opinion is extraordinary?
10    A.  Well, to think that the dealer did release the
11  title to the customer, which was a $500 fine, and the
12  other one was giving the customer an open title.  On the
13  third reassignment it wasn't assigned to nobody.  By law
14  they cannot release a title leaving it blank, per
15  requirements from the state.  They need to put the
16  buyer's name there.  That's another fine for that.
17    MR. VITTITOE:  Objection, nonresponsive.
18    Q.  At any rate, this title was recorded in the
19  state of Texas sometime subsequent to May 23, 2001 and
20  the taxes were paid on the transaction, correct?
21    A.  No, there were no taxes paid until the 23rd when
22  it was approved by Mr. Yzaguirre.
23    Q.  That's what I'm saying.
24    A.  Yes, sir.
25    Q.  On or after May 23rd, 2001 the taxes were paid

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 519

1  as the title was recorded in Austin; is that correct?
2  Is that right?  Is that right?
3    A.  I never saw the paperwork again.  So I'm sure it
4  did.
5    Q.  Okay.  You have no evidence that this was a
6  stolen vehicle transaction, do you?
7    A.  That, the lieutenant would do that.  The
8  investigator would check that.  It wasn't my job to do
9  that.
10    MR. VITTITOE:  Object, nonresponsive.  You
11  have no evidence that this was a stolen vehicle
12  transaction?
13    A.  I don't think so.  I don't know.
14    Q.  Thank you, ma'am.  Go to 20, tab 20, under
15  Exhibit 1, Bates 184 through 190.  Would you look at
16  that transaction for me?  And then I'm going to ask you
17  some questions.
18    A.  Okay.  Okay.
19    Q.  This particular transaction came to your
20  attention on or about November the 2nd, 2000.  Am I
21  correct?
22    A.  Yes, sir.
23    Q.  And apparently the title was held back, the
24  title transfer was held back for what reason?
25    A.  First of all, we had an office policy she needed

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 520

1 a bill of sale.
2    Q. All right. Anything else?
3    A. The signature didn't look the same.
4    Q. Okay. I don't see that indicated on Bates 184
5 anywhere.
6    A. Yeah, it's on the very top of the status report.
7    Q. Okay. Where is it -- the signatures do not
8 match?
9    A. Yes, sir.
10    Q. Okay. And did you make that decision?
11    A. Yes, I was the one that checked the paperwork.
12    Q. Okay. So you made the decision that the
13 signatures did not match?
14    A. Yes, sir.
15    Q. Okay. Any other reasons this transaction was
16 held back?
17    A. Like I'm telling you, the office policy as per
18 Mr. Yzaguirre, they needed a bill of sale.
19    Q. Anything else?
20    A. No, that's it.
21    Q. How about a copy of the driver's license?
22    A. Yeah, they -- well, the copy had to come with
23 the bill of sale.
24    Q. Okay. And then there is a notation on Bates 184
25 that $800 was added to the selling price?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 521

1    A. Uh-huh.
2    Q. Was it held back because of --
3    A. Mr. Yzaguirre added the $800.
4    Q. Okay. My question, though, to you is during
5 your review did you determine that the sales price was
6 too low?
7    A. Yeah, we would go by the -- Marizol would check
8 into the system with the investigators and we would more
9 or less have an idea how much the cars were worth.
10    Q. Okay. My question, though, is in looking back
11 at this transaction, were you of the opinion that the
12 selling price was too low?
13    A. Yes.
14    Q. Okay. Is that indicated anywhere in the
15 documentation?
16    A. Right next to the back of the title, the first
17 sentence, "Seller signatures do not match... also, the
18 selling price is too low."
19    Q. Okay. This transaction was approved by
20 Mr. Yzaguirre for recording in Austin?
21    A. He decided to add $800 and he said do it.
22    Q. Okay. And he approved the transaction for
23 recording in Austin?
24    A. Yes, after I explained him what was wrong with
25 the paperwork.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 522

1    Q. Okay. And when -- when did he approve the
2 transaction?
3    A. I don't remember the day.
4    Q. Okay. Whose handwriting is on 184?
5    A. The "add 800"?
6    Q. Yes.
7    A. Mr. Yzaguirre.
8    Q. Okay. And whose handwriting is "OK by
9 Mr. Yzaguirre, Jr."?
10    A. That's mine.
11    Q. That's yours?
12    A. Yes.
13    Q. But you can't tell us when this transaction was
14 approved?
15    A. I'm sure it was probably when they collected the
16 difference in sales tax.
17    Q. When was that?
18    A. August the 16, 2001. There is a copy way at the
19 end. Bates 190.
20    Q. So this transaction sat in your department for
21 almost a year?
22    A. Eight months.
23    Q. Let's go to tab 21 under Exhibit 1, which
24 commences with Bates 191 through 197. And I request
25 that you look at that documentation because I have a few

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 523

1 questions.
2    A. Okay. Okay. I'm ready.
3    Q. This transaction came to your department in May
4 of 2001?
5    A. May 17th.
6    Q. Of 2001?
7    A. Yes, sir.
8    Q. In looking at the documentation, what did you do
9 with it and what were your findings?
10    A. Okay. The customers went to the San Benito
11 branch office. They were trying to register the vehicle
12 and the office manager withheld the documents from the
13 buyers and explained them what was wrong. Then they
14 sent it to the main office, which is when I got the
15 paperwork. And, to begin with, GT Motors didn't have a
16 license to sell. I think their license expired since
17 1993, '94.
18    Q. Okay. Where is that indicated on Bates 191?
19    A. They didn't have a license to sell.
20    Q. Is that indicated on 191? I'm talking about
21 Bates 191.
22    A. Yeah, I'm reading that. I don't think Marizol
23 put it, but, yeah, it was supposed to be there.
24    Q. But it's not there?
25    A. She didn't put it. She would do the typing.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 524

1  Q. Okay. What else?
2  A. Of course, they released the paperwork to the
3  customer.
4  Q. You say, "Of course, they released the paperwork
5  to the customer." What do you mean?
6  A. Well, you see the customer had the title.
7  Q. Okay.
8  A. The dealer was responsible for doing the
9  transfer.
10  Q. All right. Anything else?
11  A. There is a grace period of 20 days to make the
12  transfer when you buy. The dealer has 20 days to
13  register the vehicle in the buyers name and this was
14  like months. Actually, it was almost a year, after a
15  year.
16  Q. It's not noted on 191, is it?
17  A. No, it's not noted.
18  Q. Okay. Anything else?
19  A. They were missing an affidavit, a repossessed
20  affidavit.
21  Q. Okay. Anything else?
22  A. And the dealer -- well, I already told you,
23  released the paperwork to the customer.
24  Q. You're talking about the dealer released the
25  paperwork?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 525

1  A. Yeah, GT Motors.
2  Q. And your understanding is the dealer is to
3  process the paperwork?
4  A. The dealer was to transfer the paperwork, do the
5  transfer, and they were responsible for paying sales tax
6  or whatever the customer had to pay.
7  Q. But, at any rate, do you recall this transaction
8  being approved by Mr. Yzaguirre?
9  A. Yes.
10  Q. What do you recall about this transaction other
11  than reviewing your notes or the office notes?
12  A. No, when it was something dealing with GT Motors
13  or any dealers, he would come to my office, he would ask
14  me, I would explain him what was wrong with the
15  paperwork and everything, and it would be the same story
16  all the time.
17  Q. Anything else about this transaction?
18  A. The same story. I would tell them what's wrong,
19  couldn't be registered. The dealer didn't even have a
20  license to sell cars. I mean, it had been years they
21  didn't have a license.
22  Q. Okay. In the prior transactions, 1 through 20,
23  do you recall GT Motors being involved in any of these
24  prior transactions?
25  A. I don't remember. The ones that would bring GT

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 526

1  Motors would be Barreda, but I don't remember all of
2  them.
3  Q. The reason I say that is I don't recall GT
4  Motors being involved in any prior transactions under
5  Exhibit 1.
6  A. That's what I'm saying, I don't remember.
7  Q. If you do, I'd like to know.
8  A. Pardon me?
9  Q. If you do, I'd like you to tell me.
10  A. That's what I said, I don't remember. From 1
11  through 20 I don't remember.
12  Q. Let's go to 22. This is a transaction that came
13  to the office's attention in June of 2001. Am I
14  correct?
15  A. Yes, sir.
16  Q. And refer to Bates 198 through 203. And then I
17  will ask you a few questions.
18  A. Okay.
19  Q. This transaction was withheld because the
20  dealer's license was expired?
21  A. Yes, sir.
22  Q. Any other reason?
23  A. It was withheld because it was expired, the
24  state doesn't give you a grace period. Your license
25  expires say June the 30th, April the 30th, whatever

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 527

1  that's it. After 12 midnight you cannot sell no more
2  cars. We're not allowed to do transfers to them. We're
3  supposed to fax everything to Austin and let them know
4  that they're still doing business even though their
5  license is expired.
6  MR. VITTITOE: Objection, nonresponsive.
7  Q. Other than the fact the dealer's license was
8  expired, was there any other reason to hold this
9  transaction back for further investigation?
10  A. No, sir.
11  Q. My understanding from the notes, the transaction
12  was approved for recording in Austin by Mr. Yzaguirre?
13  A. Yes, sir.
14  Q. Do you know the reason that he approved it?
15  A. I don't know why because, like I'm saying, these
16  people didn't have a license to sell. We weren't
17  supposed to process paperwork.
18  MR. VITTITOE: Object, nonresponsive. Do
19  you know the reason, yes or no?
20  A. Because he was one of the dealers I couldn't say
21  nothing wrong about them and I couldn't --
22  MR. VITTITOE: Object, nonresponsive.
23  Q. Do you know factually why he approved this
24  transaction?
25  A. Other than we got arguing into this matter, I

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

## Page 528

1  don't know.
2      Q. Say that again.
3      A. After we argued about this transfer, like all
4  the time, I don't know why he approved it.
5      Q. Okay. So you do not know why?
6      A. No, I do not know, sir.
7      Q. Okay. Go to tab 23, which commences on Bates
8  204 and runs through 210.
9      A. Uh-huh.
10     Q. Please look at that transaction for me as I have
11 a few questions of you.
12     A. Okay.
13     Q. This transaction came to your attention on June
14 the 29th, 2001?
15     A. Yes, sir.
16     Q. And apparently this paperwork was held for
17 further investigation. Am I correct?
18     A. Yes, sir.
19     Q. You made that determination?
20     A. Me and the investigator.
21     Q. For what reason?
22     A. Okay. B&M Wholesales was a dealer that
23 supposedly was in Harlingen on F Street, or something
24 like that. The investigator went and there was nothing
25 in that place. I mean, it's not there. Because we

## Page 529

1  would get a lot of paperwork from them, we all knew the
2  story, okay?
3      Q. You all knew the story? Is that what you said?
4      A. Yes.
5      Q. Okay. What was the story?
6      A. B&M, there was no dealership here in Harlingen
7  on the street they were stating they were. It got to
8  the point that the investigator called the state and
9  called in the registered owner, which was somebody named
10 Issac Ashley from Corpus. And he came to the office
11 along with this guy, Nick Abusalah, or whatever his name
12 is, and he told us and told the -- told the investigator
13 and signed a letter and sent a letter to the state
14 stating that he wasn't the owner of that company, of
15 that dealership.
16     Q. Is that letter in the documentation here?
17     A. That's what I'm telling you, it's a story that
18 we had a case on this B&M. He canceled the dealership.
19 We couldn't do paperwork for them. If you see the back
20 of the title, it's saying they're in Corpus. The B&M --
21 you barely can read it.
22     MR. VITTITOE: Let me object,
23 nonresponsive.
24     Q. My question, though, is is the letter that
25 you're referring to in your testimony included in part

## Page 530

1  of this documentation, 204 through 210?
2      A. It's not in this file, but there was a file in
3  the office.
4      Q. So you're saying the letter is in this other
5  file?
6      A. It's supposed to be there.
7      Q. Okay. Any other reason this transaction was
8  withheld?
9      A. Well, like I'm telling you, the owner of the
10 dealership said he's not running that business, somebody
11 is running that business, that Nick Abusalah, and that
12 he doesn't want for us to process any paperwork from
13 this guy.
14     MR. VITTITOE: Object, nonresponsive.
15     Q. Any other reason?
16     A. No.
17     Q. Handwriting on 204, whose handwriting is that?
18     A. The one "OK by Mr. Yzaguirre"? "Release"
19 whatever?
20     Q. The only handwriting on 204.
21     A. Mr. Yzaguirre, sir.
22     Q. So this transaction was released?
23     A. By Mr. -- approved by Mr. Yzaguirre.
24     Q. About six months after it sat in the office?
25     A. Yes, sir.

## Page 531

1      Q. Do you know why it was released?
2      A. It was Sosa's. I don't know.
3      MR. VITTITOE: Objection, nonresponsive.
4      A. I don't know.
5      Q. Do you factually know why Mr. Yzaguirre approved
6  this transaction for recording in Austin?
7      A. I don't know.
8      Q. Thank you. Go to the next transaction, No. 24,
9  which commences on Bates 211 through 218. And I'll ask
10 that you review that documentation as I have a few
11 questions of you.
12     A. I'm ready.
13     Q. This transaction came to your attention in
14 November of 2001; am I correct?
15     A. On November 26.
16     Q. My understanding the title documentation was
17 held by you for investigation. Am I correct?
18     A. Well, the clerks, Susie and Lupita de Leon,
19 decided to hold it and just send it back to me.
20     Q. Okay. So did you do anything with this
21 transaction?
22     A. Okay. Well, Marizol went into the system, we
23 already had a file on this vehicle from Mr. Coronado.
24 Mr. Coronado went to the office and put a complaint.
25     Q. And that complaint was what?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

086565b0-17fb-4e10-9099-a0093c799959

Page 580

1  the proposal that was prepared to create this anti-theft
2  division, all right?
3      A. Okay.
4      Q. And it's titled here the first page, it says,
5  "Office of Tax Assessor-Collector, Tony Yzaguirre, Jr.,"
6  and then the bottom of it says "Automobile Titles and
7  Registration Theft Division." Do you see that?
8      A. Yes, sir.
9      Q. Now, am I right to say that your primary
10 function as a title examiner was to catch theft?
11     A. Well, when they gave me that title examiner
12 position, I was told theft and to check all the
13 paperwork, including the transaction.
14     Q. Okay. And I understand that there were some
15 policies that Mr. Yzaguirre had promulgated that said
16 that this -- and, by the way, just to put this in
17 context, there had been four vehicles I think that
18 somehow got titles that were stolen through the Cameron
19 County tax office, right? Did you know anything about
20 that?
21     A. No, sir.
22     Q. Okay. And to put it further in context, and
23 just so the jury is excruciatingly clear about this,
24 TxDOT actually issues the titles, don't they?
25     A. Yes, sir.

BRYANT & STINGLEY, INC.

Page 581

1      Q. In other words, the tax assessor-collector's
2  office is simply a processing agency to see to it that
3  ultimately TxDOT has what the state requires to transfer
4  a title?
5      A. Yes, sir.
6      Q. Right. And so -- and then -- and because
7  evidently there had been -- well, maybe you didn't know
8  this issue. I won't even ask you that. My question
9  then to you is when you saw the star Y and other
10 supposed code information on the back of these titles,
11 did you believe that you were violating the law by
12 sending them back for forwarding to TxDOT?
13     A. The thing is that we were required, sir, certain
14 like bill of sales for the customer to bring --
15     Q. Hold on. The first answer, please, is yes or
16 no. You felt like you were violating the law?
17     A. Well, not -- well, the office policies and
18 requirements to transfer vehicle, yes.
19         MR. VITTITOE: Object, nonresponsive.
20     Q. All right. Now, just so we're clear here, there
21 is two things here, right? There is the law, right?
22     A. Yes.
23     Q. And then there are the rules that Mr. Yzaguirre
24 may have given you to help get this job done, right?
25     A. Yes, sir.

BRYANT & STINGLEY, INC.

Page 582

1      Q. Okay. So, to be clear, when you, according to
2  the code, reviewed the materials, gave them back to
3  Julio or Lupita or whoever else would take them for
4  further processing and sending to TxDOT, you did not
5  believe that you were violating the law, did you?
6      A. Well, I don't know, because I was afraid they
7  would come back and tell me, "You approved. You're the
8  title examiner. You let all this go and this paperwork
9  is missing all this."
10     Q. So there was doubt in your mind?
11     A. Well, yes, because we would require certain
12 paperwork from some other people and --
13     Q. Okay. But the certain paperwork was paperwork
14 that was not required by state law, was it?
15         MS. GILSON: Object, which paperwork?
16     Q. The bill of sale is what you're saying was a
17 policy, right?
18     A. Bill of sale.
19     Q. That wasn't required by state law, was it?
20     A. No, it was an office policy for Mr. Yzaguirre.
21     Q. Okay. And just so we're clear too, the license,
22 the copy of the seller's license, that wasn't required
23 by state law, was it?
24     A. Not from the state. It was an office policy we
25 had, sir.

BRYANT & STINGLEY, INC.

Page 583

1      Q. All right. And so so far as you know sitting
2  here today in your deposition, you never violated the
3  law by forwarding these documents for further processing
4  to TxDOT, did you?
5      A. Well, now that you explain it, I guess not.
6      Q. Okay. Then maybe you can tell me why repeatedly
7  in your petition you allege that processing this
8  paperwork was a violation of law? Can you tell me that?
9      A. Yeah, because, like I'm telling you, we would
10 require all that from people. And if you would go --
11 like if you're not an attorney, go as a citizen, as a
12 taxpayer to the tax office, trying to register your
13 vehicle, if you didn't have a bill of sale or if your
14 title said Mexico, we would stamp your title sold for
15 export and tell you, "You know what, you cannot register
16 it here because it was sold for export." We wouldn't do
17 it for nobody else.
18         I mean, people would come and even if they
19 were missing that, they would withhold their documents.
20 People would be sent back, back to the seller and tell
21 them, "You know what, go back to Mr. Trevino, or whoever
22 sold you the car, and get a copy of his driver's license
23 and get us a notarized bill of sale. And then when you
24 have it, you come back." And the titles I was seeing,
25 sir, they didn't have that. They weren't complying with

BRYANT & STINGLEY, INC.

Page 588

1  your testimony is?
2      A. No, there is some already stamped sold for
3  export and they would come back to us.
4      Q. Okay.
5      A. To process.
6      Q. And you would stop them?
7      A. No, I wouldn't stop them because Mr. Yzaguirre
8  would bring them.
9      Q. Okay. I want you to look in there and show me
10 which ones you're talking about.
11     A. There is one that it was stamped for export.
12 Can I get it?
13     Q. Yeah, absolutely.
14     A. And I think Mr. Pena did that one. There was
15 one that there was -- and it was -- it said it was
16 stamped, but I guess it didn't make the copies.
17     Q. Well, let's find it. By all means, let's find
18 it so we can discuss it.
19     A. It was one of the last ones. I think it's
20 No. 19.
21     Q. No. 19?
22     A. Yes, sir. It's the one on Leticia Garcia.
23     Q. All right. For the record, we're looking at
24 Bates No. 172 out of Exhibit 1, right?
25     MS. GILSON: I think it's actually Exhibit

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 589

1  No. 19.
2      MR. VITTITOE: Tab 19.
3      MS. GILSON: It's actually Exhibit No. 19.
4      Q. Oh, it's Exhibit No. 19. All right. Fair
5  enough. Thank you.
6      A. On the statement the lieutenants would be the
7  ones that would stamp the title sold for export and they
8  were supposed to make a copy when they would stamp it
9  sold for export, put a copy, put a date and write their
10 signature and put it -- make a copy and put it back with
11 the paperwork.
12     Q. Okay.
13     A. There is no copy in this paperwork.
14     Q. There is no copy of what?
15     A. Of the title when he stamped it sold for export.
16     Q. And do you know why?
17     A. He probably forgot.
18     Q. Who did?
19     A. Lieutenant Pena, Javier Pena.
20     Q. Look at page 175. Is that a title?
21     A. That's a title.
22     Q. Is that the one you're talking about?
23     A. It had to be stamped because -- unless this is a
24 certified copy. No, it's an original. When people
25 would come into the office and they would be stamped for

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 590

1  export, it would be the lieutenant, whoever was in
2  charge of doing it.
3      MR. VITTITOE: Objection, nonresponsive.
4      Q. The lieutenant was the one to stamp them for
5  export?
6      A. Most of the time it was them, unless they were
7  working on the field or something and Lupita or somebody
8  had one of them to be stamped, Lupita would stamp them.
9      Q. Okay. But you would agree with me that the
10 paperwork in section or Exhibit 19 does not include any
11 stamp for export only; is that correct?
12     A. That's -- not -- it doesn't say in the title,
13 but this title had to be stamped. If not -- it had to
14 be stamped. Marizol made the status report, and it had
15 to be stamped.
16     Q. Okay.
17     MR. VITTITOE: Objection, nonresponsive.
18     Q. And did the title then ultimately get issued?
19     A. I'm sure it did.
20     Q. How do you know? What makes you so sure that it
21 did ultimately get issued?
22     A. Because the paperwork was processed.
23     Q. All right. And, here again, this is the
24 paperwork that is prepared by Cameron County Tax
25 Assessor-Collector's Office, right?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 591

1      A. Yes, sir.
2      Q. And then it's forwarded to the state?
3      A. To the state.
4      Q. And the state decides whether it issues title or
5  not. Does it not?
6      A. I'm going to tell you what --
7      Q. Just answer my question, please.
8      A. Yeah.
9      Q. All right. And so far as the state was
10 concerned, assuming for the moment that you're right,
11 that the title was issued, they were satisfied with the
12 paperwork, right? I mean, they would have to be
13 satisfied with the paperwork in order to issue title,
14 right?
15     A. Can I say something?
16     Q. No, just answer my question.
17     A. Well, if you say, yeah.
18     Q. All right. And so now the next question I have
19 for you is how do you know that this particular vehicle
20 was only to be sold into Mexico?
21     A. Because I have a statement from the dealer that
22 sold it.
23     Q. Okay. And that's who?
24     A. Bates 182.
25     Q. 182?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366     Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 600

1  where we're talking about for export --
2      A. None of them are stamped sold for export.
3      Q. Okay. None of the titles are stamped?
4      A. Not the title.
5      Q. Sold for export?
6      A. I only have the invoices from the dealers where
7  they're stating a lot of them in handwriting that were
8  sold for export to wholesalers from Mexico and that no
9  sales tax were collected and they were just sold to take
10 to Mexico.
11     Q. Okay.
12     A. But there is no title stamped.
13     Q. And do you have information today that there was
14 any unpaid taxes on any of those vehicles?
15     A. They didn't pay them per the dealers because
16 they would need to collect the sales tax in order for
17 them to do a transfer.
18     Q. I think maybe -- let me -- let me ask it one
19 more time. I'll try to be more specific. Do you have
20 personal knowledge that there were any unpaid sales
21 taxes on any of these transactions that we're discussing
22 now?
23     A. I don't know. I don't know. I don't think. I
24 don't think they paid, but I wouldn't say that.
25     Q. But you don't have personal knowledge of that,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 601

1  do you?
2      A. I don't have personal knowledge.
3      Q. Okay. Fair enough. That answers my question.
4  And, in all fairness to you, Ms. Cantu, if your lawyer
5  wants to come back and discuss this with you, she's more
6  than welcome to do that. Do you understand that?
7      A. Yes, sir.
8      Q. I'm simply -- I've only got a very limited
9  period of time to work with you.
10     A. You told me that.
11     Q. Now, these first --
12     A. The other ones.
13     Q. The list that you prepared there --
14     A. These were the sold for export. So I'm just
15 going to -- these are dealers, No. 14.
16     Q. Okay. No -- all right. Just so we're clear on
17 the record, No. 1, 2, 3, 8, 11 and 19 --
18     A. Sold for export.
19     Q. -- sold for export transactions?
20     A. Yes, sir.
21     Q. In your mind?
22     A. And in the confirmation statement that I have
23 from the dealer.
24     Q. From what your investigation showed?
25     A. Yes, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 602

1      Q. Okay. But we are clear also that none of the
2  titles had marked on them export?
3      A. So far, no.
4      Q. Okay. All right. Let's go then to --
5      A. 14.
6      Q. Is it 14?
7      A. Exhibit, yeah, Exhibit No. 14.
8      Q. All right. And what is it about 14 that in your
9  mind is illegal as opposed to merely a policy decision
10 issue?
11     A. Yeah, state law it's no dealer -- dealers are
12 not allowed -- they're not supposed to let the title go.
13 They're responsible and liable to do the transfer in a
14 period of 20 working days.
15     Q. Okay. And what happened in 14?
16     A. In No. 14 JC Motors from Brownsville, they
17 withheld the document from him, the supervisor.
18     Q. All right.
19     A. Because the customer ended up in the office with
20 the title.
21     Q. Okay. And what happened?
22     A. I faxed it to Austin and that's when they get a
23 fine from the state.
24     Q. Okay. The dealer gets a fine from the state?
25     A. Yes, sir. We're not supposed -- we're supposed

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 603

1  to let the state know what happened, what was wrong and
2  if they violated they'll get a citation.
3      Q. And is this among the materials then -- these
4  type transactions, that's the paperwork that was going
5  to Austin?
6      A. Yes, sir.
7      Q. That you were faxing up there?
8      A. Yes, sir.
9      Q. Okay. And let me just ask you now, on any of
10 14, 16, 17, 21, 22 and 24, were any of those stolen
11 vehicles?
12     A. No, they weren't stolen.
13     Q. Were any of them transactions where no sales tax
14 was properly paid?
15     A. No.
16     Q. Okay.
17     A. They're different. Some were like dealers
18 didn't have a license to sell no more.
19     Q. Okay.
20     A. There is another one that the dealer didn't even
21 exist. They just made up a dealer, a P dealer license
22 number.
23     Q. Okay.
24     A. And, I mean, somebody went to the office,
25 everything was fraud. It was like there was no dealer,

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366   Harlingen (956) 428-0755   Brownsville (956) 542-1020

Page 620

1    Q. Can you then just very briefly summarize the two
2  to three times?  Go over them again, put them in
3  chronological order for me.
4    A. The first time when he went to the office.
5    Q. Okay.
6    A. And the time I asked him about Mario Solis, I
7  told him, "Hey, this is wrong.  Why did you do it?  You
8  have a copy of the dealer's note."  And he goes, "Well,
9  it's the boss."  I said, "Okay."  And the time we were
10  at the warehouse.
11   Q. Okay.  And then the second time?  Was the
12  warehouse time the second time?
13   A. No, that was like the third one, I think.  I
14  don't know if it was first the warehouse or the second
15  the Mario Solis case.
16   Q. Okay.
17   A. But it was like three times probably.  I would
18  say no more than that.
19   Q. Just out of curiosity, since I don't know all
20  the names of Exhibits 1 through 24, is the Solis matter
21  in that stack?
22   A. I think there is one.
23   Q. Okay.  But is it the one that we're talking
24  about with the star Y on the back of it?
25   A. No.

BRYANT  &  STINGLEY,  INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 621

1    Q. Okay.  All right.
2    A. No.  I don't think so.  That one because he had
3  an expired dealer license, No. 22.
4    Q. Okay.  All right.  Getting back to something I
5  was talking to you a little bit earlier about, you're
6  satisfied, are you not, that none of these transactions
7  that were ultimately okayed by Mr. Yzaguirre involved
8  theft?
9    A. I don't think they were stolen cars.
10   Q. Okay.  And am I right to say then that -- well,
11  strike that.  Okay.  Did you ever catch any documents
12  that suggested that there was a stolen vehicle?
13   A. No, sir.
14   Q. Okay.  Let's see.  Am I right to say that it was
15  1999 when for the first time you were given an office?
16   A. Yes, sir.
17   Q. And was that office that you had, was that yours
18  and yours alone?
19   A. No, sir, it was me and the data analyst or like
20  the secretary.
21   Q. Marizol?
22   A. No, back before her it was a girl named Luana.
23   Q. Okay.  So if I understand then, the offices that
24  you ever had you shared with someone?
25   A. I'm sorry.  I had my own when I was the head

BRYANT  &  STINGLEY,  INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 622

1  cashier.
2    Q. Okay.
3    A. Everything was logged.  The money was kept there
4  and everything.
5    Q. Okay.  And then when you became chief title
6  examiner, you had -- you shared an office with Marizol?
7    A. Marizol and Luana, yes, sir.
8    Q. Okay.  I wrote down here that as far as you
9  getting along with Lupita, way back when you first
10  started deposing the first day, that it was in 1999 that
11  you felt like Lupita became unfair with you?
12   A. It wasn't '99 that she was unfair.  I mean, it
13  was like towards the end.
14   Q. Of what?
15   A. Of like maybe like 2002, beginning of 2002 or
16  something.  I don't remember.  But, no, she wasn't
17  unfair.  I would always get excellent -- how do you call
18  them -- evaluations.
19   Q. Okay.  You all got along well with each other?
20   A. We were coworkers.  I would try to get along
21  with her.
22   Q. I'm just curious.  You said now that sometime
23  later on you felt like she became unfair.  Is that
24  right?
25   A. Yes.

BRYANT  &  STINGLEY,  INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 623

1    Q. And it was 2001, 2002 or what?
2    A. I don't remember.
3    Q. Was it before or after she was made chief title
4  examiner?
5    A. It was like probably before.
6    Q. Before.  And why do you say probably before?
7    A. Because I don't remember the exact time.  I
8  mean, I don't remember the -- like I'm not going to tell
9  you this month, this day, because I don't remember.
10   Q. Well, it was in December, wasn't it, of 2001
11  that she became the chief title examiner per Tony's
12  memo, right?
13   A. Yeah.
14   Q. Okay.  And does that ring a bell and tell you
15  whether she became unfair before or after that?
16   A. Before we would have like not arguments but she
17  would show me paperwork or something and I would say
18  "Well, it's missing this and it's missing that," you
19  know, and she was like "Okay" and just get out of the
20  office or whatever.  But, I mean, I never like got into
21  an argument or I never fought with her or nothing like
22  that.
23   Q. Okay.  But then later on that changed somehow
24  that you began to believe that she was treating you
25  unfairly.  Is that right?

BRYANT  &  STINGLEY,  INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

086565b0-17fb-4e10-9099-a0093c799959

Page 644

1 something like that?
2    A. No.
3    Q. No?
4    A. No.
5    Q. Okay. Let's go to the -- I understand that
6 there was a time when from time to time you would go to
7 Dillards and make payments on your account there.
8    A. I would go shopping like everybody else.
9    Q. And Diamantina Alvarado worked there?
10    A. She still works there.
11    Q. She still does?
12    A. Yes, sir.
13    Q. And do you recall any particular occurrence
14 where you went to her counter? I think she worked at
15 Estee Lauder.
16    A. I get my makeup. I'm an Estee Lauder client.
17    Q. Okay. And did you go over there and ask her to
18 make a payment on your account for you?
19    A. I think I paid some stuff, some boots that I
20 bought that day. I think I paid some boots or some
21 shoes. I don't remember what I bought. And I needed to
22 change my blush and stuff. So, yeah, I went with her
23 and I still go with her.
24    Q. Okay. But I think what my question is is was
25 she there to help you make a -- in other words, just

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 645

1 like a customer would come in and make a payment on
2 their account, do you remember actually doing that?
3    A. No, I think that time I needed to pay something,
4 plus I needed some -- I don't remember if it was blush
5 or eye shadows, but I also went for that too.
6    Q. Okay. Do you remember Ms. Yzaguirre being there
7 that day?
8    A. I never saw her.
9    Q. You never saw her?
10    A. No, sir. I don't remember seeing her. I don't
11 remember seeing her.
12    Q. You say in your petition specifically "Defendant
13 Yzaguirre allowed fraudulent vehicle registration
14 paperwork to pass through his office as a 'paid' favor
15 to friends and business associates." What evidence do
16 you have that he was actually paid to do any favors?
17    A. These people wouldn't go like regular customers
18 would go, wait in line and did all that. These people
19 would like stay there and wait for their transfers to be
20 processed and then they would leave the office.
21    Q. Did you see any money change hands?
22    A. No, sir.
23    Q. Are you aware of any single person that ever saw
24 Mr. Yzaguirre receive money for a paid favor?
25    A. No, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 646

1    Q. Is it true that it was your job to ensure that
2 the vehicle registration paperwork going through Cameron
3 County Tax Assessor-Collector's office was lawful?
4    A. Yes, I was the title examiner. I was
5 responsible.
6    Q. And did you have a reference there of the
7 regulations and rules that you were to follow?
8    A. Well, not -- I don't need a notebook or nothing
9 like that because I've worked 17 years with titles and I
10 know them left and right.
11    Q. Okay. So from your past on-the-job training?
12    A. 17 years experience.
13    Q. And then I think you went to a couple of
14 seminars from time to time?
15    A. Yes, we would go even -- I think we had some on
16 Saturdays and stuff like that. I don't remember how
17 many, but yeah, we did.
18    Q. Did you have a book of rules and regulations
19 promulgated by the state?
20    A. No, but when I had a question, I would call the
21 state and ask them if I was in doubt of something.
22    Q. Okay. I suppose at this point we have fully
23 discussed any and all paperwork having to do with
24 transactions that you've found fault with. Is that
25 correct?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 647

1    A. That's correct.
2    Q. And I think I'm right to summarize your
3 testimony in saying that you have no evidence today
4 sitting here that you found that an actual fraud was
5 perpetrated on anyone because of Mr. Yzaguirre's
6 personal okay of a transaction. Is that fair to say?
7    A. It's fair.
8       MS. GILSON: Can I ask my client something
9 real quick?
10       MR. HODGE: Surely.
11       (Discussion off the record)
12    Q. Can you tell me -- I think we've covered all
13 this. I'm trying to just get to the meat here, if I
14 can.
15       All right. I believe that's all I have.
16 I'll pass the witness.
17       MS. GILSON: I had one question.
18          EXAMINATION
19 BY MS. GILSON:
20    Q. Ms. Cantu, defense counsel just asked you a
21 question regarding whether or not that you had discussed
22 all the documents that you believe had I guess unlawful
23 problems or didn't follow policy or what have you. Were
24 there documents other than what's contained in Exhibits
25 1 through 24 that you believe had problems?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

# EXHIBIT NO. 2

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

OFFICE OF THE

## TAX ASSESSOR-COLLECTOR

P. O. BOX 952    BROWNSVILLE, TEXAS 78522-0952



TONY YZAGUIRRE, JR.
TAX ASSESSOR-COLLECTOR
RPA,RTA,CTA,CSTA

FELIX R. MUNOZ
CHIEF DEPUTY - OPERATIONS

JESSE GARCIA, JR.
CHIEF DEPUTY - ADMINISTRATION

# MEMO

To       :    Felix R. Munoz, Chief Deputy of Operations/Project Coordinator
              Jesse Garcia, Jr., Chief Deputy of Administration
              Lt. Joe Mireles, Chief of Investigations and Enforcement, CCACETF
              Lupita De León, Supervisor, Auto Division, Los Fresnos, Southmost, Port Isabel
              Ninfa Fonseca, Manager, Harlingen/La Feria Branch Tax Offices
              Linda Garcia, Manager, San Benito/Rio Hondo Branch Tax Offices

From     :    Tony Yzaguirre, Jr., Tax Assessor-Collector and
              Director, Cameron County Automobile Crimes Enforcement Task Force

Subject:      Office Changes in Policies, Rules and Procedures, Assignments and
              Reassignments

Date     :    December 11, 2001

V. Cantu
EXHIBIT NO. 37
Bryant & Stingley, Inc.

I have received numerous complaints ranging from long lines, lunch hour closed, and title transfers
from our taxpayers, citizens, and voters in the last six to eight months. I have personally noticed
long lines in all of our offices and individuals not obtaining their titles. The process of transferring
a title is taking longer than usual. I know that we have had a number of vacancies throughout the
year, and I know that we have new personnel aboard that are not fully trained.

I have been able to get personnel from the Texas Department of Transportation and Texas
Department of Public Safety to conduct a training program for our personnel. This type of training
will be very helpful; but not soon enough to avoid the existing complaints.

I have also asked the Commissioners' Court for additional help for our office; but help is not coming
as soon as I expected. I will continue asking the Commissioners' Court for additional personnel; but
for the mean time, the following changes will be made in order that we may continue to give our
taxpayers the best service that we can with what we have.

OFFICE
NSVILLE
HARRISON
544-0800
544-0808

SOUTHMOST BRANCH
BROWNSVILLE
2900 SOUTHMOST RD
(956) 986-8228
FAX: 986-8228

BRANCH OFFICE
HARLINGEN
602 E. HARRISON
(956) 427-8013
FAX: 427-8017

BRANCH OFFICE
SAN BENITO
850 E. HIGHWAY 77
(956) 361-8231
FAX: 361-8235

BRANCH OFFICE
LOS FRESNOS
105 OCEAN BLVD
(956) 233-4494
FAX: 233-5804

BRANCH OFFICE
PORT ISABEL
313 QUEEN ISABELLA
(956) 943-8101
FAX 943-8101

BRANCH OFFICE
LA FERIA
126 WEST 1ST
(956) 797-3075
FAX: 797-3075

BRANCH OFFICE
RIO HONDO
130 COLORADO
(956) 748-2345
FAX: 748-3362

003773

Page 2 of 2
December 11, 2001
Office Changes in Policies, Rules and Procedures,
Assignments and Reassignments

Effective *Tuesday, January 1st, 2002*, the Harlingen, San Benito, and Brownsville Offices will be *opened during our lunch hour*. Office managers and supervisors will make sure that our offices remain opened during that hour with adequate staff.

I have heard that some office personnel are rude to our customers who come in for service. This will stop immediately and if an employee is found doing this, that employee will deal with me directly.

If the Texas Department of Transportation can get a Texas title to a Texas automobile owner within two weeks; I believe we can solve a Texas title problem within that time frame. I know that we are short handed in personnel in examining titles coming through our offices, and I know that the personnel doing this type of work are overburdened with this task; and for this reason, *effective immediately*, I am hereby assigning Ms. Lupita De Leon to assist the Auto Theft Task Force personnel to conduct title examinations. Ms. Lupita De Leon will be the Chief Titles Examiner and Supervisor for this office and by working together with Mrs. Bibi Cantu, the process of examining titles and processing the title work will be more efficient and less time consuming. Mrs. Elida Barbosa and Mr. Rick Martinez will be assigned to the Brownsville Main Office on *Tuesday, January 1st, 2002* to assist Ms. Lupita De Leon with her day to day operation duties of the Automobile Division. Ms. Ruth Weaver will also be assigned Executive Secretary for the Auto Theft Task Force effective immediately and will be responsible for all correspondence for this division. Ms. Ruth Weaver will assist Mr. Felix Munoz, Project Coordinator, with reports submitted to the Texas Automobile Theft Prevention Authority Office and will also assist the Auto Theft Task Force personnel with legal documentation, document translations, confidential files, budget amendments, salary schedules, equipment purchase orders, personnel files, payroll, training sessions and public events.

I hope that by making these changes we will better assist our customers; either it be property tax and/or automobile title and registration problems.

As I mentioned before, I will continue to ask for additional personnel for our different divisions, but for now, I hope that we all can work together for the betterment of this office and our taxpayers.

TY/rw

xc:    Mark Yates, CPA, County Auditor
       County Judges Office
       Xavier Villarreal, Budget Officer
       Tax Assessor-Collector's Office Personnel
       File

# EXHIBIT NO. 3

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims



# *Texas Department of Transportation*

VEHICLE TITLES AND REGISTRATION DIVISION • AUSTIN, TEXAS 78779-0001 • (512) 465-7611

March 29, 2002

## Registration and Title Bulletin #035-02

TO:          All County Tax Assessor-Collectors

SUBJECT:   "FOR EXPORT ONLY" Stamp

## PURPOSE
To inform you of new procedures for Texas licensed dealers selling vehicles to foreign dealers for exportation only.

## DETAILS
In an effort to deter foreign dealers from curbstoning in Texas, the Motor Vehicle Division (MVD) has adopted rules requiring Texas licensed dealers to place a "FOR EXPORT ONLY" stamp on the front and over the unused reassignments on the back of titles for vehicles sold to foreign dealers for export.   (Refer to attachments.)  In the event that all reassignment spaces on the title document are full and a Form VTR-41-A (Dealer's Reassignment of Title for a Motor Vehicle) is used, the dealers will stamp the front and back of the title document and all unused reassignments on the Form VTR-41-A.

Stamping the front and back of titles with "FOR EXPORT ONLY" may increase visibility of illegal sales and help stop further transfer of ownership on the existing title.  The "FOR EXPORT ONLY" stamp would require foreign dealers to sell the vehicle using a bill of sale (allowed if the owner is a foreign dealer) or properly register the vehicle in their country and then transfer using a bill of sale.   Additionally, foreign residents purchasing such vehicles could not continue to transfer ownership on the existing title.

Although these rules became effective March 7, 2002, dealer compliance begins April 1, 2002. Consequently, on and after April 1, 2002, title transactions supported by title documents indicating sales that occurred on and after April 1, 2002, between Texas licensed dealers and either foreign dealers or foreign residents must be stamped "FOR EXPORT ONLY."

## COUNTY ACTION
If title transactions are supported by title documents indicating sales that occurred on and after April 1, 2002, between Texas licensed dealers and either foreign dealers or foreign residents but the title documents are not stamped "FOR EXPORT ONLY," you should process the transactions.  However, you are requested to copy the front and

County Tax Assessor-Collectors              2                    March 29, 2002

back of the associated transfer document and forward to the Title Control Systems Branch (TCS) for further disposition. These copies should be placed in an envelope and labeled "For Export Only" and sent in with the Title Package Report. TCS will then forward that envelope to the Motor Vehicle Division.

NOTE:   This requirement does not include the stamping of salvage ownership documents (salvage certificates, salvage certificates of title, and nonrepairable certificates of title).

In the event a title is stamped in error with the "FOR EXPORT ONLY" stamp, the dealer will be required to apply for title in the dealership name. Along with the application filed with the county tax office, the dealer must include a statement of fact explaining why the sale of the vehicle to the foreign dealer or foreign resident, as indicated in the title reassignment, was cancelled. If the application and statement of fact is submitted, the county tax office will process the transaction for title issuance in the dealership name.

**DEPARTMENT ACTION**
Similar title transactions processed by the Vehicle Titles and Registration Division (VTR) must meet the criteria addressed in <u>COUNTY ACTION</u>.

Appropriate revisions will be made to the Vehicle Title Manual and distributed at a later date.

**VTR CONTACT PERSON(S):**
If you have further comments or questions, please contact your local Vehicle Titles and Registration Division Regional Office. Thank you very much for your continued support.

Sincerely,

Daniel Hunt

Jerry L. Dike, Director
Vehicle Titles and Registration Division

Attachments

cc:   VTR Administration
      Motor Vehicle Division, TxDOT
      All Dealer Associations

WARNING: The form on the back of this detachable "tab" may only be utilized to notify TxDOT that you have sold the vehicle described on the attached certificate of title. A TITLE IN THE NEW OWNER'S NAME WILL NOT BE ISSUED. To have a new title issued in the new owner's name, the "Assignment of Title" section on the back of the certificate of title must be completed (by seller and buyer), and the new owner must file an application for title in his or her name at the local county tax assessor-collector's office.

▼ DETACH HERE ▼ 



**WHEN VEHICLE IS SOLD, TITLE HOLDER MUST ASSIGN AND FURNISH THIS TITLE, CURRENT LICENSE RECEIPT, AND SALES TAX AFFIDAVIT TO THE PURCHASER WHO MUST FILE APPLICATION WITH COUNTY TAX ASSESSOR-COLLECTOR WITHIN 20 WORKING DAYS TO AVOID $10 PENALTY.**

## ASSIGNMENT OF TITLE

FEDERAL AND STATE LAW REQUIRES THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP. FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.

The undersigned hereby certifies that the vehicle described on the face hereof has been transferred to the following named person:

Name of Purchaser: IRA Dealer    Street: 123 Somewhere St.    City: Elsewhere    State: Tx    Zip: 77777

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

ODOMETER READING (No Tenths): 10000

□1. The mileage stated is in excess of its mechanical limits.
□2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

Date of Sale: XX/XX/XX

Signature of Seller/Agent: _____

Printed Name of Seller/Agent: Some Body

I am aware of the above odometer certification made by the seller/agent.

Signature of Buyer/Agent: _____    Printed Name of Buyer/Agent: Ira Dealer

## FIRST REASSIGNMENT — DEALER ONLY

The undersigned hereby certifies that the vehicle described in this certificate of title or attached to the document has been transferred to the following named person:

Name of Purchaser: John Doc Auto Auction    Street: 123 Backroad    City: Elsewhere    State: Tx    Zip: 77777

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

ODOMETER READING (No Tenths): 10,000

□1. The mileage stated is in excess of its mechanical limits.
□2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

Date of Sale: XX/XX/XX    Dealer's Name: John Doc Auto Auction    Cert #: 00000

Agent's Signature: _____    Printed Name of Seller/Agent: John Doc

I am aware of the above odometer certification made by the dealer's agent.

Signature of Buyer/Agent: _____    Printed Name of Buyer/Agent: John Doc

## SECOND REASSIGNMENT — DEALER ONLY

The undersigned hereby certifies that the vehicle described in this certificate of title or attached to the document has been transferred to the following named person:

Name of Purchaser: _____    Street: _____    City: _____    State: _____    Zip: _____

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

ODOMETER READING (No Tenths): _____

□1. The mileage stated is in excess of its mechanical limits.
□2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

Date of Sale: _____

Agent's Signature: _____    Printed Name of Seller/Agent: _____

I am aware of the above odometer certification

Signature of Buyer/Agent: _____

**FOR EXPORT ONLY**

AUCTION #: _____

## THIRD REASSIGNMENT — DEALER ONLY

The undersigned hereby certifies that the vehicle described in this certificate of title or attached to the document has been transferred to the following named person:

Name of Purchaser: _____    Street: _____    City: _____    State: _____    Zip: _____

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked.

ODOMETER READING (No Tenths): _____

□1. The mileage stated is in excess of its mechanical limits.
□2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY.

Date of Sale: _____

Agent's Signature: _____    Printed Name of Seller/Agent: _____

I am aware of the above odometer certification

Signature of Buyer/Agent: _____

**FOR EXPORT ONLY**

AUCTION #: _____



# *Texas Department of Transportation*

VEHICLE TITLES AND REGISTRATION DIVISION • AUSTIN, TEXAS 78779-0001 • (512) 465-7611

June 18, 2002

## **Registration and Title Bulletin #063-02**

**TO:**        All County Tax Assessor-Collectors

**SUBJECT:**    "FOR EXPORT ONLY" Stamp

## PURPOSE

To rescind Registration and Title Bulletin #35-02 and to clarify procedures for Texas licensed dealers selling vehicles to foreign dealers for exportation only.

## DETAILS

In an effort to deter foreign dealers from curbstoning in Texas, the Motor Vehicle Division (MVD) adopted rules requiring Texas licensed dealers to place a "FOR EXPORT ONLY" stamp on the front and over the unused reassignments on the back of titles for vehicles sold to foreign dealers for export. (Refer to attachments.) In the event that all reassignment spaces on the title document are full and a Form VTR-41-A (Dealer's Reassignment of Title for a Motor Vehicle) is used, the dealers will stamp the front and back of the title document and all unused reassignments on the Form VTR-41-A.

Stamping the front and back of titles with "FOR EXPORT ONLY" may increase visibility of illegal sales and help stop further transfer of ownership on the existing title. The "FOR EXPORT ONLY" stamp will require foreign dealers to sell the vehicle by properly registering the vehicle in their country and then transfer ownership using a bill of sale. Additionally, foreign residents purchasing such vehicles cannot continue to transfer ownership using the existing title.

Although these rules became effective March 7, 2002, dealer compliance began April 1, 2002. Consequently, title transactions supported by title documents indicating sales that occurred on and after April 1, 2002, between Texas licensed dealers and either foreign dealers or foreign residents must be stamped "FOR EXPORT ONLY."

## COUNTY ACTION

If title transactions are supported by title documents indicating sales that occurred on or after April 1, 2002, between Texas licensed dealers and either foreign dealers or foreign residents but the title documents are not stamped "FOR EXPORT ONLY," you should process the transactions provided the surrendered documentation includes foreign evidence of ownership, which has been properly assigned to the title applicant. Otherwise, the transaction should be rejected for proper evidence of ownership, or the applicant may pursue the options of a tax collector's hearing or bonded title.

You are also requested to copy the front and back of the associated transfer documents that are both stamped and not stamped "FOR EXPORT ONLY" and forward to the

County Tax Assessor-Collectors                    2                    June 18, 2002

Title Control Systems Branch (TCS) for further disposition. These copies should be placed in an envelope and labeled "For Export Only" and sent in with the Title Package Report. TCS will then forward that envelope to the Motor Vehicle Division.

NOTE: This requirement does not include the stamping of salvage ownership documents (salvage certificates, salvage certificates of title, and nonrepairable certificates of title).

In the event a title is stamped in error with the "FOR EXPORT ONLY" stamp, the dealer will be required to apply for title in the dealership name. Along with the application filed with the county tax office, the dealer must include a statement of fact explaining why the sale of the vehicle to the foreign dealer or foreign resident, as indicated in the title reassignment, was cancelled. Additionally, steps should be taken to validate the Texas dealership as title applicant. If the application and statement of fact are submitted, and the Texas Dealership is validated as the title applicant, the county tax office shall process the transaction for title issuance in the dealership name.

**DEPARTMENT ACTION**
Similar title transactions processed by the Vehicle Titles and Registration Division (VTR) must meet the criteria addressed in <u>COUNTY ACTION</u> with one exception. Copies of the front and back of the associated transfer documents should be forwarded to TCS in an envelope labeled "FOR EXPORT ONLY."

Appropriate revisions will be made to the Vehicle Title Manual and distributed at a later date.

**VTR CONTACT PERSON(S):**
If you have any comments or questions, please contact your local Vehicle Titles and Registration Division Regional Office. Thank you very much for your continued support.

Sincerely,

Jerry L. Dike, Director
Vehicle Titles and Registration Division

Attachments

cc:   VTR Administration
      Motor Vehicle Division, TxDOT
      All Dealer Associations

## Front of Texas Title Indicating "FOR EXPORT ONLY" Stamp
(Assigned to a Texas Dealer, Reassigned to a Foreign Resident after April 1, 2002, and then Transferred to a Texas Resident on an acceptable transfer document.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

## Back of Texas Title Indicating "FOR EXPORT ONLY" Stamp
(Assigned to a Texas Dealer, Reassigned to a Foreign Resident after April 1, 2002, and then Transferred to a Texas Resident on an acceptable transfer document.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

## Front of Texas Title Without "FOR EXPORT ONLY" Stamp
### (Assigned to a Texas Dealer, Reassigned to a Foreign Dealer after April 1, 2002, and then Transferred to a Texas Resident.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

# Back of Texas Title Without "FOR EXPORT ONLY" Stamp

## (Assigned to a Texas Dealer, Reassigned to a Foreign Dealer after April 1, 2002, and then Transferred to a Texas Resident.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

**Front of Texas Title Without "FOR EXPORT ONLY" Stamp**
(Assigned to a Texas Dealer, Reassigned to a Foreign Resident after
April 1, 2002, and then Transferred to a Texas Resident.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

## Back of Texas Title Without "FOR EXPORT ONLY" Stamp
### (Assigned to a Texas Dealer, Reassigned to a Foreign Resident after April 1, 2002, and then Transferred to a Texas Resident.)



Acceptable for processing by the county only if proper foreign evidence of ownership is attached with proper assignment to the Texas Resident. Copy the front and back of the title, place it in an envelope labeled "For Export Only Stamp," and submit with the Title Package Report.

# EXHIBIT NO. 4

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

## WITNESS STATEMENT AFFIDAVIT

**(STATE OF TEXAS)**
**(COUNTY OF CAMERON)**

Before me, on this day personally appeared _Melquiades Sosa_

Who then and there stated: My name is _Melquiades Sosa_

I Currently reside at _5814 Southmost_.

My home phone number is (956) 5462661. I am currently employed by

_Solda) usedroti_ at _4204 southmost_.

My work phone number is (956 546266 1. Cell 495-7703.

(Please tell in your own words just what you saw, include dates and times)

hace Al rededor de un 14A2
Me hablo La sra vicenta(Bibi)cantú
Que se Le Prestaba $100 Por
un cheke El cual no tubo nunca
Fondo Para Feriarlo diciendo Que
élla me hivahAcer Fore) de PaPeles
Atorado) en el tax Office..
despues me hablo de La Oficina
de Moy torres Para Pedirme
$150 los cuales Le di diciendo
Que élla me Alludaba con los PaPele
Que tubieras Problemos Para hacer trasPoso
hubo otra ocación Que no recuerdode
donde me hablo Para Pedirme $150 Por
La mism

003714

La misma razon y nunca me
A echo un favor y yo para
Agilisar los tramites Acsedia
Adorle y pienso que es injusto
por la razón que nunca me Alludo
en nada y pienso Que esa es La
razón porque ella detenia los
titulos para Podeme Pedir ese
Dinero y Poder controlorla Ami Por
Los titulos detenidos

**THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE**

_____          05 - 15 - 02
Signature                                Date

_____          A-11
Officer taking statement            I.D.

003713

# EXHIBIT NO. 5

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VICENTA CANTU, FELIX R. | )( | |
| MUNOZ, RUTH WEAVER AND | )( | |
| DIAMANTINA ALVARADO, | )( | |
|     Plaintiffs | )( | |
| | )( | |
| VS. | )( | |
| | )( | |
| CAMERON COUNTY and | )( | |
| TONY YZAGUIRRE, JR., Tax | )( | CIVIL ACTION NO. 03-CV-96 |
| Assessor-Collector of | )( | |
| Cameron County and | )( | |
| Director, Cameron County | )( | |
| Automobile Crimes | )( | |
| Enforcement Task Force, | )( | |
| in his Individual | )( | |
| Capacity, | )( | |
|     Defendants | )( | |

ORAL AND VIDEOTAPED DEPOSITION OF
MOISES LEONEL TORRES
FEBRUARY 8, 2006

_____

ORAL AND VIDEOTAPED DEPOSITION OF MOISES LEONEL

TORRES, produced as a witness at the instance of the

PLAINTIFFS, taken in the above-styled and numbered cause

on FEBRUARY 8, 2006, reported by CORINNA N. GARCIA,

Certified Court Reporter No. 5210, in and for the State

of Texas, at the Law Offices of Frank Costilla, Jr., 5

East Elizabeth Street, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached therein.

Page 2

APPEARANCES
COUNSEL FOR PLAINTIFFS:
GAY E. GILSON
LAW OFFICE OF GAY E. GILSON
719 South Shoreline, Suite 301A
Corpus Christi, Texas 78401
(361) 887-0552
DAVID LEE McGEE
LAW OFFICES OF DAVID LEE McGEE
701 Park Avenue
Corpus Christi, Texas 78401
(361) 888-6489
COUNSEL FOR DEFENDANT CAMERON COUNTY:
HEATHER SCOTT
WILLETTE & GUERRA, L.L.P.
1534 East 6th Street, Suite 200
Brownsville, Texas 78520
(956) 541-1846
BRUCE HODGE
HODGE, JAMES & GARZA
115 East Van Buren, Suite 300
Harlingen, Texas 78550
(956) 425-7400
COUNSEL FOR DEFENDANT TONY YZAGUIRRE, JR.:
CRAIG H. VITTITOE and
ROGER W. HUGHES
ADAMS & GRAHAM, L.L.P.
222 East Van Buren, West Tower
Harlingen, Texas 78550
(956) 428-7495

ALSO PRESENT:

Joshua Claudio, Videographer
Tony Yzaguirre, Jr.
Vicenta Cantu
Felix Munoz

BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 3

INDEX

PAGE

Appearances ..................................... 2

MOISES LEONEL TORRES

Examination by Ms. Gilson ..................... 4

Examination by Mr. Vittitoe ................... 36

Examination by Mr. Hodge ...................... 61

Examination by Ms. Gilson ..................... 63

Errata Sheet/Signature Page ................... 67

Reporter's Certificate ........................ 68

Attached to the end of the transcript: Stipulations

EXHIBITS

PAGE
NUMBER DESCRIPTION    IDEN.

1   Moises Torres Criminal File ........... 18

2   Irma Torres Criminal File ............. 64

BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 4

1   THE VIDEOGRAPHER: Today is Wednesday,
2 February 8th, at the deposition of Moises Torres. The
3 time is 3:05. We're on the record.
4   Q. Okay. Please state your name.
5   A. Moises --
6   THE REPORTER: Hold on one second.
7   MOISES LEONEL TORRES,
8 having been duly sworn, testified as follows:
9   EXAMINATION
10 BY MS. GILSON:
11   Q. Please state your full name.
12   A. Moises Leonel Torres.
13   Q. Mr. Torres, you've been subpoenaed to appear
14 today to give a deposition. Do you understand that?
15   A. Yes.
16   Q. Have you ever given a deposition before?
17   A. No, ma'am.
18   Q. Your testimony is going to be taken under oath
19 today and it may be used later at a time of trial before
20 a judge and a jury. Do you understand that?
21   A. Yes.
22   Q. And you understand that the -- an oath has been
23 administered and you have the same obligation to tell
24 the truth as you would before a judge and a jury?
25   A. Uh-huh.

BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

---

Page 5

1   Q. And, for the record, I need for you to give a
2 yes or a no answer.
3   A. Yes.
4   Q. Okay. If during the deposition I ask you
5 anything that you don't understand, please let me know.
6   A. Okay.
7   Q. My name is Gay Gilson and I'm an attorney and
8 we're here today to ask you some questions regarding
9 some transactions in matters related to the Cameron
10 County tax assessor-collector's office.
11   A. Okay.
12   Q. Okay. Mr. Torres, what is your current address?
13   A. 1543 Codorniz.
14   Q. And where is that?
15   A. Brownsville, Texas.
16   Q. And what is the ZIP code?
17   A. 78526.
18   Q. And what is your telephone number?
19   A. Area code (956) 546-4130.
20   Q. And who lives with you there?
21   A. My wife and my two kids.
22   Q. What is your wife's name?
23   A. Irma Torres.
24   Q. And are your children minors?
25   A. Yes.

BRYANT & STINGLEY, INC.

McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 26

1    A. I was a runner.
2    Q. Well, so then did you actually handle the
3  paperwork?
4    A. Handle is one thing, and knowing how to do the
5  paperwork is another one.
6    Q. Okay. So did you -- did you make sure that all
7  the paperwork was present?
8    A. No.
9    Q. Okay. So how did you know -- or did you know?
10    A. I learned. I learned from my wife.
11    Q. Okay. So what was required to transfer title?
12    A. It all depends on the paperwork.
13    Q. Okay. On a used vehicle, what was required?
14    A. The bill of sale, the 130-U and the title.
15  That's about it -- and the insurance.
16    Q. Was a driver's license ever -- ever required?
17    A. Yeah, driver's license too.
18    Q. Why?
19    A. I don't know. Those are the state requirements,
20  I guess.
21    Q. Were -- did every person that waited on you
22  require a driver's license?
23    A. What do you mean waited on me?
24    Q. Well, when you were at the tax
25  assessor-collector's office and you were trying to

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 27

1  transact a title, did everyone require the same things
2  of you, each person that waited on you?
3    A. I would say yes.
4    Q. Okay. So it wasn't just one person who waited
5  on you; it was the policy in the office?
6    A. Yes, I believe so.
7    Q. Okay. And the bill of sale, do you know why the
8  bill of sale was required?
9    A. Just -- I guess the state requires that.
10    Q. Was that to help calculate the sales tax?
11    A. Yes.
12    Q. Okay. Now, if -- Ms. Cantu, would she tell you
13  what was missing when -- when you -- or when she said
14  that there was a problem with the transaction?
15    A. When -- when she rejected the titles.
16    Q. Okay. She would tell you what was wrong?
17    A. When I asked her, yes, sometimes.
18    Q. Okay. So if she if told you the bill of sale
19  was missing, then you would --
20    A. I never recall the bill of sales missing.
21    Q. Okay. Can you recall any specific --
22    A. She was -- she -- she didn't like the
23  signatures. The signatures didn't match; that's
24  basically what she would say.
25    Q. Okay. Was that the only problem she had?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 28

1    A. What do you mean?
2    Q. Was that the only problems she had with the
3  paperwork that you presented to the --
4    A. It varies, ma'am. I cannot --
5    Q. Well, do you recall any other specific problems
6  that Ms. Cantu had with the paperwork that you presented
7  for transaction?
8    A. Power of attorneys. Basically that's about it.
9    Q. Did you ever talk to Mr. -- Mr. Yzaguirre about
10  Ms. Cantu's job performance?
11    A. Yes.
12    Q. And what did you tell Mr. Yzaguirre?
13    A. I told him that she was -- she -- she was
14  rejecting all the paperwork from a certain dealer and
15  she was requesting money.
16    Q. Requesting money?
17    A. Yes.
18    Q. Like what?
19    A. 50, $100 for each transaction.
20    Q. Like a -- like a bribe?
21    A. Yes.
22    Q. And did you make any kind of formal complaint?
23    A. Yes, that time that's what I did.
24    Q. When did this happen?
25    A. I don't recall the date, ma'am.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 29

1    Q. How many times did it happen?
2    A. She used to go to the office and collect the
3  money. I was the middleman. She used to go to the
4  office and -- I would say for two to three months until
5  I said "stop" and the dealer came forward and that's
6  when I took it to Mr. Yzaguirre and that's what
7  happened.
8    Q. When was this?
9    A. I don't recall the date, ma'am.
10    Q. That's a very serious allegation. So I'd like
11  to know, was it in 2001?
12    A. I believe it was around 2002.
13    Q. 2002?
14    A. Uh-huh.
15    Q. And were any criminal charges filed over that?
16    A. I don't know, ma'am.
17    Q. Did you go to the police department with this?
18    A. No, I went to Mr. Yzaguirre.
19    Q. And what happened?
20    A. She -- I don't know. I don't know what
21  happened. I believe she got fired or something. The
22  dealer got -- I believe the -- one of the officers got
23  the statement.
24    Q. Who was the dealer?
25    A. Sosa's Auto Sales.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755     Brownsville (956) 542-1020

Page 50

1  would pay monthly, on a monthly basis.
2      Q. Okay. How long -- so is this starting in the
3  mid '90s or later?
4      A. I don't recall, sir, when she bought the
5  insurance. I don't recall.
6      Q. Did you transact any insurance business with
7  her, or was this your wife?
8      A. Basically our secretaries. Sometimes I would
9  take payments.
10     Q. But you actually saw her?
11     A. Yes.
12     Q. And would you -- would you say that this
13  insurance purchase was before 2000 or after calendar
14  year 2000?
15     A. I believe it was after 2000, I believe.
16     Q. Are you sure or are you just guessing?
17     A. I'm guessing, sir. I'm sorry. I don't -- I
18  don't recall.
19     Q. Did she pay for the insurance or were you --
20     A. No, she paid for the --
21     Q. -- or your wife providing it for free?
22     A. No, she paid for the insurance.
23     Q. And she would come by and make payments?
24     A. Yes.
25     Q. Would the business have records on that?

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 51

1      A. No, we're only allowed to have it for one year.
2      Q. Okay. But there's no doubt that it can be
3  proven that insurance policies would show in the agency
4  going to her and her family?
5      A. Yes.
6      Q. Okay. There is no doubt that the insurance
7  companies would have those records showing that
8  connection?
9      A. Yes, I believe so.
10     Q. Okay. Now, other than your word, what's the
11  proof that you were giving money to Bibi Cantu, $50 or
12  $100 like you testified here today?
13     A. What kind of proof? Like --
14     Q. Well, other than you saying that that's what you
15  did.
16     A. Well, actually, when she used to go there, my
17  wife and my secretary were -- were there and they knew
18  what she was coming for. So --
19     Q. Okay. Now I need to understand why anybody
20  would pay her or anybody else money, all right? I
21  want -- I want to understand that, especially for a law
22  enforcement major. I want to understand why you did
23  that.
24     A. It was wrong. I -- I -- I thought it was going
25  to be only once or twice, to tell you the truth.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 52

1  I'm -- it was wrong, yes. It was -- it was -- but it
2  was me -- me not paying the money. I mean, I was the
3  middleperson for the -- for the dealer, car dealer that
4  was --
5      Q. Well, when you were giving this money at her
6  request, was she telling you that this money was
7  necessary to complete the transfer --
8      A. No, no.
9      Q. -- of the papers, or did you understand you were
10  in effect paying a bribe?
11     A. Exactly. Just to release the paperwork.
12     Q. All right. How did she -- did -- did she -- how
13  did she approach you for the first time, based on your
14  recollection?
15     A. The first time I talked to her and I -- I told
16  her, "You know what, this is the problem with
17  this -- this vehicle" -- and it was -- she told me it
18  was rejected. "You know what, I'll talk to you in
19  the -- in your office, okay?" And then she went to the
20  office and that's when -- okay.
21     Q. So you had this conversation with her at the tax
22  office --
23     A. No.
24     Q. -- or over the phone?
25     A. Not over the phone. She went to the office.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 53

1      Q. So -- well, when she said she would talk you to
2  you at your office, were you talking to her in person at
3  the tax office or were you talking to her over the
4  phone?
5      A. Over the phone.
6      Q. And that's when she was telling you there was a
7  problem with the title?
8      A. Yes.
9      Q. And -- and then she said, "I'll talk to you
10  about the problem at your office"?
11     A. Yes.
12     Q. And then what did she say when she showed up?
13     A. She said with some -- it all depends. On some
14  vehicles she would charge $50 to release them, and some
15  others, $100.
16     Q. Well, did you ever ask why one was 50 and one
17  was 100?
18     A. Because she didn't like the signatures.
19  She -- I mean, she would -- she had the power to just
20  release them. And I said, "Well, I'll talk to the
21  customers." And sometimes the customer would say, "You
22  know what, I'm not going to be waiting for the title" or
23  whatever. The dealer would pay -- "you know what, let's
24  get it over with."
25     Q. My understanding is this went on for two or

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366      Harlingen (956) 428-0755      Brownsville (956) 542-1020

Page 54

1  three months?
2      A. Yes. If I recall, yes, sir. To tell you
3  exactly, I don't recall how many months this went on.
4      Q. How many times did this happen, that she would
5  come by the business not to pay for insurance --
6      A. Every -- every --
7      Q. -- but to solicit money relating to titles?
8      A. Every Friday for about two months, two or three
9  months.
10     Q. Every Friday?
11     A. Yes.
12     Q. So are you telling the jury in this case that
13  you had problems with these titles and that she'd come
14  by on Friday?
15     A. Yes.
16     Q. Would it -- would it be to collect money on one
17  transaction or several transaction?
18     A. Several transactions.
19     Q. Well, how did you know on that Friday how much
20  you were going to have to pay?
21     A. She would know.
22     Q. She would know?
23     A. How many titles she released. She would -- she
24  would release, you know -- it wouldn't be that much a
25  week, probably three, four, five.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 55

1      Q. And how did you know to have the money ready
2  when she would come by?
3      A. When -- because sometimes I will call her
4  and -- "You know, this" --
5          "Okay. I will -- I will -- I will release
6  it." Okay. I would know and just keep the money there,
7  and then Friday she would come and collect.
8      Q. Did you ever keep a list of how much money you
9  were giving her?
10     A. No, sir.
11     Q. Okay. Whenever she would indicate to you that
12  she had titles that she wanted payments for, how did you
13  go about getting the money that you were going to pay
14  her?
15     A. I would -- to tell you the truth, there were
16  some that they came to my office that the title was
17  rejected because of this problem or what. And I'd talk
18  to her -- I would talk to her and she'd say, "You know
19  what, we can fix it." Okay. And she -- "well, $100."
20  And I would tell the customer, "You know what, it will
21  be" -- it would hurt real bad to tell them, "You know
22  what," I mean, "we're going to pay this person
23  some -- some money." I would tell them, "You know what,
24  you need to pay a little bit more taxes over -- over it.
25  You need to pay $100 over $1,500" -- I mean, "$1,500 of

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 56

1  taxes, so you have to pay 97, $100."
2          "Okay."
3          "You have to pay the difference."
4          "Okay. That's no problem."
5      Q. So you never told the customers why you were
6  paying this extra money?
7      A. Just -- just basically what I told you, that
8  they needed to pay extra sales tax money.
9      Q. In other words, you never told them the purpose
10  of the extra money?
11     A. No, no.
12     Q. You just paid the money?
13     A. Yeah. The car dealer that -- that -- 80, 90
14  percent of the time was their -- his -- their -- his
15  transactions, he knew about it.
16     Q. Okay. And which car dealer are you talking
17  about?
18     A. Sosa's Used Cars.
19     Q. Because you told him about it?
20     A. Yes.
21     Q. Or did he have independent -- did he receive any
22  independent information from Bibi Cantu?
23     A. Because we used -- I used to do all the
24  paperwork for him. He would bring the customers and
25  everything to the office. We'd take copies of

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

Page 57

1  everything. And he would leave the paperwork there and
2  we would do the transfer for him for -- for an amount of
3  money we charged him.
4      Q. So you're saying that Sosa knew that the money
5  that he was advancing to you on his behalf --
6      A. Yes.
7      Q. -- was going to pay Bibi Cantu --
8      A. Yes.
9      Q. -- for her illegal services?
10     A. Yes.
11     Q. All right. And are you saying that you told
12  that information ultimately to Tony Yzaguirre?
13     A. Yes.
14     Q. Where did you tell him and when?
15     A. In his office in -- I believe it was 2002.
16     Q. And, to your knowledge, did Mr. Sosa get in
17  trouble?
18     A. No. Not that I --
19     Q. He did not?
20     A. Not -- not that I know. I took him to
21  Mr. Yzaguirre's and they took a statement and basically
22  that's about it.
23     Q. Okay. Have you ever talked to anybody in law
24  enforcement about this problem?
25     A. No, sir.

BRYANT & STINGLEY, INC.
McAllen (956) 618-2366    Harlingen (956) 428-0755    Brownsville (956) 542-1020

# EXHIBIT NO. 6

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

THE STATE OF TEXAS    §
COUNTY OF CAMERON  §

   BEFORE ME, the undersigned authority in and for Cameron County, Texas, on
__Wednesday__ this the __15th__ day of __May__, 2001, A.D., did personally appear, __Joe A.__
__Mireles__, who after being duly sworn did depose and say:  My name is __Joe A. Mireles__.
I am __40__ years old.  My date of birth is __06-22-61__.  I reside at __P.O. Box 2065__
__San Benito__, Texas Cameron County.  My telephone number is __(956) 548-946__.  I am
employed by __Cameron County Automobile Crimes Enforcement Task Force.__    My
work telephone number is __(956)544-0800__.


   On March 1st 2002 in the early afternoon hours I was standing by my desk when
title examiner Vicenta "Bibi" Cantu came into my office.  She made a comment about the
"Wranglers" (jeans) that I was wearing while she grabbed my behind (buttock), I blushed
and felt embarrassed and expressed no interest on her.  The comment she made was that I
looked good in the jeans.  There have been other occasions where she's made the same
comments on my jeans, which make me feel uncomfortable to the point where I have to
leave the room.
   Another incident occurred on April 22, 2002 I had just gotten a haircut on which she
commented that my hair was to short "te trasquilaron joker", while blowing on my ear.
Again this made me feel very uncomfortable.  The staff has been present during all these
occurrences.  At the time that this happened I remember that a co-worker by the name of
Marisol Sifuentes was present on both occasions.  I have never given her any motive so
she would act the way she has towards me.  It came to the point that I had to talk to my
wife about what was going on at my work site and I decided that the best thing I could do
was to come forward and address this matter to the Director of this department Mr. Tony
Yzaguirre.


                    **Victim**

                   5-15-02

                 **Statement taken by**

003711

THE STATE OF TEXAS     §
COUNTY OF CAMERON     §

BEFORE ME, the undersigned authority in and for Cameron County, Texas, on __Wednesday__ this the __15__ day of __May__, 2002, A.D., did personally appear, Marizol Sifuentes__, who after being duly sworn did depose and say: My name is __Marizol Sifuentes__. I am __22__ years old. My date of birth is __05-21-79.__ I reside at 4994 Las Palomas__ Brownsville, Texas Cameron County. My telephone number is 498-5173. I am employed by _The Cameron County Automobile Enforcement Task Force.__ My work telephone number is (956) 544-0800

On the beginning of March of 2002 I remember it was on a Friday I was by the copy machine which is located right next to the entrance door of Lieutenant Mireles' office sometime after 1:00 p.m. I then saw Lieutenant Mireles standing by his desk looking at some paperwork. Bibi Cantu was sitting at her desk which is located at the office space which is adjacent to the lieutenant's office. She got up from her desk and walked over to where the lieutenant was standing and she grabbed the lieutenant's butt as she said something about the blue jeans he was wearing. Lieutenant Mireles got red and was speechless and I also saw his facial expression as if he could not believe what had just happened. As Bibi came out of the lieutenant's office I said to her, "I can't believe you just did that!" to which she laughed. I then saw her go back and sit at her desk. I just kept on saying to her "Que Barbara! I can't believe you did that!" The only thing she would do was laugh and say "Ay papa girl."

By this time Lieutenant Mireles found what he was looking for and left the office through the side entrance avoiding to exit through where Bibi was sitting.

_(signature)_
(Witness)

_(signature)_ 5-15-02

Statement Taken By

003710

# EXHIBIT NO. 7

## Civil Action NO. B-03-096

Defendants' Motion for Summary Judgment on Plaintiff Cantu's
Amendment Speech Claims

## DECLARATION UNDER PENALTY OF PERJURY

STATE OF TEXAS

COUNTY OF CAMERON

"I declare under penalty of perjury under the laws of the United States of America that the attached Exhs. 1 and 5 are true and correct excerpts from the depositions of Plaintiff Cantu and Moises Torres, respectively. The attached Exh. 2 is a true and correct copy of an exhibit from the Cantu deposition. Exhs. 3, 4 and 6 are copies of documents provided by Defendant Yzaguirre in discovery. I declare under penalty of perjury that the foregoing is true and correct."

Executed on March 1, 2006.

ROGER W. HUGHES